THE STATE OF MISSISSIPPI *vs.* HEZRON JOHNSON.

The original act incorporating the "Mississippi Union Bank," was approved on the 5th of February, 1838, and but four months elapsed from that date before the bond sued on was issued, and delivered by the governor to the bank.

The 2d section of the act incorporating the bank, provides for the opening of books for subscription of the stock of the bank, under the inspection of ten managers; and also provides for the reduction of the subscription, in case a greater amount of stock should be subscribed than was authorized by the charter.

The 3d section of the charter, makes it the duty of the directors of the mother bank to decide finally on the sufficiency and validity of the title deeds, and other documents deposited by the subscribers with the commissioners, before they should be declared stockholders.

The 8th section provides, that to secure the interest and capital of the bonds, the subscribers should be bound to give mortgages, to the satisfaction of the

directors, on property equal in all cases to the amount of their respective stock subscribed.

The 26th section declares the directors are to be the judges of the sufficiency of mortgages offered for stock and loans, and they are invested with authority to report the same if not sufficient. And in such cases they might require other security, or, in default, reduce the shares of such defaulters to the amount sufficiently secured, but the contract of subscription was unconditional. *Held*, that under the operation of the act, a delivery of the title deed by a subscriber to the commissioners, would create a lien on the property in favor of the bank.

The 14th section of the charter provides for the appointment of a provisional directory by the governor, so soon as five thousand shares of the stock of the bank had been subscribed. By the 30th section, the directors thus appointed were, immediately upon their appointment, to elect a president of the bank, and give notice to the governor of the fact, who, upon being informed of the organization of the board, was authorized to execute bonds to the bank in amount corresponding to the sums subscribed, which were to be sufficiently secured in the estimation of the directors, agreeably to the directions of the charter. *Held*, that it was the intention of the legislature to declare, that upon being informed that the directors had elected a president, the governor was authorized to deliver to them bonds in amount equal to the sums subscribed for stock and satisfactorily secured.

The 29th section declares, that the bonds, with the privileged mortgages, for the sum of fifteen millions five hundred thousand dollars subscribed by the stockholders of said bank, according to their shares, for the purpose of securing a loan of money for that amount, shall be deposited in the office of said institution as security, for the reimbursement of the interest as well as the capital of said bonds guaranteed by the State.

The mortgages were not to be given, formally drawn, sealed, and delivered to the directors by the stockholders, until after the books of subscription for stock had been closed at Jackson, and after the stock subscribed had been graduated under the directions of the 2d section, which could not be done until after the expiration of six months from the date of opening the books for subscription.

By the charter of the bank, security might have been given by the subscribers to stock at the time of the subscription, either by the execution of mortgages, such as were contemplated by the 8th section, or in any other mode which would have been *satisfactory* to the directors, as required by the charter. And the mortgages then to be given were to be in all cases equal to the amount of the respective " stock " of the subscribers.

It also required as a condition, upon which the bonds might be legally delivered by the governor to the bank, that a pledge of real property should be made by the subscribers to the stock. The pledge to be made was, by the delivery to the commissioners of title deeds, patents, certificates of confirmation by the board of land commissioners of the United States, or other evidence of title,

The State of Mississippi *v.* Johnson.

which should be deemed a security by the commissioners or directors. *Held,* that by whatever name the security should be designated, the delivery of the title deeds by the subscribers to the commissioners created a special statutory lien upon the property, and which was designed by the charter to stand as a security to the bank for the nonperformance of the contract of subscription.

The lien or mortgage which would be thus created, was the security for the sum subscribed as required by section 30th of the charter.

The bonds might have been legally issued to the bank by the governor on the 5th of June, 1838, pursuant to the provisions of the original charter of the bank, and the faith of the State pledged for the purpose of raising the capital.

No provision of the supplemental charter of the bank attempts directly, or in express terms, to pledge the faith of the State in violation of 7th article, 9th section of the constitution of the State.

The State, by the subscription to the stock of the bank under the supplemental charter, did not become a debtor to the bank, nor was any additional obligation thereby imposed upon her.

The general direction was given, that the stock subscribed for by the State should be paid for out of the proceeds of the bonds to be executed to said bank, as already provided for in the original charter of the bank.

The private stockholders, in case of a failure of the bank to pay the bonds, would, under their contract as stockholders, be compelled to contribute for that purpose in proportion to their stock; and in that respect they may be considered debtors to the corporation, but the State could not be considered a debtor to the corporation.

The power to pass a law authorizing a subscription to the stock of a banking company in behalf of the State, is embraced by the general grant of legislative power in the constitution. *Held,* that the provision of the 7th article, 9th section of the constitution of the State, does not apply to the class of legislative enactments to which the one under consideration belongs.

The 7th article, 9th section, was incorporated in the constitution of the State to guard the legislature as well against sinister influences arising from interests in opposition to the public welfare, as to protect the public against the evils of hasty, ill-advised, or corrupt legislation in regard to such subjects; and of the same character is the 23d article, 3d section of the constitution.

The framers of the constitution intended, by the reference and publication of a law to borrow money on the credit of the State, &c., that the attention of the people might be called to the proposed measure, and the expediency or impolicy of such a measure might be discussed in connection with intervening election. *Held,* that it never was intended by the convention that framed the constitution to give the people, in their primary assemblies, or through the ballot box, the right of approval or veto upon the acts of the legislature passed in reference to the subjects of loans of money.

A municipal law, according to the American theory of government, is the

expression of the legislative will of the State according to the forms of the constitution; and in this State, that power is vested in the senate and house of representatives.

A law which has been adopted under the forms prescribed in the 7th article, 9th section of the constitution, is not of higher dignity or greater sanctity than a law passed according to the ordinary method. *Held,* that the power to repeal such a law before rights have vested under it, is fully and completely embraced in the general grant of power to enact laws.

No special method having been prescribed in the constitution, according to which a repealing statute should be passed, it must be adopted according to the rules ordinarily exercised in legislation.

The power to repeal a law may be greater or more extensive than the power to modify it, and it does not follow, that where the legislature has the right to repeal a law, they have the power to modify it. *Held,* that it is no violation of the constitution for the legislature to repeal, *in toto,* an act constitutionally passed for the purpose of raising a loan of money upon the credit of the State, or for the purpose of pledging the faith of the State for the payment of money, where the repeal would not work a divestiture of vested rights, or impair the obligations of a contract.

The supplemental charter of the bank did not authorize the issuance of State bonds by which a debt would be imposed upon the State, and no attempt was made by that act to pledge the faith of the State for the payment of a loan or debt, nor did it attempt a re-renewal of the pledge contained in the original charter of the bank.

The supplement was not void, in consequence of not having been passed in conformity with the provisions of the constitution, contained in the 7th article, 9th section of that instrument.

The first section of the supplemental charter did not change the general structure of the corporation, nor did it alter the purpose to which it was to be applied, or the principles upon which its operations were to be conducted.

A corporation is an artificial being or person endowed with perpetual vitality; and though the individuals who compose it, may constantly change, yet the corporation in its entirety maintains its identity and continues its existence. *Held,* that the corporation could not be changed by the introduction of a single corporator, and that one the State.

*Aliter,* if the guarantee of the State had been given to a copartnership, or to any voluntary association of unincorporated individuals.

A marked feature in the original charter of the bank, was the care manifested to guard the State against the consequences of a possible failure of the bank. *Held,* that the supplemental act did not repeal any of those features, unless its directions are manifestly inconsistent and repugnant to them.

The presumption is never entertained, that the legislature, in the enactment of any law, intentionally transcended its constitutional authority. *Held,* that an interpretation will never be adopted which will make an act conflict with the

The State of Mississippi v. Johnson.

constitution, if it can be made to bear one which is in harmony with its provisions.

Applying the above rule to this case, it is clear the legislature did not intend to repeal or modify the provisions of the 3d section of the original charter of the bank.

It was not the intention of the legislature, in the passage of the supplemental charter, to part with any security which had been provided in the original charter of the bank.

The right to subscribe to stock in the bank on behalf of the State, can in nowise be considered any part of the consideration, which the legislature intended to secure; but the adoption of the supplemental charter was intended to secure a more just and adequate consideration for the grant of the State's credit, than was provided for in the original charter.

The object of the original pledge of the faith of the State was not changed by the supplemental charter, but it was passed in aid of the original charter. *Campbell v. Union Bank*, 6 How. 625, cited and confirmed.

The liability of the State under the operation of the charter of the bank attached so soon, or whenever the bonds were legally executed to the bank, and the execution of the mortgages was neither a condition precedent to the pledge of the faith of the State, nor the condition on which the State bonds were to be executed and delivered.

Whether the directors of the bank are regarded as occupying an official relation, or as special legislative agents, vested with authority to decide whether the stock was sufficiently secured, agreeably to the terms of the charter, their decision made upon the subject committed to them is obligatory upon the State.

The same principles which govern in matters of contract between private individuals, apply to all contracts to which a State has become a party.

It does not appear from the facts, that the bonds were sold for less than their par value. *Held*, that their sale was neither illegal nor void.

If the commissioners in the sale of the bonds received "sterling money of Great Britain," at the rate of four shillings and sixpence to the dollar, that is not such an act on their part as would avoid the sale of the bonds. *Held*, that where an agent does that which he is authorized to do, and more, his act is good for that which is warranted, and void for the rest.

THIS was a bill filed on the 8th day of May, 1852, in the superior court of chancery of the State of Mississippi, by H. A. Johnson, under the provision of the constitution and laws of the State of Mississippi allowing the State to be sued, to recover of the State of Mississippi the amount of principal and interest of the following bond: —

53*

The State of Mississippi *v.* Johnson.

No. 91 } UNITED STATES OF AMERICA, { A.
$2,000 }       STATE OF MISSISSIPPI. { $2,000
*FIVE PER CENT. LOAN.*

Know all men by these presents, That the State of Mississippi acknowledges to be indebted the Mississippi Union Bank, in the sum of two thousand dollars, which sum the State of Mississippi promises to pay, in current money of the United States, to the order of the President, Directors, and Company, on the fifth day of February, 1850, with interest at the rate of five cent. per annum, payable half yearly, at the place named in the indorsement hereto, viz.: on the first days of May and November of every year until the payment of said principal sum.

    In testimony whereof, the Governor of the State of Mississippi has signed, and the Treasurer of the State has countersigned, these presents, and caused the Seal [L. S.] of the State to be affixed thereto, at Jackson, this 5th day of June, in the year of our Lord one thousand eight hundred and thirty-eight.

              A. G. McNUTT, Governor.
JAMES PHILLIPS, Treasurer.

### MISSISSIPPI STATE LOAN.

Coupon No. 21, for Fifty Dollars, being interest due on Bond A, No. 91, and payable the first day of May, 1849.

    $50.               SAM'L GWIN, Cashier.

With eighteen other coupons, similar in form to the above, for the payment of the semi-annual interest on said bond, No. 91.

On the reverse side of said bond is the following indorsement : —

£450 ST'G.

The President, Directors, and Company of the Mississippi Union Bank, do hereby designate the Agency of the Bank of the United States in the City of London, as the place of payment of the within Bond, and interest, and hereby assign and

transfer the same, for value received, to bearer, being equal to four hundred and fifty pounds sterling, and guarantee the payment of the same at the place designated.

S. GWIN, Cashier.

H. G. RUNNELS, Pres't.

Mississippi State Bond, No. 91, £450.

Redeemable Feb. 5th, 1850.

The bill charges, that the bond of the State of Mississippi, as given above, (and which was made an exhibit to the bill,) was duly executed and delivered by the State, through its accredited officers, at the time, and in the form shown by said exhibit, to the said Mississippi Union Bank, which, by the president and cashier thereof, by means of the indorsement, made on the said bond, was subsequently, for a valuable consideration, delivered to the complainant.

Charges that, at the maturity of the said bond, due and legal demand for the payment of the same, and interest thereon, was made, but that no part thereof has been paid; prays that the State of Mississippi be made defendant, &c., and that upon final hearing an account be taken of the amount of principal and interest due on said bond to complainant, for which, when ascertained, he may have a decree.

The attorney-general, in behalf of the State, answers as follows: That the bond exhibited by complainant is not the bond of the State of Mississippi, nor is she bound under her constitution to pay the same, and that it does not constitute a just or legal and constitutional claim or demand in favor of complainant against the State.

That said bond was executed and issued in pursuance of the first section of the act of the legislature, entitled "An Act supplemental to an act to incorporate the subscribers to the Mississippi Union Bank," approved Feb. 15, 1838.

Charges that said act was not passed or ever became a law in accordance with the provisions of the ninth section of seventh article of the constitution of the State.

States that on the 5th February, 1838, an act was passed,

entitled " An Act to incorporate the subscribers of the Missis-
sippi Union Bank."

Charges that neither on or before the 5th June, 1838, nor at
any time since, the provisions of the eighth section of said act
were complied with or fulfilled; and charges that no bonds of
the State were ever executed or issued thereunder, and in com-
pliance with the provisions of the fifth section and thirtieth
section of the last aforesaid act of 5th February, 1838.

Charges that, under and by virtue of the provisions of first
section of the act of 15th February, 1838, the legislature of the
State undertook to pledge the faith of the State of Mississippi,
for the payment and redemption of a debt created against said
State, in consideration of a subscription in behalf of said State
of fifty thousand shares of capital stock of a banking institu-
tion, called the Mississippi Union Bank, by the governor of said
State, under the first section of said act; and in consideration
thereof, said governor did subscribe for said stock, and in con-
sequence thereof, and in payment of said subscription, said
pretended bond, in the bill named, was executed and issued,
and not otherwise.   And charges that said act was not passed,
or ever became a law, in accordance with the provisions of the
ninth section of the seventh article of the constitution of the
State, and was, therefore, unconstitutional and void.   Charges
that said bond issued thereunder, and is also null and void.
Admits all else in the bill, not traversed, and prays to be dis-
missed.

The facts, as shown by the record, are as follow: —

1st.  That the bond sued upon was issued at the time it bears
date, by A. G. McNutt, as Governor of the State of Mississippi,
under the seal of said State, and that the same was issued for,
and on account of, the Mississippi Union Bank, and sold by
said bank or its agents, and passed into the hands of complain-
ant, as assignee, for value, and that the same remains unpaid.

2d.  That the said bond was so issued since the passage of
the act chartering the Mississippi Union Bank, and the supple-
ment thereto, all of which acts are to be considered, read, and
used in evidence in said cause; it being also shown that publi-

cation of the act entitled " An Act to incorporate the subscribers in the Mississippi Union Bank," finally passed the 5th February, 1838, was made, and said act passed, as required by the constitution of Mississippi.

3d. It is admitted, that after the passage of the act entitled " An Act supplemental to an act to incorporate the subscribers in the Mississippi Union Bank," and providing for a subscription of stock in said bank, to the amount of five millions of dollars, for and on account of the State of Mississippi, the said A. G. McNutt, governor of the State, at the time, subscribed in the books of said bank, for the said five millions of dollars' worth of stock, and soon thereafter, as the date of the bonds sued on shows, issued the said bond sued on, and other bonds, to the amount (with this) of five millions of dollars; at the time of the issuance of which bonds, the mortgages required to be given in the eighth and thirtieth sections of the original charter, had not been executed or delivered to said bank.

4th. It is further admitted, that the act entitled " An Act supplementary to an act to incorporate the subscribers in the Mississippi Union Bank," approved 15th February, 1838, was not referred to the next succeeding legislature, or published for three months previous to the next general election thereafter, and by such subsequent legislature passed and agreed to, and the yeas and nays thereon entered on the journals of the same, as required by the ninth section of the seventh article of the constitution of the State of Mississippi.

It is further admitted, that A. G. McNutt, who is now dead, did, on the 7th of February, 1842, make the following answers under oath, to the following questions: —

Did you deliver those bonds (meaning, among others, the bonds in this suit,) to the directors, as and for the payment of the stock you had subscribed for, in behalf of the State? if not, for what purpose and under what authority did you sign and deliver said bonds?

Answer. I did not. The stock was to be paid for out of the proceeds of the State bonds, executed to be sold thereafter.

Did the directors, or the stockholders, or both, comply with the requirements of the thirtieth section of the original charter,

before you signed and delivered said bonds; whether they were delivered as bonds or escrows? If not, why did you sign and deliver said bonds?

Answer. Stock had not been declared under the thirtieth section of the original charter, when I executed the five millions dollars of State bonds in June, 1838. I signed these bonds in accordance with the requirements of the supplemental act. When I approved that act, I had strong doubts as to its constitutionality and expediency. I yielded these doubts to the deliberate sense of the legislature. I was warranted in pursuing that course by the precepts of Mr. Jefferson, and the illustrious father of the republican party. I did not recommend either the original or supplemental charter of the bank. I opposed the charter in 1835 and 1836, and my vote is recorded against the charter in 1837, on the journals of the senate. Although opposed to the principles of both acts, I did not, under the circumstances, feel warranted in vetoing either.

It is further admitted, that A. G. McNutt, who is now dead, sent in a message to the legislature of Mississippi, as governor thereof, at the January session, 1839, in which he stated as follows, while speaking of the Union Bank bonds: —

On the day the books were opened at Jackson, I subscribed for fifty thousand shares of stock in the bank, and executed bonds for five millions of dollars, (the bonds sued on among others,) as soon as they were prepared for my official signature, and delivered them to the managers of the bank.

Counsel for complainant and respondent produced to the court the foregoing statements of A. G. McNutt, (the answers being sworn to before a chairman of a committee of the legislature of Mississippi,) and agree that the court may determine, if the same be competent testimony in the cause, and also what consideration or weight shall be given to the same in deciding the cause.

The legislature elected the managers, as provided for in the act of incorporation, and the bank commenced operations shortly after the passage of the supplemental act. The then governor, A. G. McNutt, issued bonds under the seal of the State to the amount of $5,000,000, which were placed in the

hands of E. C. Wilkinson, James C. Wilkins, and William M. Pinckard, as commissioners, to sell, under a power of attorney, legally and properly executed for that purpose, by the president of the Mississippi Union Bank; which said power of attorney authorized the said commissioners "to negotiate and sell the said bonds of the State of Mississippi in any market within the United States, or in any foreign market, provided, only, that the said commissioners shall not sell the said bonds for less than their par value, in current money of the United States;" and giving to them the power and authority of filling up the two blanks in the indorsement upon the back of said bonds, by inserting therein the place of payment thereof, and the name or names of the purchasers, and granting to the said commissioners, or any two of them, the same powers to act in the premises, as by the said acts of incorporation, of said bank, the president and directors thereof could exercise, and accompanying which was a letter of instruction by the bank, to the same effect.

On the 18th day of August, 1838, the $5,000,000 of bonds were sold to Nicholas Biddle, under the following contract of sale, to wit:

"This agreement witnesseth: That we, the undersigned commissioners of the State of Mississippi, and attorneys, in fact, of the Mississippi Union Bank, for, and in consideration of the amount and payments hereinafter specified, of five millions of dollars, by Nicholas Biddle, of the city of Philadelphia, to be made to us at the several times and places mentioned below, and by virtue of the power and authority in us vested by the statutes of the legislature of the State of Mississippi, and the letters of attorney of the said Mississippi Union Bank, (which said statutes and power of attorney are taken as part of this agreement as if therein inserted,) have sold and delivered to the said Nicholas Biddle two thousand five hundred bonds of the State of Mississippi, for the sum of two thousand dollars each, amounting together to the sum of five millions of dollars, as enumerated and described in the said power of attorney; which said bonds are made payable at the agency of the Bank of the United States in London, sterling money of Great

Britain, at the rate of four shillings and sixpence to the dollar, with interest, payable semi-annually, at the same place and rate. And this agreement further witnesseth, that the said Nicholas Biddle, in consideration of our said sale and delivery to him of the said two thousand five hundred bonds, as aforesaid, has agreed, and hereby does agree, to pay to us, the said commissioners and attorneys, or to our successors, or to our or their order, the sum of five millions dollars, lawful money of the United States, in five equal instalments, of one million of dollars each; one the first day of November, one thousand eight hundred and thirty-eight, and on the first days of January, March, May, and July, which will be in the year one thousand eight hundred and thirty-nine, respectively, which said payments of one million of dollars each, of November, January, March, and May, shall be made in the city of New Orleans, and the last payment of the like sum on the first day of July next, shall be made at Natchez, in the said State of Mississippi.

"In witness whereof, we, the said commissioners and attorneys, and the said Nicholas Biddle, have executed and exchanged this agreement, this 18th day of August, in the year of our Lord eighteen hundred and thirty-eight. N. BIDDLE."

The bank of the United States guarantees the punctual performance of the foregoing contract.

For the cashier: G. DUNLAP, 2d Assistant Cashier.
August 18th, 1838.

And it is also shown, that the amount of five millions, as specified in said contract, was paid, as therein agreed, at New Orleans and Natchez, and received by the bank as five millions of dollars.

It is further shown, that at the date of the respective payments, exchange on New Orleans at Jackson was worth from 5 to 8 per centum premium, and that the bond sued on was one forming part of the five millions so issued and sold.

And this cause having been submitted on final hearing, on the 21st February, 1852, the chancellor decided that the bond

The State of Mississippi *v.* Johnson.

sued on was a legal and valid obligation against the State, and had not been issued in violation of the law and constitution, and rendered a final decree against the State for the principal and interest of the bond; from which decree the defendant prayed and obtained an appeal to this court.

In order to a clear understanding of the important question involved in this suit, we propose to give the laws and proceedings of the legislature in relation thereto, as they exist upon the statute book and journals of the legislature.

At the January session, 1835, of the legislature of the State of Mississippi, (the financial condition of the State being greatly deranged,) as a relief measure, the bill to incorporate the Mississippi Union Bank, and proposing to pledge the faith of the State for $15,500,000, to aid in the establishment of said bank, was first proposed. No further action was taken upon it at that session. In November, 1835, a general election was held, and at the session of the legislature commencing in January, 1837, on the 12th of February, 1837, the bill, chartering the Mississippi Union Bank, passed the house of representatives by a vote, 49 in the affirmative, and 7 in the negative. The bill, together with the yeas and nays, as required by the constitution, was entered on the journal of the house of representatives. See journals of the house of representatives, called session of 1837, page 138. The same bill, on the 18th of January, 1837, passed the senate by a vote of 11 to 8, and the bill, with the vote, was also entered upon the journals of the senate, in accordance with the provisions of the constitution. See senate journals of same session, page 95; and was then duly signed by the president of the senate and speaker of the house of representatives, and approved by the governor.

In accordance with the provisions of the constitution, and of the 47th section of the act, the 5th section of this act was referred to the next succeeding legislature, and the act published in the newspapers of the State for three months previous to the next regular general election.

In November, 1837, that general election was held, and the legislature assembled in January, 1838. On the 23d of January, 1838, the house of representatives enacted the bill without

amendment, by a vote of 53 in the affirmative, and 23 in the negative, and the yeas and nays were entered upon the journals. See house journal, 1838, page 187; and on the 29th of January, 1838, the senate passed this act the second time without amendment, by a vote of 17 in the affirmative to 12 in the negative. See senate journal, page 207 of same session. On the 5th February, 1838, Alexander G. McNutt, then governor, signed and approved the same as a law.

This is the law *in extenso*, incorporating the Union Bank as it passed the legislature of 1837 and 1838; italicising such portions of it as are the subject of controversy in this cause: —

An Act to incorporate the subscribers to the Mississippi Union Bank.

§ 1. Be it enacted by the legislature of the State of Mississippi, *That an institution shall be established under the title of " the Mississippi Union Bank," with a capital of fifteen million five hundred thousand dollars, which said capital shall be raised by means of a loan, to be obtained by the directors of the institution.*

§ 2. Be it further enacted, That books of subscription, for the sum of fifteen million five hundred thousand dollars, divided into shares of one hundred dollars each, and intended to secure the loan of said fifteen million five hundred thousand dollars, shall be opened after twenty days' notice given in all newspapers published in this State, and in all counties in which no newspaper may be established, notice shall be given by advertisement, posted up in three of the most public places in each of said counties, immediately after the promulgation of this act, under the inspection of ten managers, to be chosen by joint ballot, by the legislature; said books of subscription shall be kept open from ten o'clock, A. M., until three, P. M., at the seat of government of this State, which said books shall be continued open for the six next ensuing months, and at the termination of which period of time, they shall be closed; immediately after the expiration of said term, the directors to be appointed, as hereafter provided for, or a majority of them, shall make a correct statement of the said subscriptions; and in case the whole sum subscribed for shall amount to more

than fifteen million five hundred thousand dollars, the said directors, or a majority of them, shall deduct the amount of such excess from, first, the stock of which sufficient security shall not be offered, and then from the largest subscriptions, in such manner, that no subscription shall be reduced in amount, while any one remains larger; and in case the whole amount of one hundred and fifty thousand shares shall not have been subscribed at the time of closing said subscription books, then the said subscription books shall be re-opened on the first day of March, in each and every year thereafter, under the inspection of directors appointed, as hereinafter provided for; and the said books of subscription shall be kept open for the space of forty days in each year, until the full amount of said one hundred and fifty thousand shares shall have been subscribed for; the managers shall publish, during twenty days, notice in the different newspapers published at Jackson, Vicksburg, Natchez, Port Gibson, Woodville, and Columbus, and the balance of the newspapers published in this State, notice of the day and place when said books of subscription may be opened: the deductions to be made by virtue of this section, shall be fair and equitable, and without reference to any particular place or places, and to be regulated in the manner prescribed by this section.

§ 3. Be it further enacted, That books of subscription for the stock of said bank shall be also opened at the seat of justice in each county in this State, under the inspection of three managers at each of the aforesaid places, who shall be elected by the legislature, viz.: for the county of Amite, E. M. Davis, Wm. H. Dillingham, and V. T. Crawford; for the county of Adams, Joseph Neibert, Arthur Fulton, and Noah Barlow; for the county of Attala, Gordon D. Boyd, Joel Harvey, and Richard Ross; for the county of Marshall, C. Kyle, Byrd Hill, and —— Randolph; for the county of Claiborne, Joseph H. Moore, Benjamin Hughes, and Joseph O. Pierson; for the county of Clarke, William Covington, Allen McClenden, and Thomas Watts; for the county of Carroll, Wm. Blank, Wm. Y. Collins, and John E. Palmer; for the county of Covington, Jesse McAfee, Daniel McLaurin, and Archibald Anderson; for the county of Choctaw, Reuben Box, John R. Golden, and John

Snow; for the county of Copiah, Hardin Burnley, Wm. Barnes, and Benjamin Weeks; for the county of Lauderdale, Epps Brown, Duncan Calhoun, and John Alexander; for the county of Jasper, Asa Hartfield, John W. Hendrick, and Seymour White; for the county of Jefferson, J. B. Coleman, John M. Whitney, and H. N. Flemming; for the county of Jackson, Samuel Davis, Patrick Ward, and B. Childers; for the county of Kemper, J. A. Marshall, Benjamin C. Oppetts, and John C. Thomas; for the county of Jones, John Moffit, Duncan Thompson, and Lennon B. Ellis; for the county of Holmes, James Higgins, Robert Cook, and Arthur Hays; for the county of Greene, Isham Moody, Daniel F. McInnis, and Alexander McLean; for the county of Lawrence, Robert Jelks, John McGaha, and Henry Calhoun; for the county of Leake, George S. Fitler, George W. Wilson, and Warren Todd; for the county of Lowndes, John A. Hogg, George Good, and William H. Walsh; for the county of Madison, J. Silverburg, John Munce, and William Montgomery; for the county of Marion, Allen Barnes, James Atkerson, and William Rankin; for the county of Monroe, James H. Bell, George Wightman, and W. L. Morgan; for the county of Neshoba, William Donaldson, William Herbert, and Bird Safford; for the county of Noxubee, James Moore, James T. Harrison, and Joseph H. Frith; for the county of Oktibbeha, Robert A. Lambkins, A. Bell, and John Billington; for the county of Perry, Abner Carter, Archibald McCallum, and John S. Hoaze; for the county of Pike, R. T. Sparkman, S. M. Catching, and A. R. Green; for the county of Rankin, William H. Shelton, Thos. S. N. King, and Charles A. Folsom; for the county of Scott, John T. Smith, Moses Collins, and S. D. Young; for the county of Simpson, N. Freeman, J. J. H. Morris, and Jos. Boggan; for the county of Smith, John Campbell, John Thornton, and Jacob Carr; for the county of Tallahatchie, Augustus L. Humphrey, Ninian McCracken, and Washington W. Mitchell; for the county of Washington, William P. Montgomery, Anderson Miller, and Robert McCullough; for the county of Wilkinson, John L. Wall, Wm. C. S. Ventress, and Thomas S. Herbert; for the county of Winston, George W. Thomison,

Hillery Portwood, and Benjamin Prestrege; for the county of Wayne, D. C. Shaw, S. H. Lang, and William Towner; for the county of Franklin, Robert Anderson, John F. Witherspoon, and Thomas Rowan; for the county of Yallobusha, John Brown, John B. Pass, and William Fly; for the county of Warren, Wm. M. Pinknard, J. J. Chewning, and William Henderson; for the county of Pontotoc, John Bell, Joel Pinson, and Thomas J. Word; for the county of Panola, Thomas B. Hill, Augustus B. Sanders, and B. B. Wilson; for the county of Bolivar, Wm. B. Cook, Peter Wilkinson, and Francis Patterson, senior; for the county of Lafayette, Alexander T. Caruthers, Beverley Mitchell, and Thos. Lane; for the county of Hancock, G. B. Toulme, Samuel White, and Willis H. Arnold; for the county of Yazoo, Robert L. Batie, Lineas B. Markham, and Robert C. Campbell; and the said managers, or a majority of them, shall keep the aforesaid books open, at each of the aforesaid places, from ten o'clock in the morning until two o'clock in the afternoon, on Tuesday of each week, for the space of three months, at such house as they shall designate, they giving thirty days' previous notice, by advertisement in the newspapers published in said counties, if any, and in the most contiguous, should there be no newspapers in the counties for which said books of subscription are to be opened for, of the time and place said books will be opened; the said managers shall have all the power and authority granted, by this act, to the managers appointed to receive subscriptions at the place designated for the location of the parent bank; and said managers shall immediately after the expiration of the three months, said books are required to be kept open, transmit to the managers of the parent bank, the books of subscription so opened by them at the aforesaid places, together with all the titles and other documents that may have been deposited with them, in order that the board of directors of the mother bank may finally decide on the validity and sufficiency of the titles so transmitted by them, before the subscribers may be declared to be stockholders, as hereinafter provided for; and should any, or either, of the managers herein appointed, fail or refuse to act,

54*

then the managers elected to open the books at the seat of government, or a majority of them, may supply all vacancies.

§ 4. Be it further enacted, That the owners of real estate, situated in the State of Mississippi, and who are citizens thereof, shall be the only persons entitled to subscribe; and shares so subscribed, shall be transferable only to such owners, until after five years, when they may be transferred to any owner of real estate in this State, whether citizens or not: provided however, to secure the capital or interest of said bank, mortgage shall be given on property of a sufficient character, and of an imperishable nature.

§ 5. Be it further enacted, *That in order to facilitate the said Union Bank, for the said loan of fifteen million five hundred thousand dollars, the faith of this State be, and is hereby pledged, both for the security of the capital and interest, and that seven thousand five hundred bonds, of two thousand dollars each, to wit: eighteen hundred and seventy-five, payable in twelve years; eighteen hundred and seventy-five, in fifteen years; eighteen hundred and seventy-five, in eighteen years; and eighteen hundred and seventy-five, in twenty years; and bearing interest at the rate of five per cent. per annum, shall be signed by the governor of the State, to the order of the Mississippi Union Bank, countersigned by the State treasurer, and under seal of the State; said bonds to be in the following words, viz:*

: $2,000.

Know all men by these presents, *That the State of Mississippi acknowledges to be indebted to the Mississippi Union Bank, in the sum of two thousand dollars, which sum the said State of Mississippi promises to pay, in current money of the United States, to the order of the president, directors, and company, in the ——.year ——, with interest at the rate of five per cent. per annum, payable half-yearly at the place named in the indorsement hereto, viz.:*

*On the —— of every year until the payment of the said principal sum: In testimony whereof, the governor of the State of Mississippi has signed, and the treasurer of the State has countersigned, these presents, and caused the seal of the State to be*

The State of Mississippi v. Johnson.

*affixed thereto, at Jackson, this —— in the —— year of our*
*Lord.* —— ——, *Governor.*
—— ——, *Treasurer.*

§ 6. Be it further enacted, *That the said bonds may be trans-*
*ferable by the indorsement of the president, and of the cashier of*
*said bank, to the order of any person whomsoever, or to the*
*bearer; and the said indorsement shall fix the place the said*
*principal and interest shall be paid; and all expenses incurred*
*thereon, shall be defrayed from the funds of the bank.*

§ 7. Be it further enacted, That both the capital and interest
of the said bonds shall be paid by said bank, at the times they
shall severally fall due.

§ 8. Be it further enacted, *That to secure the payment of the*
*capital and interest of said bonds, the subscribers shall be bound*
*to give mortgage, to the satisfaction of the directors, on property,*
*to be in all cases equal to the amount of their respective stock,*
*which mortgage may bear on cultivated lands, plantations, and*
*slaves; on town lots, with houses thereon; on other buildings,*
*yielding a rent; on lands not under cultivation, but susceptible of*
*being cultivated; and on vacant lots, capable of being improved,*
with this provision, that not more than one fifth of the stock
of each stockholder, may be secured by mortgage on unim-
proved lands, not included in any plantation, and on vacant
lots in town; no mortgage on slaves alone shall be received;
and that when a mortgage shall be offered on lands and slaves,
the value of the lands shall be equal to three fourths of the
stock for which the mortgage shall be given; that houses or
other buildings, situated in any city or town, shall always be
insured against the risk of fire, and the policy of the insurance
transferred to said Union Bank; but it shall not be required to
have the buildings on any plantation insured; no mortgage
shall be received on a brick building for more than one half of
its value; and on a wooden building for more than one fourth;
*and that no one shall be permitted to subscribe until he shall*
*deliver to the commissioners a valid act of sale, or patents, or*
*certificates of confirmation from the land commissioners of the*
*United States, or partition sales and adjudication by a decree of*

The State of Mississippi *v.* Johnson.

*a court, verified according to law, or such other evidence of title to the property proposed as a guarantee to the bank, as may be deemed satisfactory to said commissioners or directors; that property already mortgaged may be received as a guarantee:* Provided, that the directors shall first deduct from the whole value of the property, at least twice the amount of said mortgage, and then grant such, only on the excess remaining after the deduction : Provided, further, that the mortgage existing on said property, shall not prevent the board of directors from receiving them as security for stock, when the sum to be loaned is to be employed in the extinguishment of said mortgage.

§ 9. Be it further enacted, That the subscribers of the said Union Bank be, and they are hereby created a corporation and body politic, for and during the term of forty years from the passage of this act, and shall be, and are hereby made capable, under the name and style of the Mississippi Union Bank, to receive and possess all kinds of property, either movable or immovable, and to sell, alienate, demise, and dispose of the same; to loan, to negotiate, to take mortgages and pledges; and to discount on such terms, and such securities, as they shall judge proper: Provided, that the whole amount of their accounts and goods, of every description, do not exceed double the amount of the capital actually received; the profits realized and in the possession of the bank, being always considered as a part of their capital: And provided also, that the debts due by the bank, exclusive of deposits, shall not exceed double the amount of their capital; and that they shall not take more than seven per cent. interest per annum on any loan or discount; or interest exceeding six per cent. per annum on any loan or discount made on notes to order, payable within six months from the time the loans or discounts are made; and they may sue or be sued, plead and be impleaded, answer and receive answers, in all courts having competent jurisdiction; and to have a common seal, and the same to alter or renew at pleasure; and to ordain and establish such by-laws, rules, and ordinances, as they shall deem necessary and suitable for the government of said corporation, not being contrary to this act,

nor to the constitution and laws of the United States, and the laws of this State.

§ 10. Be it further enacted, That for the management of the affairs of said bank, there shall be thirteen directors, chosen from among the stockholders; five of whom shall .be elected and chosen by the legislature, by joint vote of both houses, biennially; and, upon the part of the stockholders, eight shall . be annually chosen, at the banking-house of the said bank, by the qualified stockholders of the capital of said bank; each stockholder to have one vote for every share held by him ; but no person, copartnership, or firm, shall be entitled to a greater number than one hundred votes, and no one shall be entitled to vote by proxy, more than six hundred votes ; the appointments on the part of the State to be made during the first term of the meeting of the legislature, at their regular and constitutional meetings, after the passage of this act.

§ 11. Be it further enacted, That those who shall become and be declared stockholders to the institution, under the provisions of this act, shall be required to pay in cash the sum of ten dollars over to the commissioners or directors, or their agents, on each and every share subscribed for by them, at such time as may be required by the said directors.

§ 12. Be it further enacted, That after the closing of the books, and when it shall appear that at least five hundred thousand dollars shall have been subscribed and paid in, on the original stock of the capital of said bank, the said institution shall go into immediate operation, under the provisions hereinafter mentioned.

§ 13. Be it further enacted, That the legislature shall, upon joint vote, appoint three commissioners in each of the districts of the State hereinafter designated, whose duty it shall be to ascertain, and appraise, the property of those who wish to become stockholders in the institution, as well as those who are desirous to obtain loans or mortgage; and the said commissioners shall deliver to all persons whose property they appraise, detailed and authentic certificates of its value, of the number of acres of which each is composed, how many acres are under cultivation, and how many are capable of being

cultivated, and how many are not; the nature of the culture, the number of slaves, and their condition, age, and sex, and the number of animals employed; the number and quality of the buildings, and an estimate of each and all, which certificate must be signed and sworn to before a judge or magistrate, or some one authorized to administer oaths, by said commissioners, or a majority them.

§ 14. Be it further enacted, That so soon as five thousand shares shall have been subscribed, in the manner herein provided for, the governor of the State shall provisionally appoint thirteen directors, who shall serve for twelve months, and it shall be the duty of the said directors to choose a president of the said Mississippi Union Bank, and who shall be chosen from among themselves; and the president thus chosen, shall remain in office twelve months following their appointment; and that so soon as the directors are appointed, and the president chosen, the power of the commissioners appointed to receive the subscriptions, and the papers relating thereto, and in the possession of the commissioners, shall be delivered over to the board of directors.

§ 15. Be it further enacted, That after the first appointment, an annual election of eight directors, for the stockholders, shall be held on the first Monday in March of each and every year; and the said directors, except those upon the part of State, shall be elected by the stockholders or their attorneys, with the restriction before recited, after public notice of the same is given in the newspapers published at Jackson, Vicksburg, Natchez, Woodville, Port Gibson, Columbus, and Manchester, thereby designating the time and place of said election, when the stockholders shall meet for that purpose; the time thus fixed shall be at least two months after the publication of such notice and law; and said directors shall be elected by a plurality of votes : Provided, the said shares shall have been held three calendar months previous to the election, otherwise the holders thereof shall not be entitled to vote, and the directors shall remain in office from the second Monday of March, to the same month in the year following; and the board of directors shall every year, at the first meeting after their elec-

tion, elect one of the directors to be president of the said institution, and who shall remain in office during the term for which said directors were elected as above stated : Provided, always, That if an election or appointment of directors, or of a president, shall not take place at the period fixed by the present act, the corporation shall not on that account be dissolved, but it may be lawful at any other period to hold said election, or make new nominations, as the case may be ; and the manner and place of holding the elections, shall be fixed by the by-laws and ordinance of the board of directors; and until such elections, the president and directors of the said Union Bank shall be continued in office : And provided, also, That in case of vacancy arising from death, resignation, absence from this State for the term of six months, nonacceptance, refusal to qualify, or removal from office of any director, the vacancy shall be filled by the board of directors.

§ 16. Be it further enacted, That the cashiers, tellers, bookkeepers, and all other officers and servants of the bank, shall give bonds, with security to be approved of by the president and directors of said institution, for the faithful discharge of their duties, and that their appointment shall be made by the direction of the bank; and they may be removable at the pleasure of said direction, and their salaries be fixed by the said board of directors; who may be increased or diminished, as may be deemed necessary by said board.

§ 17. Be it further enacted, That no individual can be a director of said bank, who is not a citizen, domiciliated in the State, and who does not at the time of his election, in his own right, hold at least thirty shares of the capital stock of said bank ; and no emolument, privilege, or compensation shall be allowed said director, excepting the president, as herein provided for ; nor any one be a director, who is a director of any other bank, nor his partner, nor two persons in partnership or having a joint interest in trade, be at the same time directors of said Union Bank; and if, after being elected or appointed, any director should fail, he shall be incapable of holding his office, and another shall be elected in his place, as herein provided for, with this provision ; that if the director who shall

become incapable of holding his office, or shall resign, or refuse to act, the vacancy shall be filled by the board of directors, or if a director upon the part of the State, shall be appointed by the governor.

§ 18. Be it further enacted, That said corporation shall not issue any note, bill, or check, for a less sum than ten dollars, and if payable to order, they shall be transferable by indorsement, and if payable to bearer, they shall be transferable by delivery.

§ 19. Be it further enacted, That the whole of the profits of the said Union Bank shall remain with, and be employed by the directors as a part of its capital, until the full payment of that portion of the bonds of the State specified in the fifth section, which will be payable in twelve years; after which, one fourth of the profits then realized shall be divided among the stockholders, in the proportion to which they shall be entitled respectively; and the whole of the remaining and subsequent profits of the bank shall be employed by the bank, until the full payment of the bonds of the State, which will be payable in fifteen years; after which, one fourth of the profits then realized shall be divided out among the stockholders, as before provided for and mentioned, and the whole of the remaining and subsequent profits shall be employed by the bank, until the full payment of the bonds of the State, which will be payable in eighteen years; after which, one fourth of the profits then realized shall be divided as aforesaid; and the whole amount of the remaining and subsequent profits shall be employed by the bank, until the final payment and extinguishment of all the bonds of the State in favor of this institution; and after which, the whole of the profits shall be divided as aforesaid, and all subsequent profits be divided annually, with this provision: that, in consideration of the bonds made by the State, in addition to a voice in its direction, the State shall be entitled to one tenth part of the whole profits of the bank, which one tenth part shall be paid into the treasury, at the times and in the proportions provided for by this section to the stockholders.

§ 20. Be it further enacted, That quarterly, in each and every

year, from the first of January next, after the establishment of the said Union Bank, the stockholders who desire it, may be allowed to examine the affairs of the bank; and it shall be the duty of the board of directors of the parent bank, to furnish free access and inspection of the books (save the private deposits of individuals) of the institution to the stockholders, and to give them any information they may desire touching the management of said bank.

§ 21. Be it further enacted, That the said corporation shall never refuse specie payment, in current coin of the United States, or suspend payment of any of their notes, bills, or obligations, or of any funds received by them on deposit; and if ever the said corporation shall refuse or suspend the said payment, the bearer or holder of any note or obligation, or any person having the right to demand or receive the same, or receive the amount of any deposits, as before recited, shall be entitled to receive and recover damages at the rate of fifteen per cent. per annum.

§ 22. Be it further enacted, That if, by the first day of January, eighteen hundred and thirty-nine, three thousand shares shall not have been subscribed for, it may be lawful, as the opinion of the legislature may decide upon, to revoke this charter.

§ 23. Be it further enacted, That the board of directors of the parent bank shall have power to make regulations and ordinances for the government of the affairs of the bank, and to pass by-laws for the same, which they may alter, amend, or add to, as the interest of the corporation may require; and they shall establish rules for the conducting the affairs of said bank, which they may in like manner alter, amend, or add to, as may be necessary for the service of the said bank, the same being not contrary to law.

§ 24. Be it further enacted, That it shall be the duty of the board of directors to keep a set of books, in which all their deliberations, rules, and ordinances, shall be entered; and the legislature shall have power at any time to appoint a committee to examine said books of deliberations, rules, and ordinances, and to ascertain the amount of cash, the amount of notes in

circulation, and a complete and accurate list of the balances due the bank, as well as the amount of deposits, and all other affairs of said bank, so as to be informed of its true situation, and be enabled to make a full report thereof to the legislature.

§ 25. Be it further enacted, That the capital of said bank shall be exempt from any tax imposed by this State, or by any county or body corporate, under the authority of this State, for and during the continuance of its charter.

§ 26. Be it further enacted, *That the board of directors shall be judges of the sufficiency of the mortgages offered for stock and loans, and shall have power to reject the same if not sufficient;* and in such case may require other *security,* or in default thereof, reduce the shares of such *defaulters* to the amount sufficiently secured; they may also require other and additional security, on the renewal of any loan, note, or accommodation, for which application may at any time be made, if, in their opinion, the original security is not sufficient, safe, or satisfactory; that the loans of the bank and mortgages for stock, and loans granted by virtue of this act, shall bear ten per cent. interest per annum after maturity, if not punctually paid; and the Mississippi Union Bank shall have the right to cause to be seized and sold, according to the laws of this State, the property so mortgaged, in whose hands soever it may be found, in the same manner, and with the same facilities, as if it was found in the hands of the mortgagor, notwithstanding any change of title by inheritance or otherwise.

§ 27. Be it further enacted, That if a stockholder should fail, he shall be divested of his quality of stockholder, and his share or shares shall be sold by the board of directors, with all the rights and credits thereto belonging.

§ 28. Be it further enacted, That if any individual who shall have obtained from said bank a loan, secured by mortgage, as herein provided for, shall make a voluntary or forced surrender of his property to his creditors, the said surrender shall not impair the right of the bank to any mortgaged property; and said mortgaged property shall not be comprised in any cession of estate, until the full payment is previously made of the sum due the bank, and secured by mortgage; and the bank may

proceed by order of sale, in the same manner as if no surrender had been made; and any surplus of the proceeds of such sale, after paying the debt due the bank, shall be paid over to the person's legal representatives; in no case shall the applying for, or obtaining a respite from creditors, in any manner impair or affect the right of the bank to recover all loans secured on the property of such persons; nor shall any act of seizure, or the execution of property be, in any manner, delayed or influenced thereby.

§ 29. Be it further enacted, That the bonds, with the privileged mortgages, for the sum of fifteen millions five hundred thousand dollars, subscribed by the stockholders of said bank, according to their shares, for the purpose of securing the loan of fifteen millions five hundred thousand dollars, shall be deposited in the office of said institution, as security for the reimbursement of the capital, as well as interest of said bonds granted by the State; and, whenever an application shall be made by a stockholder, to transfer his stock and be discharged, such transfer and discharge may take place upon the new stockholder's furnishing mortgage to the satisfaction of at least a majority of all the directors; in all such cases of transfer and discharge, the vote shall be taken by yeas and nays.

§ 30. Be it further enacted, *That as soon as directors are appointed, as herein before provided for, they shall proceed to the election of a president, and the same shall be notified to the governor of the State, who will thereupon execute to the said bank, from time to time, bonds in amount proportioned to the sums subscribed, and secure to the satisfaction of the directors, as required by the charter, until the whole amount of fifteen millions five hundred thousand dollars shall be furnished in bonds, as herein before provided for.*

§ 31. Be it further enacted, That the State of Mississippi shall be entitled to a credit of two hundred thousand dollars, on furnishing notes or obligations for such sum as may be required to be used, and paying the usual interest annually, and in advance; and each and every stockholder shall be entitled to a credit equal to one half of the total amount of their respective shares, which shall bear interest at the rate of

seven per centum per annum; four per cent. of such loans and interests shall be paid annually, and the individual notes of the stockholders renewed annually, until the whole loan shall be paid and extinguished.

§ 32. Be it further enacted, That there shall be established seven offices of discount and deposit, as follows, to wit:—

1st. One at Macon, in the county of Noxubee, for the use and accommodation of the counties of Lowndes, Oktibbeha, Winston, Noxubee, Kemper, Lauderdale, and Neshoba, with a capital of one million eight hundred thousand dollars.

2d. One at Augusta, in the county of Perry, for the counties of Clark, Jasper, Covington, Jones, Wayne, Jackson, Hancock, Greene, Perry, and Marion, with a capital of one million of dollars.

3d. One at Aberdeen, in the county of Monroe, for the counties of Monroe, Itawamba, Tishomingo, Tippah, Pontotoc, Chickasaw, and Marshall, with a capital of one million of dollars.

4th. And one at the town of Lexington, in the county of Holmes, for the counties of Yazoo, Holmes, Carroll, Choctaw, Attala, and Leake, with a capital of one million nine hundred thousand dollars.

5th. And one at the town of Tillatoba, in the county of Tallahatchie, and for the counties of Yallobusha, Tallahatchie, Lafayette, De Soto, Panola, and Tunica, with a capital of one million three hundred thousand dollars.

6th. One in the town of Vicksburg, in the county of Warren, for the counties of Claiborne, Warren, Washington, Bolivar, and Coahoma, with a capital of one million five hundred thousand dollars.

7th. One at Liberty, in the county of Amite, and for the counties of Pike, Amite, Wilkinson, Adams, Franklin, and Jefferson, with a capital of two millions of dollars.

The counties of Madison, Hinds, Copiah, Simpson, Rankin, Scott, Smith, and Lawrence, to be the eighth district, and to be supplied by the mother bank.

§ 33. Be it further enacted, That the parent bank of the Mississippi Union Bank shall be located in Jackson, in the county of Hinds.

§ 34. Be it further enacted, That there shall be annually appointed by the board of directors of the mother bank, to administer the affairs of said office of discount and deposit, nine directors, citizens of the State, residing and domiciliated within the counties for which said offices shall be established, five of whom shall constitute a quorum to transact business; and said directors shall choose from among themselves a president, and shall be subject to all such regulations and rules as may be adopted by the said board of directors of the mother bank, for the government of said offices, not inconsistent with the provisions of this charter.

§ 35. Be it further enacted, That there shall be appointed for each of the aforesaid offices of discount and deposit, a cashier, teller, and clerk, and other officers or servants that may be required, all of whom shall enter into bond for the faithful discharge of their duties; the amount and conditions of which said bond shall be specified and provided for by the said directors of the mother bank; and the said directors of the mother bank may remove, at their pleasure, any officer in said offices of discount and deposit, whenever the better management of the bank may require such a removal.

§ 36. Be it further enacted, That the directors of said offices of discount and deposit, shall appropriate two thirds of the capital of each office to loan on mortgage, and one third to loan on notes, promissory notes, and bills of exchange, as far as practicable, and the nature of the applications will enable them so to do; and the board of directors of said offices of discount and deposit may loan or discount upon notes secured by mortgage.

§ 37. Be it further enacted, That persons borrowing on mortgage, shall be allowed at the end of twelve months to renew their bonds or notes for twelve months longer, during the space of eight years from the date of their respective loans or discounts: Provided, that they pay and reimburse at the time of each renewal, one eighth of the whole sum originally loaned or discounted to them, as well as the interest upon the sum for which their said bonds shall be thus renewed; so that at the expiration of eight years, the whole sum originally loaned or discounted to them, together with the interest thereon, be

55*

entirely paid and extinguished: And provided also, that loans made on mortgages after the twelfth year of the charter, after being paid and fully reimbursed, similar loans may again be made, and renewable and payable in the same manner as herein before mentioned.

§ 38. Be it further enacted, That the loans to be made by said Union Bank, shall be at a rate of interest not exceeding seven per cent. on mortgages or bonds and promissory notes, payable at a term of more than six months; and not more than six per cent. on notes or bonds renewable at six months, or at a shorter time; nor shall said bank deal in exchange, domestic or foreign, at a higher rate than six per cent. per annum discount on six months' bills, or a shorter term, at seven per cent. on bills at a longer term.

§ 39. Be it further enacted, That when either of the said offices of discount and deposit, shall not yield on any one year, except the two first years from the commencement of the operation, a net interest of six per cent. per annum upon the capital invested therein, the directors of the mother bank shall then remove said office to any other place in the same district, which to them may seem proper, or withdraw the same, as they may deem advisable.

§ 40. Be it further enacted, That in case any of the branches of the Mississippi Union Bank should be withdrawn, in consequence of a failure to realize the required interest, then a sum equal to the capital of said branch shall be loaned by the parent bank, as provided for, exclusively to the citizens of those counties for which said bank was established.

§ 41. Be it further enacted, That said offices of discount and deposit, may lend money to the citizens of any other county, not enumerated in the district for which said branch was established, when there are not sufficient applications for the counties for which said offices are established.

§ 42. Be it further enacted, That the four last years of the time allowed for the continuance of this charter, shall be exclusively employed in winding up the affairs of the institution, and that no new loans or discounts shall be given or allowed during the said last four years of the charter.

§ 43. Be it further enacted, That the State shall be divided into eight banking districts, in seven of which said districts there shall be established a branch of said bank, with the capital before provided for to each, for the purpose of affording banking facilities to the citizens of those counties that compose said districts; the mother bank shall be required to do the additional business of one district.

§ 44. Be it further enacted, That after the sale of the bonds for raising the capital of said Union Bank herein before provided for, and after the realizing the proceeds of said sale on said bonds, it shall be the duty of the board of directors of said bank to refund and pay over to the subscribers to the capital stock of said bank, the amount paid by them in cash on the said stock, as required in the eleventh section of this act, with interest at the rate of five per cent. per annum; said refunding to take place and be made as follows: one third in thirty days; one third in sixty days; and one third in ninety days, after the said time herein above recited and provided for.

§ 45. Be it further enacted, That the board of directors of said Union Bank are hereby authorized and empowered to fix such salary or compensation as they may deem necessary and proper, for the commissioners appointed by the thirteenth section of this act, and to pay the same out of the funds of said bank.

§ 46. Be it further enacted, That when the said Union Bank shall have gone into operation, as provided for in the twelfth section of this act, the said bank shall not be required to loan on mortgages or stock, until the bonds specified in the fifth section of this act, shall have been sold, and the proceeds of sale be realized by said bank; but the said bank may loan, deal in exchange, discount, and take such securities as they shall deem proper, and on such time as the board of directors of said bank may prescribe: Provided, however, that the loans so to be made, shall be at the same rate of interest as prescribed in the thirty-eighth section of this act: And provided further, that said loans may be made to any citizens of the State.

§ 47. Be it further enacted, *That the fifth section of this act,*

*whereby the faith of this State is pledged for the payment and redemption of the loan contemplated by this act, be referred to the next legislature of this State, in pursuance of the ninth section of the seventh article of the constitution; and that this act be published, under the direction of the governor, in at least three newspapers of this State, for three months previous to the next regular election; and that this act, together with the yeas and nays thereon, be entered on the journals of the senate and house of representatives.*

JOHN L. IRWIN,
Speaker of the House of Representatives.

A. G. McNUTT,
President of the Senate.

Approved, so far as the action of this legislature is recognized.
·January 21, 1837. CHARLES LYNCH.

JOHN W. KING,
Speaker of the House of Representatives.

A. L. BINGAMAN,
President of the Senate.

Approved, February 5, 1838.

A. G. McNUTT.

An act supplementary to an act to incorporate the subscribers to the Mississippi Union Bank.

§ 1. Be it enacted by the legislature of the State of Mississippi, *That as soon as the books of subscription for stock in the said Mississippi Union Bank are opened, the governor of this State is hereby authorized and required to subscribe for, in behalf of this State, fifty thousand shares of the stock of the original capital of the said bank; the same to be paid for out of the proceeds of the State bonds, to be executed to the said bank as already provided for in the said charter; and that the dividends and profits which may accrue and be declared by the bank on the said stock subscribed for in behalf of the State, shall be held by the said bank subject to the control of the State legislature for the purposes of internal improvement, and the promotion of education.*

§ 2. Be it further enacted, That three commissioners be, and they are hereby appointed, within each county in this State, viz.: In the county of Adams, Wm. B. Howell, Henry L. Conner, and James Bisland; in the county of Amite, David Lee, Solomon Wethersby, and David Pemble; in the county of Attala, Nathan Sims, Samuel Little, and Isaiah Vick; in the county of Bolivar, Reddick Smith, Joseph T. Henderson, and Wm. B. Cook; in the county of Choctaw, Harrison L. Watts, Wm. Perry, and John Prewitt; in the county of Copiah, Samuel T. Scott, L. W. Ellis, and Benjamin Grissom; in the county of Chickasaw, Henry W. Norton, Benjamin Kilgore, and David Griffin; in the county of Covington, John Watts, sen., Robert Magee, and Moses McLemore; in the county of Coahoma, George B. Warren, David B. Allen, and Matthew Farrar; in the county of Carroll, Greenwood Leflore, James W. Eskridge, and John T. Brown; in the county of Clarke, Isham Evans, Alexander Trotter, and Edward Dease; in the county of De Soto, Gen. James Tate, Rev. Wm. McMahan, and Thomas W. Hancock; in the county of Franklin, George Holliway, James Hariton, and Charles Stewart; in the county of Greene, Norman McLeod, James Walley, and Thomas Baird; in the county of Holmes, John W. Cowen, Wm. Walton, and John M. Brown; in the county of Hinds, Perry King, Ira E. Williams, and Alexander McKay; in the county of Hancock, Julius Monett, George Holly, and Thomas Badson; in the county of Itawamba, William Meadley, M. Green, and T. I. Foster; in the county of Jones, Angus Ferguson, Cornelius Shaws, and Evan Elzy; in the county of Jasper, John McDonald, Wm. Bridgers, and Doctor Dozier; in the county of Jefferson, Philip O. Hughes, Joseph Dunbar, and Neil Buie; in the county of Jackson, James F. Bradford, Andrew W. Ramsay, and Charles Holland; in the county of Kemper, Harrison Anderson, W. C. Taylor, and Alsa Pace; in the county of Lauderdale, Samuel Griffith, Peter Marsh, and B. F. Park; in the county of Lawrence, John H. Otis, John H. Hilliard, and William Smith, sen.; in the county of Leake, Patrick Sharkey, Richard H. Walker, and Robert E. Halford; in the county of Lowndes, George B. Watts, Eli Abbot, and Asa

Sessions; in the county of Lafayette, James Stockard, Wm. Webb, and A. Peterson; in the county of Madison, Lewis Findley, Burress Haley, and Bennet R. Allen; in the county of Marion, Ebenezer Ford, Fleet Magee, and William Graham; in the county of Monroe, William A. Clunn, Doctor Manly, and Washington Coopwood; in the county of Marshall, Wm. B. Means, Edward L. Travis, and James W. Briscoe; in the county of Noxubee, Charles W. Allen, Albert G. Haynes, and John H. Green; in the county of Neshoba, Jesse Clement, Shadrach Jones, and William Herbert; in the county of Newton, James Hudson, Dempsey Smith, and Thomas Runnels; in the county of Oktibbeha, B. M. Moore, Elijah Hogan, and Asa Reid; in the county of Pike, James Y. McNabb, Nathaniel Wells, and Wm. Elzey; in the county of Perry, A. E. Denham, Wm. Griffin, and John Mixon; in the county of Pontotoc, Joel Pinson, John S. Doxey, and William Spencer; in the county of Panola, E. Q. Vance, David Jones, and H. T. Pollard; in the county of Rankin, Rice Wells, Daniel Fore, and J. M. Sitler; in the county of Scott, John Dunn, jun., Edward Smith, and Stephen Berry; in the county of Simpson, Willis Walker, Martin Strickland, and Nathaniel Goff; in the county of Smith, Alexander Chisholm, David Ward, and E. D. Duckworth; in the county of Tippah, Robert Warren, Thomas Young, and Moses Collins; in the county of Tishomingo, T. G. Dabbins, James E. Matthews, and H. Mitchell; in the county of Warren, Henry S. Dawson, E. G. Cook, and Henry Fernandis; in the county of Washington, A. W. McAlister, W. E. Hall, and John S. Cox; in the county of Wayne, David Fletcher, Daniel E. McRae, and Thomas Poe; in the county of Wilkinson, John H. Randolph, Francis S. Mays, and Noland Stewart; in the county of Winston, Ares Hedspeth, John Coalter, and John Matthews; in the county of Yallobusha, James H. Barefield, Benjamin Williams, and Jeremiah Hendricks; in the county of Yazoo, I. W. Cassack, John Colglazer, and Robert L. Adams; whose duty it shall be to ascertain and appraise the property of those who wish to become stockholders in the said Union Bank, as well as those who wish to obtain loans on mortgage, as provided for in the charter of the said

bank, any two of whom shall be authorized to act; and in the event of death, inability, or refusal to act on the part of any of the said commissioners, it shall be the duty of the managers or directors of the mother bank to fill any such vacancy by the appointment of others, on receiving information thereof from either of the commissioners, or from the president of the board of police of said county; and that the provisions of the thirteenth section of the charter of the Mississippi Union Bank, so far as relates to appointing appraisers for each bank district, be, and the same is hereby repealed.

§ 3. Be it further enacted, That the books of subscription for stock to the mother bank shall be opened at the seat of government, on giving at least thirty days' previous notice in at least three newspapers published in this State, and shall be kept open during the space of six months by the managers appointed to open them; and the managers shall deposit all the titles, papers, notes, and other documents in the said mother bank, duly authenticated and recorded as provided for in the charter; and the books for subscription for stock to the several branches shall be kept open for and during the space of one hundred and twenty days, by the managers appointed to open them in the several counties of this State, by giving thirty days' previous notice of the same by advertisement posted up in at least three of the most public places in each of said counties, and at the expiration of said time they shall transmit to the managers of the books of subscription of the stock so taken and secured, together with all the titles and other documents duly authenticated and recorded: Provided, that said books of subscription shall be opened in each county of this State on the same day.

§ 4. Be it further enacted, That the commissioners appointed to appraise the property of those who wish to become stockholders and obtain loans on mortgages, as well as the managers of the subscription books for the said bank, shall severally take and subscribe an oath faithfully to discharge their duty, before any person authorized to administer an oath in their respective counties.

§ 5. Be it further enacted, That the managers of the mother

bank shall furnish the managers of the subscription books, in the several counties, the form of the mortgages and notes, with all other necessary forms for taking stock and securing titles to property mortgaged.

§ 6. Be it further enacted, That subscribers to the stock in the said Union Bank, or their legal representatives,. may at any time transfer their respective shares to any citizen of this State, with the approbation of the directory of the mother bank, and that no person not a citizen of this State shall ever own any stock in this bank.

§ 7. Be it further enacted, That the said bank shall never issue its own bills at any one time to an amount exceeding twice the amount of its capital actually paid in ; and that the bills of this bank shall be signed by the president and counter-signed by the cashier of the mother bank, and shall be obligatory on the company according to the face of the same.

§ 8. Be it further enacted, That the resident citizens of the different districts shall be entitled to take the stock allotted to their respective districts: Provided, They may have taken it within one hundred and twenty days from the time of opening the said books, and after that period it may be taken by any citizen of this State ; and that portion of the stock of the said Union Bank to be subscribed for on the part of the State, as provided for in the first section of this act, shall be taken from the whole amount of the capital stock of said bank, and the subscriptions to stock at the mother bank and several branches of said bank shall be so graduated as to reduce the amount of stock to be subscribed for by individuals in a just ratio proportionate to their capital ; and that nothing in the charter of the said bank shall be so construed as to deprive the State of the amount of stock provided for in the first section of this supplemental act, and in no case shall this act be so construed as to .allow more than five directors on the part of the State, as provided for in the original act.

§ 9. Be it further enacted, That the president and directors of the said Mississippi Union Bank, or the managers thereof, shall have ample power to appoint three commissioners to negotiate and sell the State bonds, provided for in the fifth

section of the act incorporating the subscribers to the Mississippi Union Bank, in any market within the United States, or in any foreign market, under such rules and regulations as may be adopted by said president and directors or managers, not inconsistent with the provisions of the charter of said bank: Provided, said bonds shall not be sold under their par value, and that said commissioners shall not accept of any commission or agency from any other banking or railroad company whatsoever, for the disposal of any bonds for the raising of money, or act as agents for the procuring of loans upon the pledge of real estate for the benefit of any other corporation.

§ 10. Be it further enacted, That the said commissioners shall, in compensation for their services, be paid out of the funds of said bank, and all expenses thereon be defrayed by the said bank.

§ 11. Be it further enacted, That books of subscription for stock in the said bank, be opened in the county of Amite, under the superintendence of O. W. Calfield, in the place of William H. Dillingham; in the county of Adams, under the superintendence of Noah Barlow, Samuel Cotton, and Dempsey P. Jackson; in the county of Bolivar, under the superintendence of Joseph McGuire, Christopher I. Field, and Francis Patterson, Jr.; in the county of Clarke, under the superintendence of Jackson A. Williford, John Towner, and Wm. Covington; in the county of Chickasaw, under the superintendence of Wm. H. Williams, George W. Thornton, and Wiley Griffin; in the county of Choctaw, under the superintendence of John Snow, R. F. Box, and J. R. Golding; in the county of Coahoma, under the superintendence of Aaron Shelby, Wm. Richey, and Wm. I. Oldham; in the county of Carroll, under the superintendence of T. S. Ayres, Wm. Y. Collins, and John E. Palmer; in the county of De Soto, under the superintendence of John Warmick, Felix Labauve, and Milton Blocker; in the county of Holmes, under the superintendence of Arthur Hays, Robert Cook, and Otho W. Beal; in the county of Hinds, under the superintendence of Richard S. Drone, Daniel Thomas, and A. L. Dabney; in the county of Itawamba, under the superintendence of Edward Thomas,

Duncan Clarke, and Bazil Lindsey; in the county of Jefferson, under the superintendence of John M. Whitney, John R. Coleman, and Charles T. Miles; in the county of Jones, under the superintendence of John Moffit, Duncan Thompson, and Elisha Wade; in the county of Kemper, under the superintendence of Benjamin C. Oppitt, John F. Auld, and —— Latham; in the county of Lawrence, under the superintendence of Robert Jelks, Arthur Smith, and Henry E. Calhoun; in the county of Leake, under the superintendence of Daniel Skinner, Thomas Myers, and Jackson Warren; in the county of Lowndes, under the superintendence of John Davis, in place of J. A. Hogg, deceased; in the county of Monroe, under the superintendence of Nathan L. Morgan, John W. Cook, and Josiah N. Walton; in the county of Madison, under the superintendence of William Montgomery, Killis Walton, and Jas. Adams; in the county of Noxubee, under the superintendence of Richard D. Barker, in place of James T. Harrison, removed, and John L. Purdy, in place of James Moore, deceased; in the county of Newton, under the superintendence of Pierce Redwine, A. G. Tase, and Jacob Hollingworth; in the county of Neshoba, under the superintendence of Joseph Atkins, Henderson M. Walsh, and William Rodgers; in the county of Oktibbeha, under the superintendence of Robert A. Lampkins, John Billington, and E. E. Clarke; in the county of Panola, under the superintendence of James Ruffin and Samuel Wright; in the county of Pike, under the superintendence of A. R. Green, Franklin Love, and Thomas Denman; in the county of Pontotoc, under the superintendence of Benjamin M. Bradford, Samuel L. Watt, and Charles W. Martin; in the county of Simpson, under the superintendence of Nathaniel Freeman, Joseph Boggan, and Henry C. Bennett; in the county of Scott, under the superintendence of Shadrach J. Denson, Milton D. Young, and Jonathan Russell; in the county of Tishomingo, under the superintendence of John Reaves, Thomas Pate, and R. H. Bone; in the county of Tunica, under the superintendence of Andrew Kerr, John Bridges, and James N. Smith; in the county of Tallahatchie, under the superintendence of James T. Crawford, Charles

Bowen, and James A. Girault; in the county of Wayne, under the superintendence of D. C. Shaw, John H. Horn, and William Cohea; in the county of Warren, under the superintendence of Wm. M. Pinknard, J. J. Chewning, and Joseph Templeton; in the county of Yazoo, under the superintendence of Milton Piles, Robert C. Campbell, and Lineas B. Markham.

§ 12. Be it further enacted, That the county of Newton is hereby attached to the first district.

§ 13. Be it further enacted, That in estimating plantations, the ratio of land unimproved shall not exceed the land in actual cultivation, or cleared land and ready for cultivation, in a greater proportion than ten ·acres of uncultivated land to one of cultivated or cleared land fit for cultivation; and that after a tract of land being composed of connected or contiguous parts, shall exceed one thousand acres, then the ratio of uncultivated lands shall not, in such estimate, exceed five to one of the lands in one entire tract, susceptible of being cultivated: Provided, however, that when the lands not in actual cultivation shall exceed the ratio above mentioned, the excess shall be considered as unimproved lands.

§ 14. Be it further enacted, That the branch of the Mississippi Union Bank for the third district, is hereby located at the town of Ripley, in the county of Tippah.

§ 15. Be it further enacted, That the branch of the Union Bank for the fifth district, shall be located in the town of Panola, in the county of Panola.

§ 16. Be it further enacted, That so much of the original charter of the Union Bank of the State of Mississippi as conflicts with the provisions of this act, be, and the same is hereby repealed.

§ 17. Be it further enacted, That so much of the fourteenth section of the charter of the Mississippi Union Bank as provides for the appointment of a provisional directory, be and the same is hereby repealed, and the ten managers elected by the provisions of second section of the charter, shall compose the first or provisional directory, who shall be required to perform all the duties required of the said provisional directory in the original charter, and that the choice of a president for the said

bank shall be confined to their own body, and the president and directory so appointed shall remain in office until they are superseded by the election of successors by the stockholders, and by the legislature, as provided for in the charter.

§ 18. Be it further enacted, That so much of the nineteenth section of the original charter as entitled the State to one tenth of the whole profits of the bank, be repealed, and so much of the thirty-first section of the original charter as entitled the State to a credit of two hundred thousand dollars, be and the same is hereby repealed.

§ 19. Be it further enacted, That the advance required to be made on the subscriptions for stock of said bank, as required in the eleventh section of the original charter, may be paid in by the subscribers in the current bills of the banks of undoubted solvency of this State, and that no more than two and a half per cent. on the stock shall be required to be paid at the time of subscribing: Provided, however, that when this amount so advanced be refunded to the subscribers, as provided for in the forty-fourth section of the original charter, the same shall be in funds similar in value to the description of funds paid in by the subscribers.

§ 20. Be it further enacted, That if any stockholder should be dissatisfied with the graduation of the stock subscribed for by them, they may have the right to withdraw the property pledged, and cease to be stockholders, and the said stock so refused to be taken, and may be again subscribed for by giving thirty days public notice of the time of opening the books of subscription, which shall be governed by the same rules and regulations as in the first subscriptions.

Approved, February 15, 1838.

*D. C. Glenn,* attorney-general, for the State.

The main facts in issue in this cause, are to be found in the following agreement of counsel: —

1st. That the bond sued on was issued at the time it bears date, by A. G. McNutt, as governor of the State of Mississippi, under the seal of said State, and that the same was issued for, and on account of, the Mississippi Union Bank, and sold by

said bank or its agents, and passed into the hands of complainant, as assignee, for value, and that the same remains unpaid.

2d. That the said bond was so issued after the passage of the acts chartering, and supplementary thereto, the Mississippi Union Bank, all of which acts are considered as evidence, and to be read and used as such in said cause; it being also admitted, that publication of the act entitled " An Act to incorporate the subscribers in the Mississippi Union Bank," passed 5th February, 1838, was made, and said act finally passed, as required by the constitution of Mississippi.

3d. It is admitted, that after the passage of the " Act supplemental to an act to incorporate the subscribers in the Mississippi Union Bank," and providing for a subscription of stock in said bank to the amount of five millions of dollars, for and on account of the State of Mississippi, the said A. G. McNutt, governor of the State at the time, subscribed on the books of said bank at the time for the said five millions of dollars' worth of stock, and soon thereafter, as the date of the bond sued on shows, issued the said bond and other bonds, to the amount (with this) of five millions of dollars; at the time of the issuance of which bonds, the mortgages required to be given in the 8th and 30th sections of the original charter had not been executed or delivered to said bank.

4th. It is further admitted, that the act entitled " An Act supplemental to an act to incorporate the subscribers in the Mississippi Union Bank," approved the 15th February, 1838, was not referred to the next succeeding legislature, or published for three months previous to the next general election thereafter, and by such subsequent legislature passed and agreed to, and the yeas and nays thereon entered on the journals of the same, as required by the 9th section of the 7th article of the constitution of the State of Mississippi.

The clause of the constitution referred to is in these words:

" No law shall ever be passed to raise a loan of money upon the credit of the State, or to pledge the faith of the State for the payment or redemption of any loan or debt, unless such law be proposed in the senate or house of representatives, and be agreed to by a majority of the members of each house, and

56*

entered on their journals, with the yeas and nays taken thereon, and be referred to the next succeeding legislature, and published for three months previous to the next regular election in three newspapers of this State, and unless a majority of each branch of the legislature so elected after such publication, shall agree to and pass such law; and in such case the yeas and nays shall be taken and entered on the journals of each house." Con. Miss. Art. 7, § 9.

On the 5th February, 1838, the legislature chartered the Union Bank, with a capital of fifteen and a half millions of dollars, to be raised by means of a loan. In order to facilitate the bank in obtaining the loan, the faith of the State was pledged for the sum of fifteen and a half millions, as security for the capital and interest, evidenced by bonds, of which, the bond sued on is one. The capital and interest of the bonds were to be paid by the bank when due. In order to secure the capital and interest of the bonds, the subscribers for stock in the bank were bound to give mortgages on productive property at a reduced valuation, to be in all cases equal to the amount of their respective stock. When the stock had been secured as required by the charter, the governor was directed to issue bonds in amount equal to the stock thus secured. The entire profits of the bank were declared capital, until payment was made of the bonds first due. The bank bonds and mortgages were required to be deposited in the institution, as a security for the reimbursement of the capital and interest of the State bonds.

The act went into operation on the 5th February, 1838. It was never acted under. No bonds were ever issued in pursuance of it. No mortgages or other security were ever given, as required by it. It was superseded by subsequent legislation.

On the 15th February, 1838, the legislature passed "An Act supplemental to an act chartering the Mississippi Union Bank." By this law, the governor was required to subscribe for five millions of dollars' worth of the original capital stock of the Union Bank. The governor did so in pursuance of the act, and thereby the State became a debtor to the Union Bank for five millions of dollars. To pay this amount, he executed to the

bank State bonds for five millions, which were sold by the bank in the mode pointed out in this law. Among the bonds thus executed and sold, was the one sued on. The State of Mississippi denies that she is legally or constitutionally bound to pay the same.

The act of the 15th February was one of simple or ordinary legislation. It pledged the faith of the State for the payment of a debt due to the Union Bank for five millions of dollars of its capital stock. This law was not passed in the mode pointed out in the clause of the constitution already quoted. The faith of the State has, therefore, never been legally pledged, and this bond, which is exhibited as evidence of her indebtedness, imports no obligation whatsoever.

Was this a contest between two individuals, this statement of facts would prove to be an irresistible argument in the case. And was this case receiving its first impression from the legal mind of the country, the same statement would be equally conclusive and irresistible.

It must certainly be conceded by every fair mind, that *primâ facie*, on the face of the law and the record, the case is with the State. In order to hold her bound, much artificial reasoning, many forced and even fanciful deductions, are resorted to.

This is not the proper spirit in which to approach this case. The constitution has guarded the people with great care from any indebtedness. As a general rule, it prohibits all indebtedness. The legislature is clothed with a special and limited power or jurisdiction as to the creation of debts. This power they must not violate; this jurisdiction they must not exceed. It is the policy of the constitution, the source of all law. It is the protection of the mass, by whom and for whom it was framed. In this matter, the legislature may well be likened to a court with a limited jurisdiction. To enable the court to act, every thing must be shown which is required to give it jurisdiction. No powers must be assumed to it by inference or construction. The State can be bound in one way, and in no other. He who asserts a liability against the State, must show that it has been incurred in the mode provided, and in no other.

There is not such a thing known as the implied liability of the State. It is either express, or it does not exist at all.

It being conspicuously apparent that the State is not bound upon the face of the record, and by virtue of the constitution and the law, I will devote a brief observation to each of the positions by which her liability is inferred or assumed in argument.

It is insisted by the appellee, that the act of the 5th of February was passed in the mode set forth in the constitution. This is granted by me. It is further insisted, that by it the faith of the State was pledged, which is also conceded. It is then urged, that the supplement does not alter, change, or modify this law in any material particular, but was simply in aid of it. This is done to escape this consequence; that the faith of the State was pledged by the people for one purpose, and it has been applied by the legislature to a wholly different purpose.

To show that the acts of the 5th and 15th of February are two distinct and irreconcilable laws, requires no argument. The best argument is to read the two laws. They are opposite in means, they are opposite in ends, they are opposite in details, they are at war from the captions to the close, so far as the State is concerned; and so far, only, have we any thing to do with them. They have no legal identity. The fewest words make this plain.

The first act proposed to loan the faith of the State in order to furnish a capital for the Union Bank. The second act makes the State a stockholder in the bank for five millions of dollars. To secure this loan, the first required ample security by mortgage on lands and negroes. The second requires no security whatsoever. The first law requires the first profits of the bank to become capital and be applied to the payment of the capital and interest first due of the bonds. The second repeals this provision altogether. The first provides a cash payment of ten per cent. by each stockholder, and the second repeals it.

How any one, as a mere matter of fact, can say the first law is not changed or repealed by the second, passes my comprehension. Because the State is a party in the transaction, we

surely are not bound to abandon the rules of common sense in determining its rights or responsibilities. Suppose this the case of individuals. A. & Co. are engaged in a manufacturing establishment. In order to facilitate their operations, B. authorizes C. to execute his bonds for $20,000 to loan to A. & Co., upon their giving certain enumerated securities. A. & Co. find it difficult, indeed impossible, to give the securities required by B. To avoid this difficulty, C. proposes to subscribe for $20,000 worth of stock in the concern on behalf of B. He proposes to pay this debt to A. & Co. in the bonds of B., which he had been authorized to loan to A. & Co. on good security. He creates the debt, he delivers the bonds in payment of it, they are sold by A. & Co.; B. is sued upon them and plead "*non est factum*," that they are not his bonds. The case would be too clear for debate. Any court in christendom would hold that a subscription for stock in the corporation of A. & Co. was a palpable violation of an authority which directed C. to loan the bonds of B. to A. & Co. upon good security.

So it stands with the State and the Union Bank. She offered to loan her credit upon good security. Instead thereof, she was made a stockholder in the bank for five millions; her credit has never been loaned to the bank; the bank has never used one dollar of her pledge. The bank never has become her debtor. On the contrary, she has become the debtor of the bank for five millions. Under the supplement, a distinct and independent indebtedness has been imposed on the State to that amount. This indebtedness imports peculiar rights and imposes peculiar liabilities. This arises entirely under the supplement. So far from harmonizing with the original act, it is at war with its express language and its intent. One act directs the loan of the State's credit upon ample security, and every clause in it looks to this end. The other orders the creation of a debt against the State, and every clause in it looks to that end. It is to confuse terms, to confound meaning, to hold that laws so utterly dissimilar, mean one and the same thing. The play of Hamlet, with the part of Hamlet omitted, would as nearly fill the idea of its great author as the practical execution of the

supplement would coincide with the intention or language of the framers of the original act.

Throughout the original act, the paramount intention is clear to secure the State against ultimate liability upon her bonds. This security was to consist of mortgages, with various special provisions in aid of the general design. It provides for the issuance of the bonds only in amount proportioned to the security so given. Yet, by the terms of the supplement, the bonds are required to be issued without any such security.

Examine the two laws and this will be found strictly true. Under the first, the issuance of the bonds is made conditional; under the latter it is absolute; by the first, they may or may not be issued in the future; by the latter they must be issued instanter, to pay a debt as instantly created. By the original, the mortgages must be executed before any bonds can be issued; by the supplement as soon as the books of subcription for stock in the bank are opened, the governor is required to subscribe for five millions' worth of stock and pay for it in bonds.

The original act also required that the whole of the first profits of the bank should become capital and be applied in payment of the State bonds. It also required all the bonds of the bank and its mortgages to be deposited in the institution as security to the State on its bonds; and it further required a payment of ten per cent. in cash by each subscriber on the amount of his stock. These securities were not made conditions precedent to the issuance of the bonds in the express manner of the stock mortgages, yet they were each and all intended in aid of the grand feature, the "paramount intention" of that act, viz., the security of the State on her bonds. Yet, by the supplement, they each and all stand expressly repealed.

To meet the force of these facts, it is seriously contended, that notwithstanding the supplement, the subscribers for stock in the bank were bound to furnish the mortgages required by the original act, to the full amount of the capital stock of the bank; in other words, that there was nothing in the former

which prevented the execution of the mortgages; indeed, that it was the intention of this act that these mortgages should be executed. Let us test this curious assertion.

By the original charter, the capital stock of the bank was limited to fifteen and a half millions. The subscribers therefor were bound to give mortgages, to be in all cases equal to the amount of their respective stock. Thus far they were required to go, and no further. By the supplement, the governor is required to subscribe for five of the fifteen millions of stock, on behalf of the State. This left but ten millions for the other stockholders. This they could secure, and no more. They could only secure so much as they had subscribed for. They could not take or subscribe for this five millions, because the State had subscribed for it, and they could only secure so much as each had subscribed. To avoid the dilemma, the appellee courageously contends that the subscribers for stock, notwithstanding the supplement, were bound to secure the ten millions which they themselves could subscribe for, but were bound further to secure the five millions subscribed and taken by the State. That is, in plain terms, where a man subscribed for one hundred dollars' worth of stock, he was not only bound to secure it by mortgage, in order to enjoy it, but he was further bound to secure fifty dollars in addition, in order that the State might enjoy it. If such was the intent of the supplement, it was void; the legislature had no such power. The law says, charters are contracts; you cannot impair a contract by legislation. To impair a contract, is to deprive parties of rights vested under it, or to add burdens not imported in its terms. Under either head, such an intention in the supplement was void. The legislature is never presumed to have intended a void thing. The truth is, no such intention ever entered the minds of the legislature. The whole scope of the law negatives it. The very face of the law absolutely forbids it. The original act is dated the 5th February, 1838; the supplement, the 15th of the same month and year. By the second and third sections of the former, the books of subscription cannot be closed under four and six months. Until this was done, the mortgages could not be accepted and the stock declared. Yet

the supplement, in ten days from the original act, requires the governor to subscribe for five millions of stock, and execute bonds therefor, " as soon as the books are opened." This is but one of the many conflicts of the two laws. The point urged will not bear investigation. It excites a smile of wonder when casually hinted, but when solemnly urged in argument, wonder is drowned in a laugh such as that with which the rude gods of Homer shook the ancient world.

Where a law has been thus repealed expressly, and, in fact, repealed in spirit, object, and intent, I will be excused from further argument to prove that the original and the repealing act are repugnant. A perusal of the two laws amounts to demonstration.

I will here notice a view which has been taken, and which is more appropriate to this branch of the inquiry than any other to which I can assign it.

It is said that the original act, which was properly enacted, authorized the issuance of the bonds; that being thus authorized, the legislature had full power to order their issuance for any purpose whatsoever; that though authorized to be issued as a loan to the Union Bank, the legislature could order their issuance in payment of a State debt contracted with the bank. This position is as unsound in law and logic, as it is questionable in its morality. A brief analysis will dispose of it. Suppose the supplement stood alone and unsupported. It requires the governor to subscribe for five millions of stock in the Union Bank. What position is the State thus placed in? She becomes a debtor to that amount to the bank. In other words, she acknowledges herself indebted to the Bank five millions of dollars for value received, and promises, or pledges her faith to pay the same. This is done by the supplement, which was passed by but one legislature. Yet the constitution says, that no law shall ever be passed to pledge the faith of the State for the payment of any debt, unless the law is enacted by two successive legislatures. Nothing further is needed to show that, unsupported, the first section of the supplement is void. But it is said the bonds are authorized by the original act, and being legally issued, they can be applied to any purpose. You cannot create

a debt to the bank by the act, yet you can take State bonds, legally executed, and pay a debt you have not power to create. You can use a lawful power to perform an unlawful act. You can do that indirectly which you cannot do directly. You can pay a debt which you cannot create. You can evade the constitution, though you cannot violate it. True, the courts hold that an evasion of a law is equal to its violation; not so with constitutions; they are mere abstractions; avoid their dead letter and you may evade their living spirit, when and how you choose; although Chief Justice Sharkey has vainly imagined " that the spirit of a constitution was entitled to a higher degree of respect than that of a law, being the paramount law couched in general terms, and this respect it must receive from the courts whenever they are called on to enforce contracts which so palpably conflict with the constitution." The end here is not called on to justify the means, but the means is held to sanctify the end. Strange reasoning; the last product of the doctrine of implied power; a doctrine which is never so true to itself as when it is false to the constitution.

It thus becomes manifest, that this bond cannot be enforced, if we look to the supplement for its validity. Pressed by this conclusion, it is boldly assumed that the bond was issued under the original act, and not under the supplement. This is not true. The bonds were ordered to be issued by the supplement. They were issued in pursuance of its provisions. They were issued to carry out its intent and object. It spake them into active being, and their action was marked out by its provisions. It is true, the original act authorized the issuance of bonds. They were, however, to be issued as a loan to the Union Bank. No such loan was ever made. No such bonds were ever issued or pretended to be issued. I might rest the point upon the face of the laws themselves, but it may not be improper to recur to contemporaneous history for the true facts of the case.

In 1839, Governor McNutt, in his annual message, says:——

" On the day the books were opened at Jackson, I subscribed for fifty thousand shares of stock in the bank, and executed bonds for five millions of dollars, as soon as they were prepared

for my official signature, and delivered them to the managers of the bank." House Journal, p. 20.

In 1842, the same officer, in his annual message, says: —

" In pursuance to the requisitions of the act supplementary to the charter of the Mississippi Union Bank, two thousand five hundred State bonds, for the sum of two thousand dollars each, were executed in June, 1838, and delivered to the managers of the Mississippi Union Bank." Ib. 19.

In 1839, the joint committee of both houses of the legislature, in their report upon the Union Bank, use the following language: —

" After the governor of the State had made the subscription required of him by the supplement to the charter, of the five millions of the capital stock allotted to the State and executed, in pursuance thereof, the State bonds in favor thereof, the said bonds were sold by the agents of the bank." Ib. 170.

In the power of attorney given by the bank to the commissioners to sell the bonds, we find this recital: —

" And whereas, the governor of the State of Mississippi has, pursuant to the provisions of the said supplementary act, subscribed in behalf of the State fifty thousand shares of the capital stock of said bank, and has executed twenty-five hundred bonds of the said State of Mississippi," &c. Ib. 181.

By the written contract of sale of the bonds, the supplement is also made a part of the contract. Ib. 189.

The assumption that the bonds were issued under the original act, and not under the supplement, is thus put to rest. The truth of history is vindicated by its record. It accords with the face and letter, the spirit and intent, of the law itself. It is surely a pressing emergency which will demand of us to ignore the recorded facts of the past, and to contradict the substantial truth of this whole transaction.

But the accuracy of the entire preceding argument is impliedly confessed, and we are then told that the bonds can be upheld by the original act. It is asserted that the supplement may be declared void, and yet the bonds are legal and valid.

Upon examining the record, the court will find that it is an

admitted fact in the cause, that the stock mortgages, which were required and provided for by the 8th section of the charter, were not, have never been, executed. This would seem to put an end to the discussion, inasmuch as the 30th section directs that the bonds shall be issued by the governor only in amount proportioned to the stock secured, " as required by the charter." When, therefore, it is made to appear that no amount of stock was ever secured, it is easy to pronounce those bonds illegal, whose validity is made to depend upon such security.

But I am here met with this position. It is contended, that by the 30th section, the directors of the bank are made the judges of the fact whether this security has been given or not; that the law requires the stock to be secured to their satisfaction; that thus a discretion was vested in them which they have exercised, and exercised in good faith, as far as this record shows; that they called on the governor for these bonds; that they were issued by him; that they have been sold and passed into the hands of an innocent holder, for value and without notice; and though no security of any kind was given, as required by the law, yet the State is bound by the acts of her agents, and is estopped from denying that the bonds constitute a liability upon her. In other words, that the State must yield a silent assent to the acts of her agents, though her laws have been violated and her constitution defrauded.

This position is scarcely plausible. It is certainly not true. It assumes facts to exist which do not exist; it asserts a legal principle which is not applicable to the case, and reaches a conclusion which is not sound in reason or morals, is subversive of a government of laws, and fatal to the rights of the people.

The 30th section provides, that when the governor is notified of the election of a president of the bank, " he will thereupon execute to said bank, from time to time, bonds in amount proportioned to the sums subscribed and secured to the satisfaction of the directors, as required by the charter." Now, what was required by the charter? It is not left in doubt. There is here no room for discretion. Its requirements are clear and unequivocal. The 8th section of the charter declares, that

each subscriber shall be " bound " to secure his stock " by mort-
gage on property, to be in all cases equal to the amount of their
respective stock." Could language make it plainer? Yet it is
pretended that a discretion was vested in these directors by the
30th section to bind the State irrevocably by their acts, though
no security was ever given. This would be a gross misappli-
cation of a principle which is sometimes useful, in the protec-
tion which it affords to the rights of innocent third persons.
But the policy of the law is opposed to investing mere agents
with discretionary power, as a general rule. Discretion is never
presumed. Discretion only arises when the law is silent. When
the law speaks, all discretion is at an end. As it is written it
must be obeyed. When the agent obeys the law, his acts are
binding. When he exceeds his powers, his acts are void.
Here there was no room for doubt. The agent was limited,
bound, and directed, by stringent enactments. He has grossly
and utterly disregarded the plainest rules laid down for his
government. And yet it is insisted, that this simple agency
enabled him to defeat the " paramount intention " of the law
under which he acted; that when the legislature had been for
two years engaged in preparing a law, and providing ample
security for the State in every section of it, had marked out
the nature, kind, and quantity of the security, yet the directors
have the power, under the pretence of an exercise of discretion
where none existed, to defeat the whole legislation of the State
by an open, direct, and palpable violation of the express letter
of the law under which they acted.

Every law must receive a reasonable construction. It must
be so construed as the more effectually and perfectly to attain
the object in view. The paramount intention of this law was
to secure the State upon her bonds. These bonds were to be
loaned to the Union Bank, and the Union Bank was required
to secure these bonds before they could issue. Yet we are
informed that this same Union Bank was made the judge of
this security, and invested with a discretion so extensive, that
it involved a power on its part to dispense, wholly and entirely,
with any and all security, and still bind the State. Is it wrong
to call this absurd? What does it amount to when stripped of

legal verbiage, and scanned with the eye of common sense? The State proposes to loan the Union Bank her credit for fifteen millions of dollars. Before doing so, she requires ample security from the bank. The security is specified and enumerated. She then tells the bank, though you are required to give this security, and will enjoy the loan to be based upon it, I will make you the judge as to when it is given; exercise your discretion, and, though you may decide that full security has been given when no security has been given; though you may pronounce that to be which has no existence, though you may pronounce that to be true which is a mighty and a monstrous falsehood, yet will the State be bound by all the acts of her faithful agents. To state such a proposition is to crush it. Was this the intent of the legislature? Madness, then, or corruption, ruled the hour when such an intent was conceived or carried out. But no; the legislature did no such thing. They required by law, that the governor should issue these bonds when called for by the bank, and then in sums equal to the stock secured, " as required by the charter." The 8th section of the charter required the stock to be secured " by mortgage on property, equal in all cases to the respective amount of stock subscribed for." Till this was done, there was no discretion. The discretion of the agent was dormant, and came into exercise only when the law ceased. And yet, here, in flagrant violation of the law, in open and daring contempt of its whole scope, spirit, and intent, the most massive wrong has been done to the rights of a people which we read of in history. And the wrongdoers plead upon the people an estoppel!

In the case of individuals this rule is one of daily application. Where an agent is vested with discretion, and uses it in good faith, his principal is bound by his acts. When he acts under an express power, he must obey it. If he violates it, his acts are void, and do not bind the principal. There is a much higher necessity for its application to public than to private agents.

Mr. Justice Story, speaking in this connection, uses this emphatic language. He says: —

" If a private agent were, by connivance with the obligors, to

cancel an obligation contrary to the known instruction of the obligee, such an act would not bind the latter. Such an act, call it by however genteel a name we may, would be, in contemplation of law, a fraud upon the obligee. *A fortiori,* the act of a public officer in violation of the duties of his office, which constitute a part of the vital arrangements of the government, cannot be permitted to have any legal effect, by way of defence, to those who have participated in the violation and encouraged and aided it. I hold it most clear, that the acts of a public officer beyond the scope of his powers, and in violation of his public duties, are, in such cases at least, utterly void. A different doctrine would lead to the most alarming and mischievous consequences, and unsettle some of the best established principles of the law of agency." 5 Mason, R. 441.

Such is the earnest language of one who was never remark- able for any strictness of rule which he applied to the acts of government and its agents. He has well said, that the rule applied to private agents gathers additional power when applied to the agents of government. It is proper, it is essential that it should be so. A private principal has but his own private affairs to look to. No other matter concerns him. He can arrest the evil and avert the injury. But the people who are principals, have no such power. In the mass, the individual is merged. Each devoted to his private affairs, their public rights are the care of all, or of none. These rest secure in the shadow of the constitution, and are read of in the light of the law. And this happily answers the pungent sneer with which it is demanded, " Why, when this wrong was done, did not the people speak out?" The people speak! They did speak, they have spoken, to these parties, to all men, to the world. Their tongue is the constitution, their words are the laws of the land. These constitute their letter of attorney to their agents, legislative, civil, and ministerial. The whole world stands charged with notice of it. Within its scope the people are bound, without it they are not. Such is the meaning of a government of written laws and constitutions. Unless this be so, the people are at the mercy of their government. Hence

The State of Mississippi *v.* Johnson.

it is, says Mr. Madison, "The legislature, no less than the executive, (and so with all officers,) is under limitations of power."

But the rule contended for by counsel, if good in one instance must be good in all. Test it by an illustration. The legislature are agents of the people. They are agents charged with a discretion in the passage of laws. Suppose our next legislature should provide for an emission of a million of bonds, which was accordingly done, and the same are sold. The State is sued and denies her liability. The law creating the debt was not passed as required by the constitution. Admitted, says the bondholder; but the legislature is your agent for making laws. They have exercised a discretion you have given them, and you are bound by their acts. What would be the result? The case would be laughed to scorn. To bring it would be an absurdity. Yet just such is the extent of the rule here contended for. It is absolutely necessary to apply the "*reductio ad absurdum*" to some positions. Their very nature renders them proof against ordinary assault.

But a technical estoppel is pleaded upon the people. The meaning of this is, that when the law or the constitution has been violated, the people are estopped, or forbid to tell the truth about it.

The State is held to have issued commercial paper in this instance, and to be bound by the rules of the commercial law. This begs the question. When issued, the bonds may be commercial paper. But the point to be met is, that they were never issued according to law. Judge Story says: "The government has a right to prescribe its own rules on any subject. As to the custom of merchants, it can clearly have no operation to make law, much less to supersede the actual provisions of the law in respect to the sovereign rights of the government."

Nor is this any contest between the State and a foreign power; nor do the rules of the publicists or the principles of that misty code, called "International Law," which, in the world's history, has prompted more evil than it has prevented, prevail here. This is a local matter, to be decided upon local

law, and as if it were a contest between the State and one of its citizens.  The complainant must show a valid claim against the State under and according to the laws and constitution of the State, or he cannot prevail.

I have already shown that our constitution and laws were notice to the world, and at its peril it must note them.  But in this instance, there is even special notice.  The very contract of purchase of the bonds embodies in it the law which forbade the sale.  The purchaser was put upon inquiry.  He was also specially warned by the law, and finally the constitution as well as the law was brought to his notice.

And yet we are bound by an estoppel!  Estoppels are odious in the eyes of the law, even when applied to individuals.  They are only allowed in extreme cases.  The use to which they are put in this case is certainly novel, not to say original.  That an estoppel *in pais* can uphold a violation of law will strike the most indifferent; but our wonder is complete when we learn that the same shadowy principle will sanctify a violation of the constitution.  In our political schooling we have been taught to look with distrust upon "the general welfare" doctrine applied to the federal constitution, and the "higher law" light of more modern times, has spread dismay over the land.  But the disciples of both should hail the dawn of a doctrine more potent than either.  The rod of Aaron hath swallowed up all the other rods.  Authority is scarcely needed, but I cannot forbear quoting here the strong language of Henderson, long chief justice of the supreme court of North Carolina, and very eminent in his day and generation.  He says : —

"And I know of no case where the sovereign power has been estopped; the cases are all the other way, and policy and justice require they should be so.  This sovereign, or sovereign power is a trustee for the people; it acts by agents; the people should not be bound by any statement of facts made by those agents.  For their benefit the truth may always be shown, notwithstanding any former statement to the contrary."  4 Hawks, 132.

At this point, in the words of Judge Sharkey, " Let the mind

The State of Mississippi *v.* Johnson.

for a moment pause and survey the past." Let us sum the result we have reached. We see that our constitution ordains that no law shall be passed to pledge the faith of the State, unless it is proposed by one legislature, published before the people, and reënacted by a second. We find that in 1837, a law was proposed to pledge the faith of the State for fifteen millions of dollars as a loan to the Union Bank, and that this law was published, submitted, and reënacted. In this law we find the faith of the State proposed to be pledged only for a certain purpose, only on certain conditions, and only on certain security. We find that this law remains to this day a dead letter upon the statute book. We find in 1838, that another law was passed, pledging the faith of the State, which was never enacted as required by the constitution. We find the faith of the State pledged under it, by its bonds to the Union Bank for a debt of five millions of dollars' worth of its capital stock, and for no other purpose, and we find that this was done without condition, and without security. The bonds are issued, and they now are presented for the judgment of the court. They have no legal paternity, and they are outlawed by the constitution. Such is the result we have reached, and when reached, clear, cogent, high is the duty of this court to pronounce these bonds illegal, unconstitutional, and not binding upon the State of Mississippi.

But here I am met with another position, the last refuge of the bondholder. It is somewhat difficult to state it, but I will do so as briefly as possible. It is asserted, that the 9th section, 7th article of the constitution only requires so much of a law to be enacted, according to its provisions, as simply provides for a pledge of the faith of the State; that it is not necessary to publish, submit, or reënact the purpose, terms, conditions, or security upon which the pledge is to be made. That when the naked power to pledge the faith of the State has been constitutionally obtained, the legislature have the right to dispose of it as to them may seem proper; though the law proposing to pledge the faith of the State may direct the purpose to which it shall be applied, shall point out the manner in which it shall be made, and shall specify the conditions and security on which

alone it shall be done; yet that the legislature, or any succeeding, have the rightful power to change the purpose of the pledge, to alter the manner of its making, and to abolish, destroy, or relinquish the securities upon which it rests, and still the people of the State are legally bound for the same. And therefore, though the original act has become a dead letter, though its purpose has been blotted out, though its conditions are all broken, and securities gone, yet the 5th section stands vigorous amid the ruin, and the legislature can use it to create or extinguish a debt to the Union Bank, to any other bank, or for any other purpose, and still the State is liable.

When thus candidly and clearly stated, such a position would seem to fall from its own inherent weakness. The legal mind rejects it on its face, and the longer we view it, the more objectionable it becomes. Yet, with such imposing earnestness is it pressed upon us, that respect for our opponents will demand an examination which is not due to the real force of the argument.

. I meet the position by a flat denial. I fearlessly assert, that it is at war with morals, and all honesty and good faith in the affairs of government, and I insist that the exercise of such a power as is here claimed for the legislature, and which has been exerted by it in this case, is a violation of the constitution of the United States, and is a fraud upon the letter and spirit of the constitution of the State of Mississippi.

The federal constitution has provided that no State shall pass any law impairing the obligation of contracts.

An objection to a law, that it impairs the obligation of a contract, can never depend upon the extent of the change which the law effects in it. A law which impairs a contract may be accurately defined to be one which effects " any deviation from its terms, by postponing or accelerating the period of performance which it prescribes, imposing conditions not expressed in the contract, or dispensing with the performance of those which are expressed, however minute or apparently immaterial in their effect upon the contract, or upon any part or parcel of it."

The State of Mississippi, through the medium of a constitu-

The State of Mississippi *v.* Johnson.

tional law, agreed, assented, and promised to become bound to the Union Bank for fifteen millions of dollars, upon condition the bank would furnish her security to that amount in mortgages upon valuable property. The legislature has, by law, dispensed with the performance of this condition, and has undertaken to bind the State by contract to the Union Bank without such security or condition.

The supreme court has decided, that the clause of the federal constitution referred to embraced all contracts executed or executory, and whether between individuals or between a State and individuals, and that a State, or the legislature of a State, had no more power to impair an obligation in which she herself had entered, than she had to impair the contracts of individuals. The contracting parties, whoever they may be, stand in this respect upon the same ground. The obligations imposed, and the rights acquired by virtue of the contract, cannot be impaired by a legislative act. A law which discharges these obligations or abrogates these rights, impairs them, and is void.

But it is said, that there was no contract entered into by the State. The learned commentator on Statutory and Constitutional Construction, answers this objection in two compact sentences. He says : " A constitutional act of legislation, which is equivalent to a contract and is perfected, requiring nothing further to be done in order to its entire completion and perfection, is a contract executed ; and whatever rights are thereby created, a subsequent legislature cannot impair."

".The obligation created by a constitutional law, which is in the nature of an executory contract, and is supported by a sufficient consideration, cannot be annulled at the pleasure of the legislature."

Yet it is insisted, that this objection cannot be made by a State when she is a party to the contract. Now, her right to make contracts and become a party in them is well settled. Moreover, we are often assured with great gravity, that when the State divests herself of the robes of sovereignty, and enters into a contract, she is subject to the same rules of law as the individual, and Judge Marshall is cited to prove it. If this,

then, be true, is not the State entitled to protection from the same rules of law as an individual? And why not? You impose upon her all the obligations of the contract arising out of general law, must .you not secure her all the benefit of the contract as secured by the same law?

To test this matter more closely, let us examine the rights of the individual under this contract. Suppose the bank, after the passage of the original act, had secured and perfected her stock as required by the charter, the contract between itself and the State, which before was executory, became then executed and complete. It had complied with its conditions. Would not the right of the Union Bank, then, be perfect to demand the bonds of the State? So says the charter. And what is a charter — a contract in the eye of the law, beyond the power of legislation? Imagine, then, that the legislature had passed a law forbidding the issuance of these bonds, would not this law be held void as impairing the obligation of the statutory and chartered contract? It clearly would. Such, then, were the rights of one of the parties to this contract. But the legislature has wronged the State, the other party. She has contracted to loan her credit upon certain security and for a certain consideration. The legislature destroys both one and the other. Has she then no remedy? Has she power to assume the burdens of a contract and no right to the benefits of a contract? This is the position assumed, but it is not sound reasoning. It arises from a vagueness of idea, which confounds the legislature and the State. The legislature can make contracts for the State, but cannot break them; when made, that intangible, yet existent person, the State, becomes a party to it on the one hand, and individuals on the other. It then passes from the hands of the legislature and beyond its power. Rights spring up out of it, belonging to the State as well as the individual; each is equally liable under its provisions, and each equally protected against the legislature in its enjoyment by the shield of the constitution.

But it is argued, the legislature has power to change a contract with the assent of the parties, and when an individual consents, such a change is valid. This is true. It is then said

The State of Mississippi *v.* Johnson.

the legislature is the agent of the people or State, and that when it acts, the assent of the latter is presumed. Such is the general rule, but it does not apply here. The State can be bound for a contract of debt only in the mode pointed out in the constitution; before her assent can be assumed to a change in such a contract, which thereby becomes a new contract, the new contract must also pass the constitutional ordeal. Otherwise her dissent is presumed; indeed, the supreme law forbids her assent. Otherwise the legislature can do that indirectly, which it is forbid by the constitution to do directly.

The point urged by me has arisen in many adjudged cases of high authority. The case of *Green* v. *Biddle*, 8 Wheat., will be found strongly persuasive in its reasoning as well as useful in this case in more than one sense. It was this : —

Upon the separation of Kentucky from Virginia, the latter passed a law declaring that all private rights and interests in land within Kentucky, derived from the laws of Virginia, previous to the separation, should remain secure and valid under the laws of Kentucky, and be determined by the laws now (then) existing in Virginia. Kentucky ratified this law by adopting and incorporating it into her constitution.

Afterwards, from 1789 to 1823, the legislature of Kentucky continued to pass laws imposing liabilities and denying privileges to the holders of these rights and interests in land, other than those growing out of the laws of Virginia. It was finally resisted by Ben Hardin, who contended that the acts in question were void, and brought the case into the supreme court of the United States.

There it was held, after great argument, that Kentucky had entered into a compact with Virginia in her constitution. That compact and contract were synonymous, and " that the proposition offered by Virginia being accepted and ratified by Kentucky, is a contract." The court closed with this remark: " Kentucky, therefore, being a party to the contract, which guaranteed to claimants of land lying in that State, under titles derived from Virginia, their rights, as they existed under the laws of Virginia, was incompetent to violate the contract

by passing any law which rendered those rights less valid and secure."

And though Mr. Clay, then in the maturity of all his powers, urged "that it would deprive Kentucky of her sovereign right of legislation, upset rules long acquiesced in, and confirmed by habit and usage among the people, and destroy the rights of thousands," the court pronounced the long series of the laws of Kentucky void, as impairing the obligation of a contract between herself and a part of her own citizens.

Chief Justice Marshall has declared, that the nature of society and of government demands some limits to legislative power. And in 8 S. & M. 57, Chief Justice Sharkey uses this remarkable language : —

" The people of this country understand very well, that there is no power in the legislature to take from them that which they own. They know they have delegated to the legislature all the power it possesses, and no such authority has been granted. We have seen that important rights were vested in the creditors of the bank, both before and after the act of 1843. We have also seen, that those rights have been materially changed by the legislature; that they have been actually deprived of all remedy; and we have lastly seen, that the legislature possesses no such power."

In addition, I ask the careful attention of the court to the following cases: 13 Conn. 93; 6 Cranch, 87; 4 Wheat. 122, 518.

We have seen the protection of the principle insisted on extended to every corporation in the land, and to the most remote rights of an individual. A State has the power to contract. When contracting you declare her to occupy the position of an individual. What is there, then, I ask, and triumphantly ask, in her position or character, in the principles of law or in all right reason and justice, that denies to her as a mass, or a corporation, or a State, that broad protection from the fraud, the corruption, and the oppression of the legislature, which shields every individual within her limits ?

I have said the exercise of the power claimed for the legisla-

ture, was a violation of the meaning and spirit of the constitution of Mississippi.

I am first told by its advocates, that the legislature has assumed to possess this power, inasmuch as they required the 5th section only of the original act to be published, and that this amounts to a legislative construction. I answer, that this is of no value, unless the construction be a sound one, and in the next place, that the legislature of 1838 reënacted the whole law from the 1st to the 47th section, as well as the 5th; so that if legislative construction amounts to any thing here, it means that the constitution required the whole law to be submitted, published, and reënacted, and therefore the legislature could not alter or repeal it.

If we are to be governed by the plain words of the clause of the constitution in dispute, no doubts or difficulties arise. It requires in the most distinct manner, that "no law shall ever be passed to raise a loan of money upon the credit of the State, unless such law be proposed and passed and referred to the next succeeding legislature, and published three months previous to the next general election, and a majority of the legislature so elected after such publication shall agree to and pass such law."

It is difficult to understand how any one can say that a publication, reference, and reënactment of a single section of a law proposing to pledge the faith of the State, is a compliance with the constitution, when it says "the law" shall be referred and repassed. A single section of a law is no law in any sense. It is not a law in the sense of the same instrument which has required that a bill shall pass both houses and be signed by the governor, before it can become a "law." The word has a plain and ordinary legal meaning. Judge Sharkey says: "Words are the signs of our ideas, and when we wish to know legislative intention, we look at the language employed. The same rule applies when we come to construe constitutions. As men, whose intentions require no concealment, generally employ the words which most directly and aptly express the idea they intend to convey, the enlightened patriots who

framed our constitution, and the people who adopted it, must be understood to have employed words in their natural sense, and to have intended what they have said." The natural sense, the common acceptation and the legal meaning of the word law, conflict with the position taken. The people have said "the law" should be repassed, proposing to pledge their faith, and they meant the whole law, for a law is indivisible. If they had intended otherwise, they would have said, that "the section of the law proposing to pledge the faith of the State," or "so much of the law as proposes to pledge the faith of the State," shall be reënacted, &c. This they have not done. They have called for "the law," not a section, not part, but the whole law, and "they must have intended what they have said."

But it is said, that by the case of *Campbell* v. *Union Bank*, Judge Sharkey has decided that it was only necessary in this case to publish the 5th section of the original act. In the first place, the State was no party to that case. In the next, the remark of Judge Sharkey to that effect, was an "*obiter dictum*," and not necessary to a decision of the case before him; and lastly, it was a mere expression of opinion incidentally made, and not binding as the judgment of the court.

The language of the court in the case is as follows:—

"The object of the framers of this clause of the constitution, was doubtless to give the people an opportunity of judging of the policy and propriety of making a pledge of the faith of the State, and it would seem to be reasonable that enough of the law should be published, to inform them as to the object. If this could be done by publishing one section alone, then the reason for requiring publication would be fully answered, as much so as it would be by publishing the whole law. The 5th section alone contains ample information on the object in view in making the pledge."

The last sentence contains a statement of facts which we are as fully qualified to judge of as the court which volunteered it. The court was manifestly wrong; the 5th section alone does not contain ample information on the object in

view in making the pledge. The reasoning which precedes it, I will not question; indeed I shall adopt it; and this brings me to an examination of the true meaning of the constitution.

It was adopted in order " that the great and essential principles of liberty and free government might be recognized and established." Among others, the clause in question had its own appropriate mission. It was to secure the people against a reckless creation of debt by the legislature. According to the prevailing idea of that day, unless restrained, the legislature possessed this power without a limit. The history of the past, and the experience of other communities, testified that it was dangerous to the liberty of the people. Examples were not wanting to stimulate the wise caution of the convention. The condition of England, sinking under a debt too vast for computation, spoke its warning; a warning which, more than a century since, in the words of one of her most gifted statesmen, (Lord Bolingbroke,) foretold revolution and repudiation. Our sister States were just entering upon that reckless career which, with many, was closed in ruin and disaster. With these facts before them, with these considerations pressing upon them, the convention framed this clause of the constitution.

In order sensibly to construe the remedy of a law, we look steadily to the mischief it was designed to defeat. The mischief has been clearly set forth. Now what was the remedy?

The power to create a debt was directly prohibited to the legislature. Its general power over the subject was entirely taken away. No legislature in Mississippi can create a debt against her. It may propose a debt to the people; the people may assent to it or reject it; but a legislature is powerless to create it. Such is our law, little as its force seems to be apprehended by some. Yet, in a certain mode, and in that only, the people can incur a debt to bind them. This can only be done by a " law" proposed in one legislature, referred to the next, published three months " previous to the next general election," and provided the next legislature, " elected after such publication," shall agree to and pass " such law." We here find that one legislature only proposes, or offers for consideration, a law. To whom? the people! else why publish the

.58 *

The State of Mississippi *v.* Johnson.

law? If for the benefit of the legislature to be elected, the mere reference upon the face of the journal would be adequate; but is it to be published three months previous to the next session of the legislature? No; previous "to the regular election," when the fiat of the people upon the "law," which has been proposed to them, is spoken. And yet further, it is directed that the law shall be agreed to and passed by the legislature "so elected after such publication;" thus again connecting the fate of the law as nearly as practicable, with the voice of the people through an election. I say practicable, in view of the nature of an election. Now I ask, could the constitution more clearly and explicitly have required the assent of the people to a law, than is here done without demanding an express vote of yes or no from each voter at the ballot box? Yet we are still told, that this does not prove any thing except that the assent of the people is needed to the naked fact of a loan. If so, how utterly useless is this cumbrous provision. Let us trace out the result of this position. No law can be passed to raise a loan or pledge the faith of the State except for some specific purpose; a mere abstract loan is unknown to the constitution. Suppose, then, a law had been proposed to loan ten millions to the Union Bank. Could a subsequent legislature apply this loan to the Brandon Bank, to canals, to railroads, or any other purpose? All will say no. Why? Because the people assented to no such purpose. Say then it was a loan to the Union Bank upon ample security; can the legislature apply it to the Union Bank without security? Surely not; because the people have assented to no such loan. Reason irresistibly demands the same conclusion in either case.

Judge Sharkey declares, that it was the object of the framers of the constitution to give the people an opportunity of "judging" of the propriety and policy of the law, and, with wonderful liberality, deems it "reasonable" to publish enough, yes, enough of the law to inform them as to its object. Even he, then, confesses that the object of the constitution was to inform the people of the object of the law, that they might "judge" of its propriety and policy. To judge a matter, is to

consider, to try, and determine it finally.   Then the legislature cannot change the object of a law which the people have tried and finally determined.   If so, the confessed object and intent of the framers of the constitution is defeated.   Then, I ask, if " the policy and propriety" of the law is with the judgment of the people by the constitution, and the pledge to be made by it is " proposed" upon terms, conditions, and restrictions, was it not the manifest intent of the framers of the constitution, that these also should be with the judgment of the people?   Are not these, also, essential, to enable the people to "judge" of the " propriety and policy" of the law?   A law for a loan cannot be repealed, because the sovereign people have assented to it; the object of the loan is irrevocable by virtue of the same fiat, and yet we are told, that a loan coupled with terms and conditions, as vital to it as lifeblood to the human system, is at the mercy of the legislature.

The security of the stock mortgages was the " fundamental condition" of the loan.   It was the keystone of the " law." Other securities, heretofore named, were provided, each essential to the loan, because each was essential to enable the bank to go into operation, until which event no loan could be made to it.   The loan was not to " enable" the bank to go into operation, but " to facilitate its operations " when it had entered upon its career, according to the terms of the charter.   The stock mortgages were the condition of the loan, and " condition precedent" to the loan; without it, the people forbade the loan; with it, they had "judged it," tried it, found it " good," very good, and assented to its " propriety and policy."   They had pronounced the judgment required of them by the constitution.

Is it, then, the intention of the constitution that this "judgment" may be reversed and repealed? that the "reasons" of the decree shall be obliterated, and yet the decree shall stand? that the basis of the judgment shall be swept away, and yet the judgment remain? that the people shall be said to indorse the " propriety and policy" of a loan, when the prime, sole inducement of the act, its paramount condition, is extinguished?

Did I not say truly, that this doctrine is at war with morals and good faith in the affairs of government?   There is an

instinctive principle of right and wrong, which belongs to all the affairs of man and government; is as amenable to its indestructible rule as an individual. That the essence of the power here claimed would be a direct insult to this principle, a great moral fraud upon the people, even the boldest cannot deny. They may hazard the assertion of a legal right — few even dare so much — while reason, good faith, justice, and the constitution, plead trumpet-tongued against such a doctrine.

That this clause of the constitution was intended to "protect" our people, no one can doubt. Yet, by the rule asserted, its operation will be directly the reverse. A loan is proposed to them for a vast amount. To win their favor, its advantages are painted with a glowing pencil. For its "purpose," an object is borrowed from their dearest and most sacred interests; say, the great cause of education; to it may be added the building of roads, the opening of rivers, all that will conduce to the wealth and glory of the State. To quiet their fears, the law proposes to them ample indemnity against all loss or damage. They proceed to consider of the "object" of the loan, and their minds are won by the bright panorama spread before them by the hand of the legislature. They proceed to a judgment upon its propriety and policy, and their fears are rebuked by the wise precaution and jealous security of the law. They pronounce their judgment. They assent to it. What, now, were the components of this judgment? Do they assent only to a naked loan? Would they have ever assented to this loan, but for its object? And did the object alone win their consent? Would they not still have repudiated both the loan and its object, but for the terms and conditions on which it was to be made? The loan, and its object and its conditions, were one and inseparable with them. Each was naught without the other. Yet, can the legislature change its object and destroy its conditions? If so, are not the people at the mercy of the legislature? a plastic instrument in their hands, upon which to play the game of fraud, deception, and plunder? And still men say the constitution "protects" the people!

In some instances, a principle cannot be fairly viewed upon its face. You must trace out its results, and test its conse-

quences, before you can determine its correctness. Especially must this be done, when it is partly political in its nature. In ordinary law, its exact letter must govern; but when a constitution speaks a government into being, its broad policy is its letter, and its comprehensive spirit is its law. Every thing which defeats the one or opposes the other, is annihilated by its all-pervading power. Our government was fixed for permanence, and its principles were designed for perpetuity. Yet its agents are fleeting and changeful. The government stands until the great power which framed it has removed it, while the "physical identity" of its instruments is changed with every passing hour.

———— " Ut unda impellitur undâ,
Tempora sic fugiant pariter, pariterque sequuntur."

And yet these fleeting shadows of an hour are held to be clothed with a power to bind the people with a burden which will endure when they are gone; which may be lessened, but never liquidated. We may build up constitutions, we may prohibit debt, we may restrict the legislature, "bind it down from mischief," in the earnest words of Madison, "by the chains of the constitution," we may approve our loans, indorse their object, sanction their terms, and assent to their conditions, and yet we are told that, by a monstrous jugglery, without precedent or parallel in the history of government, the legislature is still free; free to break our conditions, free to defeat our objects, free to trample down the spirit and intent of the constitution.

And, lastly, I appeal to that masterly judgment of the high court, which Mr. Webster deemed had placed its author upon the roll of eminent men, which declares, "that the constitution was made by the people, made for the people, and is responsible to the people;" that "it only contains certain great principles which are to control in all legislation, and extend through the whole body politic;" that "these principles are themselves laws;" that "they bind by a moral power;" that "its every principle is to be regarded as fundamental and self-executing;" that "evasion of a constitution is a violation of it;" that "to

evade by omission is as culpable as to evade by commission, and courts of justice cannot uphold an evasion, and when such evasion is attempted, the constitution possesses a self-protecting principle, which comes in to defeat improper action, and to supply a want of action when it has commanded it;" that " the spirit of a law, as well as its letter, must be respected in its construction;" and that " the spirit of a constitution is entitled to a higher degree of respect, being the paramount law, couched in general terms, and this respect it must receive from the courts, whenever they are called on to enforce contracts which so palpably conflict with the constitution."

But if, in all this, I am wrong, the constitution of our State is a legal farce and a solemn mockery. The means designed for the protection of the people, by the wisdom of its framers, have proved but a snare and a delusion.

We have foolishly supposed, that we had embodied in our organic law a new principle in the science of government. We had imagined that, at last, we had brought to a successful close the long battle of the rights of the mass and the encroachment of the ruler; that that power, whose exercise had been the fruitful source of untold evil among the nations, the debt-creating power, was put to rest with us forever; that at length law regulated power, and the purse of the State was controlled by the judgment of the tax-payer, the hitherto "plundered ploughman and beggared yeomanry of the land."

Mississippi has claimed to be the pioneer of a great constitutional reform, and her claim has been acknowledged. The elder States have come to seek wisdom at the feet of their younger sister. Its origin was assigned to a renowned statesman, and the laurels of the battle-field were thought to pale before the genial lustre of his civic fame. Mississippi became known of men. Her constitution drew the gaze of the world, while the people thereof sang its virtue as far as the fame of our free institutions had extended. The grave and sagacious statesman looked on with an eye of sanction, while the Utopian theorist exclaimed, that it was some angel sent

> " To free this fettered world from every bond and stain,
> And bring its primal glories back again."

But we have been deceived, grossly deceived. We have deceived ourselves, and deceived the world.

> "We have scotched the snake—not killed it;
> She'll close and be herself again,"

and with a strength and power unknown even to its earlier days. The silver veil is lifted. There shines forth the promised light of redemption; the dark lineament of imposture, "in grinning mockery," meets our gaze, while this court, creatures of the constitution, high priests at the altar, hurl the brand into the temple of their rights, and announce to a deluded people,

> "Ye would be dupes and victims—and ye are!"

NOTE. The principles contained in the 9th section of the 7th article of the constitution of Mississippi of 1833, when for the first time it was incorporated in the frame of any government, was probably derived from the suggestion of the celebrated Paine, made in 1805, near half a century since, in an address to the citizens of Pennsylvania, on a proposal to call a convention to reform their constitution. His views strikingly illustrate the meaning, intent, and extent of the reform which has been effected by Mississippi. He says:—

"A constitution is the act of the people in their original character of sovereignty. A government is the creature of the constitution; it is produced and brought into existence by it. It therefore follows as a natural, and, therefore, a logical result, that the government exercise of any power not authorized by the constitution, is an assumed power, and, therefore, illegal.

"Experience shows," (even at that early day,) "that matters will occasionally arise, especially in a new country, that will require the exercise of a power differently constituted from that of 'ordinary legislation;' and, therefore, there ought to be an article in a constitution defining how that power shall be constituted and exercised. Perhaps the simplest method, which I am going to mention, is the best, because it is still keeping strictly within the limits of annual elections, makes no new

appointments necessary, and creates no additional expense. For example : ' That all matters of a different quality to matters of ordinary legislation, such, for instance, as sales or grants of public lands, acts of incorporation, public contracts with individuals or corporations, beyond a certain amount, shall be proposed in one legislature and published in the form of a bill with the yeas and nays, after the second reading, and in that state shall lie over to be taken up by the succeeding legislature ; that is, there shall always, on all such matters, one annual election take place between the time of bringing in the bill and the time of enacting it into a permanent law.'

" It is the rapidity with which a self-interested speculation on the public property can be carried through, within the short space of one session, and before the people can be apprised of of it, that renders it necessary that a precaution of this kind, unless a better can be devised, should be made an article of the constitution.

" This method has the appearance of doubling the value and importance of annual elections. It is only by means of elections, that the mind of the public can be collected to a point on any important subject; and as it is always the interest of a much greater number of people in a country to have a thing right than to have it wrong, the public sentiment is worth attending to. It may sometimes err, but never intentionally and never long. The experiment of the Merchants' Bank shows it is possible to bribe a small body of men, but it is always impossible to bribe a whole nation ; and, therefore, in all legislative matters that, by requiring permanency, differ from acts of ordinary legislation, which are alterable or repealable at all times, it is safest that they pass through two legislatures, and that a general election intervene between. The election will always bring up the mind of the country on any important proposed bill, and thus the whole State will be its own council of revision."

*W. F. Stearns,* on the same side, filed an elaborate printed argument in the case.

*Adams & Dixon,* for appellee.

The question presented by this record for the first time, to this, the court of last resort in the State of Mississippi, is one of deep and momentous interest to the holders of the bonds issued by the State for and on account of the Mississippi Union Bank. Those bonds now amount, with interest, to some eight or nine millions of dollars, and although but one of them is sued on in this action, yet they all stand upon the same footing, and the principles of law applicable to one, are applicable to all.

In presenting themselves before the legal tribunals of the State of Mississippi, the holders have given the strongest evidence of their confidence in the ability and integrity of our judiciary. Unfortunately for them, and, as we conceive, for the State of Mississippi, this question in times past, has been made the theme of vehement declamation, and partisan warfare; the people of the State have been improperly applied to, to say whether the bonds were a legal demand, and whether they would or would not pay them, thus doing that which it is, said the parliament of England, in all the plenitude of its power, cannot do, making a party the judge in his own cause. But the partisan excitement has happily passed away in a great measure; the question is now presented before the legal tribunals of the State, where alone it properly belongs, and where the holders have been invited and requested to present it. They ask for their cause, — that which they feel assured it will receive, — a calm, dispassionate, and impartial consideration.

Every point of defence has been made, and it is alike the wish of the counsel for the State, and the creditors, that every question shall be met and decided by the court; and with the counsel for the State we say, "that whatever may be that decision, we will abide by it," and we hope and trust that all good citizens will do the same.

To proceed, then, to the grounds upon which it is insisted the decree of the chancellor should be reversed.

The first and principal position assumed is, that the act which we have given in our foregoing abstract, entitled "An

Act supplementary to an act to incorporate the subscribers to the Mississippi Union Bank," is unconstitutional and void; and as it is assumed in argument, that the bonds were issued under this supplementary act alone, it is therefore contended, that they constitute no valid obligation against the State. We do not admit that it is shown by the record, that the bonds were issued under this act alone, and we shall contend that such is not a necessary inference from the facts. But waiving the argument of this position for the present, we propose to show that the supplementary act is not unconstitutional.

To do this, let us refer to the arguments used by counsel for the State, to establish its unconstitutionality; the principal one of these is, that the first section of the supplemental act undertakes to pledge the faith of the State, for a new loan or debt, whilst the legislature failed to pass, refer, publish, and repass this supplemental act, as required by the 9th section of the article 7 of the constitution of the State of Mississippi, which is in these words: " Section 9. No law shall ever be passed to raise a loan of money upon the credit of the State, or to pledge the faith of the State for any loan or debt, unless such law be proposed in the senate or house of representatives, and be agreed to by a majority of the members of each house, and entered on the journals, with the yeas and nays taken thereon, and be referred to the next succeeding legislature, and published for three months, previous to the next regular election, in three newspapers of this State; and unless a majority of each branch of the legislature, so elected, after such publication, shall agree to and pass such law; and in such case, the yeas and nays shall be taken and entered on the journals of each house: Provided, that nothing in this section shall be so construed as to prevent the legislature from negotiating a further loan of one and a half million of dollars, and vesting the same in stock, reserved to the State by the charter of the Planters' Bank of the State of Mississippi."

Now, as will be seen by the record, the original act chartering the Mississippi Union Bank was passed, referred, published, and re-passed with the yeas and nays entered upon the journals, as required by this section of the constitution of the State

of Mississippi. It was the fifth section of that original act, thus constitutionally passed, which we contend pledged the faith of the State of Mississippi; that fifth section contains these words: " That in order to facilitate the said Union Bank for the said loan of fifteen millions five hundred thousand dollars, the faith of this State be, and is hereby pledged, both for the security of the capital and interest."

This section then goes on to provide, as will be seen by reference thereto, the number and amount of the bonds, when payable, the rate of interest, how to be signed and countersigned, and gives the exact form of the bonds, which has been literally followed in the obligation sued on. It was, as we contend, this section, and this section alone, which gave the pledge, and the only pledge, of the faith of the State of Mississippi to the Mississippi Union Bank. The first section of the supplemental act creates no new obligation against the State whatever; it provides, " that as soon as the books of subscription for stock in the said Mississippi Union Bank are opened, the governor of this State is hereby authorized and required to subscribe for, in the behalf of this State, fifty thousand shares of stock of the original capital of the said bank, the same to be paid for out of the proceeds of the State bonds to be executed to the said bank, as already provided for in the said charter; " clearly showing that the legislature did not contemplate a pledge for any new or additional sum, than the sum already provided for, but merely directed an application of a part and parcel of the sum, for which the faith of the State was already pledged in a particular way; nor is the application of this sum made to a new or different object. The original pledge was to facilitate the Mississippi Union Bank, and the direction given to this portion of that original sum, is to facilitate the same Union Bank; — the only difference between the original act and the supplement, as to this five millions, being simply this: that by the original act, this five, with the other ten and a half millions, was a mere loan or accommodation on the part of the State to the bank, whereas, by this first section of the supplemental act, the State is converted into a stockholder, and entitled to all the rights, privileges, and immunities of a stock-

holder in the institution, thereby reaping a profit and a benefit where she was before but an accommodation surety to the bank.

If this were a new pledge of the State's faith, it would necessarily follow, that the whole sum for which the faith of the State was pledged, by the original and supplemental acts, would be twenty million five hundred thousand dollars; but this will hardly be seriously contended for, as the very language of the first section above quoted shows, that the five millions to be subscribed for in stock was to come out of, and to be deducted from the fifteen million five hundred thousand dollars, for which the faith of the State was pledged by the original act.

There was then no new pledge of the faith of the State for any additional sum whatever, and hence it was not necessary to pass, refer, publish, and repass the supplemental act; it was but an ordinary act of legislation, which under the constitution and laws of the State, was required to be passed only by the ordinary forms of legislation.

But it is said, that although this supplemental act may not have created any new pledge, or pledge for any additional sum, yet that it is unconstitutional because it was not in the power of the legislature to alter, modify, or change, by any subsequent act of legislation, any of the provisions of the original act which pledged the faith of the State. We insist that this proposition is equally untenable. To support it, however, it is contended, that the original act, pledging the faith of the State, was in the nature of a contract, between the legislature and the people of the State, which could not be altered by subsequent legislation; and it is insisted, that this supplemental act does materially alter the provision of the original act, in this, that to the extent of five millions of dollars, it dispenses with the mortgages required to be given by the 8th and 30th sections of the original charter, indemnifying the State against the ultimate payment of the bonds. We do not admit that the supplemental act does dispense with, or repeal the provisions of the original act requiring mortgages to be executed. No language can be found in the supplemental act constituting an

The State of Mississippi v. Johnson.

express repeal, and being an act in relation to the same subject-matter, and in aid of the original act, it will not be inferred unless it were clearly intended and expressed. But to return to the argument.

No authorities are cited to support the position, that the original act was a contract between the legislature and the people, nor do we believe that any authorities can be found to support so novel a position; the very definition of the word " contract," which is " a covenant or agreement between two or more persons, with a lawful consideration or cause," would, it seems to us, of itself, answer and refute this argument.

If it was a contract, we would ask, who were the contracting parties ? It is a plain and familiar old rule, that there must be two parties to every contract. Now the legislature is composed of representatives of the people, chosen by the people, of and from themselves; they are a portion of the people, and under our democratic form of government, are defined to be but the agents and representatives of the people; they derive all their power from the people, and acting within the pale of the constitution, are but a mode and manner of passing in a more convenient mode, than by an assemblage of the whole people, such laws as the people desire.

Would it not be, then, for the people to contract with themselves, if the doctrine contended for is correct? It certainly seems to us that it would, and that by no ingenuity of counsel can a law of this kind, as between the legislature and the people, be converted into a contract. Counsel taking for granted the assertion that it was and is a contract, cites the cases of *Green et al.* v. *Biddle*, 8 Wheat, 1, and the *Commercial Bank of Natchez* v. *Chambers*, 8 S. & M. 57, and other cases upon the subject of vested rights, and the inviolability of contracts. Now, these cases, when examined, will be found to establish a doctrine which we do not for one moment dispute, and that is, that when rights have become vested in the citizen, no legislative enactment can annul or violate such rights.

In the whole argument of the counsel on this and every other branch of this question, he takes for granted another important position, which has no foundation in law or fact,

59 *

and that is, that the section of the constitution which we have quoted above requires an act pledging the faith of the State to be referred and submitted to the people; the constitutional provision does not require or provide for any such thing; on the contrary, it requires a reference to the next succeeding legislature; its language is, "unless such law be agreed to by a majority of each house, &c., and be referred to the next succeeding legislature." It is true, that publication in three newspapers is required to be made before the next regular election, and it may be fairly inferred, that it was intended by the framers of the constitution, that the people should have notice of the proposed pledge of the State's faith, but it is not referred to them; they cannot vote for or against it at the polls, and hence they have not even a semblance of an opportunity to become parties to, and enter into, this imaginary compact. They may vote for or against the candidates for the legislature, on account of their declared preferences for the proposed measure, but even here, if designed as a plan to refer the proposed measure to the people, it is defective, because the whole number of legislators are not elected at any one general election. By reference to the composition of the senate, it will be seen that its members hold their office for four years, and hence, only one half its whole number are elected at any general election; the general elections being held every two years.

To suppose, then, that the framers of the constitution intended that the people, in their primary capacity, should become parties to a contract, when they had no opportunity of speaking directly on the measure at the polls, or of doing so, even indirectly, by an election of members to the legislature, when they had not an opportunity of electing all the members composing such legislature, would be to admit the framers of that instrument were grossly ignorant of a mode of accomplishing their design. But to test this matter more fully, let us suppose that the people at, and before a general election, pending the passage of a bill pledging the faith of the State, should, by public meetings, resolves, and memorials, and in the election of members to the legislature, declare themselves to be averse to

the passage of such a law, express their dissent to the proposed contract, and yet, that in violation of all this, the legislature at its next session should solemnly reënact, and pass the law in the mode prescribed, and that thus passed it should be signed and approved by the governor, would such a law be unconstitutional, and would this invalidate bonds issued under it? Clearly not. The legislature would, we admit, be censurable, and upon it the blame should be visited, and all the eloquent declamation should be poured out upon their heads, and not upon the heads of the unfortunate creditors, who, seeing a formal and valid law upon the statute book, intrusted the State upon the pledge of its faith. We conclude then, that this proposition of a contract between the legislature and the people, in the passage of the original act, and the unconstitutionality of the supplement, on the grounds of a violation of this contract, is wholly untenable.

But it is insisted, that under the provisions of the constitution which we have quoted, it is necessary to insert in the law pledging the faith of the State, all the conditions and restrictions in relation to that pledge, and that these conditions and restrictions cannot be altered or changed by subsequent legislation, because they are parts and parcels of the pledge; and hence, that the 8th and 30th sections of the charter of the bank, were parts and parcels of the pledge in this instance, and not subject to repeal or modification. We contend that the charter of the Mississippi Union Bank, in its provisions and details, is a wholly separate and distinct matter from the law, to be found in the 5th section, which pledges the faith of the State. Each section of the charter of the Union Bank, which is an independent proposition in itself, is a law, according to the strict definition of that term; the 5th section need not have been passed with the act incorporating the Mississippi Union Bank; it is a substantive and independent act of legislation, which could have been passed in a separate bill, and the mere fact that it constitutes one section embodied in the act of incorporation, does not inseparably blend it with the act of incorporation, or make it any the less a law, pledging the faith of the State; nor does the fact, that there were other sections

in that act, providing for the details in putting that bank into operation, and securing to the bank and State, by mortgage, the subscriptions for stock and discounts, render those sections parts and parcels of the 5th section, which alone pledges the faith of the State. The 5th section could, and would, if a constitutional enactment, be declared such, and sustained, notwithstanding that any, or even all the other provisions of the act were unconstitutional. The fact of their being embodied in the same bill, and passed at the same time, does not make them dependent upon each other or inseparable, and in the position which we have assumed, we are borne out by the legislative construction of this provision of the constitution, and of the character of the act; for we find that in the 47th section of the original act, where directions are given for the reference to the next succeeding legislature, and the publication of the act, that this language is used: " Be it further enacted, that the 5th section of this act, whereby the faith of this State is pledged for the payment, and redemption of the loan contemplated by this act, be referred to the next legislature of this State in pursuance of the 9th section of the 7th article of the constitution." Now, had the legislature considered the 8th and 30th sections, requiring mortgages to be given, to be part and parcel of the act, pledging the faith of the State, they would also have required those sections to be referred to the next succeeding legislature. The constitution does not require that all laws in relation to a subject-matter, or a corporation, which the State desires to lend its aid to, and facilitate, shall be passed, published, and repassed; for if this were true, the legislature could not pledge the faith of the State to any corporation, already in existence, and which had been created by a previous law. It would necessarily be limited to such objects and institutions as were the subjects of legislation for the first time, when the pledge of the State's faith was given, and yet there is in the section no restriction whatever to this extent; the simple requirement there, is as to the law which pledges the faith of the State, whether to an existing corporation, or object, or one then created for the first time; nor does this provision of the constitution require any other law, or laws

to be passed in this form, than the one there designated; it does not impose upon the legislature the necessity of requiring security of any kind, nor restrict them in the exercise of their discretion in the mode and manner in which the means raised by a pledge of the State's faith shall be used, applied, or secured to the given object. The whole intent of the provision, was to guard against hasty action on the part of the legislature; it was merely directory to the legislature as to the mode and manner of passing such an act, prohibiting, it is true, its passage in any other mode than that prescribed; just as the constitution provides that all revenue bills shall originate in the house of representatives — section 24; and that bills shall be read on three several days in each house, unless four fifths of the house dispense with the rule — section 23; yet no one ever for a moment supposed, that such laws could not be afterwards amended. That the true intent and object of the framers of that instrument, was to prescribe the form in which such bills should first originate and pass, will appear by the history of this provision. It was introduced into the convention which framed the constitution, by Gen. Jno. A. Quitman, and, as originally introduced, was in this form : " No law shall ever be passed to borrow money upon the faith or credit of the State, nor shall the faith of the State ever be pledged for the payment of any debt, or redemption of any loan upon any pretence whatever, without the concurrence of two thirds of each branch of the legislature." The proposition was subsequently modified in convention, and finally passed in its present form. See Journal of Convention, 94, 95, 96. The framers of the constitution never intended to assume to themselves the province of legislators, or to restrict the legislature, which they had created, from the exercise of a wise discretion in legislation.

The position assumed by counsel on behalf of the State amounts to this : that, whenever the legislature has pledged the faith of the State to a particular object, that the law so pledging the faith of the State is not subject to alterations, or modifications of any kind whatever ; it is, in fact, to give to such a law a dignity far greater than the constitution itself; for the constitution has a mode provided by which it can be changed

and amended, but this law would have none. The manifest impolicy of such a construction will plainly be seen, by supposing that the legislature of the State of Mississippi, having formally passed a law, as required by the provisions of the constitution, should discover and have made manifest to them, immediately after the final passage of such an act, that the act itself would be ruinous to the best interests of the State; would it be contended, for one moment, under this state of circumstances, that the legislature could not repeal, in whole or in part, the provisions of such an act, in case rights had not become vested under it? We think, to state such a proposition is to answer it, and that it clearly never was the intention of the framers of the constitution, thus to take away from the representatives of the people all discretion, all power, in matters so nearly affecting the interests of the people.

Let us take another instance, and suppose that the Mississippi Union Bank had gone into complete and successful operation; that it now existed, with the pledge of the State's faith for fifteen and a half millions of dollars still outstanding; would it be contended, that the legislature of the State of Mississippi, if now in session, would not possess the power, the contingency or necessity arising, to pass any act for the further security of the State, or amendatory act changing the security required to be given by stockholders, not inconsistent with the rights of the bank or the stockholders, and which the legislature might deem for the best interests of the State? We certainly think that they would possess such power, and that to deny it to them, on the ground that the provision of the constitution in question forbade any such proper legislative action, would be to charge the framers of that provision with extreme folly in inserting it in that instrument; it would be to say, that the framers of the constitution had not only undertaken to provide for the present, but had also undertaken to anticipate every contingency in the future, and to exclude all but themselves and the legislators passing such a bill, from judging of the necessity or the propriety of so amending such a law, as would be found suited to the varying circumstances of the future.

We contend, that no such unnatural and strained construc-

tion can be placed upon this provision of the constitution; that there is no word or line in it which undertakes to tie up the hands of all future legislatures, because there had been a pledge of the State's faith; that, consequently, it was competent for the legislature to pass the supplemental act here brought in question, and that it is not unconstitutional simply because it modifies or changes, and that, too, in unimportant details, an existing law, which is connected with a law pledging the faith of the State.   And here we would remark, that we consider the question as to the constitutionality of this supplemental act, as having been fully met and decided in the case of *Campbell* v. *The Mississippi Union Bank*, referred to by the chancellor, and decided by this court, and reported in 6 Howard, 625.

Upon examination, it will be found that the second plea of the defendant (Campbell) in the court below, to the right of the bank to recover, was, that the supplemental act was not passed in accordance with the 9th section of the 7th article of the constitution of the State; and that the second ground assigned as error by the counsel for the plaintiff in error, in this court, was, the unconstitutionality of this supplemental act, which was urged upon the attention of the court, and elaborately argued.   Chief Justice Sharkey, in deciding that case, stated, that it was contended that the bank charter was unconstitutional, and, in his opinion, after reciting the 5th section of the original act, says: "It appears that the original charter, in which this provision is contained, was passed in accordance with the provisions of the constitution.   The supplemental act makes no alteration whatever in regard to this section; it changes in some respects the mere details of the original charter in the mode of carrying the corporation into successful operation, and authorizes the governor to subscribe for the stock on the part of the State.   The object of the pledge is not changed; on the contrary, the supplemental act was passed in aid of the original design."   Again, he says, in the same opinion: "The fifth section alone contains ample information on the object in view in making the pledge.   Indeed, it is the only part of the whole act which does declare for what purpose,

and in what manner, the faith of the State should be pledged. By it the object was declared, and the pledge made, and the manner and time in which it was to be fulfilled fully specified."

This decision plainly embraces two propositions which we have contended for; the first of which is, that it was only necessary to publish the 5th section of the original act; and, secondly, that the supplemental act being in aid of the original act, was not required to be passed and published as required by the provisions of the constitution; and hence, is a constitutional act, from having been passed in the ordinary modes of legislation. Nor can it be contended, as insisted by the counsel in behalf of the State, that the decision of these points " was a mere *obiter dictum.*" The question was plainly presented by the plea in the cause which we have referred to, in the error assigned, and argument of counsel; and although it is true, as insisted, that the State of Mississippi was not a party to the suit, yet it is a decision of the question and principle involved, and hence binding, as we conceive, as a construction, upon the State and all others. But whether correct in this or not, we contend, for reasons which we have previously given, that the supplemental act is not unconstitutional; that the provision in the constitution referred to, is a limitation and restriction upon the legislative power, and, therefore, to be construed strictly, and not extended beyond its legitimate scope and meaning.

It is too common a practice on the part of attorneys, sometimes even of courts, to condemn every act of the legislature which turns out to be impolitic or unwise, or does not suit the peculiar views of counsel, as unconstitutional. Such is not the rule as laid down by the ablest constitutional jurists. In the language of Chief Justice Marshall, " the question whether a law is void for its repugnancy to the constitution, is, at all times, a question of much delicacy, which ought seldom, if ever, to be decided in a doubtful case. It is not on slight implication and vague conjecture, that the legislature is to be pronounced to have transcended its powers, and its acts to be considered void. The opposition between the constitution and the law should be such, that the judge feels a strong conviction

of their incompatibility with each other." *Fletcher* v. *Peck*, 6 Cranch, 87.

There are other provisions in the supplemental act, besides the first section, which are referred to and dwelt upon by counsel, to show the unconstitutionality of the act, and chiefly amongst these is the 18th section, which repeals so much of the original act as entitled the State to the one tenth of the whole profits of the bank, and a credit of $200,000; but it will be found upon examination, that the same supplemental act makes provision, in the first section, that the dividends and profits upon the five millions of dollars to be subscribed in stock by the State, shall be paid to the State, and as by the terms of the original charter each stockholder is entitled to a credit in bank for the one half of the amount of stock subscribed, it will be seen that on the score of mere benefit to be derived to the State, the State gained greatly by this supplemental act; and no argument whatever could be predicated on any supposed loss to the State in this respect, by its provisions, even if such matters of benefit or loss were legitimate arguments for or against its constitutionality. But these and other provisions of the supplemental act, as to mere details, would fall under the positions which we have assumed in the foregoing argument. We will, therefore, so far as the constitutionality of the supplemental act is concerned, here submit it to the court, feeling confident that by any and all rules of legal interpretation, it is strictly a constitutional act in all its provisions.

If, then, as we have endeavored to show, the supplemental act is constitutional, the bonds executed under and in accordance with its provisions, it will be admitted, are a valid and legal obligation against the State, unless the non-execution of the mortgages, to which we shall hereafter refer, should be found a valid defence.

But even on the hypothesis, that the supplemental act is unconstitutional, we contend, that this and the other portion of the five million of bonds are not thereby invalidated, but are, nevertheless, a legal obligation against the State. And here we would remark upon one great fallacy in the argument made

on the part of the State, that is, that the supplemental charter, it is contended, is an unconstitutional and void act, and yet that it repeals the 8th and 30th sections of the original charter. But how can this be so? The original charter, and section therein, pledging the faith of the State, is admitted to be a valid and constitutional law. If, then, it is a valid and constitutional law, how can it, or any portion of it, be repealed by an act which, it is insisted, is invalid, unconstitutional, and void? Such a proposition cannot be entertained for a moment. Being void itself, it cannot make that which is valid, void also.

Then, if the supplemental act is unconstitutional, the original·act, chartering the bank and pledging the faith of the State, is left in full force and operation as a subsisting, valid law. Taking this position to be so palpable as to need no further elucidation or argument, in what position does it leave the holders of the bonds that were issued for and on account of the Mississippi Union Bank? Are they not still entitled to recover? We contend that they are. And to sustain this position, let us leave out of view the supplemental act, and recur to the original act. We will find there ample power for the issuance of the bonds. In the first place, there will be found in the 5th section, a formal pledge of the faith of the State, to facilitate the Union Bank, to the extent of $15,500,000; and it is further provided, "that seven thousand five hundred bonds, of $2,000 each," [and after stating the time of payment,] "shall be signed by the governor of the State, to the order of the Mississippi Union Bank, countersigned by the State treasurer, and under seal of the State, said bonds to be in the following words:" [And here the form of the bond is given.]

By the 6th section it is provided, "that the said bonds may be transferable by the indorsement of the president, and of the cashier of said bank, to the order of any person whomsoever, or to bearer; and the said indorsement shall fix the place the said principal and interest shall be paid; and all expenses incurred thereon shall be defrayed from the funds of the bank."

The 30th section provides, "that as soon as directors are appointed, as hereinbefore provided for, they shall proceed to

The State of Mississippi v. Johnson.

the election of a president, and the same shall be notified to the governor of the State, who will thereupon execute to the said bank, from time to time, bonds in amount proportioned to the sums subscribed, and secured to the satisfaction of the directors, as required by the charter, until the whole amount of fifteen millions five hundred thousand dollars shall be furnished in bonds as hereinbefore provided for."

Now it will be seen, from the portion of the 5th section which we have quoted before, that the governor is fully authorized thereby to execute the bonds; and from the 6th, that the bonds may be made transferable by the indorsement of the bank, to any person, or to bearer. By the 30th section, the directors are to elect a president, and notify the governor of this fact, who will thereupon execute bonds in proportion to the sums subscribed and secured to the satisfaction of the directors. All of these are provisions relating to the mode, manner, and time, when the bonds shall be executed, and the governor of the State, and president and directors of the bank, are vested with the power to judge and fix that time. The bonds did issue. What then is the necessary and legal inference? That all acts required to be done by the governor, who was the chief executive of the State, and the directors, who are made for this purpose the agents of the State, had been performed. But it is said, we admit, what is indeed true and susceptible of proof, that the mortgages required by the 8th and 30th sections, had not been executed, and it is insisted that the execution of these mortgages was a condition precedent to the issuance of the bonds. Upon a close examination of the original charter, it will be found that this proposition is not correct to this extent. That mortgages were to be finally executed to secure the bonds, we admit. The 8th section provides for them; but it does not say when they shall be executed, or that they shall precede the execution of the bonds. The 30th section says the bonds shall be executed in proportion to the sums subscribed, and secured to the satisfaction of the directors, as required by the charter. The subscribers were not required, either before or at the time of subscribing, to execute mortgages. The latter portion of the same 8th section provides, " that no one

shall be permitted to subscribe until he shall deliver to the commissioners a valid act of sale, or patents, or certificates of confirmation from the land commissioners of the United States, or partition sales and adjudications by a decree of a court, verified according to law, or such other evidence of title to the property proposed as a guarantee to the bank, as may be deemed satisfactory to said commissioners or directors," &c.

By the 3d section it is provided, " that these title papers shall be sent to and deposited in the mother bank, until they can be examined and the mortgages executed." Now, we contend that, as all that was necessary at the time to become a subscriber was to deposit these title papers, and as the deposit of the papers was undoubtedly intended as a tacit mortgage and security for the subscription, that the directors might well determine upon such deposit of title papers, and on examination and satisfaction as to their sufficiency, that the amounts subscribed had been secured to their satisfaction, as required by the charter. If we place a different interpretation upon the act, what would we define to be a mortgage within its meaning? Would the mere execution of a paper writing with a seal, purporting to convey property, be a mortgage? or should it be an actual conveyance of property, to which the party had title, duly signed, sealed, acknowledged, and recorded? If the latter is meant by the word security, to the exclusion of all other security, why was it not expressed? In the argument of this cause, we were here met by the suggestion of the counsel for the State, that this court had recently decided that there was no such thing in this State as a mortgage created by delivery of title papers. That is true; but it will be found that the court have not decided in that case, and we imagine never will decide that it is not competent for the legislature, to pass a law, as we contend they did, by these provisions of the Union Bank charter, making the delivery and deposit of title papers a security or mortgage to the State or individuals. The decision of the cause was, as to the general statute law; it had no reference to the Union Bank charter.

But admitting, for the sake of argument in its broadest and fullest extent, that mortgages were required to be executed by

the original charter, before the execution of the bonds, and that they were not in fact executed. Here we ask again, does this admission affect the holders of these bonds? There was power granted in the original charter to the officers of the State to execute the bonds. The bonds were executed, delivered to the bank, and by the bank sold to the third persons, and made transferable by delivery, in accordance with the power granted. They are now in the hands of innocent third persons, for value. Persons who were not parties in any way to the mere private arrangement and details, as to security between the State of Mississippi and the Union Bank. Certainly the purchasers of the bonds are not in default in this matter. They were not required to give mortgages, or to see that they were given. They had no hand in the appointment of the president and directors. They could not influence their action, or compel them to a performance of their duties. They could exercise no superintendence over them whatever. They had no means, even if it were true, as argued, that it was their duty to inquire, and see that these details were complied with, as between the bank and the State, by which the fact could be ascertained. The books and vaults of the bank were not open for their inspection. The mortgages were, as we have before shown, not required to be recorded before the bonds were executed, and how, and where, then, we would ask, could they have obtained the information, with which, it is said, they stand chargeable?

These bonds were sold in the city of Philadelphia, more than one thousand miles from Jackson, Mississippi. They were carried there for sale, by three gentlemen of the first standing and respectability in the State, with a full power of attorney, and the bonds bearing upon their face the impress of the great seal of the State of Mississippi. A valid and constitutional law in the original act chartering the bank, and pledging the faith of the State, was exhibited, giving the power to issue them. What more could the purchasers of the bonds ask or require? What more than this was necessary for them to see or know? Let us suppose that the commissioners had gone to London to sell: would it be gravely contended, that those who

desired to purchase, would be compelled to call upon the commissioners to wait until they could take a trip across the Atlantic to the State of Mississippi, and city of Jackson, there to institute inquiries and examinations of the books of the bank to see if the mortgages had been executed? Certainly such was not the contemplation or intention of the legislature. With such, and so many inquiries to make, and at such enormous expense, the State could never have expected to receive the par value for her bonds, about which we have read so much from the newspaper scribblers of the day.

But we contend that, independent of all these reasons, as a mere abstract matter of law, the State cannot escape liability by so frivolous a plea as this.

What was the position of parties? The State grants a banking franchise to a corporation, created and styled "The Mississippi Union Bank." The State, in addition, becomes interested in that bank. It is to receive, by the terms of the original charter, one tenth of the profits, and a standing credit of $200,000. For these resulting benefits, the State loans this institution its paper and credit to the amount of $15,500,000. The State is, then, a party jointly interested in the bank, by its legislation; the State provides for the execution and delivery of the bonds, upon the performance of a certain condition by the bank, and by the same legislative enactment, as we have before seen, the governor of the State and directors of the bank, are to be the judges, whether that condition is performed, and there is no supervisory power over their action. They are, then, for this purpose, the exclusive judges of the fact. They are vested with the discretion and the power to decide. They do decide and adjudge that all precedent conditions have been performed, and that the bonds shall be executed and sold. They are executed and sold to the third person. Now as between these third persons and the State, what is the legal rule and liabilities of the parties? It is as we insist, precisely the same as between private individuals; and in this we are sustained by the most eminent elementary writers, and repeated adjudications. "A sovereign State is subject to the same rules as private individuals, in matters of contract." Vattel, Law of

Nations, 225, 226 ; · *United States* v. *Bank Metropolis*, 15 Pet. 377.

In the case here referred to, reported in 15 Peters, the court says : " When the United States, by its authorized officers, become a party to negotiable paper, they have all the rights, and incur all the responsibility of individuals who are parties to such instruments."

Let us suppose, that this was a case between individuals : that A. covenanted and agreed with B., for the purpose of advancing B. in business, that he would loan him his name and credit in the form of acceptances for $5,000, provided B. should first give security by mortgage to the satisfaction of C., who is named and appointed to receive the security, and judge of its sufficiency ; and that the acceptances are to be delivered to C., and sold in the market upon the demand of C. ; that the demand is made by C. for the acceptances without any security having been given, and they are executed payable to bearer, delivered and sold in the market to third persons ; can A. set up, in his defence on the demand of a third person, for pay- ment of such acceptances, the fact that C. had neglected to take the mortgages ? Certainly not; for the right and power to judge of the fact of performance of the condition precedent was vested in C., and in C. alone ; and A. would be compelled by any court of justice to pay the debt to the holder of the bills ; and his recourse, if any, would be upon C., the only party in default.

The directors of the bank and the governor were the appointed officers and agents of the State to examine into, report, and act upon the fact of the execution of the mortgages. Security was required to be given to the satisfaction of the directors. Being then the judges of the fact, and the only judges, all the authorities are clear that their determination, and the action predicated upon it, by which rights became vested in third persons, where there was, as in this case, perfect freedom from any pretence of fraud in the persons who have acquired such rights, is conclusive upon the State. In the language of the supreme court of the United States, " It is an universal principle, that where power or jurisdiction is delegated

to any public officer or tribunal over a subject-matter, and its exercise is confided to his or their discretion, the acts so done are binding and valid as to the subject-matter; and individual rights will not be disturbed collaterally for any thing done in the exercise of that discretion, within the power and authority conferred. The only questions which can arise between an individual claiming a right under the acts done, and the public, or any other person denying their validity, are power in the officer, and fraud in the party. All other questions are settled by the decision made, or the act done, by the tribunal or officer; whether executive, legislative, judicial, or special, unless an appeal is provided for or other revision by some appellate or supervisory tribunal is prescribed by law." *United States* v. *Arindo et al.*, 6 Peters, 691. So in the case reported of Ross, *Doe, ex dem.* v. *Borland,* 1 Peters, 655, where power was given to land commissioners to hear evidence and determine as to facts, the court held that every fact necessary to warrant the action of the commissioners was presumed to be proven before them, and that their adjudication as to the fact was final and conclusive.

And regarding the governor and directors as the mere agents of the State in taking security and receiving the bonds, the rule is equally plain and obvious; for we are told on the best authority, that "the responsibility of the principal to third persons, is not confined to cases where the contract has been actually made under his express or implied authority. It extends further, and binds the principal in all cases where the agent is acting within the scope of his usual employment, or is held out to the public or the other party as having competent authority, although in fact he has, in the particular instance, exceeded or violated his instructions and acted without authority. For in all such cases where one of two innocent persons is to suffer, he ought to suffer who misled the other into the contract, by holding out the agent as competent to act and as enjoying his confidence." Story, Agency, 540, § 443, and authorities there cited. So, whether we regard the governor of the State and the directors of the bank, in the power conferred upon them, to receive and judge of the sufficiency of the

The State of Mississippi *v.* Johnson.

mortgages before executing the bonds, as holding the character of a tribunal with power vested in them for that purpose, or as the mere agents of the State, the result is the same, and the defence, on the score of the non-execution of the mortgages, will not avail the State.

We insist, then, that the bonds could have issued under the original charter, and that the non-compliance with the provisions of that original act, requiring mortgages to be executed, cannot be sustained as an argument against their issuance under that act alone. And if we are correct in the position, that the supplemental act is not unconstitutional, and that it did not necessarily repeal the provisions in the original charter requiring mortgages to be executed, the reasons which we have endeavored to advance, and the authorities which we have cited, will apply with equal force to this state of the case. But if, as it may be contended and argued, that the supplemental act did repeal the provisions of the original charter requiring mortgages to be executed, and if, as we contend, it is nevertheless a valid and constitutional enactment, why then there was no necessity whatever for the execution of the mortgages.

And here, we would remark upon the position assumed by counsel, that the bonds were necessarily issued under the supplemental act. To support that position, quotations are given from the messages of Governor McNutt. We contend, that this is no evidence whatever of the fact; and if his declarations are to be referred to, we would call the attention of the court to what he stated, under oath, before a committee of the legislature, and which will be found presented in the record in this case. He was asked the direct question, whether the five millions of bonds executed were executed in payment of the State subscription for stock provided for in the supplemental act. He answered emphatically, that they were not. But these matters are not evidence; they are only presented in the record for the consideration of the court; they throw no light whatever upon the merits of this case.

It matters not whether Governor McNutt, in executing the bonds, supposed he was acting under the supplemental or

original act. If there was a valid and subsisting law conferring the power, as we contend there was, in the original act, it is all that can be required. Let us take a simple example, and suppose a party having two powers of attorney to do the same act; the one informal and invalid, though not known to the party acting, is the one under which he claims and supposes himself acting. He performs the act intended to be authorized by both : does the mere fact, that the one of the powers under which he supposed himself acting, was invalid, renders the act so performed invalid? Certainly not; there was, the court would say, a valid power authorizing the act, and this is all that is required. The principal, when called upon to meet the liability created by the act, would not be heard for a moment, when it was shown that he had executed a valid power which was in existence and unrevoked at the time the act was done.

But it is said, that the bonds could not have issued under the original charter alone ; because, if they were, they were prematurely issued, as the time had not elapsed during which the books for subscription were to be kept open. Let us suppose that the time had not elapsed, and other little matters of detail had not been performed, that were provided for in the charter of the bank ; what has this to do with the liability of the State? The charter of the bank was a private act; individuals were not bound to take notice of it. Even if it were raised to the dignity of a public law, it may be doubted whether the purchasers of these bonds were required to take notice of it. The record shows that the bonds were sold in the city of Philadelphia and State of Pennsylvania ; our statute law was not law there, which they were bound to take notice of; much less were they bound to take notice of the provisions of a bank charter. It has been held, "that ignorance of the law of a foreign country is ignorance of fact." *Haven* v. *Foster*, 9 Pick. 112. We insist, then, that upon the hypothesis that the supplemental act is unconstitutional, there is full power given in the original act to execute the bonds, and that as they were executed; in legal contemplation, the presumption arises, that

they were executed under the original act, which, being admitted to be in all respects a constitutional act, the bonds are a legal obligation against the State.

There is but one other objection to which we wish to call the attention of the court; and here we must do the attorney-general the justice, and, as we consider, compliment, to say, that he has not urged it upon the attention of the court; and that is, as to the sale of these bonds. As we are anxious to have every point examined and decided, we wish to call the attention of the court to it. The facts as to the sale are fully stated and shown by the record. They are simply, that the bonds were sold in Philadelphia, on the 18th day of August, 1838, for five millions of dollars, made payable in the cities of New Orleans and Natchez, in five equal instalments of one million of dollars each; the first instalment on the first day of November, 1838, and the remaining four on the first days of January, March, May, and July, thereafter. And the money was accordingly paid at New Orleans and Natchez, and received by the bank at a time when exchange on New Orleans was worth in Jackson from five to eight per centum premium.

The bonds were to be redeemed by the State, at the agency of the Bank of the United States, in London, England, at the rate of four shillings and sixpence to the dollar, each bond of $2,000 being estimated at £450.

Now, the argument, if, indeed, it deserves to be dignified by that name, is, first, that the bonds were not sold for their par value, because it is said a credit was given of some months, during which time the bonds were bearing interest. Our answer to this is, that it was only by the provisions of the supplemental act, which all good repudiators declare to be unconstitutional, that the bonds were required to be sold at par. If, then, they are correct in their position, that the supplement is unconstitutional, this provision, with all others, falls to the ground, and with it falls the argument.

But if, as we contend, the supplemental act is constitutional, we reply to the objections by calling attention to the fact that the city of Philadelphia is upwards of one thousand miles from Jackson, the place where this money was to be used; and that

the commissioners are supposed to have been vested with some discretion as to the manner and mode of conveying the money to Jackson which was paid for the bonds. To accomplish such a distance, with such an amount of money, at that time, when the facilities for travel were not very great, nothing like what they are at present, would necessarily require some time; and be attended with very great expense, and danger of loss to the State. The commissioners were authorized to sell in any market in the United States or Europe. The purchasers were of course only expected and required to pay for the bonds where they purchased them. Had this money, then, been paid to the commissioners cash in hand, in Philadelphia, and a par transaction made of it there, as those who make this objection would have had them do, how can we estimate how much below par the fund would have been, from expenses, delays, and perhaps unavoidable losses, by the time that it reached Jackson?

Yet we find that the commissioners make an arrangement by which the money was not made payable in Philadelphia, but in New Orleans and Natchez, and that, too, at a time when the fund could be drawn on, and the bills sold in Jackson at an advance of from five to eight per centum. They thus saved the bank all cost or expense for transportation, and enabled it to secure an advance on the sum of four millions, which was paid in New Orleans, estimating that they sold the exchange at six per centum premium, of $240,000. And we accordingly find that, upon a committee being appointed by the legislature to examine into and report as to this sale, that they did report, bestowing the highest praise upon the commissioners, for the able and efficient manner in which they had discharged the trust reposed in them, and declaring that the commissioners had not only sold the bonds at par, but had done better, and enabled the bank to realize something more than par. But if we will examine the charter, we will find, that provision was made that the bank should defray all the expenses of the sale. And as the bank received five millions of dollars, and gave the State the full benefit of a credit to that extent, on the pledge of $15,500,000, what right has the State to complain? The only

object that the legislature could have had in view, was to limit the liability of the State to the sum which was pledged and agreed to be raised by a sale of the bonds. The bank had the unquestioned right to dispose of the fund as she deemed best, after it was obtained. As the bank had to defray all the expenses attendant upon the sale, it may be readily supposed that she instructed the commissioners to do just what they did; that is, to avoid expense in the transportation of the money, and enable the bank to obtain a premium, by having it paid by the purchasers of the bonds in New Orleans and Natchez. The advantages secured, and the additional sum received, far overbalanced the small amount of interest that could accrue on the bonds in the few months that elapsed between the sale and payment, at five per centum per annum, the rate of interest which the bonds bore. But something has also been said, as to the rate and amount at which these bonds were made redeemable or payable by the State. The objection here is, if we are correctly informed, that the sum of £450 is greater than $2,000, and, consequently, that the State would have to pay more in redeeming the bonds than she received in their sale. This is another error. The bonds were made redeemable in England; the money there is in pounds, shillings, and pence. Some basis had to be established as the rate of valuation or exchange from American to English currency. As the bond upon its face was for $2,000, and that sum only, it was not in the power of the commissioners to increase it to the extent of one cent. It was already executed under the seal of the State. Neither the commissioners, Mr. Biddle, the party contracting the purchase, nor the sub-purchasers, ever thought or dreamed for one moment that the commissioners who sold the bonds, or any one else, could extend or increase the liability of the State of Mississippi to any thing more than the sum specified in the bond. But the commissioners and Mr. Biddle did think it advisable and proper, as the bonds were to be paid in the city of London, where a different currency existed, and were to fall into the hands of sub-purchasers, who were more familiar with the English currency, to adopt a basis or sum in English currency which would be equivalent to $2,000 there, at the place

of payment. Hence, in the indorsement on the back of the bond, making it payable to bearer, the words are used, "being equal to four hundred and fifty pounds sterling." Nothing more was expected of the State, then or now, than the sum of two thousand dollars, in American currency, with interest at the rate of five per centum per annum, as stipulated on the face of the bond, or its equivalent in English currency. And we feel authorized to say to those who make these small and trivial objections, that we only claim of the State $2,000 and interest on each of the bonds, and that we will undertake, if furnished with the means, to pay off the whole debt at that rate.

But as to these matters, though we want them examined into carefully, and fully decided, feeling confident that there is nothing in them that can or will in the least militate against our right to the affirmance of the decree of the chancellor, we will not further trouble ourselves or the court. But if there were in them any ground of objections and legal defence, we think the State has as fully and completely waived it as she has that in relation to the non-execution of the mortgages, by her acquiescence in the acts of the directors of the bank who called for the issuance of the bonds, in those of the governor who executed them, and the commissioners who sold them.

The officers and agents of the State, its legislature, and people, all knew that the bonds had been executed, had been sold; and when the legislature met, in January, 1839, that the money was then being received; two instalments only, of one million each, having then been received. Yet no objection or protest was made. The purchasers of the bonds were not notified that there was any thing improper or illegal in the transaction. They were permitted to go on, trusting and confiding in our good faith, until they had paid the whole amount; yes, until years afterwards, before they were told that the sale was illegal. In 1841, we find the legislature passing resolutions declaring the bonds were legally and properly executed and sold, and constituted a valid obligation against the State. See House Journal, 1841, 416.

What is the principle, equally of law, justice, and equity, in

such a state of facts as this? No question is better settled. "If a contract is made by the agent without authority, a subsequent ratification will give it validity; for the maxim is, a subsequent ratification is equal to a prior authority." Story's Agency, 542.

And so the silence of the State and all of its officers, executive and legislative, for so long a time, will be construed into acquiescence and ratification of the sale; for such is the law as expounded by the most eminent writers, not only as applicable to individuals, but as equally applicable to nations or States. Vattel's Law of Nations, 219.

But it is urged, that this money never benefited the State. This is replied to by the same eminent writer, as follows: "Whether the money borrowed has been turned to the advantage of the State, or squandered in foolish expenses, is no concern of the person who has lent it; he has intrusted the nation with his property, and the nation is bound to restore it to him again; it is so much the worse for her, if she has committed the management of her affairs to improper hands." Ib. 225.

In conclusion, we insist, that the reasons assigned for a reversal of the decree of the chancellor are wholly insufficient; that the bond sued on, with the other bonds executed and sold for and on account of the Mississippi Union Bank, are valid and legal obligations against the State of Mississippi, according to the strict letter of the law and the constitution. And as we are in a court of law, we have endeavored to argue the question with reference to the legal obligation alone, and to meet and answer the technical objections made, which, in our humble judgment, are, as a defence, unworthy of the great and prosperous State of Mississippi; a State which it is said has set the example amongst even the States of this great Union of a free and republican government; a State that has recently called upon her sister States to abide by and carry out in good faith the pledge contained in the constitution of the Union, on the subject of the peculiar institutions of this and all the other southern States; a State which is held up, by her so-called democratic politicians, as an example to all other States and to

the nations of the earth. If, indeed, she would occupy this proud position, and be an example worthy of being followed, let her redeem her plighted faith; let her restore that which she has received on the security of her name and seal; let her set an example of 'good faith, truth, honor, and justice, worthy of being followed. Mississippi was once an example to her sister States. She was once the pride of the galaxy. Her name at one time stood high, and then her plighted word was never repudiated. It was in her primeval state. She was then as the garden of Eden, before the serpent entered and tempted. But now, how changed! She has suffered herself to be tempted, and that, too, with a few dollars and cents. She has fallen from her high estate, and her name is now a by-word and reproach to herself and the whole sisterhood of States. But there is here, as in the moral world, a plan of redemption left. That is, an erasure of the foul blot by the payment of her debt; and we cannot but hope and believe, that, with the decision of this court in its favor, that plan can and will be adopted.

We submit this cause, then, to your honors, as we would feel ready and willing to submit it to the impartial and unprejudiced mind of every intelligent man who will give the subject a calm and deliberate examination; feeling confident in its justice, and that it is not only sustained by the municipal and commercial law, and the law of nations, as we have endeavored to show, but that it is sustained and supported by those high and immutable principles of justice and truth that have been disseminated for the guidance and redemption of our race by the Great Lawgiver of the Universe.

Chief Justice SMITH delivered the opinion of the court in this case.

This was a bill filed in the superior court of chancery, against the State of Mississippi, by the appellee, under the provisions of the statute, enacted in compliance with the 10th section, 7th article of the constitution, directing the method and designating the court in which suits against the State should be brought.

The foundation of the suit was an instrument under the seal of the State, signed by the governor and countersigned by the treasurer of the State, dated 5th of June, 1838.

It was alleged in the bill, that this instrument was executed and delivered by the person then filling the executive office, under authority duly conferred by law.

It purports on its face to be the bond of the State of Mississippi, for two thousand dollars, payable in the current money of the United States. It was made payable to the order of the president and directors of the Mississippi Union Bank; and was by them transferred by indorsement to the bearer.

The defence made by the State is based upon the alleged invalidity of the bond, it having been, as averred in the answer, made, delivered, and sold without authority, and in violation of law.

This cause was tried in the court below on facts admitted and established by an agreement of counsel; and the chancellor, holding the said bond to be a valid obligation against the State, rendered a decree in favor of the complainant for the amount of the principal and interest thereon. Hence the cause is brought into this court.

Other claims, to the amount of many millions of dollars, exist against the State of Mississippi, of similar character, the validity of which depends upon precisely the same conditions with that which is the present subject of adjudication. So far, therefore, as the action of the judicial department is concerned, the decision which it is now our duty to pronounce, will, probably, be decisive of their fate. For that reason alone, the present contest is one of deep interest.

But, leaving out of view the magnitude of the sum, necessarily, though indirectly involved in the present controversy, the importance of the principles which must be discussed and decided, and the very delicate relation in which this court must always stand in regard to controversies in which the State is an interested party, admonish us of the necessity of a thorough and earnest, but calm and impartial investigation of the subject.

The questions presented by the record, in the case before us,

61 *

are entirely of a legal character, arising upon facts which, as above remarked, are established by the agreement of counsel. These facts are substantially as follow, to wit:—

An act entitled "An Act to incorporate the subscribers to the Mississippi Union Bank," was passed by the legislature of this State, and approved by the governor, on the 5th February, 1838. The bank, thus incorporated, was to possess a capital of fifteen millions five hundred thousand dollars, "to be raised by means of a loan to be obtained by the directors of the institution."

By the 5th section of that act, it was provided, "that in order to facilitate the said Union Bank for the said loan of fifteen millions five hundred thousand dollars, the faith of the State be, and is hereby pledged, both for the security of the capital and interest, and that seven thousand five hundred bonds, of two thousand dollars each, to wit: eighteen hundred and seventy-five payable in twelve years; eighteen hundred and seventy-five payable in fifteen years; eighteen hundred and seventy-five payable in eighteen years; and eighteen hundred and seventy-five payable in twenty years; bearing interest at the rate of five per cent. per annum, shall be signed by the governor of the State, to the order of the Mississippi Union Bank, countersigned by the State treasurer, and under the seal of the State."

The said act was passed in strict conformity with the directions contained in the ninth section of the fourth article of the constitution of this State, which is in the following words, to wit: "No law shall ever be passed to raise a loan of money on the credit of the State, or to pledge the faith of the State for the payment or redemption of any loan or debt, unless such law be proposed in the senate or house of representatives, and be agreed to by a majority of the members of each house, and entered on their journals, with the yeas and nays taken thereon, and be referred to the next succeeding legislature, and published for three months previous to the next regular election, in three newspapers of the State; and unless a majority of each branch of the legislature, so elected, after such election, shall agree to and pass such law; and, in such case, the yeas

and nays shall be taken and entered on the journals of each house," &c.

An act, supplementary to the said act incorporating the Mississippi Union Bank, was passed by the legislature and approved by the governor, on the 15th of February, 1838.

This act was passed in the ordinary method of enacting laws, and was not referred, published, and reënacted, according to the provision of the constitution above quoted. By the first section of that act it was provided, that " so soon as the books of subscription for stock in the said Mississippi Union Bank are opened, the governor of this State is hereby authorized and required to subscribe for, in behalf of this State, fifty thousand shares of the stock of the original capital of said bank, the same to be paid for out of the proceeds of the State bonds to be executed to the said bank as already provided for in the said charter; and that the dividends and profits which may accrue and be declared by the bank on the said stock subscribed for in behalf of the State, shall be held by the said bank, subject to the control of the State legislature, for the purposes of internal improvement, and for the promotion of education."

The managers for the bank, whose election was provided for in the original act, were elected by the legislature during the same session, and were organized subsequently as a board of directors for the bank, pursuant to the directions of the supplementary act.

When the books of subscription for the stock of said bank were opened, the governor subscribed, in behalf of the State, for fifty thousand shares, or for five millions of the stock, pursuant to the directions of the supplementary act as above quoted. On the 5th day of June thereafter, he issued the bond in suit, with other bonds of the same character, and for equal sums, amounting in the aggregate to five millions of dollars.

At the time when these bonds were delivered by the governor to the directors of the bank, the mortgages, which were required to be given by the 8th and 30th sections of the original charter, had not been executed or delivered to the bank.

The bonds which had thus been issued by the governor, and delivered to the bank, were sold by her agents, in the city of Philadelphia, on the 18th of August, 1838. The agents or commissioners for the sale of these bonds, acted under a power of attorney, duly executed by the bank, which, with the original and supplemental acts, was made part of the contract between the commissioners and the purchasers of the bonds. The commissioners were expressly restricted by the charter of the bank, and their letter of attorney, from selling the bonds for less than their par value.

The sale was made for five millions of dollars, payable in five equal instalments; the first four of which were to be made at the city of New Orleans, on the first days of November, January, March, and May, respectively, thereafter. The last instalment was to be paid on the 1st of July, 1839, at Natchez. The several instalments of the loan were paid to and received by the bank, at the times and places designated in the contract. At the respective dates, when the payments were made, exchange on New Orleans, at the city of Jackson, ranged from five to eight per cent. premium.

The exceptions taken to the decree of the chancellor, are based in the first place, and chiefly, on the ground that the bond in controversy was issued without legal authority and in violation of law.

In support of this position it is contended: 1. That the bonds which were executed and delivered by the governor to the Mississippi Union Bank, of which the bond in suit was one, were not issued in execution of or under the provisions of the original act chartering the bank. 2. That the sole authority for the issuance of the said bonds, if in fact any such power existed, was derived from the supplemental act; and 3. That the latter act was a mere nullity, not having been enacted by the legislature in conformity with the directions of the provision of the constitution above quoted.

If these propositions are maintainable, the conclusion is inevitable that the bond in suit, by the mere act of sealing and delivery, did not become a valid obligation binding on the State.

The original act, as we have seen, was approved on the 5th of February, 1838. Hence, but four months had elapsed from that date, before the bond in suit, which bears date on the 5th of June following, was delivered by the governor to the bank.

It becomes important, therefore, to inquire, whether, according to the just construction of the act, the State bonds, for any portion of the contemplated loan, could have been legally issued by the governor at that date. Several provisions of the said act are referred to as indicating the negative of this proposition. We will quote such as we think bear upon the question : —

The second section provides for the opening of the books for the subscription of the stock of the bank, at the city of Jackson, under the inspection of the ten managers. The books were required to be kept open for the period of six months; at the end of which time, the directors were required to make an estimate of the whole amount of the subscriptions; and in case a greater amount of stock should be subscribed than was authorized by the charter, to reduce the amount of stock taken by individuals, reducing first the largest amounts.

The third section provides for the opening of the books in the several counties of the State, under the inspection of three managers, to be elected for each county. The books were to remain open in the counties for three months; when they were to be transmitted to the managers at the seat of government, together with all title deeds and other documents which may have been deposited with them by the subscribers, " in order that the directors of the mother bank might finally decide on the validity and sufficiency of the same, before the subscribers should be declared stockholders."

By the first clause of the eighth section, it was declared, " that to secure the interest and capital of the bonds, the subscribers should be bound to give mortgage, to the satisfaction of the directors, on property, to be in all cases equal to the amount of their respective stock, which may bear on cultivated land, plantations," &c. And by the twenty-ninth section, it was provided, " that the bonds, with the privileged mortgages, for the sum of fifteen millions five hundred thousand dollars,

subscribed by the stockholders of said bank, according to their shares, for the purpose of securing the loan of fifteen millions five hundred thousand dollars, shall be deposited in the office of said institution, as security for the reimbursement of the interest as well as the capital of the said bonds granted by the State."

These several provisions of the act leave no room to doubt as to what was the intention of the legislature in regard to the time when the mortgages, which were required to be given by the 8th section, were to be executed. It is clear that those mortgages were not to be given, that is, formally drawn, sealed, and delivered to the directors by the stockholders, until after the books of subscription for the stock were closed, at the city of Jackson, and after the stock subscribed had been graduated under the direction of the second section.

This, it is manifest, could not be done until after the expiration of six months from the date of opening the books.

If, therefore, upon no assumed condition of things, would the directors of the bank have a legal right to demand of the governor a delivery of bonds for any amount, or the governor possess the authority to issue them unless mortgages had been previously sealed and delivered by the subscribers to the directors, or, in other words, if the formal execution of mortgages by the subscribers for stock was a condition precedent upon which the right of the directors to apply to the governor for a delivery of bonds, or the authority of the governor to issue them depended, it must be admitted that the bond in suit was issued in violation of the act incorporating the bank, and of which fact the purchaser was presumed to have notice.

We will proceed, therefore, to inquire whether such is the construction which should be put upon the act. And in order to ascertain the proper construction, we must first determine the character and extent of the obligations incurred by the subscribers to the stock and the stockholders.

As we have seen, the capital of the bank was not to be raised by the contribution of the subscribers or stockholders. The charter provided, expressly, that the capital should be procured by means of a loan, which the directors were authorized to

obtain. To aid them in the accomplishment of that purpose, State bonds were to be issued, by the governor, to the full amount of the capital, for the payment of which, the faith of the State was pledged. The bonds were to be issued as a loan or grant to the bank, which was to be bound to the holders for their punctual payment. When the stock was graduated, and the stockholders ascertained, they were bound to give mortgage to the satisfaction of the directors, to be in all cases equal to their respective stock. Those who should be declared stockholders, were also required to pay in cash ten per cent. upon the amount of their stock, at such time as the directors should require. — Sec. 11. This amount, however, was to be refunded by the bank, with interest, after the bonds were sold and the proceeds realized. — Sec. 44. In the event of the inability of the bank to pay the State bonds, which could only arise from the loss or destruction of the capital procured by the loan, the stockholders were bound by their mortgages to contribute in proportion to their respective stock. This, then, was the extent of the obligation arising from the contract of the stockholder.

By the contract of subscription which necessarily preceded and was entirely distinct from the contract of the stockholders, the subscriber to the stock was bound to execute to the directors of the bank a valid mortgage, on a satisfactory amount of property conditioned for the payment of a sum corresponding to the amount of stock, of which he might be declared the holder. But before or at the time of entering into such contract, the subscriber was required by the 8th section of the charter, "to deliver to the commissioners a valid act of sale, or patents or certificates of confirmation from the land commissioners of the United States, or partition sales and adjudication by a decree of court, verified according to law, or such other evidence of title to the property proposed as a guarantee to the bank as may be deemed satisfactory to said commissioners or directors." The plain meaning of which was that a person who should desire to become a subscriber to the stock of the bank, before he should be permitted to do so, was required to pledge a satisfactory amount of property to which he had a

valid title, to the bank, as a security for the performance of his contract of subscription.

We have seen that, by the third section, it was made the duty of the directors of the mother bank to decide, finally, on the "sufficiency and validity of the title deeds and other documents deposited with the commissioners." By the 26th section, the directors were declared to be "judges of the sufficiency of mortgages offered for stock and loans, and were vested with authority to reject the same if not sufficient." In such cases they might "require other security, or in default thereof, reduce the shares of such defaulters to the amount sufficiently secured." Hence, although the directors possessed a discretionary authority in regard to the validity of the title and the sufficiency of the pledge, and might, in the exercise of that discretion, entirely reject the subscription or reduce it in amount, on the part of the subscriber the contract of subscription was unconditional.

We do not doubt, therefore, that under the operation of the act, a delivery of title deeds by a subscriber to the commissioners, would create a lien on the property in favor of the bank. And we deem it unimportant for the purposes of our inquiry to determine whether the transaction should be held to constitute, in a strict sense, an equitable mortgage, or as creating only a special statutory lien; as in either case, it could be nothing more nor less than a security, which the corporation would hold for the due performance of the contract of subscription.

The 14th section declared, " That so soon as five thousand shares shall have been subscribed, in the manner herein provided for, the governor of the State shall provisionally appoint thirteen directors, who shall serve for twelve months, and it shall be the duty of the said directors to choose a president of the Mississippi Union Bank, and who shall be chosen from among themselves; and the president thus chosen, shall remain in office twelve months following their appointment; and that so soon as the directors are appointed and the president chosen, the power of the commissioners appointed to receive the sub-

scriptions and the papers relating thereto, and in the possession of the commissioners, shall be delivered over to the board of directors."

It is evident from the last clause of this section, that it was within the contemplation of the legislature, that five thousand shares of the stock would be subscribed before the closing of the books, and of consequence before any subscriber could be declared to be a stockholder. It is equally clear, that the governor might be required to appoint the provisional directory before that event could take place. Indeed, it is clear that the condition might have arisen, on which it would become the duty of the governor to appoint the directory within the first week after the books were opened for subscription to the stock. But upon the supposition, that the legislature did not intend that any bond should issue until after the books were closed, and the stockholders declared, that provision would seem to be useless and unmeaning. For upon that assumption, although a directory might be appointed within very few days after the opening of the books, their duties as such could not attach until after they were closed.

Then, for what purpose was it declared, that so soon as five thousand shares should be subscribed, in the manner provided for, the governor of the State should provisionally appoint a directory, whose duty it was made at once to organize by the election of a president of the bank, and to apply to and receive from the governor the bonds directed in the charter to be issued by him?

The answer to this inquiry we think is an obvious one, and will aid us materially in solving the question under examination.

By the 12th section it was declared: " That after the closing of the books, and when it shall appear that at least five hundred thousand dollars shall have been subscribed, and paid in on the original stock of the capital of said bank, the said institution shall go into immediate operation, under the provisions hereinafter mentioned."

According to the direction contained in this section, the corporation could not commence its banking operations with a

cash capital paid in, of less than a half million of dollars. That was an indispensable condition, and there was but one method prescribed by the act in which it could be realized. The entire capital of the bank was to be raised by the means of a loan which the directors were authorized to obtain, and to aid in the attainment of that object, the State had pledged her faith, and directed the issuance of her bonds.

Under the most favorable circumstances, the process adopted for the purpose of raising the capital of the bank, would be a slow one. A considerable length of time would, of necessity, elapse from the issuance of the bonds, before they could be disposed of, and the proceeds received by the bank. We presume that the legislature were desirous, at as early a date as practicable, consistent with the security of the State, to put the bank into successful operation. The journals of the legislature contain abundant evidence, that this event was awaited with great and general anxiety. The provisions of the 14th section appear to have been framed with the view of preventing unnecessary delay, of hastening the negotiation of the bonds, the only means whereby the capital of the bank could be raised; in fine, of shortening the process by which the benefits expected to be derived from the establishment of the Union Bank would be secured.

We can perceive no other purpose which the provisions of the 14th section were calculated to subserve, and we can conceive of no other motive which could have suggested their adoption. If it were intended by the legislature, that the State bonds might be issued as soon after five thousand shares had been subscribed, and a provisional directory organized, a delay of many months would be prevented. The direction in regard to the provisional directory, upon such a supposition, would be intelligible and necessary; but upon the supposition that no step was to be taken towards a negotiation of the bonds until after the books were closed, that particular action of the legislature would seem to us not to be directed to any practical object whatever.

We come, then, directly to the point, whether it was within the legislative intention that the bonds should, upon any condi-

tion of things, be issued by the governor before the mortgages were executed, as directed in the first clause of the 8th section of the charter.

A permanent board of directors, for the government of the affairs of the corporation, to be elected in part by the stockholders, was provided by the 15th section. The provisional directory were not to be charged with the control and management of the banking operations of the institution. They were to raise the capital by negotiating the State bonds; to organize the company, and to put the bank into operation. Before banking operations could be commenced, the charter required capital to be paid in, to the amount of at least a half a million of dollars. The capital could be raised in one method only. That method was a sale of the bonds to be executed to the bank by the governor. Hence the necessity of the provisions of the 30th section, by which it was declared: " That so soon as directors are appointed, as hereinbefore provided for, they shall proceed to the election of a president, and the same shall be notified to the governor of the State, who will thereupon execute to the said bank, from time to time, bonds in amount proportioned to the sums subscribed, and secure to the satisfaction of the directors, as required by the charter, until the whole amount of fifteen millions five hundred thousand dollars shall be furnished in bonds, as herein provided for."

This language is too plain to permit us to doubt. By the 14th section, as we have seen, directors were to be appointed so soon as five thousand shares of the stock had been subscribed. By the section last above quoted, the directors thus appointed, immediately upon their appointment, were to elect a president, and to give notice to the governor of that fact. Upon being informed of the organization of the board, the governor was authorized to execute bonds to the bank in the amount corresponding to the sums subscribed, and which, in the estimation of the directors, were sufficiently secured agreeably to directions of the charter.

It appears to us impossible to doubt in regard to the time when, in legislative contemplation, the bonds were to be executed. The language is explicit; the intention is express.

Upon being informed that the directors had elected a president, the governor thereupon was authorized to deliver to them bonds in amount equal to the sums subscribed for stock and satisfactorily secured.

But it has been argued, that when the legislature required in the section above quoted, that the stock subscribed should be secured to the satisfaction of the directors, before the bonds should be issued, they meant the security designated in the first clause of the 8th section, that is, that mortgages should be given conditioned for the payment of the bonds. Hence, it is contended, that as those mortgages could not be executed until after the stockholders were declared, the legislature did not intend, although the language of the 14th and 30th sections may bear a different interpretation, that the bonds should issue until after the closing of the books and the graduation of the stock.

That no doubt may be left upon the mind in reference to this branch of the subject, we will proceed to answer the argument.

The 30th section does not require, in express terms, the execution of mortgages or any other form of security. The bonds are to be issued in amount proportioned to the sums subscribed, and secure to the satisfaction of the directors, as required by the charter.

Now it will not be questioned, that security might have been given by the subscribers at the time of the subscription, either by the execution of mortgages, such as were contemplated by the first clause of the 8th section, or many other modes which would have been satisfactory to the directors, unless the words, " as required by the charter," have reference to some provisions of the act, which designated the character of the security which should be taken.

We infer from the language employed in the 30th section, that the legislature had reference to the time of subscribing, or to some point anterior to this time, when the stock should be graduated, and the stockholders declared. For until that was done, it could not be said with strict propriety that the subscribers were stockholders, or that stock was owned by any

one.   Upon that supposition, it was proper to speak of the "sums subscribed," instead of "the stock" which was owned by the subscribers, which would not have been the case if it had been intended to designate the security, which the subscribers were required to give for the payment of the bonds, in proportion to the amount of stock which had been allotted to them.   It is conceded, that the mortgages referred to in the first clause of the 8th section, were designed to be executed after the stock had been graduated, and the stockholders were declared.   Upon that hypothesis, the language employed we think sustains the view which we have taken of the subject. It is not there said, that the mortgages are to be in all cases equal to the amount of the "sums subscribed."   But it is declared, that the mortgages then to be given are to be in all cases equal to amount of the respective "stock" of the subscribers.

The "sums subscribed" are different from the "stock declared."   This is evident, because the directors were vested with full authority to reduce the amount of subscription of any subscriber, or to reject it altogether.   The largest subscriber to the stock, by the decision of the directors, from which there was no appeal, might turn out to be the smallest stockholder, or no stockholder at all.   Hence the phrases "sums subscribed" and "the amount of their respective stock" were not equivalent terms; they conveyed distinct and different meaning.

Upon the principles of common sense, as well as the plainest rules of construction, it is to be inferred that the legislature in the same act, and in treating of different parts of the same subject, did not intend to convey the same idea by the use of these terms.   Hence, that they had no reference to the "stock," which was graduated and allotted to the stockholders, and which could not be done until after the books were closed, when they declared that bonds should be delivered by the governor "in amount proportioned to the sums subscribed, and secure to the satisfaction of the directors."

If the security required in the 30th section, before the bonds were to be executed and delivered to the bank, was not, as we infer, the mortgages designated in the first clause of the 8th

62 *

section, the question naturally arises in regard to the security which was in reality contemplated.

To that question we answer, that the security, which in our opinion the charter required, as the condition upon which the bonds might be legally delivered by the governor to the bank, was the pledge of real property to be made by the subscribers to the stock. The pledge thus to be made was by a delivery to the commissioners of the title deeds, patents, certificates of confirmation by the board of land commissioners of the United States, or other evidences of title which should be deemed a satisfactory security by the said commissioners or the directors, in compliance with the second clause of the said 8th section, which is in the following words, to wit: "No one shall be permitted to subscribe until he shall deliver to the commissioners a valid act of sale, or patents, certificates' of confirmation from the board of land commissioners of the United States, or partition sales and adjudication by a decree of court verified according to law, or such other evidence of title to the property proposed as a guarantee to the bank, as may be deemed satisfactory to said commissioners or directors."

We have above considered the effect of the deposit of title deeds with the commissioners, by the subscribers to the stock of the bank. In our opinion, by whatever name the security should be designated, the delivery of his title deeds by the subscriber to the commissioners, created a special statutory lien upon the property, which was designed by the charter to stand as a security to the bank for the due performance of the contract of subscription.

That such is the operation of the act, we think is too evident to admit of debate, and we feel well assured that the lien, or mortgage which would be thus created, was the security for "the sums subscribed," required by the 30th section. For if not designed for that purpose, we are unable to perceive what object the legislature had in view, in requiring security to be given by the subscriber to the stock for the performance of his contract of subscription.

If it were not intended to base some future action of the corporation upon the security given by the subscribers, that

they would perform their contract, why require them to encumber their estates? If it was not intended, that the bonds should be issued before the stockholders were declared, and mortgages formally sealed and delivered, this provision of the charter would be worse than useless. But on the other hand, if the subscriptions to the stock secured by a pledge of real estate, were designed to be the basis upon which the bonds of the State were to be issued, we perceive very clearly the object and utility of the provision, and the reason why a provisional directory was to be appointed so soon as five thousand shares were subscribed, with authority to apply to the governor for a delivery of bonds, equal in amount to the sums subscribed.

After a careful review of this branch of the subject, we have come to the conclusion, that the bonds might have been legally issued to the bank by the governor, on the 5th June, 1838, pursuant to the provisions of the original act by which the bank was incorporated, and the faith of the State pledged for the purpose of raising the capital.

In the next place, it is contended that the said bonds, including the one in suit, were executed and delivered to the bank, under the authority conferred, if in fact such authority existed at all, by the supplemental act. We will not at this stage of our examination discuss this proposition, as it is obvious that no valid objection against the legality of the bonds could be based upon it, if its correctness were conceded, unless it could also be shown that the supplemental act was null and void.

The supplement, as we have seen, was not adopted agreeably to the directions contained in the 9th section of the 7th article of the constitution of this State, which we have above quoted; it was passed as an ordinary act of legislation, by one legislature, and approved by the governor. Having been passed in the manner stated, the supplemental act is alleged to be inoperative and void:

1st. Because it attempts to pledge the faith of the State for the payment of a debt.

2d. Because, by the passage of that act, the legislature have attempted to repeal several important provisions of the original act, and have attempted to repeal or dispense with the condi-

tions upon which the State in the original act agreed to be bound for the payment of the bonds, the execution and delivery of which are provided for in said act.

It is certain, that by no provision of the supplement has the legislature directly or in express terms attempted to bind the faith of the State for the payment or redemption of any loan or debt.

By the first section of the supplemental act, as we have above seen, the governor was required, upon the opening of the books of subscription for stock, to subscribe for, in behalf of the State, fifty thousand shares of the capital stock of said bank, to be paid for out of the proceeds of the State bonds, to be executed to the bank in the manner prescribed in the original charter. This portion of the supplement contains the only provisions, which, upon any rational construction of the act, can furnish the slightest foundation for the assumption, that the supplemental act pledged the faith of the State for the payment of a debt of five millions of dollars due to the Union Bank.

We will be enabled to judge of the correctness of this position, when we clearly understand the character of the transaction.

The first section of the supplement did not authorize the issuance of bonds for any purpose whatever. It directs that the stock subscribed for the State should be paid for out of the proceeds of the bonds, the execution of which was authorized by the original act. The faith of the State for the payment of the bonds had been formally and constitutionally pledged by that act. There was certainly no attempt to renew that pledge; and it is equally evident that there was no attempt to increase the liability of the State. For under no possible contingency, could she be made liable for more than fifteen millions five hundred thousand dollars.

Nor do we think it can be said with truth, that the State, by the subscription to the stock, became a debtor to the bank, or that any additional obligation was thereby imposed upon her. There would be some ground for the assertion, if the first section of the supplement had directed that bonds should be

executed to the bank in payment of the State stock, or had it
even provided for the payment of the stock out of the proceeds
of any particular portion of the bonds, the execution and
delivery of which were provided for in the original act. But
such was not the fact. The general direction was given, that
the stock subscribed for the State should "be paid for out of
the proceeds of the bonds, to be executed to said bank as
already provided for in the said charter."

The effect of this provision was to place the State, in regard
to the payment of the stock, precisely on the same footing with
the private stockholders. Such, it is manifest, is the necessary
result, as the stock of the bank was to be for, or, which is the
same thing, the entire capital of the bank was to be raised by
means of the loan, provided for in the original act. The pri-
vate stockholders, in case of a failure of the bank to pay the
bonds, would, under their contract as stockholders, be required
to contribute for that purpose, in proportion to their stock.
Hence, in that respect, it might be said that they stood in the
relation of debtors to the corporation. But such was not the
condition of the State. She bore no such relation to it. Under
no view of the subject can it be maintained, that the State
became her debtor. She would in such case become directly
responsible to the holders, to the full extent of her bonds out-
standing. But in no event could she be required to contribute
to the bank, and, therefore, in no sense could be the debtor of
the bank.

But were it conceded, that the State, in a strict legal sense,
became the debtor of the bank to the amount of her subscrip-
tion to the stock, we are of opinion that the provision of the
supplementary act, authorizing the subscription, would not, for
that reason, conflict with the constitution, and be consequently
void.

Undoubtedly the authority to pass a law for the purpose of
authorizing a subscription to the stock of a banking company,
in behalf of the State, is embraced by the general grant of
legislative power in the constitution. And it appears to us a
question which scarcely admits of debate, that the provisions
of the 9th section of the 7th article of the constitution, do not

apply to the class of legislative enactments to which the one under consideration belongs. It will certainly not be contended, that an act passed by the legislature for the purpose of authorizing contracts to be made in behalf of the State, for the purchase of property, for the erection of public buildings, or for the construction of works of internal improvement, or for many other purposes, by the terms of which the State would be bound for the payment of money, can be considered a law passed to pledge the faith of the State "for the payment or redemption of a debt," and, therefore, within the operation of the constitutional provision; and if not within its operation, it appears to us certain, that an act passed for the purpose of authorizing, in behalf of the State, a subscription to the stock of an incorporated company, would not be more so.

2. We pass, then, to the consideration of the next position taken in reference to the supplement.

By the counsel for the State it is contended, that the legislature does not possess the power to repeal or materially change the provisions of a law passed according to the forms prescribed by the 9th section of the 7th article of the constitution; at least, without observing the same process in the passage of the repealing act which was required in the adoption of the original law. This is denied by the counsel for the appellee, who further insist, that the supplemental act has not repealed or materially modified the essential conditions on which the faith of the State was pledged in the original act of incorporation.

By section first of the second article of the constitution, the powers of the government of the State of Mississippi were divided into three distinct departments, and each of them confided to a separate body of magistracy, to wit: "those which are legislative to one, those which are judicial to another, and those which are executive to another." The 4th section of the third article vests "the legislative power of the State" in the senate and house of representatives, which, together, are styled "the legislature of the State of Mississippi."

The legislature, therefore, possesses the entire legislative authority of the State, and may, consequently, perform any act of a legislative character, which is not repugnant to the consti-

tution of the United States, nor expressly prohibited by that of the State of Mississippi.

The right to enact laws for the purpose of effecting loans in the name and upon the credit of the State, is unquestionably a part of the legislative power which was granted in the constitution. This is conclusively shown, if any doubt could otherwise exist, by the 9th section of the 7th article, which contains a distinct recognition of this power by the precise directions there given, as to the mode in which it is to be exercised. Hence, if no limitation or restriction had been put upon the exercise of the right, by the constitution, it would have been competent for the legislature to pledge the faith of the State, for the purpose of raising a loan of money, or for the payment or redemption of a loan or debt in the ordinary form of enacting laws. But the constitution, in the section referred to, has prescribed the method in which a law intended for that purpose must be passed. The provisions of that section, however, are no more, or in any other way, a limitation upon that particular branch of the legislative power, than the 23d section of the 3d article, which prescribes the general mode of enacting laws, is a limitation on the legislative authority of the two houses. Hence, the power itself is not limited, although it cannot rightfully be exercised unless the form of procedure be strictly observed.

But did it follow, that because the power to borrow money on the credit of the State, or to pledge the faith of the State for the payment of the loan or debt, must be exercised, if at all, in the specific mode prescribed in the constitution, a law which has been regularly passed for those purposes, is for that reason of higher import, of greater sanctity, and less the subject of the repealing power, than any law for ordinary purposes, passed in the usual mode of enacting laws?

This is a very interesting question, and one of importance, as all questions are which involve a construction of the organic law of the State. It has been examined with the diligence and ability which its interest and importance demand by my colleague, Judge Yerger, who has arrived at a conclusion in which I fully concur. I will, however, in as brief a manner as pos-

sible, state the grounds upon which I base my opinion on the subject.

In doing this, it will be necessary to notice certain positions assumed in the argument at bar, by counsel who assume the affirmative of this question.

It is broadly asserted, indeed it seems to have been taken for granted in the argument, that the constitution requires a law which proposes to create or impose a debt upon the State, to be submitted to the people; and that the validity of such a law depends upon their assent. It is further insisted, that the people of the State, or the State itself, are a party to such a law in a different sense; or that they stand in a relation to it different from that in which they stand to any act of legislation passed according to usual forms.

We are very far from yielding our approbation to either of these propositions.

A bill or law by which it is proposed to borrow money on the credit of the State, before it can be valid, must, as we have seen, be passed by a majority of each house at one session, and then referred to the next succeeding legislature. In the mean time, before the next general election, it must be published for three months in three newspapers of the State; and, finally, it must be reënacted by the next succeeding legislature, to which it had been referred. These are the ceremonies to be observed in the passage of a law of that character; and hence, it is not true that such a bill or law, in the progress to its final adoption, is either to be referred or submitted to the people. But why, it is asked, refer and publish such a law, if it is not intended to ascertain the will of the people in regard to its final adoption or rejection? And if so, why evoke an expression of the will of the people, if it were not intended that their will should, in such cases, authoritatively control the subsequent action of the legislature in regard to the passage of the law?

To these questions it may be replied, that the constitution does not, in express terms, require a formal expression of the will of the people. And if any argument could be based upon the assumed implications of the 9th section of the 7th article, it is fully rebutted by the fact, that no provision has been made

The State of Mississippi *v.* Johnson.

or authorized, by which the popular will could be ascertained. A provision by which the people would be made direct participants in the exercise of legislative power, would not be in keeping with the frame and structure of the government, and directly repugnant to the theory of a representative republic. It would, moreover, be in opposition to the provisions of the 4th section of the 3d article of the constitution, which declares that the legislative power of a State shall be vested in a senate and house of representatives.

In legislative proceedings, the object of which is to procure money on the credit of the State, private interests may easily arise, which are in opposition to the public welfare. In such cases, improper and improvident legislation may be apprehended. Errors committed in the legislation on these subjects, are not always remediable by ordinary means. For, where money obtained for these purposes has been wasted, or injudicious contracts have been entered into, the injury cannot be repaired by the repeal of the objectionable law.

Hence, to guard the legislature as well against sinister influences, arising from interests in opposition to the public welfare, as to protect the public against the evils of hasty, ill-advised, or corrupt legislation in regard to such projects, the provisions of the ninth and seventh article were incorporated into the constitution.

Precisely of the same character, and designed to secure similar purposes, are the provisions of the 23d section of the 3d article of the constitution, by which it is declared, that "no bill shall have the force of a law, until on three several days it be read in each house, and free discussion be allowed thereon, unless four fifths of the house in which the bill shall be pending may deem it expedient to dispense with this rule."

Such, it is believed, were the sole objects of the framers of the constitution. By the reference and publication of a law intended to borrow money on the credit of the State, or to pledge the faith of the State for the redemption of a loan or debt, they intended to direct the attention of the people to the proposed measure. The expediency or impolicy of such a

measure, would, therefore, be discussed in connection with the intervening election; the attention of the public would be drawn to the subject, and the dangers of hasty and improvident legislation prevented; for, by that means, the legislature would be enabled to act under the direct counsel and advice of the whole of their constituents.

That this is the proper construction of the provision under consideration, and that it never was intended by the convention who made the constitution, to give the people, in their primary assemblies, or through the ballot-box, the right of approval or veto upon the acts of the legislature, passed in reference to the subjects of loans, will appear more evident, when we inquire whether the final action of the legislature upon a law of the character which we have been considering, would be constitutionally void if done in opposition to the known wishes of the people.

Let us take as an illustration the act under consideration. If that law had not been reënacted, but finally rejected, in opposition, as it will not be denied it would have been, to an immense majority of the people, whose will was ascertained, would the action of the legislature, in rejecting it, have been a violation of its constitutional obligations? In other words, had they, or had they not, in the case supposed, a clear constitutional right to reject the law in opposition to the known wishes of the people? We presume that there is no one who will maintain that, apart from any question of propriety or expediency, the legislature in such a case would not have the undoubted constitutional power to refuse to pass the law.

On the other hand, if it be supposed that the act had been finally passed, in opposition to the known wishes of a majority of the people, we presume that no one would deny to the law validity on that account, or insist that the courts, for that reason, would be bound not to enforce it.

In each of these supposed cases, the conduct of the legislature might be a gross violation of the confidence reposed in the members by their constituents; their conduct may have been unwise and inexpedient in the last degree. But the question

in each case was a question of constitutional power, and not, whether the legislator is bound by the principles of political morality to conform to the wishes of his constituents.

Another position assumed by counsel, in connection with this question, is, that the people stand in a different relation to a law passed for the purpose of borrowing money for the State, than they do to an ordinary act of legislation. If we understand counsel, they in effect contend, that a law of this character is in the nature of a contract to which the State is a party; and that, before it has been carried into effect, or rights have vested under it, it cannot be repealed or modified by the legislature. Doubtless, such a law, when carried into execution, or when the terms proposed in it are accepted, becomes a contract. Rights acquired under it cannot be impaired by subsequent legislation; but until such is the case, there is no pretence for saying that the law was a contract of the State, and, for that reason, is incapable of being repealed or modified, because the repealing act would be an act impairing the obligation of contracts.

If a law passed to borrow money cannot, before it has been carried into effect, be repealed, or modified, it is certainly not because it is to be regarded as either an executory or executed contract, but because the power to repeal a law of that character has been expressly excepted out of the grant of legislative power in the constitution, or because the peculiar ceremonies to be observed in the passage of such a law, necessarily imply a negation upon the right of appeal.

A municipal law, according to the American theory of governments, is the expression of the legislative will of the State, according to the forms of the constitution.

In this State, the legislative power is vested in the senate and house of representatives; they are the constituted organs through which, in the enactment of laws, the sovereign will of the State is declared.

For the purpose of ascertaining that will, several methods, having respect to different subjects of legislation, have been prescribed in the constitution.

As in the passage of a law intended to appropriate money

from the treasury to works of internal improvement, the legis-
lative will must be declared by a majority of two thirds of each
house. The same method is observed when it is proposed to
pass a bill in opposition to the executive veto. A different
method is observed when it is proposed to borrow money on
the credit of the State. The legislative will, for that purpose,
cannot be declared by one legislature, but the majority in each
house of two concurring legislatures, can alone proclaim it.

But where no specific method has been prescribed in the con-
stitution for ascertaining that will, it must be declared, neces-
sarily, by a simple majority of each house. For, as the mem-
bers of either house are precisely equal, the will of the majority
must be taken as the united will of the whole. And such, of
necessity, is the method of ascertaining the legislative will in
regard to all subjects of legislation, where no specific method
has been prescribed.

A law passed in any of these methods is obligatory, because
it is the constitutional expression of the legislative will of the
State. Hence, of necessity, a law which has been adopted in
any one of these methods, cannot be more or less valid than a
law which has been enacted in conformity with any other of
the prescribed forms.

A law, therefore, which has been adopted under the forms
prescribed in the 9th section of 7th article, is not of higher
dignity, or of greater sanctity, than any law passed according
to the ordinary method; for, in either case, the law is but the
declaration of the sovereign will of the State.

The power to repeal is as fully and completely embraced in
the general grant of legislative authority, as the power to enact
laws. This power is vested in the legislative department,
unrestricted by any express provision of the constitution.
Certainly, it is restricted in some respects by the spirit, or by
the general provisions of that instrument. For example, a law
could not be repealed if the repeal would work a divestiture of
vested rights, or impair the obligation of a contract. But,
subject to such limitations, the repealing power must of neces-
sity be as broad and as comprehensive as the power of enact-
ment. This is evident; for a repealing statute is as much an

The State of Mississippi *v.* Johnson.

expression of the legislative will of the State, as the act was which is repealed.

No specific method has been prescribed in the constitution, according to which a repealing statute should be passed. An act which proposes to repeal a previous law, must, therefore, be adopted, according to the form in which the legislative power is ordinarily exercised. That is, it must be agreed to by a majority in each house of the legislature. It cannot be doubted, that the power to repeal a law passed to pledge the faith of the State, for the purpose of raising a loan of money, before rights have become vested under it, exists in the legislature. And we think it equally certain, that the power to repeal such a law must be exercised in the ordinary mode of enacting laws; for if it cannot be exercised in that method, it cannot be exercised in any other, for the plain reason that the constitution has not so declared. The same result would follow in relation to laws passed over the veto of the governor, or to laws passed to appropriate money to works of internal improvements. Laws passed in either of these methods, as well as all laws passed to borrow money on the credit of the State, would remain on the statute book as permanent and unalterable as the constitution itself.

The power to repeal may be greater or more extensive than the power to modify, because a modification may be only a partial repeal; generally, therefore, it is true, that the power to repeal embraces the power to change or modify. But it does not follow, that in cases in which the legislature would unquestionably have the right to unconditionally repeal a law of that character, they would, therefore, possess the right to modify the law in every particular, and to any extent they might deem expedient. For the power to alter or modify, like the power to repeal, must be limited in the extent to which it may be exercised, by the true intent and spirit of the general provisions of the constitution. Hence, although the legislature possesses the unrestricted power to repeal a law of that character before it is carried into effect, a right cannot be claimed for it so to alter or modify the law as to make the amendatory act a distinct and substantive act of legislation, by which another and a distinct

63 *

pledge of the faith of the State would be effected. This is evident; for by the general intent and spirit of the constitution, it was never designed that the faith of the State for the purpose of raising a loan of money, should be pledged, unless her will, to that effect, should be indicated by the assent of two concurring legislatures.

Having ascertained that it is competent for the legislature to repeal, *in toto*, an act of the legislature, constitutionally adopted, for the purpose of raising a loan of money on the credit of the State, or for the purpose of pledging the faith of the State for the payment or redemption of a loan or debt, and the extent to which the power to alter, change, or modify, may be exercised in reference thereto, let us test the unconstitutionality of the supplemental act by the conclusions at which we have arrived.

We have already considered some of the grounds on which it is alleged that the supplement was void, and consequently that the bond in suit was illegal and invalid, having been executed and delivered under the authority thence derived. We have seen that the supplement did not authorize the issuance of State bonds, by which a debt would be imposed upon the State, and that no attempt was made in that act to pledge the faith of the State for the payment of any loan or debt, and that it did not attempt a renewal of the pledge contained in the original act.

By the 1st section of the original act, it was provided, that an institution should be established, under the title of "the Mississippi Union Bank," with a capital of fifteen millions five hundred thousand dollars, to be raised by means of a loan to be obtained by the Directors of the institution. To aid the bank in the procurement of the capital, the faith of the State was pledged. The pledge is contained in the 5th section, and if disconnected or independent of the other provisions of the act, it is absolute and unconditional. In that section it is declared "that in order to facilitate the said Union Bank for the said loan of fifteen millions five hundred thousand dollars, the faith of this State be and is hereby pledged both for the security of the capital and interest," &c.

It is not contended that the 5th section, which contains this

The State of Mississippi *v.* Johnson.

pledge, has been repealed, or attempted to be repealed, or altered, or in anywise modified by the enactment of the supplemental act. It is however insisted that provisions of the original act, which prescribed the conditions on which the State pledged her faith, have been repealed or materially modified, whereby the contract, by which the State guaranteed the payment of the bonds, has been materially altered.

The provisions of the act referred to as having been repealed or essentially modified, are contained in the 8th, 11th, 19th, and 31st sections of the original act.

By the 31st section the State was to be entitled to a standing accommodation in the bank of two hundred thousand dollars, on paying the usual rate of interest; under the 19th section the State was entitled to one tenth of the net dividends or profits of the Bank as a bonus; by the 11th section the stock-holders were required to pay in cash, ten dollars per share, for each share of their stock, at such time as the directors should require; and by the 8th section, the subscribers were bound to secure the payment " of the capital and interest of said bonds," by the execution of mortgages satisfactory to the directors, on property to be in all cases equal to their respective stock. These stipulations, it is contended, were the terms on which the State agreed to pledge her faith and issue her bonds to procure the capital of the bank.

It is not only contended that they were the conditions of the pledge, but were in truth and fact intended to be conditions precedent to any liability of the State.

It is unnecessary to comment upon the position, that the provisions of the 11th, 19th, and 31st sections, were intended to direct the performance of acts, previous to the doings of which the bonds of the State could not legally be issued. For unless such were the intention of the charter, it is manifest that they cannot be regarded as conditions at all, on which the liability of the State would attach, as her obligation would commence so soon as the bonds were legally issued, and it is scarcely necessary to remark that it was contemplated by the legislature, that the bonds should be issued before she could be entitled to receive one tenth of the dividends of the bank, or enjoy her

standing accommodation, or before the directors might require of the stockholders a payment of ten dollars on each share of their stock.

If the execution of the mortgages by the stockholders, intended to secure the payment of the principal and interest of the bonds, as provided in the 8th section, was a condition upon which alone the bonds could be legally executed and delivered to the bank, then it is evident, that the liability of the State could not attach until that was done. In that case, the execution of the stock mortgages, in the strictest sense, would be a condition precedent.

It is conceded, as contended for, that upon a just construction of the charter, the stock mortgages were not to be executed until the subscription books were closed, the stock graduated, and the stockholders ascertained. But we have shown that, upon the true construction of the charter, it was intended by the legislature, that bonds might issue so soon as fifty thousand shares were subscribed, and a provisional directory appointed by the governor, and that it was within the intention of the act, that the directors would be appointed before the books for the subscription of the stock to the bank were closed, and, consequently, before it could be ascertained who were the stockholders, and, of necessity, before the stock mortgages could be executed.

The bonds, then, to be issued, were to be in amount equal to the sums subscribed and secured to the satisfaction of the directors by a pledge of real property. That was the condition on which the right of the directors to apply to the governor for a delivery of the bonds, as well as his authority to issue them, depended; hence, it is impossible that the execution of the stock mortgages was the condition, on the performance of which the bonds were to be delivered to the bank; and as the pledge of the faith of the State would attach, and her obligation be fixed, by a legal delivery of the bonds by the governor to the bank, it follows, as a necessary consequence, that the execution of the mortgages required by the 8th section, was not a condition on which the State, by the pledge of her faith, would become bound.

The execution of the stock mortgages, then, not being a condition precedent on which the liability of the State depended, it results that they are to be regarded as a security, and in no other light, provided in the charter, by which the State was to be indemnified against her liability on the bonds.

Regarding the mortgages as a security to the State, and not as the condition of her contract, the question arises, whether it was competent for the legislature, in the ordinary method of enacting laws, to repeal the provision of the charter, by which it was provided, or, in other words, to dispense with the security altogether?

If the repeal or discharge of that indemnity would not constitute a distinct and substantive act of the legislature, by which another and distinct pledge of the faith of the State would be made, there is no pretence for saying that the legislature did not possess the unconditional authority, however unwise or inexpedient the exercise of it might have been, to pass an act for that purpose. The simple statement of the proposition is sufficient to show that it is correct; for, undeniably, the right to release any debt, obligation, or liability assumed by any person to the State, or any penalty incurred, is included in the general grant of legislative power in the constitution.

The same principle applies with full force to the alterations made in the 11th section, and the alleged repeal of the provisions of the 19th and 30th sections, which secured to the State one tenth of the net profits of the bank, and a right to a standing loan of two hundred thousand dollars. The repeal of those provisions may have been unwise; it may have been a flagrant abuse of their powers, by the legislature; but with questions of that character it is not our province to deal; our province is to determine whether the authority does or does not exist, and for that purpose alone we look to the constitution.

· It is further contended, that the 1st section of the supplement, which authorizes the State to become a stockholder, has produced a radical change in the character and organization of the corporation. This proposition is based upon the 4th section of the original act, by which it is declared, "that the

owners of real estate, situated in the State of Mississippi, and who are citizens thereof, shall be the only persons entitled to subscribe to the stock of the bank."

In support of this position, it is seriously urged, and gravely maintained, that by the introduction of the State as a stockholder, a new and distinct corporation was established: hence, as the State, by her contract, agreed to deliver a specified number of bonds, for a stated amount, to the Mississippi Union Bank, as constituted by the charter of incorporation, the supplemental act which created a new corporation and required the bonds to be delivered to it, thereby materially and essentially changed the terms of the contract; and in effect created a new pledge for different purposes.

Respect for the learned and ingenious counsel who urge the argument, requires us to notice it.

The 1st section of the supplement has not, it is evident, changed the general structure of the corporation; it has not changed the method in which the capital of the bank was to be procured; it has in no respect altered the purpose to which it was to be applied; nor has it changed the principles upon which its operations were to be conducted.

The contract of the State was with the corporation, as a person created by law, and not with the individual corporators. The pledge was given in order to facilitate the bank, as a corporate body, not the subscribers to the stock, in procuring its capital. The bonds were to be delivered to the bank, in its corporate character, and the bank, in that character, and not the stockholders, were authorized to negotiate them. The distinguishing peculiarity of a corporation is, that it is an artificial being or person endowed with perpetual vitality; although the individuals who compose it may be constantly changed; although they may be rapidly and entirely changed, yet the corporation in its entire end, maintains its identity and continues its existence. Hence, we cannot conceive how a corporate body, whose identity is in nowise dependent upon the identity of the individuals who compose it, but which consists in the purposes for which it was created; its privileges and capacities as defined by its organic law; a corporation which

might consist of one hundred and fifty-five thousand corporators, could be changed by the introduction of a single corporator, who, though not a resident citizen of the State, was nevertheless composed of the whole of the citizens of the State. Hence, we are also unable to understand why a delivery of the bonds to the bank, of which the State was a stockholder, for that reason and that reason alone, would not, in a strict technical sense, be a delivery to the bank as established by the original charter.

The argument would doubtless be sound and entirely applicable, if the guarantee of the State had been given to a copartnership or to any voluntary association of unincorporated individuals. For example, if the State were to guarantee the payment of a debt, to be incurred, or the performance of a contract to be made by two persons, she would not, by the terms of her agreement, be bound for the separate debt of either, or for a joint contract or debt of either, or both of them, with a third party. But if they constituted a corporate body, and the guarantee had been given them in their corporate character, the rule would be different, for the plain reason, that the introduction of a new corporator, or the change of a former one, would not constitute a change in the parties to the contract.

From the view we take of the questions connected with this branch of the subject, we are compelled to hold, that the supplemental act was not void in consequence of not having been passed in conformity with the directions contained in the 9th section of the 7th article of the constitution.

In the argument at bar, it was contended that the first section repealed or dispensed with the execution of the mortgages provided for in the 1st clause of the 8th section of the original act, for the amount of the stock subscribed in behalf of the State.

That the security required to be given, constituted an essential condition upon which the faith of the State was pledged. Hence, that it could not be repealed or dispensed with by an act of the legislature passed in the ordinary method of enacting laws.

Let it be admitted that the supplement would be unconstitutional if it were intended to effect a partial repeal of the 8th section.

The question arises, whether such in fact was its intent and operation.

The original act and the supplement, it is true, are separate legislative enactments.

But, when they are to be construed for the purpose of enforcing their respective provisions, they must be examined in reference to each other. Being strictly *in pari materiâ*, they should be construed as one statute. Hence, upon a familiar rule of construction, we are bound to give to each of the provisions of these two acts their full operation and effect, if they can by any just interpretion be made to harmonizê. For otherwise, the full and entire intentions of the legislature might not be carried into effect.

Applying this principle, the first remark to be made upon the two acts, is, that it was the manifest intention of the legislature to supply ample indemnity to the State against her liability on the bonds, which were to be issued under the provisions of the charter. This careful consideration for the safety of the State, is apparent from many provisions of the charter. By the 7th section it is made the duty of the bank to pay both the interest and the principal of the bonds as they shall severally fall due. By the 8th section, as we have seen, mortgages were to be given by the stockholders to secure the payment of the principal and interest of the same. Hence, the entire assets of the bank, including the mortgaged property of the stockholders, were subjected to the payment of the bonds.

It is, then, evident that, under the provisions of the original charter, the State never contemplated the payment of a dollar, unless the mortgaged property and the entire assets of the bank should prove insufficient to discharge the bonds.

If the supplement has released any part of that security, and the State has thereby been subjected to loss or danger of loss, we may expect to find that a sufficient inducement, which constituted the motive of the legislature, was offered. Otherwise,

the action of the legislature, in that respect, would not only be unmeaning but exceedingly unwise.

What, then, was the motive which operated upon the legislature, and which induced them, as it is alleged, to release the security provided in the original act, to the extent of five millions of dollars? It was certainly not released, in order to obtain the privilege of becoming a stockholder; as it was perfectly competent for the legislature, at the passage of the supplement, no rights then having vested under the charter, to have altered it in any respect which would not have interfered with the essential conditions of the State's pledged faith. The State might have stipulated in the supplement for a greater proportion of the profits of the bank than the tenth of the dividends reserved in the 19th section, or a sum in specie 'might have been demanded. Hence, the authority to subscribe to the stock, in behalf of the State, was not a privilege conceded by the bank, but a right reserved by the State. Indeed, we may look in vain for an adequate motive on which to base the action of the legislature, unless it should be conceded, that the provision of the first section, by which the State was made a stockholder, is essentially and necessarily repugnant to the provisions by which the stockholders were bound to secure the payment of the whole of the bonds. In other words, that the State could not subscribe to the stock, without thereby releasing the individual subscribers from the obligation to secure the payment of the whole of the bonds. In that event, it might be supposed that the State would prefer to forego the advantages she held under the original charter, that is, complete security against her liability, and a right to one tenth of the profits of the bank, with the right to a standing accommodation, in order to become a stockholder with all the risks and liabilities attaching to her as such.                                    •

A marked feature in the original act is the care manifested to guard the State against the consequences of the possible failure of the bank. The entire security of the State was a paramount consideration with the legislature.

The provisions, therefore, which were intended to effect that object, are important and material. We are hence bound to

hold them unrepealed or substantially altered by the adoption of the supplement, unless its directions are manifestly inconsistent with and repugnant to those provisions.

In what respect, then, does the first section of the supplement conflict with the provisions of the 8th section of the original act? The supplement directs that five millions of the stock shall be subscribed in behalf of the State, and paid for out of the proceeds of the bonds which were to be issued under the original act.

Could not that be done without impairing to the smallest extent, the security held against her liability? Surely this will not be denied.

If the legislature had directed that one third of the net profits of the bank should be paid to the State, in consideration of the loan of her credit to the corporation, instead of the one tenth, as provided in the original act, there would have been no doubt on the subject, that the security of the State had not been repealed to any extent whatever; and this was substantially the object and effect of the supplement.

The capital was not to be contributed by the stockholders. It was to be procured by means of a loan to be effected on the credit of the State.

The State, in fact, was to furnish the whole of the capital. The bank was bound to pay the bonds, both principal and interest, as they should fall due. The money borrowed by the State, or the capital of the bank, was therefore pledged for that purpose. The bank could only pay the bonds by means of the profits of its banking operations, or by an application of the capital itself. The stockholder, by virtue of his subscription and the execution of the required mortgage, acquired a right to his proportion of the dividends, which were to be paid out under the provisions of the charter, before the bonds were paid off and discharged. He was also to be entitled to this proportion of the surplus, if any should remain, after that was done and the affairs of the bank closed. The State, as a stockholder, in these respects, was entitled to the same rights, and nothing more. Hence, the effect of the first section of the supplement was to secure to the State the dividends or profits

which might be made upon the proportion of the capital of the bank which her stock represented; which would be a little less than one third of the whole.

It seems, therefore, scarcely to be doubted, that the adoption of the first section of the supplement was not a constructive repeal of any of the provisions of the 8th section.

The question, then, like all questions which arise in the interpretation of the statutes, is one purely of legislative intention.

The presumption is never entertained, that the legislature, in the enactment of any law, intentionally transcended its constitutional authority. Hence the rule, in construing statutes, that an interpretation will never be adopted, which will make an act conflict with the constitution, if it can be made to bear a different one, which is in harmony with its provisions.

The objection to the provisions of the first section is based exclusively upon the supposition that it is unconstitutional; and it is alleged to be unconstitutional because it repeals in part the 3d section of the original act.

Applying the rule above laid down, there is no escape from the conclusion, that the legislature did not intend to repeal or modify the provisions of that section, as it has not expressly declared its intention to do so; and as we can put a construction upon the two acts which will make their respective provisions in reference to this subject harmonize with each other and with the constitution.

The act as it was passed on the 5th of February, 1838, was deemed by the legislature to be imperfect in several of its minor details and some of its important provisions.

The objection mainly urged was, that the law was inexpedient and unjust as it regarded the State. The law proposed to lend the credit of the State to a banking corporation, to the extent of fifteen and a half millions of dollars, by which means it was expected the stockholders in the bank would be enabled to realize great profits. Of necessity, comparatively but few of the citizens would or could become participants in the enterprise. The entire consideration to be received by the State,

was one tenth of the net profits of the bank, and a right to a credit of two hundred thousand dollars in the bank, upon the payment of the usual rate of interest. The consideration secured by the act was deemed inadequate. It was thought to be greatly disproportioned to the very extraordinary grant of privileges made to the corporation, by which it would be enabled to wield a capital, which in fact belonged to the whole State, of fifteen and a half millions of dollars. This was the evil which mainly engaged the consideration of the legislature, and which it was intended to be remedied by the passage of the supplemental act. The legislature designed to secure a just and adequate consideration for the grant of her credit by the State.

In adjusting the provisions of the supplemental act, the security of the State was not overlooked. This is shown by the journals of the house of representatives, in which the bill was introduced. A resolution was passed instructing a committee of the house to inquire and report whether the bill for the incorporation of the bank could be constitutionally amended; if so, how far, and whether it would not be expedient so to amend the same, as to convert the said bank into an institution owned and entirely controlled by the State of Mississippi. House Journal, 1838, 59.

The said committee, whose report was received and agreed to, reported, that, in their opinion, it was competent for the legislature to amend the details of the Union Bank charter, but as to that portion of the said charter which related to the subscribers or stockholders "being, in their opinion, the primary condition on which the faith of the State was to be pledged, they had no power to change the same, unless it should be again submitted to the people." Ib. 117.

Taking it, then, as certain, that it was the opinion of one branch of the legislature, that they had not the power to alter the provision in relation to the subscribers and stockholders, because they considered it the condition upon which the faith of the State was to be pledged, the inference is a very strong one, that they did not, by an act passed at the same session at which the report of the committee was made and agreed to,

intend, not having expressly so declared, to repeal or alter that very condition.

Assuming, then, that it was not the intention of the legislature to part with any security which had been provided, we are bound to put such an interpretation upon the supplemental act, if it can be done consistent with the recognized rules of construction, which will most fully carry into effect the intentions of the legislature.

It will not be doubted, that in the adoption of the supplement, the principal object was to secure a more just and adequate compensation for the grant of the State's credit, than was provided in the original act. But this object, the main purpose of the act, would be entirely defeated if it should be held, that the provisions of the 8th section were repealed to the extent contended for in the argument.

That such a result would follow, is not to be doubted, unless it can be shown that the privilege of becoming a stockholder, to the amount of five millions of dollars, was the price or consideration for the loan of the State's credit, which the legislature designed to effect by the adoption of the supplement. But this right to subscribe to the stock can in nowise be considered any part of the consideration which the legislature intended to secure, for the plain and obvious reason, that it was not a concession by the corporation, or the private stockholders to the State, but a simple reservation of an unquestionable right.

Taking it, then, as certain, that the right to take stock in the bank, in behalf of the State, was no part of the consideration upon which the State had agreed to lend her credit to the corporation, upon the supposition that the stockholders were released from the obligation to secure more than ten millions and a half of the bonds, leaving the State unprotected to the full amount of her stock, or five millions of dollars, what would the State gain by the supplemental act? We answer, nothing not one cent.

On the contrary, she would be greatly the loser by the operation. For, having parted with the whole of the privileges and emoluments secured in the 19th and 31st sections of the

64*

original charter, if the provisions of the 8th section were repealed so as to leave five millions of the bonds unprotected, by the mortgages therein provided, the State would stand in no other attitude than a private stockholder, being subject to all loss or risk of loss, which might occur by the loss or destruction of the capital.

We do not believe that such was the intention of the legislature, or that such a construction can legitimately be put upon the supplemental act; which would bring it in conflict with the 8th section of the original act. We hold, therefore, that the provisions of the latter section have in no respect been changed.

Having examined the several grounds on which it was alleged, that the supplemental act was void, we have come to the conclusion that it was not void, but hold it to be a valid legislative enactment.

In the case of *Campbell et al.* v. *The Union Bank*, 6 How. (Miss.) R. 625, the question of the constitutionality of the supplemental act was a subject of adjudication. The court in that case adopted the same conclusion to which we have been led by a careful examination of the subject. The decision in that case has been attacked, and its authority questioned, on the ground, that the question decided was not properly in the case or before the court; but, we think, without sufficient reason. The question was raised, and elaborately discussed by counsel, and although the decision was not made to turn upon the question of the validity of the supplement, it was in the case and was directly decided by the court.

The language employed in delivering the opinion, was direct and explicit in regard to the question we have considered.

It leaves no doubt, that it was the well defined opinion of this court, at that time, that the supplement was constitutional.

The opinion of the court was delivered by the learned chief justice, who said: " It appears that the original charter, in which this provision (the 5th section) is contained, was passed in accordance with the provision of the constitution. The

supplemental act makes no alteration whatever in regard to this section. It changes in some respects the mere details of the original charter, in the mode of carrying the corporation into successful operation, and authorizes the governor to subscribe for the stock on the part of the State. The object of the pledge is not changed; on the contrary, the supplemental act was passed in aid of the original design."

Concurring with the opinion of the court in that case, we might have been justified in resting our decision on the validity of the supplemental act upon the authority of that case.

We might thus have avoided the labored investigation we have gone into; but the respect which we felt to be due to the learned and ingenious arguments of counsel, and the peculiar prominence which has been given the question, made it proper that we should, with diligence, examine the various grounds taken in regard to the unconstitutionality of the supplemental act.

The conclusion to which we have come, in regard to the validity of that act, dispenses with the necessity of deciding whether the bond in suit was issued under it, or under the original act, as in either case, so far as the mere fact of the execution or delivery was concerned, it would not be void.

The next question presented for our examination is, whether the bond is not void, as to the State, because it was executed and delivered to the bank before the mortgages were given as required by the 8th section of the original act.

The facts in reference to this question, as we have seen, are admitted by the respective counsel. It is agreed, that the bonds which were issued by the governor, including the bond in suit, and amounting in the aggregate to five millions of dollars, ·were executed and delivered to the bank, before "the mortgages required to be given in the 8th and 30th sections of the original charter had been executed or delivered to said bank."

The 30th section does not provide for the execution of mortgages. In the argument it was insisted, that the security alluded to in that section was the security which was provided ·in the 8th section. The latter section, as we have seen, pro-

vided, that, to secure the payment of the principal and interest of the bonds, the subscribers should be bound to give mortgage, to the satisfaction of the directors, on property, to be in all cases equal to the amount of their respective stock.

The argument on this question, proceeded on the supposition that the execution of these mortgages was a condition precedent to the execution and delivery of the bonds. Upon that ground it was contended, that the State could not be made liable on any bond, although issued by the governor in the discharge of authority derived from the act, unless, in fact, the mortgages had been previously executed.

We have above decided, that the liability of the State, under the operation of the act, would attach, so soon or whenever the bonds were legally executed to the bank, and that the execution of the mortgages was neither a condition precedent to the pledge of the faith of the State, nor the condition on which the State bonds were to be executed and delivered.

According to the facts agreed upon, the bond in suit was issued by the governor, under the seal of the State, for and on account of the Mississippi Union Bank, and it was transferred by the bank, and passed into the hand of the complainant, as assignee, for a valuable consideration.

These facts are sufficient to establish a right, *primâ facie*, on the part of the complainant to recover. And applying the principles which we have settled in the cause, there is nothing in the record which could warrant this court in holding that the bond in suit was either irregularly issued under a valid authority, or issued without any authority and in violation of law.

But were it conceded, that upon a just construction of the charter, it was not the intention of the legislature that the bonds should be issued unless the mortgages were previously executed, the same conclusion would follow.

The same principles which govern in matters of contract between private individuals, apply to all contracts to which a State has become a party. This rule is founded on the presumption, that sovereign States, who are supposed to be always ready to perform their undertakings, and to discharge their just

obligations, could desire no better rules by which to ascertain their own obligation and rights, than those according to which they dispense justice to their citizens.

We have above quoted the provisions of the charter, which prescribed the duties and defined the authority of the governor and the directors, in regard to the execution and sale of the bonds.

Upon the supposition that the execution of the mortgages was the condition on which the bonds were to be delivered to the bank, there would be no room to doubt that the directors were vested with a discretionary authority, in regard to the execution and sufficiency of the mortgages required to be given by the stockholders. The 26th section declares, that the board of directors shall be the judges of the sufficiency of the mortgages offered for stock and loans, and shall have power to reject the same, if not sufficient; they may also require other security, and in default thereof, reduce the shares of such defaulters to the amount sufficiently secured.

Further directions are given in the 30th section. The directors were authorized to apply to the governor for the bonds, who was thereupon to issue them from time to time, in amount proportioned to the sums subscribed and secured to their satisfaction.

These provisions vested the directors with ample discretionary authority, in regard to the execution of the mortgages. They might reduce the shares of the subscribers, and might even reject the subscription altogether, if in their opinion the property offered was insufficient or the title insecure. In the express language of the act, they were made the judges of the sufficiency of the mortgages. The powers conferred upon them in respect to the mortgages, were intended to be used expressly for the benefit of the State. Their authority extended to the determination of the important facts involving the rights of the subscribers to the stock, as well as the interest of the State, and their determination was irreversible. Hence, on the hypothesis that the execution of the mortgages was the condition on which the execution of the bonds and the liability of the State depended, the directors were doubtless officers, or special

agents of the State, vested with ample discretionary authority to determine whether that condition was performed agreeably to the directions of the charter. And if such was their character and authority upon well recognized principles, their determination in regard to the matters committed to them, was binding on the State.

That the directors exercised the authority vested in them by the law, and that they did determine that the condition on which the bonds were to issue had been performed, was established in the estimation of the law, by the facts, that application was made to the governor for the bonds, and upon such application, that they were issued by him. The facts necessarily embraced in the determination of the directors, that is, the legal execution of the bonds required by the 8th section, are held, in law and equity, as conclusively proved, so far as the rights of third parties arising from that action of the directors are concerned. The only question which can arise in reference to the determination of the directors is, whether, under the act, they had the power to decide that the stock subscribed was properly secured; and, having determined that fact, whether they had a right to apply to the governor for the bonds, and whether the holders of the bonds came fraudulently into possession of them. In other words, the questions are, power in the directors, and fraud in the holders of the bonds. Hence, the admission that the mortgages were not executed previous to the issuance of the bonds, can have no effect upon the right of the complainant to relief against the State.

The principles which govern the case under consideration are distinctly laid down by the supreme court of the United States, in the case of *The United States* v. *Arrondo et al.*, 6 Peters, 691. The court in that case say, that " it is a universal principle, that where power or jurisdiction is delegated to any public officer or tribunal over a subject-matter, and its exercise is confided to his or their discretion, the acts so done are binding and valid, as to the subject-matter, and individuals will not be disturbed collaterally, for any thing done in the exercise of that discretion, within the power and authority conferred. The only questions which can arise between an individual claiming a right under

the acts done, and the public or any other person denying their validity, are power in the officer and fraud in the party. All other questions are settled by the decision made, or the act done by the tribunal or officer, judicial, legislative, executive, or special, unless an appeal is provided for; or otherwise, revision by some supervisory tribunal is provided by law."

According to the doctrines here recognized, whether we regard the directors as occupying an official relation, or as special legislative agents, vested with authority to decide whether the stock was sufficiently secured agreeably to the terms of the charter, it is clear that their decision made upon the subject committed to them, is obligatory upon the State. And it matters not how erroneous that decision may be, or how fraudulent, unless the party claiming a right under it is affected with a knowledge of the fraud, it is not the less conclusive of the fact that the security was given.

Conceding, then, that it was the expressed intention of the legislature, that the bonds should not issue unless the mortgages were previously executed, a *bonâ fide* transferree of the bonds would be perfectly shielded by the action of the directors, and the admission on the part of the State that the decision of the directors was correct, implied by the delivery of the bonds to the bank.

We will here close our remarks upon this question, which have already been extended too far, as the point we have been discussing is not necessarily involved in the decision of the cause.

The bonds bear date the 5th June, 1838. They were sold on the 18th August for five millions of dollars, the aggregate amount, in the city of Philadelphia. The proceeds were to be paid in five instalments; the four first in New Orleans, and the last at Natchez. The bonds bore interest from date, at the rate of five per cent. per annum.

Including the interest which would accrue up to the time at which the respective instalments would become due, the bonds were sold for less than their nominal value. As they were sold for less than their nominal value, it is said they were sold in violation of the 9th section of the supplementary act, which

provided that the bonds should not be sold under their par value.

Hence, it is alleged that the contract by which they were transferred to the purchasers was illegal and void, and, consequently, conveyed no title to the assignee.

This objection was not urged in the argument by the attorney-general; and I allude to it now, more for the purpose of referring to the opinion of my colleague, Judge Yerger, and to express my concurrence in the conclusion at which he has arrived, than for the purpose of a particular examination myself.

The claim in controversy is entirely legal in its character; but as it is a demand against the State, it could only be enforced in the court of chancery.

That court, in some cases, under certain circumstances, may adjudicate upon the legal rights of parties before it. But in such cases there must exist incidents of an equitable character, which in the first instance gave to that court jurisdiction; and having obtained jurisdiction, a court of chancery will, upon a fixed principle, decide all the questions in the case, whether they are legal or equitable. But in all cases, that court administers justice according to the peculiar forms and principles of a court of equity. In cases like the one at bar, in which the State is a party, its jurisdiction depends upon the statute alone. But we presume in designating the court of chancery as the court in which suits against the State, whether for the assertion of equitable or legal demands, must be brought, it was not intended by the legislature to alter the principles upon which the law is administered in a court of equity. Hence, all of the rights of the parties to the present suit, whether equitable or legal, will be protected and enforced.

It is a maxim of a court of equity, that he who seeks equity must do equity.

If we shall determine, that for aught that appears upon the record, the bond in suit was not void, but, on the contrary, was a valid and binding obligation, when delivered into the hands of the bank, against the State, it will follow, that although the latter might not be bound in law or equity to pay more upon

The State of Mississippi *v.* Johnson.

the bond than was received by the bank, under no circumstances would an innocent assignee for a valuable consideration, be entitled to receive less than the amount actually received by the bank.

Hence, if it were conceded, that in consequence of an illegality in the sale, an action at law could not be maintained upon the bond, the question before the chancellor was not whether the complainant had a right to relief, but simply as to the amount of the decree.

We are of opinion, that it does not appear from the facts of the case that the bonds were sold for less than their par value; consequently, that the sale was neither illegal nor void.

I deem it unnecessary to comment upon the grounds upon which I base my opinion on this point, as the question will be fully examined in the concurring opinion of my colleague, Judge Yerger.

Having examined the questions which we believe to be material to the decision of the case before us, with the care and diligence which their importance demand, and being satisfied that the decree of the chancellor was correct, it becomes our duty to affirm it.

Mr. Justice YERGER delivered the following opinion in the case.

While I concur most fully in the opinion of the court, pronounced by the chief justice, 1 deem it proper to express my individual opinion upon the questions presented by the record, and to give some of the reasons which have influenced the formation of that opinion.

The importance of the questions in controversy will justify, if they do not require, this course. Every member of the court has given to this case an attentive and careful examination. The important and interesting questions arising in it, and which were presented in a novel and unusual manner, were well calculated to evoke a most patient investigation.

On the one hand, a private individual presented himself before the judicial tribunals of the State, alleging that he had a just and legal demand against the State, the payment of

which had been refused; that this demand consisted in the bond of the State, sealed with the great seal, signed by the governor and treasurer, and executed and delivered to him, pursuant to an act of the legislature, by which the faith of the State was pledged for its payment and redemption.

On the other hand, the State of Mississippi denied the validity of this bond, alleging that it was sealed and delivered by the governor without authority, and that the act of the legislature, from which he pretended to derive his power, was unconstitutional and void, and that no contract or agreement made under it created any valid obligation binding upon the State.

We are not unaware of the unusual·interest which these questions have excited for many years, and that they were at one time the subject of an animated political controversy.

But sitting here as judges to administer the law, under the solemn sanction of our oaths, we have endeavored to discard from our minds every extraneous and improper influence, and to address ourselves without bias, to the candid examination of the legal questions presented by the record. As judges, it is our duty to declare the law, not to make it. Reasons of State policy or political expediency should not influence our judgment. It is our duty to decide the law of the case as it appears upon the record, regardless of all consequences. Entertaining these views, and having formed my opinion in accordance with them, I am only anxious to explain the grounds on which I have proceeded, so as to satisfy the mind, that the judgment given in this case, is the only one which could have been given in accordance with the rules of law.

The first question presented for our examination, was the right or power of the court to entertain jurisdiction of the case.

In all governments it is a fundamental maxim, that no suit can be instituted against the State without its own consent; but, as a distinguished writer upon international law has observed, " as the promises, the conventions, all the private contracts of the sovereign are naturally subject to the same rules as those of private persons, if any difficulties arise on the

subject, it is equally conformable to the rules of decorum, to that delicacy. of sentiment, which ought to be particularly conspicuous in a sovereign, and to the love of justice, to cause them to be decided by the tribunals of ,the State; and such, indeed, is the practice of all civilized States that are governed by settled laws." Vattel, Laws of Nations, 226.

Under the influence of such just and proper sentiments, the State of Mississippi has declared, that "the legislature shall direct, by law, in what manner, and in what courts, suits may be brought against the State." Constitution, Art. 7, § 10.

In obedience to this requirement of the constitution, it was enacted by the legislature, by an act passed 15th February, 1833, that "hereafter, it shall be competent for any person or persons deeming him, her, or themselves, or body politic, to have a just claim against the State of Mississippi, to exhibit and file a bill in equity, in the superior court of chancery, against the State," &c. Hutch. Code, 769.

Since the enactment of this statute, many suits have been instituted against the State in accordance with its provisions, and decrees in many instances have been rendered against the State. The present suit was brought pursuant to these provisions, and a doubt cannot, therefore, exist, that under the constitution and laws, we have jurisdiction of it, and are bound to render judgment in the premises.

In this matter we have no discretion : the path of duty is plain and obvious. As the constitution and laws have authorized suits to be instituted against the State, it is the duty of the court to pronounce judgment in them, as in all other cases that may come before it.

As the plaintiff has appealed to the judicial tribunals of this State, the matters in controversy must be decided according. to the constitution and laws of Mississippi, and to those rules of law which regulate and govern alike the contracts of States as the agreements of private individuals.

It is a principle of international law, applicable to all nations, and recognized by every civilized community, that every treaty, compact, contract, or agreement, entered into by the proper

authority, in the name and on behalf of the State, is binding and obligatory upon the State; and every principle of equity and good faith requires its performance and fulfilment. This general rule, however, must be understood with this qualification or limitation, that is, wherever the constitution of the government, or the fundamental law of the State, has limited the power and authority of those authorized to contract in the name of the State, no compact or agreement made by them, will bind the State, unless made in accordance with the provisions and requirements of the fundamental law. Whoever, therefore, undertakes to deal with a party purporting to contract in the name of the State, must look to the power and authority of that party to bind the State, according to the constitution and laws of the same.

As a general proposition, it may be stated to be a fixed rule of law, that every sovereign and independent State has the right to borrow money, to create debts, and to pledge the faith of the State for the payment and redemption of the same. It may be also stated, as an equally fixed rule, that the legislature of every State in this Union has full power and authority to contract loans in the name of the State, and to pledge the faith of the State as a security for the payment and redemption of the same, and may exercise this power, unless its exercise has been prohibited by the constitution of the State. This right pertains to the legislature as a usual and ordinary power of government belonging to every independent political community. It is a right possessed fully by the legislature of the State of Mississippi, but one which must be exercised by it, pursuant to the provisions of the constitution. These provisions are as follows: "No law shall ever be passed to raise a loan of money on the credit of the State, or to pledge the faith of the State for the payment or redemption of any loan or debt, unless such law be proposed in the senate or house of representatives, and be agreed to by a majority of the members of each house, and entered on their journals, with the yeas and nays taken thereon, and be referred to the next succeeding legislature, and published for three months previous to the next regular election, in three newspapers of this State, and unless

a majority of each branch of the legislature, so elected, after such publication, shall agree to and pass such law." Constitution, Art. 7, § 9.

It will thus be readily seen, that the constitution does not prohibit the power of the legislature to pass laws to bind the State for the payment or redemption of a loan of money. On the contrary, the power exists in the amplest degree, but it can only be exercised in the mode and manner prescribed by the constitution.

The object had in view by the framers of the constitution is obvious. It was not to take away from the legislature the power of passing laws to borrow money in the name of the State, but to provide against hasty, inconsiderate, and ill-advised legislation, by means of which heavy burdens might be cast upon the people of the State.

It is frequently argued, that this provision of the constitution refers to the people of the State the question, whether, or not, the law shall be passed. But this is a mistake. The law is to be passed by one legislature, and then "referred to the next succeeding legislature," not to the people; and if passed by a majority of each branch of the legislature, to whom it is thus referred, and approved by the governor, it then becomes the law of the State; and contracts made under it are obligatory and valid.

It is true, that a publication of the law is required to be made for three months " previous to the next regular election," but the law itself is not submitted to the people, for their ratification or approval. It may, indeed, be presumed, that members of the legislature will be selected with some reference to their opinions upon the propriety of passing the law; yet the people themselves never vote upon the law itself.

Indeed, as the government of the State is organized under the constitution, it may be that a majority of the people voting would be in favor of the passage of the law, while a majority of the members elected to the legislature would be opposed to it, and thus prevent its enactment. So, too, it might happen, that a majority of the people were, in fact, opposed to the passage of the law, while a majority of the legislature were in

65 *

favor of it, and would have full power under the constitution to pass the law, and bind the State against the will of the actual numerical majority of the people of the State.

It is proper that these views should be borne in mind, as this question is frequently argued upon the assumption that the constitution refers a law by which it is proposed to pledge the faith of the State for a loan of money or the redemption of a loan or debt, directly to the people for their approval; and that the law when reënacted by the second legislature, becomes a compact or agreement, made by the people, instead of a law of the State, passed by the legislature of the State under the provisions of the constitution, and, therefore, subject to repeal, alteration, and amendment, by the legislature, in the same manner, and to the same extent, as all other laws, the enactment of which is authorized by the constitution.

It is alleged on behalf of the complainant, that the bond on which this suit is founded, was executed by the State as a security for the payment of a loan of money made to "the Mississippi Union Bank," and that the faith of the State was pledged for the payment and redemption of the same, by a law passed in the manner prescribed by the constitution. This is denied by the State, which contends that the statute, by virtue of which the governor executed and delivered the bond, was not passed in accordance with the requisitions of the constitution, and that the State is not, therefore, bound to pay the same.

From the facts which are agreed in this case, and from the general laws of the State, it appears, that on the 21st day of January, 1837, an act of the legislature, entitled "An Act to incorporate the subscribers of the Mississippi Union Bank," was passed and approved.

By the first section of this act it is provided, "that an institution shall be established under the title of 'the Mississippi Union Bank,' with a capital of $15,500,000; which said capital shall be raised by means of a loan, to be obtained by the directors of the institution."

The fifth section declares, "that in order to facilitate the said Union Bank, for the said loan of $15,500,000, the faith of this

State be and is hereby pledged, both for the security of the capital and interest, and that seven thousand five hundred bonds, of $2,000 each, bearing interest at the rate of five per cent. per annum, shall be signed by the governor of the State, to the order of the Mississippi Union Bank, countersigned by the State treasurer, and under the seal of the State."

The forty-seventh section of the statute provides, " that the fifth section of this act, whereby the faith of the State is pledged for the payment and redemption of the loan contemplated by this act, be referred to the next legislature of this State, in pursuance of the ninth section of the seventh article of the constitution, and that this act be published under the direction of the governor, in at least three newspapers of this State, for three months previous to the next regular election, and that this act, with the yeas and nays thereon, be entered on the journals of the senate and house of representatives."

On the 5th day of February, 1838, this statute was reënacted by the legislature and approved by the governor, and it is admitted in the " agreed facts " of the case, that every requirement of the constitution was complied with, so as to make the same a valid law, pledging the faith of the State, in the manner and for the purposes therein contained.

On the 15th February, 1838, an act of the legislature was passed, entitled " An Act supplementary to an act to incorporate the subscribers to the Mississippi Union Bank." " The Mississippi Union Bank " was organized and went into operation pursuant to the provisions and enactments of the foregoing statutes, and the bond in suit was executed and delivered by the governor, under a supposed power and authority conferred upon him by them. The fact is also agreed, that the " act supplementary " was not passed by two legislatures.

By inspecting the original act, it will be seen that various provisions were made in it for the organization of the bank, and for the security which should be given to the State by the stockholders, as an indemnity against ultimate liability on account of the bonds. It is alleged, that this original law was altered and changed in many essential particulars by the "supplementary act," and that, in consequence thereof, no contract

could be made under them which would bind the State, until the supplement was also enacted by two legislatures, according to the provisions of the ninth section of the seventh article of the constitution. The argument in behalf of the State is substantially as follows: "The Mississippi Union Bank" was not organized under the original act, approved on the 21st of January, 1837, and 5th February, 1838, but under that act and the "supplementary act," approved 15th February, 1838; that the "supplementary act" made many important changes in the original act; that all the provisions of the original statute constituted "the law," by virtue of which the faith of the State was pledged; that this pledge was entirely conditional, dependent upon the provisions and requirements of that statute; and that as the "supplementary act" altered and repealed the original act in many important particulars, by virtue of which the ultimate liability of the State was increased, and her security greatly lessened, the State was thereby absolved from any obligation under the original act; that no material change could be made by the legislature in the original law, without absolving the State, unless the law making such change was passed by two successive legislatures, in the same manner that the original law was passed. The original statute is said to have been materially changed by the "supplementary act," in the following particulars:—

1. By the fourth section of the original act, "the owners of real estate, situated in the State of Mississippi, and who are citizens thereof, shall be the only persons entitled to subscribe: Provided, however, to secure the capital or interest of said bank, mortgage shall be given on property of a sufficient character and of an imperishable nature."

It is alleged, that by the first section of the supplementary act the above provision was changed, and the State was admitted as a stockholder for one third of the capital stock.

2. By the eighth section of the original statute, the subscribers for stock were bound "to secure *the capital* and interest of the bonds by mortgage on property, to be in all cases equal to the amount of their respective stock." This, it is said, was repealed by that section of the supplemental act which author-

ized the State to become a subscriber for stock, and thus materially impaired the security provided by the original law for the State's ultimate indemnity.

3. It is said, the 11th section, requiring a payment of ten dollars per share, to be paid in cash at the time of subscribing, was altered by the nineteenth section of the supplement authorizing the payment to be made in current bills of solvent banks, and lessening the amount to be paid to two and a half per cent.

4. It is said, the nineteenth section of the original act, which entitled the State to one tenth of the whole profits of the bank, and the thirty-first section, entitling it to a credit of two hundred thousand dollars, were repealed by the eighteenth section of the supplement.

5. It is likewise argued, that other alterations and changes were made, which had the effect to increase the responsibility of the State and to lessen her security.

In the opinion of the court, delivered by the chief justice, he has shown that, by a fair construction of the original and supplemental acts, no change materially altering the liability of the State, as provided in the original statute, was made by the supplement.

In the examination I now propose to make, I shall take it for granted that the supplemental statute did alter and repeal the original, in the manner alleged by counsel, and so treating it, the following questions are presented for consideration : —

First : Did all the provisions of the original act, chartering the Mississippi Union Bank, enter into and form a part of " the law " by which the faith of the State was pledged, or did the fifth section alone constitute that law ?

Second : If the whole of the original act constituted " the law " by which the faith of the State was pledged, could a single legislature repeal any of its provisions, so as to change or diminish the security required by it to be given to the State by the subscribers for stock ?

Third : Could a single legislature authorize any other persons to become subscribers for stock except those mentioned in the

original act, and continue the liability of the State for the loan
of money contemplated by it?

First: Did all the provisions of the original act enter into
and form a part of the law by which the faith of the State was
pledged for the loan of money, to be made by the "Mississippi
Union Bank?" It will be admitted, that if the "Mississippi
Union Bank" had been an existing corporation, it would have
been competent for the legislature, by a statutory provision, to
have pledged the faith of the State for a loan of money to be
made by it, without making the charter of the bank a part or
portion of the law by which the faith of the State was pledged.
And I presume no one would contend for a single instant, that
if such a law had been passed, it would not have been in the
power of a single legislature, with the consent of the stock-
holders, to have made any alteration in the charter without
affecting the liability which the State had agreed to assume.
It will also be admitted, that if, at the same session of the legis-
lature, two separate acts had been passed, one of them pledging
the faith of the State generally for a loan of money, to be made
by an existing corporation, and the other providing for the
security, which that corporation should give as an indemnity for
the liability the State had agreed to incur, these two acts could
not be said, in a legal sense, to constitute a single "law," so
that the repeal of the one, providing for the security to be given
to the State, would have altered or repealed that by which the
State had pledged her faith. If these premises be admitted,
and of their truth there cannot be a doubt, will the mere fact
that the law, by which the faith of the State was pledged,
formed a section in a statute which provided for the incorpora-
tion of a bank, and for the security to be given to the State for
the loan of its credit, necessarily make all the various provi-
sions, touching the organization of the bank, and the manner
in which the State shall be secured, parts and parcels of the law
by which the faith of the State was pledged. A law enacted
by the legislature, is but the expression of the legislative will
in the manner prescribed by the constitution, establishing a rule
of action in reference to a given subject; and in a single statute

may be found many laws upon distinct and different subjects. It is very certain that the legislature of 1837 might have made provision by several statutes. First: for the charter and organization of the Union Bank. Secondly: to pledge the faith of the State for a loan of money to be made by the bank, when organized. And thirdly: for the security which the subscribers for stock in said bank should give to the State as an indemnity against ultimate liability. These are three several, separate, and distinct subjects of legislation. The passage of two of them by a single legislature would have given them the force and validity of laws; but the other required the action of two successive legislatures to make it obligatory. If three separate acts of this kind had been passed, it would never have been contended that they entered into and formed a single law by which the faith of the State was pledged, and that no change could have been made in either of them, without absolving the State, unless such change had been agreed to by two successive legislatures. Nor in my opinion does the fact that these three distinct subjects of legislation were joined in one statute, alter the rule of construction which should be applied to them. It is certainly competent for the legislature to incorporate in one statute many and different laws upon distinct subjects, and such legislation is not unusual, and when so joined, though contained in the same statute, they are different laws, regulating different things, one of which may be repealed without affecting the validity of the other. Nor can it be said in legislation of this kind, that there is a tacit, binding condition, that no part of the statute shall be enforced unless all is, or that no part shall be repealed without repealing the other. I may illustrate this view by reference to the proceedings in congress, touching the bill reported at the session of 1850, usually known as the " omnibus bill." In this bill provision was made for the admission of California, the settlement of the boundary between Texas and New Mexico, the organization of territorial governments for New Mexico and Utah, for the recapture of fugitive slaves, and the abolition of the slave-trade in the District of Columbia. Now, if this bill had passed, although it is very probable that many members would have been induced to vote

for it, because of the various subjects joined in it, yet it could not be said in a legal sense, that the law for the recapture of fugitive slaves was any part of the law by which the boundaries of Texas and New Mexico were established, or that the validity of the law, admitting California, depended upon the condition that the law abolishing the trade in slaves in the District of Columbia, should not be repealed. If, then, it be conceded that the legislature possesses the power of embracing within one statute various provisions, regulating different subjects, each forming an independent law capable of enforcement without reference to the other, it was certainly within the power of the legislature in 1837, to include in the statute by which the Mississippi Union Bank was chartered, a law by which the faith of the State could be pledged for a loan of money, without making all the provisions of the statute, touching the organization of the bank, portions of such law.

The whole question in the point of view I am now considering it, is one of legislative intent. If the legislature intended that all the provisions of the statute, touching the organization of the bank, and the security to be given to the State for the loan of its credit, should form a part of the law, by which its faith was pledged, then such intention would prevail, and they would all form parts of one and the same law. But if such was not the intention of the legislature, then the mere fact that these several provisions were included in one statute, would not make them all parts of the same law, which it became necessary to pass by two successive legislatures. The question, then, arises, What was the intention of the legislature on this subject?

If we look at the act itself, that intention is obvious. By the constitution it is provided, that the legislature which in the first instance passes a law, pledging the faith of the State, shall refer that law to the next succeeding legislature for its approval. Now, in looking at this act, it will be seen that the 5th section alone was referred by the legislature of 1837 to the succeeding legislature ; that section, therefore, and that alone, was intended by them to contain the law by which the faith of the State was pledged. It was the only section of the statute which required

the action of two legislatures to give it validity. The remainder of the statute became the law, when it was passed by the legislature of 1837, and approved by the governor. It is true the 5th section may have been passed with reference to the other provisions of the statute, but those other provisions were not referred to the next succeeding legislature, and therefore formed no part of the law by which the faith of the State was authorized to be pledged. By looking at the 5th section, it will be seen that it is general, absolute, and unconditional, " that in order to facilitate the said Union Bank, for the said loan of $15,500,000, the faith of the State be, and is hereby pledged, both for the security of the capital and interest," &c. The 47th section of the act declares, " that the 5th section of this act, whereby the faith of the State is pledged for the payment and redemption of the loan contemplated by this act, be referred to the next legislature of this State, in pursuance to the 9th section of the 7th article of the constitution," &c. As it was then the 5th section which the legislature of 1837 referred to the next succeeding legislature in accordance with the requirements of the constitution, it was that section by which the faith of the State was pledged, and that section, therefore, contained " the law " pledging it; so the legislature have declared ; such they have announced as their intention, and that intention makes the law. The pledge of the faith of the State made by the 5th section is general. It is unconditional and absolute, and was made in order to facilitate the Union Bank in obtaining the loan provided for in the first section of the act. The various sections contained in the charter by which · provision was made to indemnify and secure the State· for the liability which she had agreed to assume, were not made· conditions precedent, the performance of which were necessary to give validity to the law pledging the faith of the State.. They were not conditions precedent to the passage or enactment of the law itself. At best, they can only be considered as conditions which were to be performed subsequent to the passage of the law, before the governor was authorized to issue the bonds for which the 5th section had made provision.

The State of Mississippi *v.* Johnson.

As, therefore, these various provisions touching the security to be given by the stockholders, were not conditions incorporated in the law by which the faith of the State was pledged, which were to be performed, before the law itself was constitutionally enacted, their repeal or modification might be made by a single legislature, without invalidating the law previously passed in pursuance of the constitution, pledging the faith of the State generally as a security for the loan of money to be made by the Union Bank.

Secondly: But if it be conceded that the whole of the original act by which the Union Bank was chartered, and all of the provisions thereof, constituted the law by which the faith of the State was pledged, the question then arises, Could not a single legislature repeal or modify any of the provisions of that law, touching the security and indemnity to be given to the State, without affecting those provisions of the law which pledged the faith of the State for the loan of money to be made by the bank. The solution of this question depends upon the powers which have been conferred upon the legislature by the constitution.

In this country it is a political axiom, that all political power resides in the people; that the aggregate community, the collected will of the people, is sovereign. But while this is admitted, it is nevertheless true, that the aggregate community is not the sovereignty which exercises daily the sovereign power. The aggregate people cannot act daily in their capacity as sovereigns; and hence, they assemble in convention, and organize and establish a government, investing it with so much of the sovereign power as the case requires. This sovereign power, thus delegated and placed in the hands of the government, acts for, and in the name of, the State. But the government thus established, though it possesses sovereign power, does not possess the absolute and entire sovereign power of the State. The people still retain that portion of the sovereignty which they have not delegated to the government, but as to such portions which they have delegated, the government is sovereign, as representing the aggregate will of the people.

When the people of Mississippi assembled in convention to

organize a government, they declared in the constitution which they then established, that "the powers of the government of the State of Mississippi shall be divided into three distinct departments, and each of them confined to a separate body of magistracy, to wit: those which are legislative to one, those which are judicial to another, and those which are executive to another." Constitution, Art. 2, § 1.

Again, they declare, that "the legislative power of the State shall be vested in two distinct branches," both together constituting "the legislature of the State of Mississippi." Art. 3, § 4.

Out of the general powers of government thus delegated, the constitution declares, that all of the first article, known as the "declaration of rights," shall be excepted. It also declares, that "all laws contrary thereto, or to the provisions of the constitution, shall be void." It therefore appears, that, according to provisions of the constitution, the legislature possesses the whole law-making power of the State, and may pass any law which does not contravene the provisions of the State constitution, or the constitution of the United States. With these exceptions, the legislature has the absolute, unlimited sovereign power of making laws. These laws, when made, although in the opinion of the court they may be unwise, impolitic, unjust, and oppressive, yet, if they do not contravene the provisions of the constitution of the United States, or of the State constitution, are imperative and obligatory, and it is the duty of the court to enforce them. If the legislature pursue the authority delegated to them, their acts are valid. If they transgress the boundaries of that authority, their acts are invalid. But the wisdom, the policy, the justice of their acts, within the pale of the constitution, can never be impeached or inquired into by the court.

Among the general powers of legislation, and one which is exercised at almost every session, is the power of enacting laws to absolve parties from the performance of contracts made by them with the State, to release debts due to the State, and also to release mortgages made to the State to secure those debts. This is an ordinary, usual, and general subject of legislative action, in which the power of the legislature is full, sovereign,

and unlimited. In the exercise of this power, the legislature can release any and every debt due to the State; they can release all mortgages, or other security taken or received by the State for any debt due to it. They can dispense with the performance of all contracts made with the State, and absolve the parties from all penalties and forfeitures; and these powers they frequently and ordinarily exercise.

If, then, such be the ordinary power of the legislature, and that they are, cannot be disputed, it follows, that if the subscribers for stock to the Mississippi Union Bank had executed the mortgages provided for in the eighth section of the original act, to secure the payment of the State bonds, the legislature would have had full, ample, and unlimited power to have released, vacated, and discharged those mortgages, and to have absolved the subscribers for stock from the payment of the same, and from all liability to the State. I do not say that the legislature ought to have exercised this power, or that it would not have been unwise, and impolitic, and injurious to the people for them to have exercised it. But they possessed the power, and in their wisdom and discretion they might have exercised it, and the State would still have been bound to pay the bonds for which its faith was pledged. If, then, the legislature possessed the power to have released the mortgages after they were executed, and to have absolved the subscribers from liability to the State, it follows, as a corollary necessarily deducible from this proposition, that the legislature could by law dispense with the performance of the condition or the execution of the mortgages, in the first instance. But, again, the constitution only requires the action of two legislatures to pass a law pledging the faith of the State. It nowhere provides that such a law when made shall not be repealed, altered, or modified, by a single legislature. As remarked in a former part of this opinion, when a law is passed in the constitutional manner whereby the faith of the State is pledged, it does not become a contract or compact made by the people, and, therefore, only to be changed or modified by them. But it is merely a law of the State, made by the law-making power of the State, with more deliberation and solemnity, it is true, than

ordinary laws; but still, under the provisions of the constitution, necessarily subject to repeal, alteration, and amendment, by the legislature, as all other laws.

But it is said, although this may be true, yet, as the constitution has declared that no law shall be passed pledging the faith of the State for a loan of money but by the concurrence of two successive legislatures, it cannot be repealed in any other manner. This proposition, though plausible, is not tenable under the provisions of the constitution. By looking at that instrument, it will be found that the legislative power has not been so restricted; and unless restricted by that instrument, the power to repeal, alter, or amend a law by which the faith of the State is pledged, exists, and may be exercised in the same manner that it is exercised in repealing all other laws. As before shown, the whole legislative power of the government is vested in the legislature. That power they may exercise over every subject in which they do not come in conflict with the constitution of the United States, or which is not prohibited by the constitution of the State. By looking to the constitution, it will be seen that it has prescribed the general rule by which all laws shall be enacted. This rule will be found in article 3, § 23, and in article 5, § 15, in which it is declared, that "bills may originate in either house, and be amended, altered, or rejected by the other; but no bill shall have the force of a law, until on three several days it be read in each house and free discussion allowed thereon, unless four fifths of the house in which the bill shall be pending shall deem it expedient to dispense with this rule; and every bill having passed both houses, shall be signed by the president and speaker of their respective houses;" and "shall be presented to the governor for his approval," &c. To pass a bill in each house requires only a majority thereof, and every bill passed in the foregoing manner by a single legislature, and approved by the governor, becomes the law of the State, with two, and only two, exceptions. One of those exceptions is found in article 7, § 8, in relation to appropriations of money from the treasury to objects of internal improvement, to pass which requires the approval "of two thirds of both branches of the legislature."

The other is contained in section 9, of article 7, and relates to the manner in which laws shall be passed to raise a loan of money on the credit of the State, or to pledge the faith of the State for the payment or redemption of any loan or debt.

With these two exceptions, every act of the legislature which does not conflict with the constitution of the United States, or some provision of the State constitution, if passed and approved in the manner designated in article 3, § 23, and article 5, § 15, becomes the law of the land, and is valid and obligatory.

The supplemental act under consideration makes no appropriation of money from the treasury to objects of internal improvement, neither does it pledge the faith of the State for any loan of money, or for the payment or redemption of any loan or debt; it is not, therefore, an act of the legislature coming within either of the above named exceptions. Nothing, therefore, was requisite to give it validity, but its passage and approval, according to the general rule prescribed in the constitution for the enactment of laws. It is true, the first section of the supplemental act empowered the governor to subscribe in the name of the State for stock in the bank, but it provided for the payment of this subscription out of the proceeds of the bonds which he had been directed to issue under the original act, and for the payment of which, when issued, the faith of the State had already been pledged by that law. In this connection, the question may be asked, whether the entire law by which the State had agreed to pledge her faith might not have been repealed before any contract was made under it, by a single legislature, or would it have required the concurrence of two successive legislatures to effect such repeal? The latter proposition will certainly not be contended for. No one, certainly, would insist, that if to-day a law were passed by which the faith of the State was pledged for a loan of money, to be made by the New Orleans, Jackson, and Great Northern Railroad Company, that a single legislature would not have power to repeal this law before any contract was made under it, if it became manifest that that company was insolvent, and would, therefore, be unable to pay the debt at maturity. To deny such power to the legislature, and to require the action of two

successive legislatures to make such a repeal, would place it in the power of the company, before a second legislature could act on the subject, to contract for the loan according to the provisions of the original statute, thus rendering the State liable for the debt, although one legislature might have previously repealed the entire law. Such a position could not be successfully maintained; yet, no proposition can be clearer than this. If a single legislature can repeal an entire law, pledging the faith of the State, in order to save the State from irreparable loss, the same legislature must possess the power to alter or repeal any portion of that law, which in their wisdom they may believe the greater interests of the State demand, provided such alteration or repeal does not amount to the enactment of a new " law, pledging the faith of the State for a loan of money, or the payment or redemption of a loan or debt," different from that provided for by the law thus repealed or altered. A power to repeal the whole of a law, necessarily includes the power to repeal a part. Again: Let it be supposed, that by the act of 1837 it had been declared that the subscribers for stock in the Union Bank should deliver to the governor, as a security for the payment of the money to be borrowed on the credit of the State, the stock of incorporated banking companies, and had made it the duty of the governor to issue the State bonds when such stock was delivered to him, would it be seriously contended, if this bank stock had become worthless, and totally inadequate as a security before the bonds were issued, that a single legislature would not have had the power so to alter and modify the law, as to require other and better security to be given before the issuance of the bonds?

Yet, if they could make any alteration in the law by which the security to the State was changed, they certainly might have repealed the entire provision, requiring security to be given, if in their opinion the true interests of the State required such action upon their part. Some analogous provisions of the constitution may serve to illustrate these views. By section 8, article 7, it is declared, that: " No money from the treasury shall be appropriated to subjects of internal improvement, unless a bill for that purpose be approved by two thirds of both

branches of the legislature." If, under this provision, an appropriation were made to the Southern Railroad Company, with a proviso that the treasurer should not pay the money until the company gave bond and security to repay the State, no one would contend that it would require a majority of two thirds to repeal this proviso. Why? Because a majority of the legislature may pass any law where the constitution has not otherwise provided, and it has nowhere provided that a law releasing a party from an obligation or penalty in favor of the State, shall not be passed by an actual majority of a single legislature.

In looking to the constitution, it will be seen that there is but one law which requires enactment by two successive legislatures to give it validity. That is, a law by which the faith of the State is to be pledged for a loan of money, or, for the redemption or payment of any loan or debt. All other laws may be passed by a single legislature. Now it is obvious, that a law which merely releases or dispenses with a security which had been required as an indemnity to the State for the loan of its credit, is not in any sense a law pledging the faith of the State either for a loan of money, or the redemption of any loan or debt. It is not, therefore, a law which the constitution requires to be passed by two successive legislatures, in order to give it validity.

This brings me to the third question which I proposed to investigate. Did the fact, that the supplemental act authorized other persons than those named in the original act to become subscribers for stock, make it necessary that the supplemental act should be passed by two legislatures in order to render the State liable for a loan of money, made by the corporation organized under the provisions of both acts?

Those who maintain the affirmative of this proposition, assume as a fact, that the corporation so organized was another and different corporation than that referred to in the law, by which the faith of the State was pledged. They seem entirely to overlook the essential nature and character of a corporation, to wit, its continued existence as the same artificial being, notwithstanding the individuals who compose it may repeat-

edly change. They also overlook the additional fact, that when the law was passed pledging the faith of the State for a loan of money to be made by the " Mississippi Union Bank," no such corporation was then in existence, but that it was thereafter to be organized, pursuant to the authority conferred by law for that purpose. The first section of the act declared, that " an institution should be established under the title of ' The Mississippi Union Bank,' with a capital of $15,500,000, to be raised by means of a loan, to be obtained by the directors." The 5th section declared, that the faith of the State should be pledged both for the security of the capital and interest of said loan. The loan contemplated by this act was not to be made to or by any particular individual, who might subscribe for stock in the bank. Neither was it to be made to, or by all those persons who might become subscribers for stock. But the loan was to be made by the bank itself, in its corporate capacity. The credit of the State was, therefore, but to the corporation, not to the individual members or subscribers. The bonds of the State were to be made payable to the corporation, and were lent to it, not to the subscribers for stock. The contract of guarantee on the part of the State was made for and on account of the corporation, and not the individual subscribers or stockholders. The faith of the State was, therefore, to be pledged for the performance of a contract to be made by the corporation itself, and not by the subscribers for stock. But, as before stated, when the law was thus passed pledging the faith of the State for the loan of money to be made by the bank, no corporation had been organized, the bank was not in existence, but was thereafter to be organized and formed. The principle of law is undeniable, that a law authorizing the creation of a corporation does not of itself create one; such a law is a mere authority or power conferred by the legislature; a privilege granted that a corporation may be formed and created. It is also undeniably true, that until the charter thus proposed is accepted by the parties to whom it is proposed, until the stock is subscribed and the corporation organized, pursuant to its provisions, the legislature possesses

full and unlimited power to repeal the entire law authorizing its formation, or to modify or change any of the provisions of that law. Under this general power they may increase or limit the number of subscribers. They may give authority to others than those named in the original act to become subscribers, and empower them to accept and enjoy the benefits of the proposed incorporation, and they may modify or alter the qualifications to be possessed by those who shall become subscribers. Under this general power thus possessed by the legislature, they had unquestionable authority to change and modify the 4th section of the original act, which required subscribers for stock to be citizens of the State, owning real estate therein, and to confer upon any other person the right or privilege of subscribing for stock in the company thus to be created. We must, therefore, conclude that the law pledging the faith of the State for a loan of money to be made by " The Mississippi Union Bank," a corporation not then in existence, but to be organized at a future day, was passed with reference to the general power thus belonging to the legislature, under which general power the legislature could increase or diminish the number, or change the qualifications of those who might become subscribers for stock until the corporation was organized.

The legislature, by the supplemental act authorizing the State to subscribe for stock in the Union Bank, only exercised one of the legitimate powers of legislation, known to exist in it at the time the law was passed, pledging the faith of the State for the loan of money to be made by that inchoate corporation, and the law thus passed, can receive no other proper construction than such as leaves to the legislature the privilege of exercising those powers of legislation conferred upon them by the constitution, and which they were not bound by any contract to refrain from exercising. It must be treated as a law by which, in legal effect, the State agreed to facilitate by means of its credit, a loan of money to be made by the directors of " The Mississippi Union Bank," whenever that corporation might be organized and formed according to the provisions of the original act, and such amendments and modi-

fications thereof, as the legislature by virtue of their general legislative power were authorized to make, in order to carry into effect the great purpose for which the original act was passed, to wit, the establishment of a bank with a capital stock to be raised by means of a loan of money to be negotiated by the directors of the institution.

But it is said that the bank, organized under the original and supplemental acts, is a different institution from that referred to in the law, by which the faith of the State was pledged. This result, it is said, has been produced by the admission of the State as a stockholder under the provisions of the supplement. This position is not tenable. It is evidently founded upon the assumption, that the introduction of a new member into a corporation changes the corporate body. This principle when applied to unincorporated companies is correct, but it does not apply to corporations.

A distinguishing characteristic of a corporation is the very fact, that "the body continues the same, notwithstanding the change of the individuals who compose it; so that new members may be introduced at any time, without changing the corporation." Chief Justice Marshall says: "The great object of an incorporation is to bestow the character and properties of individuality on a collective and changing body of men." 4 Peters, R. 562. Judge Story says: "It is certainly true, that a corporation may retain its personal identity, although its members are perpetually changing; for, it is its artificial character, powers, and franchises, and not the natural character of its members, which constitute that identity." This position is fully illustrated by the government of the United States, which being a moral and not a natural person, possesses the attributes of a corporation. The United States at this time is a body politic composed of thirty-one separate and independent States. New States may be admitted into the Union from time to time, but their admission does not create a new or different confederacy. The body politic remains unchanged; the moral being known as the United States preserves its identity, and is bound by its contracts in the same manner, and to the same extent, as if the original

members composing the Union had remained unchanged. All debts due to it remain, all contracts made by it exist, and all liabilities incurred for, or on account of it, subsist, to the same extent as if new members had not been introduced. Tested by this principle, applicable to all corporations, it is clearly obvious, that if the "Union Bank" had actually been organized and gone into existence under the original act, the admission of the State into it as a member, according to the provisions of the supplemental act, would not have changed the identity of the corporation.

Inasmuch, then, as it is not the natural character of its members which constitutes the identity of a corporation, but its artificial character, power, and franchises, which determine that fact, it is impossible to resist the conclusion that "The Mississippi Union Bank," organized under the original and supplemental acts, is the identical corporation referred to in the law pledging the faith of the State. The name is the same; "the artificial character, powers, and franchises," are essentially the same; the objects and purposes of its creation are the same; and the State was admitted as a member, in order to promote and effect the original intents and purposes with and for which the bank was to be established.

But it is said, that the State, by the original act, was only liable as a guarantor, and that, by the supplement, she became liable as a principal debtor. This is a mistake. It is true, that by the supplement, the State was authorized to subscribe for stock. But the supplement also provided, that this stock should be paid for out of the proceeds of the bonds, the issuance of which had already been authorized; and both the original and supplemental acts provided, that the "bank" should be held primarily liable for the payment of the bonds. The supplemental act did not change, in this particular, the relative position of the State and the bank. The State, under both acts, as between it and the bank, always occupied the position of a guarantor or surety, having the right to subject the entire assets of the bank to the payment of the bonds, or any part of them.

There are two other points made on behalf of the State, which I will briefly notice, before concluding this opinion. It

is due to the attorney-general to remark, that, although he called the attention of the court to them, he did not seem to rely with any confidence upon their sufficiency to defeat the right of the complainant to a recovery.

It is said, that the commissioners who sold the bonds violated the provision contained in the 9th section of the supplement, which declares, that " said bonds shall not be sold under their par value."

The commissioners, in a report made by them on the 17th August, 1838, to the president of the Union Bank, and which will be found in the report of the joint committee of the legislature, appointed to examine the affairs of the bank, in January, 1839, use the following language in relation to the sale : " The sale was made at par value, part in specie or its equivalent, in five instalments, on the first days of November, January, March, May, and July next."

The term " par value," used in the 9th section, is not of dubious import. The commissioners were empowered " to sell the State bonds in any market within the United States, or in any foreign market, provided said bonds should not be sold under their par value." Each of said bonds was for the sum of $2,000, and its value in the State of Mississippi was the amount for which it was made payable. Hence, the " par value " of each bond, at the place where it might be sold, would be such an amount of money as would be equivalent or equal to $2,000 in the city of Jackson, where the bank was located, and to which place the money was to be transmitted. McCulloch, in his commercial dictionary, says, " the par of the currency of any two countries, means, among merchants, the equivalency of a certain amount of the currency of the one in the currency of the other, supposing the currencies of both to be of the precise weight and purity fixed by their respective mints." As the currency of every State in the Union is the same, if the rate of exchange between them was at par, the owner of a sum of money deposited in any city in the Union, could obtain for it precisely the same sum in any other city. This state of things, however, rarely if ever exists, because, to produce it, it is necessary that the debts reciprocally due by

each State to the other should be equal. It appears from the agreed case, that in 1838 and 1839, when the several instalments for which the bonds were sold fell due, and were paid in New Orleans, according to the contract, that the rate of exchange between the cities of Jackson and New Orleans was from five to eight per cent. in favor of New Orleans. It therefore follows, that every million of dollars paid to the bank in the city of New Orleans, was equivalent to a payment of one million and fifty thousand dollars in the city of Jackson, because the bank was enabled to realize that sum in the city of Jackson, by reason of the difference .in exchange between the two places.

It will thus be seen, that the sale made by the commissioners of the bonds for $5,000,000, was equivalent to the bank to the sum of $5,250,000. But as the State bonds bore interest from their date, at the rate of five per cent. per annum, which the bank had to pay, the amount of interest accruing on the bonds till the payment of each instalment would have to be deducted, to show the actual sum which the bank realized from the sale made by the commissioners. A simple arithmetical. calculation will show, that this accruing interest paid by the bank did not equal the premium received for exchange, and that the bank, therefore, realized from the sale of the bonds a sum greater than the actual amount of the bonds, and the interest due on the same, when the payments were made. The sum thus received was greater than the "par value" of the bonds, which would only have been a sum equal to the actual amount of the bonds, and the interest accruing thereon, when the money was paid to the bank. This objection to the sale made by the commissioners is not valid, and, therefore, is no ground for reversing the decree of the chancellor.

But it is said, the agreement made by the commissioners in the sale of said bonds, that they should be paid in London, in sterling money of Great Britain, at the rate of four shillings and sixpence to the dollar, was made without authority. If this be true, I am at a loss to conceive in what respect it can affect the liability of the State to pay the bonds.

By the ninth section of the supplement, the commissioners

were empowered to sell the bonds in any American or foreign market, "under such rules and regulations as may be adopted by the president and directors or managers, not inconsistent with the provisions of the charter of the bank." By the sixth section of the original act, the bonds were transferable by the indorsement of the president and cashier of the bank, to the order of any person or to bearer, and the indorsement was to "fix the place where the principal and interest should be paid."

The bonds were delivered to the commissioners, indorsed in blank, and "under the rules and regulations" adopted in reference to the sale, the commissioners were authorized "to fill up the blanks in said indorsements, by inserting therein the place of payment of the principal and interest of each, and also the name or names of the purchasers thereof."

It thus appears, that the commissioners had the power to negotiate and sell the bonds in any market, and to designate the place of payment of the principal and interest, so that the only excess of power that can be alleged against the commissioners, is the agreement that the principal and interest should be paid "in sterling money of Great Britain, at the rate of four shillings and sixpence to the dollar." I do not deem it necessary to examine whether or not the commissioners exceeded their authority in making this agreement. If they did, it is not such an act on their part as avoids the sale of the bonds. The general rule of law in relation to the execution of powers by an agent, is well established to be this: "Whenever the agent does that which he is authorized to do, and more, it is good for that which is warranted, and void for the rest."

Judge Story says: "Where there is a complete execution of the authority, and something ex abundentiâ is added, which is improper, there the execution is good, and the excess only is void, if the excess can be distinguished from the rightful execution." Story on Agency, 157, 158. Many examples are cited by him to illustrate this rule. The present case, upon the hypothesis that the commissioners exceeded their power in the agreement to pay in sterling money, and fixing the rate at which it should be paid, falls directly within the above rule. They had the power to sell, and the power to designate the place of payment. To that extent their power was well exe-

cuted and the sale valid. If the additional agreement was made without authority, it is void; but as such excess of authority is clearly distinguishable from the part rightly executed, the excess only is void, and the sale of the bonds valid; for, to that extent the commissioners were fully empowered to act, and executed their power rightfully.

In any point of view in which I have been able to consider this case, the conclusion has forced itself upon my mind, that nothing contained in the provisions of the supplemental act, nor any act of the commissioners relating to the sale, has absolved the State from the liability assumed by the fifth section of the original act.

I have thus given, at considerable length, but in as brief space as possible, some of the reasons which induced me to concur in the opinion of the court, delivered by the chief justice. It cannot be said that the case is one entirely free from difficulty.

The arguments of the attorney-general, and his associate counsel, are very able; presenting the case in favor of the State, in a point of view which entitled it to much consideration. Every member of the court has bestowed upon it the most anxious investigation, and the result has been an entire concurrence of opinion, affirming the decree of the chancellor.

Fisher, J., concurred in the foregoing opinions and decision.

Petitions for a reargument of this case were refused by the court.

Petition for a reargument, by *T. J. Wharton*, for the State.

Before proceeding to notice in detail the various points reviewed by your honors, I desire to consider, very briefly, the question, For what purpose, to whom, and upon what terms, did the original act propose to pledge the faith of the State? 2d. Whether the supplemental act conforms to the original act in these particulars; and 3d. What is the legal effect of a departure therefrom.

I am well aware that I am presuming to tread upon ground over which others, incomparably my superiors, have passed,

and which have not been overlooked by your honors in the opinion already delivered. At the risk of subjecting myself to the charge of inexcusable vanity, I shall, however unsuccessful the effort may prove, undertake to vindicate the positions assumed, and so ably maintained on behalf of the State by the attorney-general, in his brief on file, and in his argument before the court. The apology I offer will be found in the interest and novelty of the questions themselves, and the importance of the case, both as to the amount involved and the attitude which the State has heretofore taken and steadily maintained in the face of the world.

1. For what purpose, to whom, and upon what terms did the original act propose to pledge the faith of the State ? In this inquiry, I shall not pause to consider the contemporaneous history of the country, though the court may be judicially advised of it, or the reason or necessity which may be supposed to have existed to authorize or to justify the attempt to pledge the faith of the State, at the time, in the manner, and for the purpose it is insisted in argument by counsel for the holders of the bonds, it was done.

My business is rather to consider what was designed to be done, and what was actually done, in regard to a pledge of the faith of the State, by the legislature as shown by the acts. On the 5th of February, 1838, an act was passed by the legislature chartering the " Mississippi Union Bank." The same act had been passed at the session immediately preceding, and submitted to the people, in conformity with the requirements of the 9th section of the 7th article of the constitution, which is in these words : " No law shall ever be passed to raise a loan of money upon the credit of the State, or to pledge the faith of the State for the payment or redemption of any loan or debt, unless such law be proposed in the senate or house of representatives, and be agreed to by a majority of the members of each house, and entered on their journals, with the yeas and nays taken thereon, and be referred to the next succeeding legislature, and published for three months previous to the next regular election, in three newspapers of this State, and unless a majority of each branch of the legislature, so elected after

67 *

such publication, shall agree to and pass such law; and in such case the yeas and nays shall be taken and entered on the journals of each house." The first section of that act declares "that an institution shall be established under the title of the Mississippi Union Bank, with a capital of fifteen millions five hundred thousand dollars, which said capital shall be raised by means of a loan, to be obtained by the directors of the institution."

The 2d section provided for opening books of subscription at Jackson, for $15,500,000, the stock to be divided into shares of $100 each, "intended to secure the loan of said sum; said books to be opened within twenty days after the promulgation of said act, and to continue open for six months then next ensuing, at the termination of which period they were to be closed; immediately after which the directors provided for in subsequent sections of said act were required to make a correct statement of said subscriptions, and in the event the whole sum subscribed for amounted to more than $15,500,000, it was made the duty of said directors to deduct the amount of such excess, 1st, from the stock, of which sufficient security was not offered, and 2d, from the largest subscriptions, &c. The 3d section, after naming the commissioners to receive stock in the various counties of the State, (whose duties were to continue for three months after opening books), provided, that at the expiration of that time, the said commissioners or managers under whose inspection said books were opened, should transmit to the managers of the parent bank, the books of subscription so opened by them, together with all the titles and other documents that may have been deposited with them, in order that the board of directors of the mother bank may finally decide on the validity and sufficiency of the titles so transmitted by them, before the subscribers should be declared to be stockholders, as provided for in another section.

Who are authorized to become stockholders? The 4th section informs us "The owners of real estate, situated in the State of Mississippi, and who are citizens thereof, shall be the only persons entitled to subscribe, and shares so subscribed, shall be transferable only to such owners, until after five years,

when they may be transferred to any owner of real estate in this State, whether citizens or not, provided, however, to secure the capital or interest of said bank, mortgage shall be given on property of a sufficient character, and of an imperishable nature."

The 12th section provided, " that after the closing of the books, and when it shall appear that at least $500,000 shall have been subscribed, and paid in on the original stock of the capital of said bank, the said institution shall go into immediate operation, under the provisions hereinafter mentioned."

The 11th section provided, that those who should be declared stockholders should be required to pay, in cash, the sum of ten dollars over to the commissioners or directors, on every share subscribed for by them, when required by the directors, which said sum, by the 44th section, was to be refunded to the subscribers to the capital stock of said bank after the bonds were sold, and the proceeds thereof realized by the said bank.

The 26th section provided, " that the board of directors shall be judges of the sufficiency of the mortgages offered for stock and loans, and shall have power to reject the same if not sufficient, and in such case require other security, and if it is not given, reduce the shares to the amount sufficiently secured."

The 8th section declares, " that to secure the payment of the capital and interest of said bonds," (referring to the bonds to be issued under the 5th section,) " the subscribers shall be bound to give mortgage, to the satisfaction of the directors, on property to be in all cases equal to the amount of their respective stock, which mortgage may bear on cultivated lands," &c. ; " and that no one shall be permitted to subscribe until he shall deliver to the commissioners a valid act of sale, or patents, or certificates of confirmation from the land commissioners of the United States, or partition sales, and adjudication by a decree of a court, verified according to law, or such other evidence of title to the property proposed as a guarantee to the bank, as may be deemed satisfactory to said commissioners or directors," &c.

The 14th section provides " that so soon as 5,000 shares

shall have been subscribed in the manner herein provided for, the governor of the State shall provisionally appoint thirteen directors, who shall serve for twelve months," &c.

The 5th section declares, " that in order to facilitate the said Union Bank, for the said loan of fifteen millions five hundred thousand dollars, the faith of this State be, and is hereby pledged, both for the security of the capital and interest; and 7,500 bonds, of $2,000 each," payable in specified instalments, "shall be signed by the governor of the State, to the order of the Mississippi Union Bank, countersigned by the State treasurer," &c., enumerating in their order the various instalments of bonds.

The 7th section provided, " that both the capital and interest of the said bonds shall be paid by said bank at the times they shall severally fall due."

The 30th section provides, " that as soon as directors are appointed, as hereinbefore provided for, they shall proceed to the election of a president, and the same shall be notified to the governor of the State, who will thereupon execute to the said bank, from time to time, bonds in amount proportioned to the sums subscribed, and secure to the satisfaction of the directors, as required by the charter, until the whole amount of fifteen millions five hundred thousand dollars shall be furnished in bonds, as hereinbefore provided for."

The 29th section provides, " that the bonds, with the privileged mortgages, for the sum of fifteen millions five hundred thousand dollars, subscribed by the stockholders of said bank, according to their shares, for the purpose of securing the loan of fifteen millions five hundred thousand dollars, shall be deposited in the office of said institution, as security for the reimbursement of the capital, as well as interest of said bonds, granted by the State."

The 47th section provided, " that the fifth section of this act, whereby the faith of the State is pledged for the payment and redemption of the loan contemplated by this act, be referred to the next Legislature of this State, in pursuance of the 9th section of the 7th article of the constitution."

The 19th section provides, " that the whole of the profits of

the said Union Bank shall remain with, and be employed by the directors as a part of its capital, until the full payment of that portion of the bonds of the State specified in the 5th section, which will be payable in twelve years, after which one fourth of the profits then realized shall be divided among the stockholders in the proportion to which they shall be entitled respectively ; and the whole of the remaining and subsequent profits of the bank, shall be employed by the bank until the full payment of the bonds of the State which will be payable in fifteen years," and so continuing until all the bonds are paid in the order they mature, after which, " in consideration of the bonds of the State, in addition to a voice in its direction, the State shall be entitled to one tenth part of the whole profits of the bank," to be paid into the treasury of the State.

The 31st section provides, that the State shall be entitled to a credit of $200,000 on furnishing notes or obligations for such sum as may be required to be used, and paying the usual interest in advance, &c.

We have thus, at very great length, collected such portions of the original act as pertain immediately to the point under consideration. It being admitted in the pleadings that said act was passed, in strict conformity with the terms and conditions prescribed in the 9th section of the 7th article of the constitution, we were desirous to ascertain precisely to whom, to what extent, and upon what conditions this pledge of the faith of the State, contained in the 5th section, was made. We knew of no better way, in the first instance, of doing that, than by extracting such portions of said act, as bear upon those points, and presenting them in connection. And now having done so, and having made ourselves acquainted with the various relations they sustain to each other, the light which each reflects upon the other, no matter how widely legal minds may differ as to the question of the liability of the State on other grounds in the case, if it were *res integra*, I apprehend all could very nearly agree in regard to the extent of the liability created by the act now under consideration.

Upon the hypothesis, that the bond in suit was issued under the original act, and that, at present, is the one to which we

will confine ourselves, let us see how the case stands. Out of the various sections of that act which we have quoted we deduce the result, that the State agreed to pledge its faith to facilitate the Union Bank in effecting a loan of $15,500,000, the amount of its capital as aforesaid in the charter, that the only persons who could be stockholders in said bank are declared to be citizens of, and owners of real estate, situated in the State of Mississippi, who shall execute mortgages on cultivated lands, plantations, and slaves in said State, in value equal in all cases to the amount of their respective stock, that the title to the property thus mortgaged shall be satisfactory to the directors of said bank, until the execution of which mortgages they could not be declared to be stockholders, that as soon as 5,000 shares had been subscribed in the manner provided for, the governor was authorized to appoint a provisional directory, that those who should be declared to be stockholders, in the manner prescribed, should pay in cash the sum of ten dollars to the directory or commissioners on every share of stock subscribed for by them, that the governor should issue bonds in amount proportioned to the stock secured by mortgages, as aforesaid, in consideration of which bonds so issued, the State was to be entitled to one tenth part of the whole profits of the bank after the bank had paid off and discharged all the bonds issued to it, and also to a credit of $200,000 in the shape of accommodations, that the bonds, with the privileged mortgages for securing the loan of $15,-500,000, were to be deposited in said bank. Such were the terms and conditions, and such the purposes upon which, and for which, the faith of the State was pledged. If these be the declared restrictions, no others will be implied. Upon them, and them only, can the liability of the State be fixed. They constitute the law of the contract. I care not whether it be in a matter of controversy growing out of the issuance of the bonds, as between the bank and the State, or an assignee of the bank. They were part of — nay, the very consideration upon which the State agreed to pledge her faith. We cannot, by any legal casuistry, escape the conclusion, that she consented to the pledge of her faith upon all the limitations, secu-

rities, and advantages proposed in the act. The act was an entire thing, as well in the advantages and indemnity it offered to the State, as in the liabilities it proposed to bring her under, in case she consented to the loan of her faith. The undertaking of the State being special, and limited to the very terms upon which the pledge was asked, the same are to be taken as the criterion of liability. But we are anticipating the argument on another branch.

It sufficiently appears from the section quoted, that the object of the State, in the pledge of its faith, was to facilitate the Union Bank in obtaining a loan. It was for that purpose and to that bank the 5th section proposed to the people to pledge the faith of the State in the manner contemplated by the 9th section of the 7th article of the constitution, and to no other and different purpose or bank. We have already answered the latter clause of the inquiry, upon what terms did the original act propose to pledge the faith of the State, by quoting the sections bearing on that point, and by enumerating the privileges and disabilities contained in them. If, then, the bond in controversy was issued to the Mississippi Union Bank as organized by said act, and for the purpose and on the terms prescribed in said act, the liability of the State is clear and indisputable.

In the agreement of facts signed by the counsel for the State and the holder of the bond in suit, it is admitted that the mortgages required to be executed, as provided in the 8th and 30th sections, had not been given when said bond was issued and was delivered to said bank.

Having seen for what purpose, to whom, and upon what terms the original act proposed to pledge the faith of the State, we proceed to inquire in the second place, whether the supplemental act conforms to the original act in those particulars.

The supplemental act was passed on the 8th day of February, 1838, in the house of representatives, in the senate on the 13th day of the same month, and was approved by the governor on the 15th day of February, 1838, that is, ten days after the original act was finally passed. It is admitted, that this act was never submitted to the people or passed by two

legislatures. We will observe the same order in considering the provisions of the various sections of this act, which we did in regard to the first act.

The 1st section provides, " that as soon as the books of subscription for stock in the said Mississippi Union Bank are opened, the governor of this State is hereby authorized and required to subscribe for, in behalf of this State, fifty thousand shares of the stock of the original capital of the said bank, the same to be paid for out of the proceeds of the State bonds, to be executed to the said bank as already provided for in the said charter, and that the dividend · and profits which may accrue and be declared by the bank on the said stock subscribed for, in behalf of the State, shall be held by the said bank subject to the control of the State legislature, for the purposes of internal improvement and the promotion of education."

The 6th section provides, " that subscribers to the stock in the said Union Bank, or -their legal representatives, may at any time transfer their respective shares to any citizen of this State with the approbation of the directory of the mother bank, and that no person, not a citizen of this State, shall ever own any stock in this bank."

The 8th section, after other specifications not necessary to be mentioned,. declares that the " portion of the stock of the said Union Bank to be subscribed for on the part of the State, as provided for in the 1st section of this act, shall be taken from the whole amount of the capital stock of said bank, and the subscriptions to stock at the mother bank, and the several branches of said bank, shall be so graduated as to reduce the amount of stock to be subscribed for by individuals in a just ratio proportionate to their capital, and that nothing in the charter of the said bank shall be so construed as to deprive the State of the amount of stock provided for in the 1st section of this supplemental act, and in no case shall this act be so construed as to allow more than five directors on the part of the State, as provided for in the original act."

The 16th section provides, " that so much of the original charter of the Union Bank of the State of Mississippi as con-

flicts with the provisions of this act, be, and the same is hereby repealed."

The 18th section is as follows: "That so much of the 19th section of the original charter as entitled the State to one tenth of the whole profits of the bank, be repealed, and so much of the 31st section as entitled the State to a credit of $200,000, be, and the same is hereby repealed."

The 19th section modifies the 11th section of the first act, in providing that the sum of $10, which the latter required stockholders to pay in cash on each share subscribed for by them might be paid in the notes of solvent banks of this State, and that not more than 2 1-2 per cent. on the stock shall be required to be paid at the time of subscribing.

The 20th and last section authorized any stockholder who might be dissatisfied with the graduation of his stock, to withdraw the property he had pledged, and cease to be a stockholder, &c. There are other, but not important alterations. The foregoing will suffice for the purposes of the argument.

We have now reached the second point from which to take an observation and make a reckoning.

Let the picture of the "Mississippi Union Bank," as established by the first act, and the pledge of the faith of the State, as contained in the 5th section thereof, be brought into juxta-position with the institution created by the supplemental act, which it is proposed shall be the beneficiary of the pledge of the faith of the State, made to the former. In which of the tests, by which we tried the first act, does the latter agree? Scarcely the germ of the former is retained.

All the wise and provident safeguards thrown around the pledge of the faith of the State by the terms of the first act, evidencing the same jealousy and profound sagacity which suggested the adoption of the 9th section of the 7th article of the constitution, are cloven down. The whole relation which the State sustained to the bank, created by the former act, is changed. Robbed of the advantages which it was supposed would accrue to her from the bonus of one tenth of the profits of the institution, and of the $200,000 for which she was to

have credit in the shape of accommodations, whilst her liabili-
ties are infinitely increased. Instead of awaiting the period,
when the stock subscribed for has been all secured by mort-
gages on unincumbered property, and those mortgages de-
posited in the bank "as security for the reimbursement of the
capital as well as interest of said bonds granted by the State,"
instead of awaiting the organization of the institution, the
election of directors, &c., and the issuance of bonds thereafter,
"from time to time in amount proportioned to the sums sub-
scribed, and secured," the governor is required, "as soon as the
books of subscription for stock are opened, to subscribe for
fifty thousand shares for the State," &c. Thus changing the
relation of the State from a mere security or guarantor under
the original act, with the most abundant and undoubted
indemnity, in the mortgages of the stockholders, into a stock-
holder herself to the amount of $5,000,000.

But a most vital change of the first act, as was appositely
noted in the brief filed on behalf of the State by Mr. Stearns,
was effected by the supplemental act, in the absolute surrender,
"without the shadow of an equivalent, of the only reliable and
safe indemnity provided by the first act for the security of the
State, the mortgages of the stockholders. The State, by the
supplemental act, being still bound to issue $15,500,000 of her
bonds, for $5,000,000 of which she would have no security
whatever, in the event of the failure of the bank." But enough
has been said upon the utter dissimilarity of the two institu-
tions of the 1st and 2d acts in the point of view I am now
considering the case. It was the Mississippi Union Bank
created by the 1st act, to which the pledge of the faith of the
State was given. It is demonstrated in the brief of the
attorney-general, that the bond in suit could not, in the nature
of things, have issued under, and in pursuance of the terms
and conditions of that act. That act bears date 5th February,
1838; the bond was issued 5th June, 1838; the 2d section of
said act required the books of subscription of the parent bank
to continue open six months. No one could be declared a
stockholder until the directors had passed upon and approved
the title to the property mortgaged by him to secure the stock

The State of Mississippi *v.* Johnson.

subscribed for by him; and this could not be done until the books were closed, the stock graduated, titles examined, mortgages executed, and stockholders declared. Were there any doubt upon this point, it would be removed by the clear and emphatic terms of the 12th section of the first act, which provides that said bank should go into immediate operation; when? I answer in its own words: "After the closing of the books, and when it shall appear that at least five hundred thousand dollars shall have been subscribed, and paid in on the original stock of the capital of said bank." Both contingencies must have occurred. The books must have been closed, and then if it appears, not before, that said sum has been subscribed and paid in, said bank could go into immediate operation.

I will now proceed to review with the utmost deference, and I hope fairness, the various grounds upon which the opinion of your honors places the liability of the State.

It is conceded by your honors, that if the bonds which were issued by the governor to the Union Bank, were not issued in execution of, or under the provisions of the original act, and if the sole authority for the issuance of said bonds was derived from the supplemental act, and if the latter was a mere nullity, not having been enacted by the legislature, in conformity with the directions of the provision of the constitution already referred to, then the mere act of sealing and delivery of said bonds by the governor did not constitute said bonds a valid obligation on the State.

Let us inquire whether there is not indubitable evidence, that said bonds did not issue under the original act?

Our time has been hitherto occupied in endeavoring to ascertain to whom, and upon what terms, the faith of the State was designed to be pledged. In pursuing that inquiry, we first considered the terms and provisions of the original charter, as though that were the only act by which it was pretended the bonds had issued. We put the Mississippi Union Bank in operation first, as it may be supposed it would have existed, if the supplement had never been passed. We had an exact drawing of the edifice intended to be constructed,

and, though it was never built, we saw how it would have looked if it had been. We next pursued the same order in presenting a diagram of the building, the specifications of which were furnished by the supplement. We placed the two side by side, that we might be able to see in how far they resembled.

We shall not content ourselves with a mere outside view of the two edifices. We will feebly essay to thread their labyrinths, to examine their composition. In other words, we will first make a minute examination to discover whether the bonds were issued under the first act. 2d. If not, whether they were under the supplement; if not under either separately, were they under the two conjoined; and if under the two conjoined, did any obligation thereby devolve on the State. We will leave out of view, at this point, every other question involved in the inquiry, but the one of time when the bonds were issued. We insist, that by the terms of the first act they were forbidden to be issued before the expiration of six months from the opening of books for subscription for stock at the seat of government. It is admitted in the argument of counsel and the opinion of your honors, that they issued within four months after the final passage of said act. That act required books to be opened at Jackson, after twenty days' notice had been given in all the newspapers of the State, immediately after the promulgation of said act.

It also required books for subscription to be opened at the seat of justice in each county of the State, and be kept open for three months, thirty days' previous notice having been given through the newspapers published in said counties; at the expiration of that time, the commissioners appointed to receive subscriptions for stock in the various counties, were to transmit the books of subscription so opened by them, together with all the titles, papers, and other documents deposited with them, " in order that the mother bank may finally decide on the validity and sufficiency of the titles so transmitted by them before the subscribers may be declared to be stockholders, &c. Suppose, now, that the bonds were issued immediately after the books of subscription in the various counties had been closed, and the title papers which had been received were

· transmitted to the mother bank for approval, and the objection is still unanswered, that they issued before the' time authorized by law. Whatever difference of opinion may exist as to whether the bonds. could be issued before the expiration of six months, the time during which the books were to be kept open at Jackson, we think it clear that the shortest period of time within which they could issue, would be that during which the books are required to be kept open in the various counties, after making allowance for the time of publishing notices of opening them in said counties. Now the 3d section of the original act required, that the opening of books in the various counties should not take place until after thirty days' previous notice had been given in the newspapers published in said counties, and then they were to remain open for three months, at the 'end of which time the books for subscription, together with the evidences of title to the property proposed to be pledged, should be transmitted to the mother bank, and that the subscribers should not be considered stockholders until said titles had been examined and approved by the managers of said mother bank. If, therefore, it be supposed that all the various requirements of said act were complied with at the earliest moment they could have been after the passage of said act, how stands the case? Why thus. The act was passed on the 5th day of February, 1838, if the publications were made in all the counties in which the books for subscription were required to be opened, on the day of the passage of the act, that would bring it to the 5th of March, 1838; then add the three months, during which they were to be kept open, and you bring it to the 5th day of June, 1838. The bonds were issued and bear date the 5th day of June, 1838. It will thus be seen, that upon the supposition that the notices were published in all the papers of the State on the very day the first act was approved, said publications,.and the three months thereafter, during which the books were required to be kept open, would extend to the very day on which said act required said books to be closed. But something more was requisite. After said books were closed, all title papers deposited with the commissioners were to be transmitted to the mother bank,

68 *

and be examined and approved before the subscribers could be considered and declared stockholders. For, until that ceremony were gone through, it did not appear but that all said subscriptions would be rejected by the mother bank, and books have to be re-opened. And it was not until "after the closing of the books, and when it shall appear that at least $500,000 shall have been subscribed, and paid in, on the original stock of the capital of said bank, the said institution shall go into immediate operation," &c., section 12; by the governor "provisionally appointing thirteen directors, upon the appointment of whom the power of the commissioners to receive the subscriptions and the papers to be delivered to said directors closed," section 13. The 30th section provided for the issuance of bonds, in the language following: "That as soon as directors are appointed, as hereinbefore provided for, they shall proceed to elect a president, and the same shall be notified to the governor of the State, who will thereupon execute to the said bank, from time to time, bonds in amount proportioned to the sums subscribed, and secure to the satisfaction of the directors, as required by the charter, until the whole amount of $15,500,000 shall be furnished in bonds, as hereinbefore provided for."

But is it credible that the thirty days' previous notice required to be given of the opening of the books, could have been given on the very day the first act was approved? How could knowledge of it have been conveyed to the publishers of all the papers in the State on the day of its passage? Is it likely, too, that every paper in the State was published on the same day, and that day the very day on which said act was passed? We think this conclusive of the question. The bonds were either not designed to be issued under the first act, or were not issued at the time, and upon the terms required. So that we might safely rest here, as to that matter of fact, even if your honors should hold that this was not a law of a general nature, and, therefore, falling under the 6th section of the 7th article of the constitution, which declares, "that no laws of a general nature, unless otherwise provided for, shall be enforced, until sixty days after the passage thereof."

But leaving the question of the mere date of the bonds, as

The State of Mississippi v. Johnson.

showing that they were not issued under the first act, we pass to other provisions of said act in support of the same proposition; still bearing in mind that it is admitted in the "agreed facts," that at the time of the issuance of said bonds, the mortgages required by the 8th and 30th sections of the first act had not been executed.

It is conceded by your honors, that if the formal execution of mortgages by the subscribers for stock was a condition precedent, upon which the right of the directors to apply to the governor for a delivery of bonds, or the authority of the governor to issue them, depended, then the bonds were issued in violation of the act incorporating the bank, of which fact the purchaser was presumed to have notice.

Let us see if those supposed facts do not really exist. The 8th section provides "that to secure the payment of the capital and interest of said bonds, the subscribers shall be bound to give mortgage to the satisfaction of the directors, on property to be in all cases equal to the amount of their respective stock," &c. Here mutual and dependent covenants were clearly entered into. By the 5th section, the pledge of the faith of the State was made; for what purpose? "To facilitate the said Union Bank, for the said loan of $15,500,000, both for the security of the capital and interest." By the 8th section, already quoted, the indemnity is provided. Every stockholder was bound to give mortgage for every dollar of stock declared to him; and the liability of every stockholder, in case of the failure of the bank, is declared by the 44th section to be in proportion to his stock. What, then, is the point of time fixed for the issuance of the bonds by said act? That involves the inquiry, When and upon what terms was said bank to be organized, and put into operation?

The 12th section declares, that when the books are closed and $500,000 at least had been subscribed and paid in, on the original stock of the capital of said bank, the said institution was to go into immediate operation. There is some ambiguity in the phrase "stock of the capital." But we think the meaning of it clearly revealed by the other sections of the act. It is insisted, however, that the only mode provided for in the act

by which that sum ($500,000) could be raised, as well as the entire capital of the bank, was by a loan made upon the pledge of the faith of the State. Does not the preceding section, the 11th, provide a mode by which said sum may have been raised, by those who were declared stockholders paying in cash the sum of ten dollars on each and every share subscribed for by them, not each and every share of which they may be declared stockholders?

It was then provided by the 14th section, that as soon as five thousand shares shall have been subscribed "in the manner herein before provided," (it was only by the 11th and 12th sections that any provision had been therein before made,) the governor should appoint a provisional directory of thirteen, to serve for twelve months. As soon as they were appointed and a president chosen, the powers of the commissioners appointed to receive stock ceased, and they were required to deliver to the directory all papers held by them.

Then comes the 30th section, which declares, "as soon as directors are appointed, as herein before provided for, they shall proceed to the election of a president, and the same shall be notified to the governor of the State, who will thereupon execute to said bank, from time to time, bonds in amount proportioned to the sums subscribed, and secure to the satisfaction of the directors, as required by the charter, until the whole amount of $15,500,000 shall be furnished in bonds, as herein before provided for." Now the argument on the other side is, that inasmuch as directors were to be appointed as soon as $500,000 (or five thousand shares) had been subscribed and paid in, and as soon as the directors were appointed and the governor notified thereof, he was required to issue bonds, as just quoted from the 30th section; it is, therefore, certain, that the execution of the mortgages required of those declared to be stockholders was never intended to be a condition precedent to the issuance of the bonds.

The 26th section made the directors judges of the sufficiency of the mortgages offered for stock and loans, with full power to reject the same if not sufficient, to require other security, and in default thereof, reduce the shares of such defaulters to the

amount secured. In the exercise of this power, it might turn out that all the subscribers had failed to satisfy the directors as to the title they held to the property proposed to be pledged or mortgaged, and thus their entire subscriptions be rejected, whilst, according to the view of the opposite side, the bank might be in possession of the bonds of the State. Where would be the security of the State in that case?

But how consistent with reason, and the obvious and admitted design of that act, to secure the pledge the State was asked to give, by mortgage, as provided in the 8th section, is the position of the State, to wit: That as soon as the directors were appointed they should examine the title to all property proposed to be mortgaged, require the execution of mortgages to so much as the titles were sufficient, and then, from time to time, demand of the governor "bonds proportioned to the sums subscribed, and secure to the satisfaction of the directors," &c.

Again, what does the cautious language of the 30th section import? What does the phrase "from time to time" refer to? Transfer one or two lines, and not only is the section itself relieved of all difficulty, but it will serve to throw much light on the general subject. "That as soon as directors are appointed, as herein before provided for, they shall proceed to the election of a president, and the same shall be notified to the governor of the State, who will thereupon execute to the said bank, from time to time, bonds in amount proportioned to the sums subscribed, and secure to the satisfaction of the directors," &c.

And thus, if the execution of the mortgages was not a condition precedent to the issuance of the bonds, they were at least to proceed *pari passu*. So that, as provided by section 8, "to secure the payment of the capital and interest of said bonds, the subscribers shall be bound to give mortgage to the satisfaction of the directors, property to be in all cases equal to their respective stock," &c. But if the argument on the other side is correct, and the mortgages were not required to be executed before the bonds could be issued, why is the governor restricted by the 30th section in the issuance of the bonds "from time to time," in amount proportioned to the sums subscribed,

and secure to the satisfaction of the directors, as required by the charter, until the whole $15,500,000 shall be furnished in bonds, as before required. Why could he not issue the whole amount at once, and before mortgage had been executed?

But it is said by your honors, that the 14th section, in providing for the election of a provisional directory, so soon as five thousand shares had been subscribed, in the manner provided for in said act, is unmeaning and useless, if the issuance of the bonds was delayed until the execution of the mortgages. Why so? What is there to negative the idea that their powers, for the time they were authorized to act, were not as ample as those of the directory who were to succeed them, at the end of their term? Why could they not, under the 26th section, be judges of the sufficiency of mortgages to secure stock, and, in general, do any and every act devolving upon the latter, so long as they remained in office? They are no more restricted by the section under which they derive their appointment, than are their successors under the section appointing them.

The 14th section is relied on to show that the bonds issued under the first act, and that it was the intention of the legislature that the issuance of the bonds should not be delayed for the execution of the mortgages provided for in the first clause of the 8th section. The 14th section provides, that " so soon as five thousand shares shall have been subscribed, in the manner herein before provided for, the governor shall provisionally appoint thirteen directors," &c. Before banking operations could be commenced, the charter required capital to be paid in to the amount of at least $500,000. It is argued that this could only have been raised in one way, to wit: by a sale of the bonds.

Can this be so? The first place in which mention is made of the $500,000 to be raised before the appointment of the provisional directory, and the commencement of banking operations, is in the 12th section, which is in these words: " That after the closing of the books, and when it shall appear that at least $500,000 shall have been subscribed and paid in, the said institution shall go into immediate operation under the provisions hereinafter mentioned. We have already remarked that

this sum might have been intended to be raised by the ten dollars which each subscriber for stock was required by the 11th section to pay in cash on each share subscribed to the commissioners or directors, or their agents. Now it is manifest, from the language of the 10th section, that it did not contemplate that said sum was to be raised upon the pledge of the faith of the State, or bonds issued upon that pledge. It is too clear for argument, that the $500,000 provided for in the 14th section, were not to be raised upon the bonds of the State. If they were, how is the language used explainable? " after the closing of the books, and when it shall appear that at least $500,000 shall have been subscribed and paid in," on what? " on the original stock of the capital of said bank." The State did not subscribe, was not authorized by said act to subscribe for stock. Besides, to suppose that it was raised on her bonds, would prove that she issued her bonds before the appointment of the provisional directory, for they could not be appointed until after the contingency provided for in the 14th section had occurred. In addition to this, the opposite side only contend, that the earliest moment when the governor could issue the bonds was after the appointment of the directory, and as directed in the 30th section.

Again, it is said that when, by the 30th section, the governor was required to " execute bonds to the said bank, from time to time, in amount proportioned to the sums subscribed, and secure, to the satisfaction of the directors, as required by the charter," the legislature did not refer, by the words " secure to the satisfaction of the directors," to the mortgages required to be executed by the first clause of the 8th section.

What, then, was meant by those words in the 30th section? What was to be " secure to the satisfaction of the directors?" Not the bonds of the State. What were to be the " sums subscribed?" Not the amount for which bonds should issue. We do not see how a doubt can exist on this point. By the 8th section, mortgages were required to be given to the satisfaction of the directors, on property equal in all cases to the amount of stock subscribed; and by the 30th section, the governor was to issue bonds from time to time, in amount proportioned to the

sums subscribed, and secure to the satisfaction of the directors. Clearly the two sections refer to the same securities or mortgages, else why the term from time to time, and why were the bonds to be issued in amounts proportioned to the sums subscribed and secure, &c.? True, the 30th section does not in express terms require the execution of mortgages. It does, however, by the clearest intendment, by the most irresistible implication, when we refer to other sections relating to the same point. It does, as "required by the charter." An express limitation, by the very terms of the 30th section, is imposed upon the governor in issuing the bonds. He had no discretion in the matter. He was only authorized "to execute bonds to the bank, from time to time, proportioned to the sums subscribed, and secure to the satisfaction of the directory."

Before the closing of the books opened in the different counties, no mortgages could be executed by the subscribers on account of stock subscribed by them. The commissioners could only receive from them such "valid acts of sale, or patents, or certificates of confirmation from the land commissioner of the United States, or partition sales," &c., as are enumerated in the 8th section. These they were required, at the expiration of three months after opening books, to send to the mother bank, and the directory would examine the titles; if approved, mortgages would be executed. The subscribers only delivered to the commissioners such evidences of title as they held, to be examined, &c. The words, "as required by the charter," qualify and fully explain that the security referred to was the mortgages provided for, in the first clause of the 8th section. If this be not so, but the words in the 30th section refer to some form of security, taken by the commissioners before the titles were examined to the property offered to be pledged, that security might prove utterly worthless, and be rejected by the directors. The objection we make is not obviated by the argument drawn from the words, "sums subscribed," which, it is said, should be "stock declared," to support the view we urge. The terms "subscribers," "stockholders," are frequently used in the act as convertible. For example: The first clause of the 8th section says, the "sub-

scribers shall be bound to give mortgages in all cases equal to the amount of their respective "stock," not "subscription." The 9th section declares, that the "subscribers" of the said Union Bank be, and they are hereby created a corporation and body politic for forty years, &c.

If the security referred to in section 30 be not the mortgages provided for in section 8, what, then, is it? Of what does it consist? Is it the only security, or is it merely cumulative to that of the mortgages, which, it is said, were not to be executed before the issuance of the bonds? We are told that it consists of the pledge of real property to be made by the subscribers to the stock, by delivery of "title deeds, patents, certificates of confirmation by the board of land commissioners of the United States, or other evidences of title which should be deemed satisfactory security to the said commissioners or directors," as provided in the second clause of the 8th section. But the bank had refused, or, rather, the charter prohibited her from, declaring subscribers for stock to be stockholders on the pledge of those things. They had first to undergo the scrutiny of the directors. If they were approved, the subscribers were declared stockholders. They should not be regarded as higher security to the State for issuing her bonds.

I will not now consider the effect of the deposit of those papers with the commissioners in creating a statutory mortgage, or lien, on the property to which they related. The words "secure to the satisfaction of the directors," found in the 30th section, we think cannot relate to the title papers deposited with the commissioners. First. Because the 3d section provides, that when the books are closed in the different counties at the end of three months from the time they were opened, the commissioners are required to transmit them to the mother bank, together with all the papers relating to titles so deposited with them, and the directors are to examine them, and decide on the validity and sufficiency of the titles. When, therefore, we speak of "secure to the satisfaction of the directors," we must mean after they have examined them, and graduated the stock in pursuance of the terms of the 26th section; and this could only be done after the books had been closed at

the mother bank, (which were required to be kept open for six months,) for, until they were closed, the graduation of stock could not be made that was to be made when the titles were examined. As soon as that was done, the mortgages were to be executed. And then, and not till then, was the contract of subscription complete. When they were secured to the satisfaction of the directors, the " stock was declared " and mortgages executed. And thus, by that rule of construction, we are drawn irresistibly to the conclusion that the 30th section did refer to the very mortgages required by the 8th section.

We beg leave, therefore, to say, with all deference, we think your honors in error, in the view suggested, of the object of the legislature, in requiring security to be given by the subscribers to the stock for the performance of their contract of subscription. You say, " if it was not intended that the bonds should be issued before the stockholders were declared, and mortgages formally sealed and delivered, the 30th section of the charter would be worse than useless. But if, on the other hand, the subscriptions to the stock secured by a pledge of real estate were designed to be the basis upon which the bonds of the State were to be issued, we perceive very clearly the object and utility of the provision, and the reason why a provisional directory was to be appointed so soon as five thousand shares were subscribed, with authority to apply to the governor for a delivery of bonds equal in amount to the sums subscribed." It was not a subscription for five thousand shares which authorized the appointment of a provisional directory; for, although that language is used in the 14th section, which provides for that provisional directory, it is yet coupled with a qualifying term. The language is, " that so soon as five thousand shares shall have been subscribed in the manner herein provided for," &c.

The 12th section prescribes that manner. It says, " that after the closing of the books, and when it shall appear that at least five hundred thousand dollars shall have been subscribed and paid in on the original stock of the capital of said bank, the said institution shall go into immediate operation," &c. It is not necessary, in order to maintain the position of the State,

that it should be conceded that the entire sum of the stock of that bank should have been subscribed for and secured by mortgages, before any portion of the bonds could have been executed. I only insist that, by the 30th section, bonds could not be issued for a greater sum than the amount of stock which was, at the time, subscribed for and secured by mortgages to the satisfaction of the directors," &c. We have now concluded the first inquiry, viz.: Were the bonds issued under the original act? Believing that they were neither intended to be, nor were, in point of fact, issued under that act, we are to inquire, in the second place, if they were issued under the supplemental act; whether said supplement is not null and void, because not passed in conformity with the constitutional provision relating to such a bill.

We will not notice the provisions of said act at this point, further than to refer to them as already considered in the former portion of this argument. The more convenient order will be to take up the question of the constitutionality of the supplement, in the first instance.

It is admitted that that act was never referred to the people under the 9th section of the 7th article of the constitution, and that it was passed by only one legislature.

We have noticed the points in which the provisions of that act differ from those of the original act. We have seen that the State was required by the former act, to pledge its faith as the basis of a loan which the bank was to obtain, and which was to furnish its capital; that the indemnity the bank was required to give the State, was the mortgages contemplated by the 8th section of the first act; that as an inducement to the State to make this pledge, she was to be entitled to one tenth of the whole profits of said bank, after it had paid the bonds of the State, and that the State was also to have credit in said bank to the amount of $200,000; that in addition to the indemnity afforded by said mortgages, the profits of the bank were to be applied, in the first instance, to the payment of the loan obtained on the bonds of the State, and that said bonds were to be issued by the governor, from time to time, in amounts proportioned to the sums secured by mortgages executed by the

stockholders. Now, by the supplement, the State is deprived of the tenth part of the profits, and the credit of $200,000; and instead of the security of the mortgages to the amount of the bonds to be issued, viz., $15,500,000, she is required by the first section, as soon as the books of subscription for stock are opened, to subscribe for 50,000 shares of the stock of the original capital of said bank, to be paid for out of the proceeds of the sale of her bonds, which were still to be issued for the whole $15,500,000, thus reducing the security of the mortgages to the sum of $10,000,000.

But it is said, that the supplement, in none of its sections, proposed to pledge the faith of the State, and, therefore, there was no necessity for any reference to the people, or for its passage by two successive legislatures.

I shall not now pause to consider the question whether it is not competent for the legislature, in the exercise of its ordinary powers, to direct that the State shall not become a stockholder in a banking institution, or a party to a contract for the purchase of property, for the erection of public buildings, or the construction of works of internal improvements.

I do not, with profound respect, consider that those questions are even incidentally involved in the point under consideration. We freely admit, that the legislature, in the exercise of its ordinary powers, has the fullest jurisdiction of all those matters, without evoking an expression of the popular will, in the manner pointed out by the 9th section of the 7th article of the constitution. But we say its action in the premises was the exercise of extraordinary powers, only committed to it upon the express terms and conditions of said section of the constitution. The object was to obtain a loan on the faith of the State. The question at the foundation is, Did the State lend its faith? If so, for what purpose and upon what terms? If the pledge was for a specific object upon specific terms, the trust was special, could be used for no other object, nor for the same object on different terms. The object and the terms were a part of, nay, the very consideration, of the pledge; were the very law of the contract of the pledge.

If inferential reasoning is to be resorted to, we say, that not

only was the pledge made for the specific object, and upon the very terms proposed, but that it could have been obtained on no other and different, for the familiar rule applies, that the expression of one thing is the exclusion of another. If the pledge was made for one object, then it was not for another; and by no action of the legislature could it have been differently used, any more than an agent or trustee, acting under a limited power, can exercise general discretion.

If the pledge was made to a particular institution for a particular purpose, such, for example, as that contemplated by the first act, then it can only be applied, under a second act, to the same institution under the same restrictions. It is not a mere question of power, but one of the exercise of a power coupled with a condition.

Was the pledge asked for a specific purpose, upon specific terms? If so, it is idle to say that it was granted for a different purpose, and upon different terms. What does the very section which proposed to pledge the faith of the State declare to be the use which was designed to be made of it when pledged? The 5th section provides, "that in order to facilitate the said Union Bank, for the said loan of $15,500,000, the faith of the State be, and is hereby pledged, both for the security of the capital and interest," &c. What Union Bank? The one created by the said original act, with all the specifications provided therein. Not another to be afterwards created. But the power claimed virtually asserts the right to appropriate that pledge, when thus cautiously made and limited, to all the restraints and safeguards thrown around it by the first act, and wholly pervert it to another and totally different object. If this can be done, lost to us for ever will be all the promised benefits of that wise provision of the constitution. If this be so, no restriction has been thrown around the legislature. Its discretion, and not the popular will, controls in the use of the pledge. If this be so, it was useless labor and idle consumption of time and of money, for the legislature, which passed the first act, to have digested, with so much care, the various sections of that act.

Why not content themselves with simply passing the 5th

69 *

section; refer that to the people and at the next session seize the pledge of the faith thus made, and use it for any and every purpose they thought proper. But these things cannot be. That great conservative sovereign power, which the people of Mississippi reserved to themselves by the express terms of the constitution, of being the sole judges of the time when, person to whom, and the purposes and conditions upon which they would pledge that which is more sacred than chastity to woman, only less sacred than the oracles of God himself, the faith of the State, cannot be thus trifled with. The very fact that the legislature, which passed the first act, did go through with the labor of digesting the whole scheme, to consummate which the pledge of the faith of the State was solicited, by implication furnishes at least legislative construction, that they considered it necessary that the whole plan should be developed and submitted to the people to enable them to act understandingly in the premises.

We shall be very brief in further considering whether there are material alterations made in the first act by the supplement. We have seen in what relation the State stood to the bank proposed to be established by the first act. We have attempted to show that she was amply indemnified by mortgages for every dollar of the bonds to be issued by her; that the execution of the mortgages was a condition precedent to the issuance of the bonds. The first section of the supplement provides that the State shall subscribe for 500,000 shares of the stock of the original capital of said bank as soon as the books of subscription were opened. Here, at once, an entire change is effected in the relations of the State to the bank, one never contemplated by the first act. But the change effected by said section did not stop there. The stock so subscribed for, was to be paid for out of the proceeds of the bonds. The profits which accrued on said stock, so subscribed for by the State, were declared to be held by the said bank, subject to the control of the legislature, for purposes of internal improvement and the promotion of education. The 19th section of the original act provided, that the whole of the profits should be employed by the bank as a part of its capital, until the full payment of that portion

of the bonds which were payable in twelve years; after which, one fourth should be divided amongst the stockholders, and the remaining three fourths, and the whole of the profits subsequently accruing, were to be devoted to the payment of the bonds falling due in fifteen years; and one fourth of the residue to be divided amongst the stockholders, and the remaining three fourths, and the subsequent profits, to the next class of bonds, and so continuing to apply the profits, first, to the payment of the next class of bonds, and then one fourth to the stockholders, until the final payment of all the bonds issued by the State. That the State was ever after to have one tenth of the whole profits in consideration of the issuance of her bonds.

This subscription for stock by the State, reduced the stock to be subscribed by individuals, to $10,500,000, and, to the same extent, reduced the mortgages and the security they afforded the State for the payment of the bonds. For, as before remarked, her bonds were still to be issued for the original amount of the capital of the bank, $15,500,000. The 8th section of the supplement declares, that the portion of stock subscribed for by the State, should be taken from the whole amount of the capital stock, and that the subscriptions of individuals should be so graduated as to reduce the amount of stock to be subscribed for by them. It also declares, that nothing in the first act should be so construed as to deprive the State of the amount of stock so subscribed for by her. Said section conflicts directly with the 8th section of the first act, which provided for the execution of mortgages to secure the payment of the entire capital and interest.

The 6th section of the supplement authorizes subscribers, at any time, to transfer their respective shares to any citizen of this State, with the approbation of the directors of the parent bank.

The 4th section of the first act declares, that shares of stock should only be transferable to the owners of real estate situated in Mississippi, said owners being resident in said State, until after five years, when they may be transferred to any owner of real estate in this State, whether they be resident

here or not. The 8th section of the supplement declares, that the resident citizens of the different districts shall be entitled to take the stock allotted to their respective districts.

The 4th section of the first act declared, that only citizens of Mississippi, owners of real estate situated therein, should be stockholders.

The 18th section of the supplement repeals so much of the 19th section of the first act, as gave the State one tenth of the whole profits of the bank, and also so much of the 31st section as entitled the State to a credit of $200,000. The 16th section of the supplement repeals all parts of the first act which conflict with the supplement.

Thus it will be seen, how widely the bank, established by the first act, differs from that established by the second. They are no more the same institution than is the god of the Hindoo, the god of Jacob. It was the Mississippi Union Bank, of the first act, to which the State pledged her faith. Then it could not have been to the Mississippi Union Bank of the second act which, though bearing the same name, is an illegitimate child of the first, and not entitled to inherit.

Is it true, that the liability of the State was not increased by the subscription for stock directed in the first section of the supplement? If the bank failed, what security had she for the five millions of bonds issued by her for the stock subscribed by her, in making up the capital of $15,500,000? The whole amount of mortgages of individual stockholders was reduced to $10,500,000.

Would not the loss of those $5,000,000 most clearly fall on the State?

By the original charter, if it failed, the State was fully protected by mortgages to the whole amount of the capital, consequently, to the whole amount of her bonds.

How, then, can it be said, that the State, by her subscription for stock, did not become a debtor to the bank, or incur any additional obligation?

The fact, that the first section of the supplement did not direct that mortgages should be executed to the bank in payment of the stock subscribed by the State, does not answer the

objection we urge. The fact stands out undeniably true ; the State was still required to issue her bonds to the full amount of the capital stock of said bank, $15,500,000, whilst the entire sum which could be subscribed, and for which, consequently, mortgages could be executed, was only $10,500,000. The fact, that mortgages were not required of the State for the stock subscribed by her, is also another of the great changes made in the first act by the latter. For by the first act, mortgages were required to be executed proportioned to the amount of stock declared, and the reason given is, that they were to be security for the principal and interest of the bonds issued by the State.

But it is said, the effect of that provision of the supplement is to place the State precisely upon the same footing with private stockholders, in regard to the payment of the stock. That is one of the very objections we urge.

Does the fact, that if the bank failed to pay the bonds the individual stockholders would be required to contribute for that purpose, in proportion to their stock, and that in that sense and to that extent they might be considered debtors of the bank, at all conduce to show that the State would not still be a debtor on account of the stock subscribed by her, and bound, without security, for the bonds which she might be required to issue for the stock taken by herself? We think not.

The force of the objection is not met, as far as we can see, if it be conceded that she did not become a debtor to the bank by her subscription. We do not, however, by any means, concede that. It is said, however, that the subscription for stock by the State, as provided in the first section of the supplement, did not pledge the faith of the State, and, therefore, there was no necessity to refer the supplement to the people, or pass it by a second legislature. Let us look into this.

Could the bank have gone into operation? was it competent for the governor to have appointed the provisional directory as provided in the 14th section of the first act, and have issued any portion of the bonds when the 50,000 shares, which the State was required to subscribe, were taken ? Now those 50,000 shares were to be taken as soon as the books were

opened. The 14th section of the first act declares, that so soon as 5,000 shares were subscribed and paid in, the governor should appoint the provisional directory, and the 30th section of the first act, as we have seen, provided, that as soon as the directors were appointed, they should elect a president; the same should be notified to the governor, " who would thereupon execute bonds, from time to time," &c. This could hardly be contended for, because it was expressly provided by the 14th section of the first act, that so soon as the directors were appointed, the power of the commissioners to take stock ceased. But a previous section had provided, that the books, except of the parent bank, were to remain open for three months. This argument, of course, proceeds on the admission that the supplement is to be treated as constitutional, and as forming, with the first act, one entire law, which I do not concede.

As the supplement was not referred to the people, or passed by two successive legislatures, if it created any new and substantive provisions in the charter of the bank, and in the very being and constitution of the bank, as affecting the pledge and faith of the State, it is admitted that it was unconstitutional. By the very terms of the section proposing to pledge the faith of the State, the 5th section of the first article, it is declared, " that in order to facilitate the said Union Bank for the said loan, &c., the faith of this State be, and is hereby pledged." The people knew for what, and upon what terms, they were pledging the faith of the State. It was not a general loan or pledge merely for the amount specified, which the legislature could use in its discretion, but was to facilitate the said Union Bank, all the powers of which, when to be put into operation, all the securities of which to protect the State, were known to the people. It was not lent to create a bank in which the State was to be a stockholder for five millions of dollars. The very terms of the section proposing a pledge of the faith of the State, show that this restriction was a part of the terms of the pledge.

If these restrictions were a part of the pledge, then, whatever may be said of the general powers of the legislature as to the

right to repeal, no one will seriously contend that it could pass any law extending or varying these restrictions, which would not have to be referred to the people, as provided in the clause of the constitution referred to.

Were not bonds to be issued covering, as well the five millions subscribed for by the State, as for the stock subscribed for by individuals ? Whether the State, by subscribing, became a debtor to the bank, or the holders of the bonds, those bonds, which might be issued on account of the shares thus subscribed by the State, certainly did import a pledge of the faith of the State, and that pledge of faith, it cannot be pretended, was given by the people, or was ever referred to them.

We think it will not do to answer this by saying that the State had already pledged her faith for the entire capital stock of the bank, and, therefore, there was no additional liability imposed on her. We do not think this will avail any more than to assert, that, upon five thousand shares of the stock being subscribed, and the provisional directory appointed, in pursuance of the terms of the 14th section of the first act, the governor could have been required to execute and deliver to the bank bonds for the full amount of the original capital, before any mortgages whatever had been executed.

But it is insisted that, because the legislature may direct a subscription for stock in a bank where no limitations or restrictions exist, therefore, it may where they do exist, under a special pledge of the faith of the State.

It is replied, however, that the pledge had nothing whatever to do with the details of putting the bank in operation; that the legislature had as ample power in readjusting those after, as before the question was submitted to the people. It is further contended, that it was only necessary to publish the 5th section, which contained the pledge intended to be made. All that does not answer the position taken by the State. And this, even though it be conceded that there is nothing in the argument, that by the terms in the constitution "no law shall ever be passed to pledge the faith," &c., was not clearly meant all the sections forming parts of the entire law. For, by the

express terms of the said 5th section, it is made manifest that all the various sections of the act were distinctly before the people, whether by all being published or not. All formed a part of the pledge given. The language is, "that in order to facilitate the said Union Bank for the said loan of," &c.

We have already sufficiently commented on the words, "the said Union Bank." But what is meant by "the said loan?" For, it was for that, that the pledge was to be made. Why, surely, the loan provided for in the other sections of the act. You are obliged to refer to them to see what that loan was, its amount, its terms and conditions, and the use to which it was to be applied. Those other sections necessarily, therefore, formed parts of the one containing the pledge, and the pledge itself was made upon the conditions of those other sections. Therefore, the legislature could no more bind the people, by any material alteration of those sections thus made part of the con-tract of the pledge, than they could in the first place have bound them by an act pledging the faith of the State, which was never submitted to them at all.

The provision of the constitution is rendered wholly nuga-tory upon any other rule of construction. If the will of the people, in giving or refusing the pledge, is only to be sought for in the action of the next succeeding legislature, and that legis-lature is to be invested with unrestricted authority, and if the section containing the pledge, in referring, in general terms, to all the other sections of the act, does not, in the very nature of the case, limit the pledge to the very conditions of those sec-tions, and none others, then the discretion of the legislature is substituted for the will of the sovereign people, and the whole-some reform intended by the constitution is converted into a syren song to entice the people into a snare. As well might it be contended, that the pledge could have been used to procure a loan for the Union Bank to establish a commission, factorage, and brokerage office, or to construct bridges, railroads, and other works of public improvement.

If correct in these views, then, when the legislature passed the supplement, making such radical changes in the original act, in the very being and construction of the bank thereby

created, as evidenced by changing the character of those who were authorized to take stock and become corporators, and all the other various alterations which we have noticed ; then that supplement could only be a valid law after it was published and referred to the people.    Indeed, I am not prepared to say that, the supplement having attached itself to the first act, it did not become necessary to publish and refer both, as the two were to be one law, and that not the law to which the people had pledged their faith.

Any other or different construction invests the legislature with the power to seize the pledge when given, repeal all else with which it is connected, and make it the basis of any system it pleases.    As well may it be contended, that it is no infringement of a patent right to take the principle of the invention, and by an ingenious change of machinery or application evade the laws governing in such case.

But it is argued, that the legislature possesses the power to pass just such laws as the two under examination, as to everything but the 5th section of the 1st article, independent of the clause of the constitution referred to, and therefore it may alter or repeal, at pleasure, all other portions of the two acts.    That is not the question.    The point is, are not the other portions inseparable parts of the pledge, being, by the language of the 5th section, which proposes the pledge, incorporated into the pledge as containing the conditions on which the pledge is granted.    If so, the conclusion is irresistible, that the repeal of those parts operates the repeal of the pledge.    An utter failure of consideration is established.

We admit, that a law pledging the faith of the State, when passed in conformity with the provisions of the constitution on that subject, is of no higher import or greater sanctity, or less the subject of the repealing power of the legislature than any other law for ordinary purposes passed in the usual mode of enacting laws.

But we say, that when that repealing power is exerted it must be *in toto*, not partially.    The same act which repeals the other sections, which set forth the purposes and conditions and

uses for which the pledge was given, equally repeals the pledge itself.

That is a limitation upon the repealing power created by the constitution itself, and by the terms of the contract for which and upon which the pledge is given.

The same remark, with the same qualification, applies also to the objection, "that the people or the State are a party to a law pledging the faith of the State, after it has been passed as required by the constitution, in the same sense in which they are a party to any act of legislation passed according to the usual form."

There is but one way by which the provision of the constitution can be made effective of the end intended. And that is, if it did not contemplate an actual submission of the question of the pledge of the faith of the State to the people through the ballot-box, then the succeeding legislature, passing the second time on the act, must adopt the whole act as originally passed, or repeal the whole, the 5th section included. It certainly cannot take the capital which was lent to the copartnership of A. B. & Co., on special conditions, and dissolve that firm, and organize a new one of C. D. & Co., and turn over the capital to them. No, the consideration fails, the capital must be returned to the owner.

It is admitted, that the objects of the framers of the constitution, in the clause under review in requiring the reference and publication of laws to pledge the faith of the State for a loan of money, "were to direct the attention of the people to the proposed measure." Exactly. But what proposed measure? Why the loan of the faith of the State to a bank organized on certain principles, and giving the State certain privileges and securities against liability on that pledge. We agree, that the "expediency or impolicy of such a measure would be discussed," "and the attention of the public drawn to the subject, and the danger of hasty and improvident legislation prevented. For, by that means, the legislature would be enabled to act under the direct counsel and advice of the whole of their constituents."

The State of Mississippi *v.* Johnson.

We quote the whole passage for the purpose of indorsing it, and claiming it as an argument in our favor.

It assumed that, because the legislature could reject the law containing the pledge, after its reference to and approval by the people, therefore they have full power of altering or amending.

We think this a *non sequitur.* The people are made liable for nothing when the whole law, the section containing the pledge, and all, are repealed.

Again it is said, that the second legislature have the power to pass such a law in opposition to the known wishes of a majority of the people. What, then, becomes of the 9th section of the 7th article of the constitution. What was gained by referring it to the people, if there is no mode of ascertaining their will, or if there be, it may be disregarded when ascertained.

The reason why a law passed to borrow money on the faith of the State cannot be partially repealed or modified by a succeeding legislature, as other laws can or may be, before it has been carried into effect, and the money obtained is, because, upon the argument already made, the pledge was given to a particular thing, for a particular purpose, and upon limited conditions which are specified in the other sections, which make parts of the one which contains the pledge; and, therefore, a partial repeal operates to release the State from her pledge. In this sense all the parts and sections made up the entire law. And the language of the constitution is, "no law shall ever be passed to pledge the faith of the State," &c.

One section of a law is no more the whole law than one segment of a wheel is the wheel itself, or one leg of a triangle is the triangle itself.

The succeeding legislature may refuse to reënact the law after its reference to the people, though approved by them, yet its power is limited to a repeal or a reënactment of the whole law, pledge and all.

A pledge of the faith of the State is asked. It is given upon the terms on which it was asked. The legislature may decline to accept or use it, after it is given. If it accept

or use it, it must do so upon the terms it was asked and given.

This distinction is at the foundation of the whole question. It is this which destroys all analogy between the power of the legislature, as to the right of repeal, in an act to pledge the faith of the State, and an act of ordinary legislation.

With great deference, we think your honors concede all that is contended for by the State, when you say: " Hence, although the legislature professes the unrestricted power to repeal a law of that character, before it is carried into effect, a right cannot be claimed for it so to alter or modify the law as to make the amendatory act a distinct and substantive act of legislation, by which another and distinct pledge of the faith of the State would be effected."

It is by that very rule we wish the supplement tested. If tested by that, we think it clear, " that another and distinct pledge of the faith of the State " was " effected," or the pledge which was given was applied to another and distinct person, and upon other and distinct terms, than those the people intended.

But it is argued, on the opposite side, that the position of the attorney-general is, that the supplement is unconstitutional, null, and void; therefore, it does not enter into this controversy; and, as it is not denied, that the first act was passed in conformity to the provisions of the 9th section of the 7th article of the constitution, and as the 5th section, which contains the pledge, was passed by two legislatures, therefore the State is liable under the first act. This, however, assumes that the bonds were issued under the first act, and that it was only necessary to publish and refer the 5th section of that act, the contrary of which we think we have proved.

It is insisted, that the legislature, under the general grant of powers in the constitution, may release any debt, obligation, or liability, assumed by any person to the State, or any penalty incurred; and consequently, that it did not exceed its powers in the changes made in the supplement. This argument is based on the assumption, that the mortgages were only a security to the State for the pledge of its faith and the issuance

of its bonds; and that they were not intended to be executed before the bonds were issued, and that no rights had vested, and no liabilities were incurred under the first act. We have already attempted to answer this position, by a comparison of the different sections of the first act. In doing so, we think we showed, if this argument was true, that the bonds might be issued at a time when there was no security whatever provided for them. For the only security which it is pretended existed, or could exist, before the mortgages were executed, was the mere deposit of title papers made by subscribers at the time of applying for stock, and which were regarded by the charter of too light a character to declare stock upon, and we asked if they were to be considered sufficient security for a pledge of the solemn faith of a sovereign State, and one, too, which had by her constitution proved herself to be so jealous of her plighted faith. We showed that, as it was made the duty of the directors to reject the stock subscribed, unless the title papers, thus placed in their hands, were approved, no security whatever might be afforded the State for the bonds.

Again. The stockholders, by the 29th section of the first article, could, on certain terms, transfer their stock, and be discharged; and by the 20th section of the 2d act, (which your honors hold to be constitutional,) they had the right, if dissatisfied with the graduation of the stock subscribed for by them, to withdraw the property pledged, and cease to be stockholders, and their stock could be again offered to subscribers.

Now, to test the matter of any lien being created on the lands proposed to be mortgaged by the subscribers, before stock was declared, we submit, that a judgment rendered against said subscribers, after the deposit of their title papers in the hands of the commissioners to receive stock, and before an examination had been made, the titles approved and mortgages executed would be a lien on said lands. Would not a sale of said lands, made by the subscribers, intermediate the time of subscription, and the examination and approval of the titles and the execution of the mortgages, convey a valid title to the purchaser? It certainly would, unless it could be shown that the purchaser had notice of such deposit. Indeed, I think it.

70.*

would in any event. Upon general principles, there can be no doubt of it. I know of nothing in the first act which could change the rule of construction.

Again. In regard to the general power of the legislature to release debts and obligations, or other security to the State, we reply, this is not a case coming under the ordinary powers of the legislature; they are securities upon which the State has issued her bonds and incurred liabilities; and that a release of these by the legislature operates, *ipso facto*, a release of the pledge of the faith of the State.

Besides; under the pledge of the 5th section, rights had been vested which could not be impaired, without again referring the question to the people. Every citizen of the State was liable to be taxed to redeem the faith of the State. They had agreed to assume this liability, in consideration of the indemnity afforded the State by the provisions of the first act. The conditions of that liability could not be changed without their consent.

The converse of this is true, if the argument be well founded, that the provision of the constitution and the will of the people impose no restraint upon the legislature in the use made of a special pledge of the faith of the State, all the purposes and securities of which are limited and defined. But that argument, throughout, begs the question, which is the *gravamen* of the whole controversy, namely : Was it a naked pledge of the faith of the State, or was it coupled with limitations? It also defeats the admitted objects of the framers of the constitution in the clause under notice.

It is urged, that the pledge of the faith of the State was to the bank in its corporate character, not to the stockholders. It is not perceived that this, by any means, meets the position of the State; that the pledge was special, not general, whether made to the one or the other. The point of the identity of the corporation, under the first and second acts, I shall not here discuss, as I have noticed it in another portion of my argument, and, as I am advised, Judge Mayes will file a brief on that subject.

It is argued, that there is no real conflict between the 1st

section of the supplement and the 8th section of the first act, and that the legislature did not intend to repeal the latter by the adoption of the former. First, because it has not so declared expressly; and second, because a construction can be given both which will make them consistent. We have already, in fact, considered the conflict between the two sections. By the original act, the whole amount of stock was to be subscribed by citizens of the State, who were to execute mortgages for the same on real estate in the State; which mortgages were to be security for the payment of the capital and interest of the bonds. The capital was to be borrowed on the bonds of the State. The 8th section provided, that the mortgages were to be in all cases equal to the amount of the stock. The 1st section of the supplement makes it the duty of the governor, as soon as books of subscription are opened, to subscribe for fifty thousand shares for the State; the same to be paid for out of the proceeds of the State bonds, and the dividends and profits on said stock to be held by said bank, subject to the control of the legislature, for purposes of internal improvement and education. Here no mortgages are to be executed by the State, and none by stockholders for the shares subscribed by the State; but bonds are to be issued covering that amount, as well as the stock of individuals; and, as we have already remarked, if the bank failed, the State would be bound to pay the $5,000,000 subscribed by herself without any security whatever. But there is a great conflict between the latter clause of that 1st section, which refers to the profits and dividends, and the 19th section of the first act, which provides: "That the whole of the profits of said Union Bank shall remain with and be employed by the directors, as a part of its capital, until the full payment of that portion of the bonds of the State specified in the 5th section, which will be payable in twelve years; after which, one fourth of the profits then realized shall be divided among the stockholders, in the proportion to which they shall be entitled respectively; and the whole of the remaining and subsequent profits of the bank shall be employed by the bank, until the full payment of the bonds of the State, which will be payable in fifteen years; after

which, one fourth of the profits then realized shall be divided out among the stockholders, as before provided for and mentioned ; and the whole of the remaining and subsequent profits shall be employed by the bank, until the full payment of the bonds of the State, which will be payable in eighteen years ; after which, one fourth of the profits then realized shall be divided as aforesaid ; and the whole amount of the remaining and subsequent profits shall be employed by the bank, until the final payment and extinguishment of all the bonds of the State in favor of the institution ; after which the whole of the profits shall be divided annually, with this proviso, that, in consideration of the bonds made by the State, in addition to a voice in its direction, the State shall be entitled to one tenth part of the whole profits of the bank, which one tenth part shall be paid into the treasury, at the times and in the proportions provided for by this section to the stockholders."

Here it is made apparent, that it was the intention of the legislature that the profits of said bank should pay off and satisfy the bonds. They were to be applied to the classes of the bonds as they respectively became due. When they exceeded the instalments, at their maturity, one fourth of the excess was to be divided amongst the stockholders; the other three fourths were to be retained by the bank, ready, with other accruing profits, to be applied to the succeeding instalment; and so continuing the whole series. We think no doubt can be entertained, that it was the belief of the legislature, in the passage of that section, that the profits would discharge the whole of the bonds. The 1st section of the supplement interposes, and diverts the profits on $5,000,000, the amount of the State's stock, from paying the bonds, to purposes of internal improvement and of education; and not the profits on that amount only, but the entire interest of the State in the whole profits on the entire capital of the bank, after the bonds were paid. To that extent it created a bank for internal improvement, and for purposes of education.

I desire to know if the legislature possessed the power, so to alter the provisions of the first act, as to divert the profits of the bank to that extent, why they could not equally have

diverted them to the full amount, and thus have dispensed with every security and all share in the profits claimed by the State?

The motive which is assigned for the passage of the said first section is, that the consideration which the State was to receive by the first act was inadequate to the grant of the faith of the State for the whole capital of the bank, (which is said, in fact, to belong to the whole State,) of fifteen millions and a half. The answer is, that though the profits to the State might be less, the liabilities were less. For in the first case she would be indemnified by mortgages to the full amount of her bonds; in the other case, she had no security at all for $5,000,000, the amount of her own stock, if the bank failed. But it is a question of power, not of motive. Are the terms on which the pledge was given changed? If so, the legislature has no power to pass it. The report of the committee of the house of representatives, appointed to consider whether the first act could not be constitutionally amended, " so as to convert the bank into a State institution, owned and entirely controlled by the State of Mississippi," is quoted to prove that such was the motive. As that report is introduced, we claim the benefit of it. They reported, that the legislature had the power to amend the details of the charter; but as " to that portion of the said charter which related to the subscribers or stockholders " being, in their opinion, " the primary condition on which the faith of the State was pledged, they had no power to change the same, unless it should be again submitted to the people." House Journal, 1838, 118. Now, was there no such change made in regard to subscribers and stockholders?

We have already shown, that other persons than those prescribed in the first act were, by the supplement, entitled to become stockholders; so in relation to the transfer of stock, as prescribed in the two acts, which we have also adverted to. Yet the provisions of the first act on these very points, thus changed by the supplement, were the " primary conditions on which the faith of the State was pledged." " Therefore, they

had no power to change the same, unless it should be again submitted to the people."

But the fact, that the supplement was passed at the same session that the report was made, is cited in proof, that the house of representatives did not consider they had the power to alter the provisions of the first act, in relation to "subscribers and stockholders." From that the inference is drawn, that "they did not, by an act passed at the same session at which the report was made and agreed to, not having expressly so declared, intend to alter or repeal that very condition." We reply, we are to look to the act itself, and the plain and obvious meaning of it, for the exposition of the legislative intention.

Where the terms of the act are specific, and the meaning obvious, no construction need or can be allowed, to assign a motive or intention different from that arising out of the plain language used in the act.

Much less shall any inference be drawn from the fact, that because the committee on the part of the house reported that the provisions of the charter relating to subscribers and stockholders could not be altered, as they were the primary conditions on which the faith of the State was pledged, therefore those alterations were not made. We say that vital and fundamental changes were made in those very particulars. And we appeal to the alleged changes themselves. There is no necessity to have recourse to the report of that committee in the construction of the acts under consideration. If the provisions of the two differ, of course the latter prevails, as the evidence of legislative intention and motive. Besides, there is no ambiguity in the terms of the law, calling for any other than the rules of interpretation which obtain when the language of the act is plain, precise, and having a well understood meaning.

On these points, we refer your honors to the authorities which will be found cited in the conclusion of this brief.

The stockholders are not the same in the two acts. Stock may be taken by one class of persons, under the one, who

could not take under the other.  Stock may be transferred under the one, at a time and to a class of persons, it could not be under the other.

We do not contend, that the right to take stock in the bank was the inducement to the State to lend her credit, and that, for that reason, the supplement should have been referred to the people and passed by two successive legislatures.   We say it wholly changed the character of the bank chartered by the first act, as well as the liability and security of the State, as provided by that act; all of which were the conditions upon which she had consented to the pledge of her faith under the first act, and, therefore, the second act should have been referred to the people and passed by a second legislature.

We have now concluded our examination of the provisions of the supplement; first, with reference to their agreement with those of the original act; and secondly, with reference to the constitutional power of the legislature to alter, modify, or repeal the former; and thirdly, to discover whether the bonds issued under the supplement or not.   The latter point we were indifferent about, as we think we showed they could not have issued under the first act; which was sufficient for our purpose, if your honors adopt the view we entertained in regard to the power of the legislature over the faith of the State, pledged for a specific purpose, upon prescribed terms and conditions.

If we are correct in this view, nothing whatever is to be presumed against the State by the mere execution and delivery of the bonds by the governor, and their sale by the commissioners appointed by the legislature.

It is said, because the directors are made judges of the sufficiency of the mortgages offered for stock, and have power to reject the same, as provided in the 26th section of the first act, and, by the 30th section, can call on the governor and demand the issuance of " bonds proportioned to the sums subscribed, and secure to the satisfaction of the directors," &c.; therefore, on the hypothesis, " that the execution of the mortgages was the condition on which the issuance of the bonds and the liability of the State depended, the directors were special agents of the State, vested with ample discretion to

determine whether that condition was performed agreeably to directions of the charter," and having determined that, their decision was binding on the State. It is also said, that they did so decide, will be presumed by their calling on the governor for the bonds, and his issuing them.

On the point of estoppel here presented, which denies the right of the State to call in question the execution of the mortgages, I can add nothing to the very able brief of the attorney-general, which I trust will be reëxamined.

Your honors say, that "were it conceded that, upon a just construction of the charter, it was not the intention of the legislature that the bonds should be issued, unless the mortgages were previously executed," you would still hold, that the State was liable. That would be upon the presumption that the directors had discharged their duty and had taken the mortgages. It could not apply in this case, however, as it is admitted in the "agreed facts," that they were not executed when the bonds issued. Moreover, your honors have admitted, that "if the bonds were not issued under the first act, but were under the second, and if that was not passed in pursuance of the directions of the constitution, and, therefore, void, then the mere sealing and delivery of the bonds by the governor did not create a liability on the State." Suppose that the directors had surreptitiously obtained possession of the bonds of the State, signed by the governor, and with the great seal of State attached, which were prepared to be delivered when the mortgages were executed, would the State be estopped from showing that fact? The State alleges in this case, that the bonds issued fraudulently and in violation of law and the constitution. As a sovereign, her voice is only heard speaking through her constitution, just as the voice of Jehovah is heard speaking through the Hóly Bible. All who treat with those who profess to represent her, must know, at their peril, that they are clothed with the power they undertake to exercise.

The case of *The United States* v. *Arredondo*, 6 Peters, 691, quoted by your honors, we cannot consider as conflicting with the position assumed by the State in this case. It was there held, that "where power was confided to the discretion of an

agent or public officer, the acts performed by him are valid as to the subject-matter, and individual rights would not be collaterally disturbed for any thing done in the exercise of that discretion, within the power and authority conferred." So we say. Whatever was done within the power and authority here conferred by the constitution and law, we do not object to. Your honors have repeatedly and correctly held, that all special jurisdiction is to be exercised in strict consonance with the law creating it.

So you have held, in the case of the sale of lands of decedents, by executors and administrators, that as their powers are special, created and defined by statute, the record of the proceedings of the court, which is one of limited jurisdiction, must affirmatively show upon its face that every act was done which was required by law to be done, to vest title in the purchaser, or the sale will be vacated.

Your honors hold, that were it conceded that the charter required the execution of the mortgages as a condition precedent to the issuance of the bonds, you would presume that this had been done, because the directors were made sole judges in regard to the execution of the mortgages and the approval of titles, and the governor was required to issue bonds on the application of the directors. In other words, you would presume that the directors had rightfully exercised their discretion, and they would not have called upon the governor for, and he would not have issued, the bonds, unless the mortgages had been executed. But no presumption can be indulged in that matter here, as it is admitted by the opposite side that the mortgages had not been executed when the bonds issued. And a party having once admitted on the record that a thing was not done, is estopped from setting up in argument that it was done. And also, because of the admission of your honors, just noticed, that if the bonds were issued under the supplement, and that was not passed pursuant to the directions of the constitution, and, therefore, was void, then the mere sealing and delivery of the bonds by the governor did not create a liability on the State. There is, therefore, nothing in this which militates against the position of the State; but the proposition

must stand as at first stated. Was the execution of the mortgages the condition upon which the bonds were to be issued? We will not return to the discussion of that proposition at this point.

Recurring to the object of the provision of the 9th section of the 7th article of the constitution, it is said by your honors, "it was not to take away from the legislature the power of passing laws to borrow money in the name of the State, but to provide against hasty, inconsiderate, and ill-advised legislation."

But it must be recollected, that it is the organic law we are speaking of. We are not now considering what are the ordinary powers of the legislature, after the legislative department of the government is created. This is a provision which is being adopted at the moment the legislature itself is being created. It is the fiat of the sovereign people, speaking the government itself into being, and impressing upon it the law of its being. It is a primary, undelegated power of the people, pertaining to their sovereignty, and now, for the first time, a body of magistracy is being created, who are to exercise just so much power, and no more, as the creator confers upon it. This legislature is the creature of the constitution. It is a solecism to speak of taking from it that which it never possessed. It presupposes prior existence in the creature to the creator. Whereas, the framers of the constitution impose a limitation upon the power, in the very act which creates the power.

Therefore, the objection we make is not answered by saying, that in the absence of this clause in the constitution, the power would have resulted to the legislature under the general grant of the constitution. It was against the implication of such a power the constitution has provided. It is not less an act of original power to have imposed the limitation, than it would have been to have withheld the power altogether. Indeed, it is the same thing precisely, as though the constitution had declared as follows: The legislature shall and may have the power to pledge the faith of the State to raise a loan of money, or for the payment or redemption of any loan or debt; but such power shall only be exercised in the mode and manner pre-

scribed in said clause. And then the acts of creating and limiting the power spring from the same source, and are simultaneous.

The general power to pledge the faith of the State still resides in the bosom of the sovereign people. The qualified power has been conferred on the legislature. It is, at last, the approval of the people, in some form, no matter how much speculation may be indulged, which gives even this qualified exercise of the power the sanction and authority of law.

To contend, therefore, that whilst it · is the approval of the people that gives it vitality, that breathes into it the breath of life, the will of the people may be disregarded, is to set at naught the very law of its being.

I have heretofore been considering the question, whether the bonds issued under the original act. I think I have shown that they did not. I have also noticed the point, whether they issued under the supplement. I have endeavored to prove that they did. But suppose that, instead of issuing under either separately, they issued under the joint provisions of the two.

If the argument I have offered be true, that material alterations were made by the supplement in the provisions of the first act; if new powers were created and old ones modified, whereby the very organic structure and constitution of the bank were wholly changed, and the safeguards and securities thrown around the pledge of the faith of the State were repealed; and if all the other sections of the first act were to be considered as connected with the fifth section, and, therefore, limitations and restrictions upon the pledge, then those sections and the fifth section constitute the law to pledge the faith of the State; from all these the corollary would result, that the two acts being now moulded into one, and that one not the law which had been published, and referred, and passed by two legislatures, that ceremony would be essential to its validity. To meet these positions, it is said, it must be admitted, "if the Mississippi Union Bank had been an existing corporation, it would have been competent for the legislature, by a statutory provision, to have pledged the faith of the State for a loan of money to be made by it, without making the charter of the bank a part or portion of the law by which the faith of the

State was pledged," and that it would also have been " in the power of a single legislature, with the consent of the stock-holders, to have made any alteration in the charter, without affecting the liability which the State had agreed to assume."

· To this we reply, that if the law so passed should be couched in the terms of the 5th section, referring to all the other sections of the act for an explanation of the nature of the pledge and the conditions on which. it was asked and granted, then those sections and conditions are a part of the pledge itself, and the action supposed would be no more competent in the case stated, than the case before your honors. And we cite the argument already made as applicable.

The same reply is also made in the case supposed, of two laws passed at the same session of the legislature, one of which proposes a general pledge of the faith of the State, and the other the indemnity and inducement offered the State for the pledge of its faith. It is asked, if those two acts could be said, in a legal sense, to constitute one law, so that the repeal of the one which provided the indemnity would be a repeal of the other. I reply, as the pledge was asked, so was it granted.

Otherwise, it is only necessary for the legislature to pass an act to obtain a general pledge of the faith of the State for any and all purposes, and for all time, publish and refer it in the manner proposed by the constitution, pass it at the next session, and relieve themselves forever, in pledging the faith of the State, from the inconveniences proposed by the 9th section of the 7th article of the constitution.

If the argument, that it was only necessary to have referred the 5th section of the first act, and passed it again at the next session of the legislature, be admitted, it does not impair the force of the position taken by the State. For we repeat, the fifth section, in its very terms, renders it indispensable to refer to the other sections for a knowledge of the pledge sought: " that in order to facilitate the said Union Bank for the said loan."

Now, is not the language of the section unintelligible, unless reference is made to the other sections ? It would be to stultify the people to suppose they would have given the pledge without

having their attention directed to, and their action based upon, the whole law. And even if it be granted, that the publication of the other sections might have been dispensed with, it does not, by any manner of means, negative the idea that they were not informed of them. They were, at least, published in the manner other laws are required to be, and every citizen is presumed to know the laws of his State; he cannot plead ignorance of them.

The fact that the legislature may, in a law made up of various sections, and all relating to different matters, repeal one section, and that not operate a repeal of all, does not show that they can, in a law, all the sections of which relate to one matter, repeal one without repealing thereby all the other sections, if such connection and mutual dependence exist between them as we contend do between the 5th section and all the others of the first act. One of the most familiar rules of construction is, that all the sections of a law, *in pari materiâ*, are to be considered in connection. Violence shall not be done to all the other sections, to favor a particular construction of any one.

That is the mode in which the legislative intent in passing the law is to be ascertained. It is a very good one by which to ascertain the intent of the people in pledging the faith of the State in this case. Whether the various sections of an act are to be considered as making as many laws as there are sections, or but one, is to be deduced from a comparison of each and all the sections.

If the position contended for be true, that the 5th section of the first act contains the entire law which it was necessary to refer and publish, and that it was an absolute and unconditional pledge, not embracing the terms and provisions of the other sections, then it seems to us the conclusion would follow, that it was only necessary for the next legislature to pass that section, and the requirement of the constitution would be satisfied. Can such a position be maintained?

We will pursue the argument no further. We have endeavored, in all honesty, to maintain the position of the State. The views expressed, however erroneous they may be held to be, are conscientiously entertained, after as patient and impartial

71 *

an investigation of the case as we have been able to bestow upon it.

The apology we offer for the otherwise inexcusable length of our argument, will be found in the brief period of its preparation. Short as that time was, it has been subject to many interruptions by other duties. We have, therefore, been deprived of the opportunity of reviewing and condensing.

I ask the attention of your honors, in conclusion, to the following principles and rules of law, now too well established to be called in question, which, I think, fully sustain all the positions I have contended for, and which furnish the true criteria in the construction of the two acts, and the provision of the constitution under examination : —

" Relative words in a statute may make a thing pass, as well as if expressed particularly." Raym. 50.

" No principle is more firmly established, or rests on more secure foundation, than the rule which declares, when a law is plain and unambiguous, whether it be expressed in general or limited terms, the legislature shall be intended to mean what they have plainly expressed, and consequently no room is left for construction." 9 Port. 268; 2 Cranch, 358; Ib. 10; 7 Ib. 52; 12 Pick. 223, 226.

" A mere failure of justice would not be a sufficient ground for construing statutes against their clear meaning, so as to give a court jurisdiction." 10 Pick. 506.

" It is only where the construction is doubtful, that the argument 'from a failure of justice' applies." Ib.

" A law is the best expositor of itself." 2 Cranch, 33.

" Every part of an act is to be taken into view for the purpose of discerning the intention of the legislature." Ib.

" It is to be interpreted according to the intention of the legislature apparent upon its face." 2 Peters, 662.

" Every technical rule as to the construction or force of particular terms must yield to the clear expression of the paramount will of the legislature." Ib.

" The most general and natural mode of construing a statute is to construe one part by another part of the same statute, for this best expresseth the meaning of the makers, and such con-

The State of Mississippi v. Johnson.

struction is '*ex visceribus actus.*'" 7 Bac. Ab. 452; 1 Brock.
C. C. R. 162.

" The whole statute must be inspected to ascertain its meaning." Ib.

" If any part of a statute be obscure, it is proper to consider
the other parts of the same act; for the words and meaning of
one part of a statute frequently leads to the sense of another."
1 Leach, C. C. 352, 355; 2 East, P. C. 898; Plow. 365; 11
Mod. R. 161.

" A statute ought, upon the whole, to be so construed that,
if it can be prevented, no clause, sentence, or word, shall be
superfluous, void, or insignificant." 1 Show. 108; Hard. 344;
1 Har. 285; 4 Blackf. 148.

" Every clause and word shall be presumed to have been
intended to have some force and effect." 22 Pick. R. 571;
1 Story, Com. 383, 384; Ib. 411, 436.

" Where words in a statute are express, clear, and plain, the
words ought to be understood according to their genuine and
natural signification and import, unless by such exposition ·a
contradiction or inconsistency would arise in the statute, by
reason of some subsequent clause, from whence it might be
inferred that the intent of parliament was otherwise." Parker,
233; Hobart, 93, 97; 7 Mass. R. 523.

" If the meaning of a statute be doubtful, the consequences
are to be considered in the construction; but where the meaning is plain, no consequences are to be regarded in the
construction, for this would be assuming legislative authority."
*The Queen* v. *Simpson*, 10 Mod. R. 344; 13 Mass. R. 324.

" Where the language of a statute is clear, direct, and positive, leading to no absurd results, courts are to be governed by
the obvious meaning and import of its terms, and not to extend
its operations because they suppose the legislature intended to
give a more effectual remedy." 3 Kelly, 146.

The rule is laid down by Chancellor Kent, (1 Kent, Com.
447,) as follows: " It is a principle in the English law, that
an act of parliament, delivered in clear and intelligible terms,
cannot be questioned, or its authority contradicted in any
court of justice. When it is said in the books, that a statute,

contrary to natural equity and reason, or repugnant, or impossible to be performed, is void, the cases are understood to mean, that the courts are to give the statute a reasonable construction. They will not, out of respect and duty to the lawgiver, readily presume that any unjust or absurd consequence was within the contemplation of the law. But if it should happen to be too palpable in its direction to admit of but one construction, there is no doubt in the English law as to the binding efficacy of the statute."

The "will of the legislature is the supreme law of the land, and demands perfect obedience." 1 Kent, 447.

"It is," says Sir Wm. Blackstone, "the exercise of the highest authority the kingdom acknowledges on earth" — the will of parliament.

The same doctrine is laid down by the last named author, in his 1st Vol. Com. 63. See also the note of the learned editor of that work, same page.

" When the law is clear, it must not be eluded in order to grasp its intention. Words must be used in their usual and most known signification, unless they appear plainly to have been used in another sense." 21 Wend. R. 211.

" To ascertain and fix the true sense of a law, we must examine the context." 1 Bouvier, Inst. 41.

The words used in the 5th section of the first act, in relation to the pledge of the faith of the State, namely: " That in order to facilitate the said Union Bank, for the said loan," &c., are to be construed by the foregoing rules. The same rules prevail in the construction of penal statutes, where the words "then and there," " said and aforesaid," are used. For example, in indictments. Hence, it is said, in 1 Chit. Crim. Law, 181 : " After the time has been once fixed, or named with certainty, it is afterwards sufficient to refer to it by the words 'then and there,' which have the same effect as if the day and year were actually repeated."

The same author, at page 182, says: " In some cases the words, ' then and there ' are more certain than even a repetition of the day and year, for the latter will not be sufficient when, in order to complete the offence, connected acts must be shown

to be done at the same time; but the terms, 'then and there' must be adopted." So with the words in an indictment, "jurors aforesaid, upon their oaths aforesaid," "of the county aforesaid," &c., and many other examples which might be given.

In *Brien* v. *Williamson*, 7 How. 20, the learned Chief Justice Sharkey, remarking upon the provision of the constitution which prohibited the introduction of negroes into the State for sale, said : "In the language of a learned jurist, the constitution was made by the people, made for the people, and is responsible to the people."

"It is, from its very nature and object, the supreme law of the land, fixed and unalterable, except by the power that made it. It contains only certain great principles, which are to control in all legislation, and extend through the whole body politic. These principles are of themselves laws. General principles, thought to be essential to a free government, are declared ; and (emanating from the sovereign authority) that mere declaration imparts to them all the force of a supreme law."

"It became, by that mere declaration, *proprio vigore*, a law ; and whether it may be supposed to be defective in not providing all the means necessary to enforce the prohibition makes no difference, provided it can, by any means, be carried into effect."

"Its design was evidently to protect the people against a supposed evil."

"It was one of those principles which required no legislative aid to give it strength," &c.

"All fundamental principles, whether inherent or otherwise, in any form of government, constitute a part of the law of that government. When the people prescribe their constitutional form of government, they ordain that every part of that form must have its appropriate effect. Every principle is to be regarded as fundamental and self-executing."

"Surely, we may claim for our constitutional provision the dignity of a principle, even if it is too vague for a prohibition ; and being a principle, it must be carried out ; it cannot be defeated by contract." All of which are words of wisdom ; as

applicable to the clause of the constitution we have been considering, as to the one of which the eminent jurist was speaking.

Petition for a re-argument, by *Daniel Mayes.*

In presenting the following petition for re-argument, the undersigned has to express his deep regret, that the time allowed by the court, which could be devoted to its preparation, is not sufficient to enable him to digest, methodize, and condense his views, on any one of the topics which properly enter into the discussion; and has wholly precluded the possibility of presenting various views, which seem to him to strengthen and fortify the conclusion to which his mind was irresistibly forced, contrary to his preconceived opinion, during the progress of the argument in court.

A position proved by one unaswerable argument, is as firmly established, as if it were proved by ten thousand. And if I fail in establishing my position, so clearly and fully, that no unprepossessed mind can entertain a doubt, I hope the court will perceive, that the failure results only from a defect in my mode of argument.

The position which I take is this : —

The Mississippi Union Bank, which went into operation, was not the Mississippi Union Bank provided for in the original act, which was passed by two successive legislatures, and for which that act pledged the faith of the State. That the faith of the State never was pledged, or authorized to be pledged, for the bank which went into operation, under the supplemental act; and consequently the bonds were issued payable to, and transferred by, that bank without any authority whatever.

This being my position, the first question naturally is, — in what does the identity of a bank consist? What is it that imparts to a bank its individuality, so that it is itself, and not another bank? Of what changes is it susceptible, without losing its identity, and becoming another bank? And what changes will put an end to its identity, and render it a different artificial being? Until the mind is supplied with a clear and

definite idea in this respect, it is impossible to enter upon the discussion with any certainty of reaching the true conclusion.

But with it, truth may be ascertained, with the certainty of a mathematical demonstration. Let us then ascertain in what this identity consists.

Every person, whether natural or artificial, must conform to the law impressed upon it, by its creator, and so long as it does so, it may continue to exist, as the same person, notwithstanding a change in its component parts; but that change in its component parts must be brought about by the operation of some law, impressed upon it in its creation. If new laws are impressed upon it, so changing its constitution, that it has a body, which it never could have had according to its original organization, and which impart to it faculties and capacities which it had not, and never could attain by the operation of the law, which alone acted upon it, in its first state of being, and to which it must conform in its new state of being, it becomes a different creature, for such a result can only be produced by a new exertion of creative power, by the creator of that being, whether that creator be God, creating man, and impressing upon him all the laws of his being, or a legislature chartering a bank, and impressing upon it the law of its being. It makes no odds how great these changes are, or what difference there be in the body, faculties, or capacities of the being, in the various stages of its existence. If those changes are brought about by the operation of laws impressed upon it in the first stage of its being, it remains the same individual.

Take for instance an egg: By the law impressed upon it, it becomes a worm. It feeds upon the leaves of the mulberry, goes through its various moultings, becomes a chrysalis, and in the proper time it exists as a beautiful butterfly. All these changes result, from the faculties and capacities of the being which first existed in the form of an egg, and ended in that of a butterfly. They were all effected by itself — by its acting in obedience to the law impressed upon it by its creator, when it first came into existence as an egg. No additional exercise of creative power was necessary. It may, therefore, be said to

have retained its identity, notwithstanding its existence in these very different forms.

Let me further illustrate : —

Man is a being having a body composed of material substances, among which are bones, muscles, tendons, hair, horn, ivory, &c. Among other laws of his being, is one by which the particles of matter, of which these bones, muscles, tendons, hair, horn, ivory, &c., are formed, are constantly passing from his body, and their places supplied by others of the same kind. He is also a moral, intellectual, rational being, having, as we believe, an immortal soul.

An ox, is a being composed of material substances, among which are bones, muscles, tendons, hair, horn, ivory, &c.; but he is not a moral, intellectual, and rational being, nor has he, as we believe, an immortal soul. Among the laws of his being is one, by which he has the power, notwithstanding the particles of matter which form this body are constantly passing away, of supplying their place by other particles of matter, of the same kind.

So long as the man or the ox produces these changes pursuant to the laws that constitute the one a man and the other an ox, the man remains the same man, and the ox the same ox.

Now let it be supposed that God impressed upon the ox a law, different from that of his original constitution, by the operation of which new law, in supplying the place of the first material, by introducing the new, he assumes the form and organization of man, and becomes a rational, moral, and intellectual being, having an immortal soul.

Does he after this change remain the same ox that he originally was, although his body is still mainly composed of bones, tendons, muscles, hair, horn, ivory, &c. ? .

Thus we see, that the identity of the being ceases, when the changes in body, faculties, and capacities are produced by the operation of a new law, and could not have been produced in pursuance of the law impressed upon the being in its first state of existence. If this is not the true and only test, what is the test? — for there must be some test of identity, or there is no reasoning about identity at all. We now perceive that

the test of identity is this : that no odds how great the changes, if they take place in conformity with the law, under which the being had its first existence, the being remains the same ; but if a new exertion of creative power is necessary to impress on the being different or additional laws, by which different or additional laws only, the change of body, faculties, and capacities, can be brought about, the being does not remain the same. Thus prepared I proceed with the argument.

The first section of the original act, provides, that an institution shall be established under the title of " The Mississippi Union Bank," with a capital of $15,500,000, which said capital shall be raised, by means of a loan, to be obtained by the directors of the institution.

The 4th section provides, " That the stock shall be subscribed, (1) by the owners of real estate, (2) that the real estate shall be situated in the State of Mississippi, (3) that they, the subscribers, shall be citizens of the State of Mississippi, (4) that the shares shall be transferable only to such owners (viz.: owners of real estate in Mississippi, who are citizens of Mississippi,) until after five years ; (5) that after five years, the stock may be transferred to any owner of real estate in Mississippi, whether citizen or not, with a proviso, that to secure the capital or interest of said bank, mortgage shall be given on property of a sufficient character, and. of an imperishable nature.

In this section, then, we have a complete identification of the description of persons, who could be stockholders, and an express exclusion of all persons who did not belong to the described class.

No one can become a stockholder or member of the corporation, but (1) by a subscribing for stock, or (2) by a transfer of stock previously subscribed. This is true in the very nature of things. Those who may become stockholders, by subscribing, must be (1) " owners of real estate, (2) situated in the State of Mississippi, and (3) who are citizens thereof," and those only. This is true by the express provision of the original statute. The subscribers must, therefore, be exclusively natural persons, for a corporation is not " a citizen." The State of Mississippi is, therefore, by this section expressly excluded;.

unless it can be proved, that the State of Mississippi, in its corporate or political character, is a citizen of the State of Mississippi. And this, it is presumed, will not be contended for. And for the same plain reason the State could not have become the owner of stock by transfer.

If it were possible to make this proposition more clear and conclusive, it is done by the proviso requiring that, " to secure the capital or interest of said bank, mortgage shall be given, on property of a suitable character, and of an imperishable nature."

Thus, then, we find that the institution spoken of in the first section, and which was to be under the title, or name of " The Mississippi Union Bank," is an institution with a capital of $15,500,000, to be exclusively subscribed for, and owned by (1) natural persons, (2) owners of real estate, (3) situated in the State of Mississippi, and (4) who are citizens thereof; and that all corporations, whether political (as State) or otherwise, are, by express words of exclusion, debarred of the privilege of becoming members of that institution. They can by no means be corporators, but by a clear and manifest violation of the charter.

Next comes the fifth section, which alone authorizes the pledging of the faith of the State.

It provides, " That in order to facilitate the said Union Bank, for the said loan of $15,500,000, the faith of this State be, and is hereby pledged, both for the security of capital and interest."

Now what bank is it, to which the words " the said Union Bank " refer? Can it be pretended, with the least plausibility, that they have reference to any bank but the bank before spoken of? And what is the bank before spoken of? Is there any other bank mentioned in the charter, save the bank before mentioned? No one will pretend that there is. What, then, is the bank before spoken of? How can it be contended, or by what strange logic can it be shown, that it is not a bank, (1) with a capital of $15,500,000, (2) to be subscribed by natural persons only, (3) who are owners of real estate, (4) situated in the State of Mississippi, and (5) who are citizens thereof?

Such bank, then, being the only bank spoken of in the charter, and to which the words, " the said Union Bank " necessarily and exclusively apply, the fifth section expressly confines the

pledge of the faith of the State, to facilitate that bank, to be composed of a described, fixed, and ascertained class of persons, and for no other bank whatever.

The words, "the said loan of $15,500,000" refer to the loan mentioned in the first section, for there is no other loan mentioned in the act.

The bank which was to obtain that loan was the institution mentioned in the first section. It was the directors of that institution, and that institution only, who were authorized to obtain the loan. It was to facilitate that institution, and that institution only, that the faith of the State might be pledged, and that institution was to be composed exclusively, (1) of the owners of real estate, (2) situated in the State of Mississippi, (3) and who are citizens thereof.

The statute declares that "the faith of the State be, and the same is hereby pledged, both for the capital and interest" of that identical, ascertained, and fixed institution, which has been before as specially, absolutely, and positively ascertained and declared, as human language can identify, define, or declare it.

Therefore, as the faith of the State was pledged by the fifth section, and by no other section, to facilitate the bank, consisting of the class of persons mentioned in the fourth, and for no other bank, it conclusively follows, that if the identical bank, for which the faith of the State was then pledged, was never organized, never went into operation; the faith of the State was never pledged for any bank. The fifth section did not pledge it for any bank or institution, save that which was provided for by the fourth section. There is no other section which pledges the faith of the State.

The original charter having been passed by two legislatures, pursuant to the constitution, all admit that the faith of the State would have been pledged by the fifth section of the act, had the bank gone into operation without the passage of the supplemental act.

I admit, that under the general grant of legislative power, it could wholly repeal, or change, or modify the charter, to any extent or in any manner whatever. But this neither proves, nor tends to prove, any thing in the present controversy. The

question is not, whether the second legislature could repeal or modify the charter. The only question is, Did the fifth section of the original act pledge the faith of the State, for the corporation formed under the charter, as modified or changed by the supplement ?

The corporation, as the charter was thus modified, consisted of stockholders, who were owners of real estate situated in the State of Mississippi, and who were citizens thereof, to the extent of $10,500,000 of the capital, and of the State of Missis-.sippi for the residue, that is, $5,000,000.

By the sixth section of the supplemental act, it is provided, ·" That subscribers to the stock in the said Union Bank, or their legal representatives, may at any time transfer their respective shares to any citizen of this State, with the approbation of the directory of the mother bank, and that no person not a citizen of this State shall ever own any stock in this bank."

Here we find another important change in the essential nature and character of the corporation; for by the fourth section of the original act, the corporation was so constituted, that, until after five years, no person could receive a transfer of stock, and thus become a corporator, unless such person was (1) the owner of real estate, (2) situated in the State of Mississippi, (3) and who was a citizen thereof, and after five years any person might become a corporator, by receiving a transfer ·of stock, if such person was the owner of real estate in Mississippi, whether such person was or·was not a citizen of Missis-.sippi. Whereas, by the sixth section of the supplement, no person, not a citizen ¨of the State, could ever own stock, or become a corporator ; but any person who was a citizen of Mississippi might receive stock, by transfer at any time, whether such person was or was not the owner of real estate.

The question then becomes, singly and simply, one of identity.

1st. Is a corporation, with a capital of $15,500,000 owned exclusively by natural persons, who are the owners of real estate, situated in the State of Mississippi, and who are citizens thereof, one and the same with a corporation consisting of such owners of real estate, who are citizens of Mississippi, to the extent of $10,500,000 of the capital, and of the State of Missis-

sippi, in her sovereign political character to the amount of $5,000,000?

2d. Is a corporation, which, by its constitution, cannot receive into its body any but natural persons, one and the same with a corporation which can, by its constitution, receive into its body a sovereign State?

3d. Is a corporation which, until after five years, cannot receive into its body any person but the owners of real estate situated in the State of Mississippi, and who are citizens thereof, one and the same, with a corporation which can receive into its body, at any time, any citizen of the State of Mississippi, whether such citizen be the owner of real estate or not?

4th. Is a corporation which can receive into its body after the expiration of five years, any owner of real estate in Mississippi, whether citizen or not, one and the same with a corporation which can at no time receive into its body any but citizens of Mississippi?

5th. Again, is a corporation which cannot receive into its body, by transfer of stock, any person, but upon the proviso, that the capital or interest is secured by mortgage to be given on property of a sufficient character, and of an imperishable nature, one and the same with a corporation which can receive into its body any citizen of the State, upon the single condition that the transfer of stock is made with the approbation of the directory of the mother bank?

It is impossible to answer any of these questions affirmatively, yet each must be answered affirmatively, or the corporation authorized by the original act, and to facilitate which, in procuring a loan, the faith of the State was pledged, is not the same corporation with that which went into operation under the supplemental charter. It is admitted on all hands, that the faith of the State cannot be pledged, except by the assent of two legislatures, ascertained in the manner required by the constitution.

Now did the legislature which passed the original charter, ever consent to a pledge of the faith of the State for any purpose but "to facilitate the said Union Bank for the said loan

72*

of $15,500,000?" the words, the "said Union Bank" directly referring to a bank to be constituted upon the principles, and to consist of the description of persons mentioned in the fourth section.

To make their pledge of the faith of the State extend to "the Mississippi Union Bank," as modified by the supplement, is not to construe the language the legislature has used, for they have used no language which embraces such an idea. Their language expressly limits the pledge to the bank, which they were incorporating.

They used the definite article "the," and the word of reference "said," thus expressly limiting and tying down the pledge to the bank before described. Their language admits of no latitude of construction. Indeed, it admits of no construction at all. For there is no ambiguity. Words more plain, simple, and definite, cannot be found in the English language. And yet, to hold that the State is bound for these bonds, is to hold that the words the "said Union Bank," do not refer to the bank which they were chartering, to be composed of the class or description of persons which they had declared should only compose it, but that the words, the said Union Bank, mean a bank consisting of the State of Mississippi, in her sovereign character, to the extent of near one third of the stock; and of the described class of persons, for the residue, when it is obvious that such a corporation was never in their mind, and when by plain, express language, they have excluded from the corporation they were creating, and to facilitate which they agreed to pledge the faith of the State, every person, whether natural or artificial, except those of the class mentioned in the fourth section.

When they declare, "that the faith of the State be, and is hereby pledged," how can it be contended, that the faith of the State was by them intended to be pledged, in order to facilitate a bank which had no existence, which they did not intend to give an existence, and which, so far as their action was concerned, could never have an existence?

By the forty-seventh section of the original act, the fifth section, whereby the faith of the State is pledged for the payment

and redemption of the loan contemplated by that act, was referred to the next legislature, although the whole act was ordered to be published, as required by the constitution.

Why was this? The reason is most obvious. One legislature could pass an act incorporating a bank. They had passed an act incorporating the " Union Bank." As its creator, they had organized it according to their own will. They had imparted to it all such faculties and capacities as they intended it should possess. They had declared its body should consist of a certain class of persons, to whom they were willing to grant the franchises specified in the charter; but these franchises, and no other, would they grant. And they would grant them to persons of a particular class, by them designated, and to no other persons. And having impressed on this their creature, its every faculty and capacity, and declared of what material its body should consist, to facilitate the action of that being, by them thus created, the materials of its body, ascertained, fixed, and limited to a particular class of persons, and all other persons being expressly excluded from that body, and the faculties and capacities of the body to be so constituted, having been by them ascertained and declared, they consented to pledge, and did pledge, the faith of the State, to aid this being, the workmanship of their own hands; but they never did pledge the faith of the State for any other corporation except the identical corporation which they chartered.

They, therefore, did not refer the charter to the next legislature for modification or change, and agree to pledge the faith of the State for the corporation which might go into operation under the charter, as it might be modified or changed by the next legislature. They gave no such consent; they made no such pledge. But having pledged the faith of the State to facilitate the action of their own creature, and that pledge not being obligatory on the State until ratified by the next legislature, they simply refer to that legislature the question, Will you ratify this our pledge, made by us, to facilitate this corporation of our creation?

That legislature did ratify it, by again passing the entire act, which was approved on the 5th of February, 1838. How did

the matter then stand? Two successive legislatures had, in strict conformity to the constitution, agreed to pledge, and had pledged, the faith of the State, " in order to facilitate the said" Union Bank," that is, the Union Bank provided for in the original charter, to wit, a bank composed exclusively of the ascertained and described class of persons mentioned in the fourth section, and who were to have the abilities and capacities specified in that charter. Was the faith of the State, then, pledged for a bank constituted differently from that bank? Had either legislature agreed so to pledge it? Certainly not. Well, that bank never went into operation. But on the 15th of February, 1838, the supplemental act passed. It so modified or changed the charter, by a repeal of many of its provisions, and by the addition of other provisions, that the corporation under the charter, as thus modified, changed and added to, was in its component parts, and in its faculties and capacities, a different corporation from that, to facilitate the operation of which the two successive legislatures had agreed to pledge the faith of the State.

The corporation provided for in the original act never went into operation, and, consequently, the State is not bound for that. The corporation provided for by the supplemental act did go into operation.

Is the faith of the State pledged for that? and the answer to this depends on the question, Did two successive legislatures agree to such a pledge? It has already been shown, that the legislature, which passed the original charter, had no idea of such a corporation, that by express provision they excluded the possibility of its existence, under the original charter; and that they made the pledge to facilitate the corporation, provided for in the original charter, and for no other corporation which might go into operation, constituted in part under the provisions of that act, and in part under the provisions of another act, of the extent, or character of the changes effected by which, they could have no possible idea. They perfectly defined, in every particular, the corporation for which they agreed to pledge the faith of the State; and for that corporation, and that corporation only, they pledged the faith of the State. Therefore,

if the faith of the State is pledged, it is pledged for the corporation, which might have been formed under the act passed by two successive legislatures, although it never went into operation; or it is pledged for the corporation which went into operation under the charter, as changed by the supplement, although by no possibility could any legislature, but the last, have sanctioned such a pledge.

But it is said, that those who maintain the affirmative of the proposition that it was necessary that the supplemental act should be passed by two successive legislatures, or the faith of the State was not pledged for the corporation thereby provided for, " assume as a fact," " that the corporation so organized was another and different corporation than that referred to in the law by which the faith of the State was pledged. They seem to overlook the essential nature and character of a corporation, to wit, Its continued existence as an artificial being, notwithstanding the individuals who compose it may repeatedly change ?" I have not assumed, but have proved conclusively, that the corporation provided for by the original act, is a different corporation from that which went into operation under the supplemental charter, nor can the force of my reasoning be resisted, unless the three following propositions can be maintained.

1st. That it is of the essential nature and character of a corporation that it has a continued existence as the same artificial being, notwithstanding the individuals who compose it may repeatedly change; and

2d. That this change may be effected by an act of the legislature, and not in virtue of a principle, or capacity impressed or conferred on the corporation itself by the law which gives it its being, and from which alone it derives every faculty and capacity which it possesses; and

3d. That this change can take place in a corporation which never was a corporation, for the Mississippi Union Bank, spoken of in the original charter, never had a being.

Neither of these propositions can be maintained. The reverse of each is true.

It is not of the essential nature and character of a corpora-

tion that it has a continued existence as the same artificial being, notwithstanding the individuals who compose it may repeatedly change.

It is true of the generality of corporations, that they have this power of a continued existence as the same corporation, notwithstanding the individuals composing it may, from time to time, change.

But the legislature being the creator of the corporation, can impress upon its creature, just such character, and endow it with just such abilities or capacities as it chooses. The corporation has the abilities and capacities conferred by its creator, and none other; he may give the power of continued existence, notwithstanding a change of members, or he may deny that power; he may limit the corporation to particular individuals by name, or he may confine it to a particular class of individuals, by words describing the class, and excluding all others, as was done by the fourth section of the original act; he may provide that the first corporation shall have no successors, or that they may have successors, and he may declare what persons by name, or what class of persons, by describing the class may be successors, as was also done by the fourth section of the original act.

A corporation is as really and truly the creature of the legislature, moulded and fashioned according to its will, and as absolutely and positively deriving its every faculty and capacity from that will, as man is the creature of Jehovah, moulded and fashioned to His will, and deriving from Him every faculty and capacity possessed by man.

And as the man consists, not merely of organized matter, indeed with the principle of life, but all his faculties and capacities, constitute parts of him; so a corporation consists of the natural persons incorporated, and the faculties and capacities conferred upon them by the legislature. One of the capacities of man is this : that although the matter which forms his body is continually passing from it, he can digest food, and by its assimilation, supply the place of the old with new organized matter. And although by the continued operation of this principle, the entire material forming his body may be changed,

his personal identity still remains; but this power of substituting new to supply the place of old matter, is one conferred upon him by his creator, and must be exercised in conformity with the law of his nature, impressed upon him, in the act of creating, and constituting him as he is.

Independent of this he has no power of assimilation, or receiving into his body new materials, to supply the place of the old.

The food which he can digest and assimilate is limited, and confined by the law of his being. Precisely so it is by a corporation. Its body is composed of such natural persons as the legislature, its creator, chooses to admit into its composition; its capacity to receive new materials to supply the place of the old, is limited and confined to such persons, whether described by name, or by classes, as the legislature may choose to admit, by the act of incorporation. It can no more receive into its body individuals excluded by the law which imparts to it its life, and impresses upon it its constitution, than the natural man can receive and incorporate into his body materials excluded by the law of his being.

The natural man cannot, according to his organization, digest and by assimilation supply the waste of his body by eating arsenic instead of bread. To be enabled to do so his organization must be changed; it cannot be done by continuing him the same man. It requires a new exercise of the creative power of Jehovah. The exercise of legislative power in chartering corporations, in declaring of what component parts they shall consist, and what faculties and capacities they shall have, is an exercise of creative power. And a bank constituted as that authorized by the original act, can no more receive into its body, (without a new exercise of this creative power of the legislature,) the State of Mississippi, than man can digest and incorporate into his body arsenic, without a new exercise of the creative power of God. The legislature knew this, and, therefore, exerted this creative power by passing the supplemental act.

Now by the original act the body of the corporation was to be composed: (1) of natural persons; (2) owners of real estate;

(3) situated in the State of Mississippi; (4) who were citizens thereof.

No person whether natural or artificial could form a part of this body, as it was to be originally constituted, nor had it the power according to the law of its being of receiving into this body any person whether natural or artificial, except such as are before described, until five years should have elapsed. It might, then, receive and incorporate into itself as substitutes, or to supply the place of former members, any owner of real estate in the State of Mississippi, whether a citizen or not. Provided, however, to secure the capital and interest of said bank, mortgage should be given on property of a sufficient character, and of an imperishable nature.

According to the very law of its being, its ability to receive into its body, either by subscription of stock, or by transfer of stock, other persons than those described was excluded. Although, then, it might have a continued existence, as the same artificial being, notwithstanding the individuals who compose it may repeatedly change, it could not have a continued existence as the same artificial being, notwithstanding the change effected by the supplemental charter, for that introduces into its original organization the State of Mississippi, in its sovereign political character. The State of Mississippi is not of the class of persons, who by the law of its being could enter into or compose a part of this artificial person, "The Mississippi Union Bank," mentioned in the original act, and also by the supplemental charter, the law impressed upon it by the original act was so changed as to confer the capacity of receiving into its body persons who could not have entered into its composition by the original act, and also to deprive it of the capacity of receiving into its body, persons who could be received by the original act.

Therefore, the new exercise of the creative power of the legislature was resorted to, and the supplemental act passed.

How, then, can it with any plausibility be contended, that the corporation provided for in the original act is one and the same, with the corporation which went into operation under the supplemental act; and that it has a continued existence as the

The State of Mississippi *v.* Johnson.

same artificial being, notwithstanding the individuals who compose it may repeatedly change?

How can it be said that it had a continued existence as the same artificial being, when the first never had an existence at all? For the corporation authorized by the original act was never formed. There was never a stockholder, a president, or director, under the original act. As, then, there was no individual composing part of the artificial being authorized by the original act, there could be no change in the individuals who composed that artificial being.

It is certainly true, as stated by one of the learned judges, that the act of assembly did not create a corporation, that it only conferred on persons, the power to form themselves into a corporation. Under the original act no persons did form themselves into a corporation. There was, therefore, no corporation under the original act, and unless the corporation which was formed is one and the same with a corporation which never was formed, it cannot be that the corporation formed under the supplement, is the same corporation with that which might have been formed, but was not, under the original act.

That which never was cannot be the same with that which was. That which was not, was nothing; that which was, was a thing, and a thing and no thing cannot surely be the same. The corporation provided for in the original act, never having been formed, if it continued, it continued no thing, for that which is no thing, cannot by its continuance become a thing.

It is admitted by the learned judge, that " this principle, when applied to an unincorporated partnership, is correct, but it does not apply," says he, " to corporations. A distinguishing characteristic is the very fact, that the body continues the same, notwithstanding the change of the individuals who compose it. So that new members may be introduced at any time without changing the corporation." The principle which is spoken of above is the principle contended for on the part of the State, that the provision of the supplemental charter which permitted the State of Mississippi to become a stockholder to the amount of $5,000,000, rendered the corporation which went into operation under its provisions a different corporation, from that

for which the original act provided, and which never was formed, and which if formed must have been composed exclusively of "the owners of real estate, situated in the State of Mississippi, and who are citizens thereof," and which words are followed, by the excluding provision, "that they shall be the only persons entitled to subscribe for stock."

If we admit the soundness of the argument, (and this I cannot admit,) how does it warrant the conclusion, that a bank composed of stockholders, one of whom is the State of Mississippi, subscribing for $5,000,000 of stock, and the others being "the owners of real estate situated in the State of Mississippi, and who are citizens thereof," and which corporation was actually formed, is the same corporation which might have been formed under a charter, expressly providing, "that the owners of real estate situated in the State of Mississippi, and who are citizens thereof, shall be the only persons entitled to subscribe" for stock, when the latter corporation never was formed. The argument must prove this, or the conclusion does not follow.

Now let us examine the argument itself. Why is it, that the principle spoken of when applied to unincorporated partnerships is correct? Most unquestionably it is, because by the general law under which unincorporated partnerships may be formed, there is no principle conferring upon them the ability to change the partners, and remain the same partnership. If the law under which unincorporated partnerships are formed, contained such principle, the partnership would remain the same, notwithstanding a change of partners.

Why is it, and how far is it, that a distinguishing characteristic of a corporation is the very fact, that the body continues the same, notwithstanding the change of the individuals who compose it?

It surely is not contended, that a corporation has this power in and of itself, inherent in its very nature, wholly independent of and towering above the legislative power, that the legislature has not the power to create a corporation, and deny it this faculty of a change of members; that the legislature could not provide that a number of individuals, by name, shall

be a corporation. Nor will it be denied that they could create a corporation, and make a valid provision, that the corporation should consist of a described and ascertained class of persons, and of no others. If the legislature has not such a power, it is because there is some provision in the constitution of the United States, or the State constitution, which would be violated by such an enactment. It is not, then, a distinguishing characteristic of a corporation, that the body continues the same, notwithstanding the change of the individuals who compose it. It is not " the very fact" that the body continues the same, notwithstanding the change of the individuals, that distinguishes an incorporated company from a corporation. The corporation possesses, or does not possess, this power of change, as its creator, the legislature, which imparts to it its every power, confers this capacity of change, or withholds it. If the legislature imparts this faculty, it has it. If the legislature withholds this faculty, it has it not, unless the creature transcends in power its creator.

The question then again recurs, What was the power or capacity of the corporation provided for in the original act? Had it the general power of receiving into its body, and making part of itself, the State of Mississippi, in its sovereign political capacity? It has already been shown that it had not.

But now let it be supposed that a distinguishing characteristic of a corporation " is the very fact," that the body continues the same, notwithstanding the change of the individuals who compose it. It is said, that those who contend that the bank which went into operation is a different corporation from that authorized by the original act, overlooked the fact, that when the law passed pledging the faith of the State for a loan of money, to be made by the " Mississippi Union Bank," that no such corporation was in existence, but it was thereafter to be organized, pursuant to the authority conferred by the law for that purpose. It is repeated, " That when the law was thus passed, pledging the faith of the State for the loan of the money to be made by the bank, no corporation had been organized; the bank was not in existence; but was thereafter to be organized and formed. The principle of law is undeniable,

that a law authorizing the creation of a corporation does not of itself create one. Such a law is a mere authority or power conferred by the legislature, a privilege granted, that a corporation may be formed and created."

It is certainly true, that a law authorizing the creation of a corporation does not of itself create one. Such a law is a mere authority, or power conferred by the legislature, a privilege granted, that a corporation may be formed and created. Let it be supposed, then, that a distinguishing characteristic of a corporation is, the very fact that the body continues the same, notwithstanding the change of the individuals who compose it; yet the body must exist before the individuals who compose it can change. And as the act itself does not create a corporation, but is only a power conferred by the legislature to form a corporation, the corporation must have been formed, in virtue of this power, or there was no corporation. In virtue of the power conferred by the original act, passed by two successive legislatures, in conformity with the provision of the constitution, no corporation was formed.

That body, therefore, never existed. There could, therefore, be no change of the individuals who composed it; and the corporation formed under the supplemental charter could not be the same body. It was an original and new body, essentially differing in its constituent parts, in its franchises, and privileges, from the body which could have been formed under the original act, and for which body alone did the first legislature agree to pledge the faith of the State, when that body should be formed and organized; and to the president of which, and to the president of no other body, did the first legislature authorize the governor to deliver the State bonds. It was to the president of "that body," and to the cashier of "that body," and to the president and cashier of no other body, that the legislature intrusted the power to transfer the State bonds by indorsement, and until it is proved that that corporation was formed, and that the president and cashier of that corporation transferred the bonds, it is not shown that the present holders have any right to them, or that the governor and treasurer had any power to issue them. They were but the agents of the State, and unless two successive

legislatures authorized them to issue the bonds of the State to the corporation which went into operation under the supplemental charter, the State was no .more bound than it would have been, had any other individuals issued the bonds.

Let us take a simple, and, as I believe, a correct view of the effect of the passage of the supplemental act. The original act had been passed by two successive legislatures, in strict pursuance of the constitution. It provided for the incorporation of an institution under the title of " The Mississippi Union Bank, with a capital of $15,500,000, which capital shall be raised by a loan to be obtained by the directors of the institution."

" By the 4th section, the owners of real estate situated in the State of Mississippi, and who are citizens thereof, shall be the only persons entitled to subscribe; and shares so subscribed, shall be transferred only to such owners," &c. " That in order to facilitate the said Union Bank for the loan of $15,500,000, the faith of the State be, and is hereby pledged, both for the security of the capital and interest." This act having been passed by two successive legislatures, but no stock having been subscribed, it was in the power of the legislature to repeal it. They did not repeal the act wholly, but the legislature determined that the corporation thereby authorized to be formed, never should be formed. This determination they had the right and power to execute, and this power they did exercise by the supplemental charter. They determined that a different corporation should be formed, and they made provision for its formation by the enactment of the supplemental charter.

The corporation which they authorized was to consist of the State of Mississippi for $5,000,000, and of the citizens of Mississippi, &c., for $10,500,000. The franchises, privileges, duties, and rights of this corporation, are in many important respects different from those of the corporation authorized by the original act. All this they had the power to do.

But they also determined, that the faith of the State should be pledged for this corporation of their creation; and provided that the governor should issue the bonds of the State, payable to this corporation instead of the corporation provided for in

73*

the original act; that they should be transferable by the indorse-
ment of the president and cashier of the corporation by them
authorized, and not by the president and cashier of the corpo-
ration which might have been formed under the act which
had been passed by two successive legislatures.

This they had not the power to do. For by that legislature
only was the faith of the State pledged for that corporation.
By that legislature only was the governor authorized to issue
the bonds payable to that corporation. The mere retention of
the name, " The Mississippi Union Bank," did not make this
their creature, the same bank which might have been organized
under the original act as passed by the two legislatures.

If it is said, in answer to this, that the supplemental charter
contains no provision pledging the faith of the State, I reply,
that although this does not strengthen my argument, it renders
its conclusiveness more strikingly manifest. If the faith of the
State is only pledged by the act which was passed by the two
successive legislatures, it was not pledged by even one legisla-
ture for the corporation which actually went into operation
under the supplemental act.

To present this argument, and the certainty with which it
establishes my conclusion in an unquestionable point of view,
let it be supposed, that when the original act was put upon its
passage it had been rejected: or, having been passed, it was
vetoed by the executive, and that a bill had been introduced in
the legislature at the time the supplement was introduced to
incorporate an institution " under the style of The Mississippi
Union Bank, with a capital of $15,500,000, which said capital
should be raised by means of a loan to be obtained by the
directors of the institution." That it had further been provided,
that five hundred thousand shares of the stock should be sub-
scribed for by the State of Mississippi, and that the remainder
of the stock should be subscribed by the owners of real estate
situated in the State of Mississippi, and who are citizens
thereof; that it was then provided, that " in order to facilitate
the said Union Bank for the loan of $15,500,000, the faith of
the State be, and is hereby pledged, both for the security of the
capital and interest," &c., in the words of the fifth section, and

that every provision had been embodied in this act, which remained in force upon the passage of the supplemental act, and that this act passed on the day on which the supplement did. Now would this act, thus passed, pledge the faith of the State under the constitution, without being referred to another legislature?

The legislature which first passed the original act had pledged the faith of the State as far as its action could contribute to do so, in aid of the Mississippi Union Bank, which it had incorporated.

The second legislature had pledged the faith of the State, as far as it could do so, in aid of the " Mississippi Union Bank," which it had incorporated. If the bank provided for by the first legislature is the same bank provided for by the second, then two legislatures had pledged the faith of the State for that bank, and the State would be bound. But unless that provided for by the first, is the same provided for by the second, then but one legislature had agreed to pledge the faith of the State, and the State would not be bound until the law which pledged its faith should have been passed by another legislature. Now in what respect is there a substantial difference between the case supposed, and the case actually before the court?

The ingenuity of man can point out no substantial difference.

The end effected by the supposed case of an executive veto of the first, and the subsequent passage of the second act, is precisely the same end with that effected by the passage of the first act by the two legislatures, and the changes in its provision by the passage of the supplemental act.

The only difference is in the manner of doing the thing. There is no difference in the thing done.

The constitutional provision, that the faith of the State should be pledged only by a law passed by two legislatures, was not intended to prohibit mere matters of mode or form in pledging the faith of the State. It was intended to incorporate, and did incorporate into the very framework of the State, a fixed and inviolable principle, which should protect the State from being involved in debt, until the subject of that indebtedness should actually be presented to the people of the State,

that they might influence the decision of the question, whether the State should become indebted or not.

This influence it was intended the people of the State should exercise through the ballot-box, by electing such persons members of the legislature as they believed would carry their will into execution, by passing, or refusing to pass the law pledging the faith of the State. It is only to make this great principle of the constitution ridiculous, to give it an effect which but prohibits modes or forms of doing a thing, and not the thing itself. The danger intended to be guarded against was the incurring of large debts to the ruin or serious embarrassment of the State, without due deliberation, and the direct influence of the people, on the decision of that question through the ballot-box. The form of producing this evil was of no consequence. Constitutions are not framed to protect the community against mere modes or forms of legislative action; they are framed to protect it from the effects of legislative action. Things, not words, modes, or forms, are to be regarded. Hence is our legal maxim, "*Legislaturum est viva vox, rebus et non verbis legem imponere.*" "The voice of legislators is a living voice, imposing laws on things, and not on words."

If the conclusion be true to which the court has come, the constitutional provision is worse than useless. While it holds out a seeming of protection to the people, it is only a lure to deceive and mislead them.

It is said by the court, in substance, that although a charter is enacted authorizing the formation of a corporation, and the particular corporation defined and ascertained, and a provision made to pledge the faith of the State in aid of that corporation, a subsequent legislature, to which the question of pledging the faith of the State is referred, may at any time, before rights are vested under the charter, wholly repeal the act of incorporation, or modify and change it, as it may choose. All of which I grant. But the question is not whether they have the power to repeal or modify. The question is wholly different. It is, What is the effect of the exercise of that power?

It is further said, that inasmuch as this power to repeal, alter, or modify the charter, belongs to the general legislative

power, " we must, therefore, conclude that the law pledging the faith of the State for a loan of money to be made by the Mississippi Union Bank, a corporation not then in existence, but to be organized at a future day, was passed with reference to the general power thus belonging to the legislature, under which general power the legislature could increase or diminish the number, or change the qualifications of those who might become subscribers for stock until the corporation was organized.

" The legislature, by the supplemental act authorizing the State to subscribe for stock in the Mississippi Union Bank, only exercised one of its legitimate powers of legislation, known to exist in it at the time the law was passed pledging the faith of the State, to be made for an inchoate corporation; and the law then passed can receive no other proper construction than such as leaves to the legislature this power of legislation conferred upon them by the constitution, and which they were not bound by any contract to refrain from exercising.

" It must be treated as a law by which, in legal effect, the State agreed to facilitate by means of its credit a loan of money to be made by directors of the Mississippi Union Bank, whenever that corporation might be organized and formed according to the provisions of the original act, and such amendments and modifications thereof as the legislature, by virtue of their general legislative power, were authorized to make in order to carry into effect the great purpose for which the original act was passed, to wit: the establishment of a bank with a capital stock to be negotiated by the directors of the institution."

It is said : " We must, therefore, conclude, that the law pledging the faith of the State for a loan of money to be made by the Mississippi Union Bank, a corporation not then in existence, but to be organized at a future day, was passed with reference to this general power, thus belonging to the legislature, by which the legislature could increase or diminish the number or change the qualifications of those who might become subscribers for the stock." 'That it must be treated as a law, by which in legal effect, the State agreed to facilitate by means

of its credit a loan of money to be made by the directors of the Mississippi Union Bank, whenever that corporation might be organized and formed according to the provisions of the original act, and such amendments and modifications thereof as the legislature, by virtue of their general legislative power, were authorized to make in order to carry into effect the great purpose for which the original act was passed, to wit: The establishment of a bank with a capital stock, to be raised by means of a loan of money, to be negotiated by the directors of the institution." And thus the supposed great object of the legislature in passing the original act, in the very teeth of its express declaration, that they pledged the faith of the State to facilitate the corporation, the charter of which they enacted is made to override and grind into powder the manifest great object of the people in forming that constitution, under which only that legislature has its being, and from which it derives its power. By what process of reasoning it can be proved, that we must so conclude, or by what process of reason it can be proved, that it must be treated as a law by which in legal effect the State so agreed, I am wholly at a loss to conjecture.

No attempt is made to do one or the other, and I have in vain exerted my best ability to discover some reasoning which would tend to such conclusion. I can conceive of none, and if I could, I should be met and refuted by the express language of the fourth and fifth sections of the act, wherein the legislature that passed that act emphatically declare as a part of the fundamental law of the corporation which they were creating, and to aid which they agreed to pledge the faith of the State, "that owners of real estate situated in the State of Mississippi, and who were citizens thereof, shall be the only persons entitled to subscribe." That in order to facilitate the "said Union Bank" for the said loan of $15,500,000, the faith of this State be and is hereby pledged. If this is not a perfect declaration that they made the pledge, in aid of a corporation to be formed under the charter which they granted, and no other corporation, I can conceive of no language which would distinctly express their meaning. It is true, they have not said it in express

words, but the words which they use are not ambiguous, and admit of no other application. · That they did so intend, is not merely a probable, but necessary inference from the language they have used. They meant that, or they meant nothing. When it is said, the legislature having the general power wholly to repeal, modify, or change charters, we must, therefore, conclude that the law pledging·the faith of the State for a loan of money to be made by the Mississippi Union Bank, a corporation not then in existence, but to be organized at some future day, was passed with reference to this general power, thus belonging to the legislature, under which the legislature could increase or diminish the number, or change the qualifications of those who might become subscribers for the stock, I can only assent to the truth of the proposition, if it was so modified, as to declare, that it was passed subject to this power, not in reference to it, and add, that the exercise of this power repealed the pledge.

But there is no mistaking the sense in which it is used by the court, for it is added: " It must be treated as a law by which, in legal effect, the State agreed to facilitate by means of its credit a loan of money to be made by the directors of the Mississippi Union Bank, whenever that corporation might be organized and formed according to the provisions of the original act, and such amendments and modifications thereof as the legislature, by virtue of their general legislative power, were authorized to make in order to carry into effect the great purpose for which the original act was passed, to wit: the establishment of a bank with a capital stock, to be raised by means of a loan of money to·be negotiated by the directors of the institution."

Important as are the interests of the State involved in this controversy, they shrink into utter insignificance when compared with the new and startling doctrine embodied in these few words ; a doctrine against which as a lawyer, a man, and a citizen, I most respectfully enter a solemn protest for myself, my children, and my country ; a doctrine which, if true, strikes at the very root of civil liberty, by annihilating the power of conventions and legislatures, the force of constitutions and

statutes, and which erects the judiciary into a sovereign with unlimited power. The distinction between legislative and judicial power is entirely annihilated, and the former as effectually swallowed up by the latter as were Dathan and Abiram by the earth, when at the command of Jehovah it opened its bosom to receive them.

If, when the legislature says, (1) " that the owners of real estate (2) situated in the State of Mississippi, (3) who were citizens thereof, (4) shall be the only persons entitled to subscribe, (5) and shares so subscribed shall be transferable to such owners only until after five years, (6) when they may be transferred to any owner of real estate in this State, whether citizens or not; (7) provided, however, to secure the capital or interest of said bank, mortgage shall be given on property of sufficient character, and of an imperishable nature;" and when they have added, (8) that "in order to facilitate the said Union Bank for the said loan of $15,500,000, the faith of this State be, and is hereby pledged, both for the security of the capital and interest," a court may say, that they intended that pledge as a pledge of the faith of the State, not for that bank only, but for any bank that might go into operation under that charter, or for any other bank, that might go into operation under any modifications of it that might be made by another legislature, language has ceased to have a meaning, and it is utterly impossible that a legislature can so express its meaning that a court may not declare, that its legal effect is to do any thing and every thing that may be conceived of, whether it be to add to, substract from, or vary the clear, unequivocal sense of the most unambiguous and definite terms that a legislature can employ. There is no limit but in the discretion of the judiciary. But it is a maxim of the law, that words have meaning, and that courts shall so construe them, that every word shall, if possible, have operation, and all construction shall be upon the words, and no construction shall be put upon the words which gives to them a meaning which they do not contain. " The words of a statute are to be taken in their ordinary and familiar signification and import; and regard is to be had to their general and proper use; for *jus et norma*

*loquendi*, is governed by usage; and the meaning of words spoken or written ought to be allowed to be, as it has been taken to be, *loquendum est ut vulgus.* 4 Rep. 47.

But if the usage have been to construe the words of the statute contrary to their obvious meaning by the vulgar tongue, and the common acceptation of terms, such usage is not to be regarded, it being rather, say the books, an oppression of those concerned than a construction of the statute." Vaughn, 169 Parker, 44.

In *Rex* v. *Stake Damerel*, 7 B. & C. 569, it is laid down, that "where the object of the legislature is plain and unequivocal, courts ought to adopt such a construction as will best effectuate the intention of the lawgiver. But they must not, in order to give effect to what they supposed to be the intention of the legislature, put upon the provisions of a statute a construction not supported by the words, though the consequence should be to defeat the object of the act."

In *Rex* v. *Ramsgate*, 6 B. & C. 712, it is laid down, that, "Where the legislature has used words of a plain and definite import, it would be very dangerous to put upon them a construction which would amount to holding, that the legislature did not mean what it has expressed. The fittest course, in all cases where the intention of the legislature is brought into question, is to adhere to the words of the statute, construing them according to their nature and import, in the order in which they stand in the act of parliament."

In *Rex* v. *Inhabitants of Great Bentley*, 10 B. & C. 527, it is said: "The most enlightened and experienced judges have for some time lamented the too frequent departure from the plain and obvious meaning of the words of the act of parliament, by which a case is governed, and themselves hold it much the safer course to adhere to the words of the statute, construed in their ordinary import, than to enter into inquiry as to the supposed intention of the parties who framed the act."

In *Rex* v. *Gwenop*, 3 T. R. 135; *Rex* v. *Markes*, 13 East, 165; 2 Co. Inst. 111; 11 Rep. 33, the force of the word "such,"

in a statute, is treated of, and it is held, that though general words are used in their plain and ordinary sense, the word "such," will restrain and limit them to a particular description of things contained in a preceding section to which the word "such" refers. The same question arose in *Morris* v. *Miller*, 6 B. & C. 446; and *Bennett* v. *Daniel*, 10 B. & C.; and the same rule was again and again declared. In 6 Rep. 76, it is said, "always in statutes, relation shall be made according to the matter precedent."

"The good expositor," says Lord Coke, "makes every sentence have its operation to suppress all the mischief," he gives effect to every word in the statute, he does not construe it so that any thing should be vain and superfluous, nor yet makes exposition against express words, for *viperina est expositio quæ corridit viscera textus.*" 11 Rep. 34, citing 2 Bulst. 179; 10 Rep. 105. In *Moser* v. *Newman*, 6 Bing. 561, it is said: "When in several statutes in *pari materiâ*, the legislature is found sometimes inserting, and sometimes omitting a clause of relation, it is to be presumed that their intention has been drawn to the point, and that the omission is designed." "But," says Lord Ellenborough, "if it were not intended, we can only say of the legislature, *quod voluit non dixit.*" 6 East, 518.

So, in the present case, even if the first legislature did intend to pledge the faith of the State for such bank as might go into operation under the charter, with such modifications, alterations, or additions as the next legislature might make, the court, in the language of Lord Ellenborough, can only say of the legislature, *quod voluit non dixit.*

If words go beyond intention, or fall short of it, it rests with the legislature to make the alteration or addition. "Our decision," says Lord Tenterden, "may perhaps in this particular case, operate to defeat the object of the statute; but it is better to abide by this consequence than to put upon it a construction not warranted by the words of the act, in order to give effect to what is supposed to be the intention of the legislature." *Rex* v. *Barham*, 8 B. & C. 104.

In *Notley* v. *Buck*, 8 B. & C. 164, we read: "The words may

probably go beyond the intention, but if they do, it rests with the legislature to make an alteration; the duty of a court is only to construe and give effect to the provision."

In 1 T. R. 52, we read: "It is safer to adopt what the legislature have actually said, than to suppose what they meant to say."

In 1 T. R. Rep. 52, it is held, that "a *casus omissus* can in no case be supplied by a court of law, for that would be to make laws. Judges are bound to take the act of parliament as the legislature have made it."

In the case of *Brandling* v. *Barrington*, 6 B. & C. 475, Lord Tenterden said: "Speaking for myself alone, I cannot forbear observing, that I think that there is always danger in giving effect to what is called the equity of the statute; and that it is much safer and better to rely on, and abide by the plain words, although the legislature might possibly have provided for other cases had their attention been directed to them." Bailey, (J.,) said: "I certainly think that the present case comes within the mischief intended to be remedied by the statute, (8 Anne, c. 14, § 1,) and I should have been better satisfied if it could have been brought within the fair construction of the words of that enactment. But I think we should be attributing too comprehensive a meaning to the words of the statute." Holroyd, (J.,) said: "This case does not appear to have been contemplated by the legislature, although it may, perhaps, be within the mischief which they intended to remedy."

The indubitable rule, then, is this, that to bring a case within the operation of a statute, it should not only be a case within the legislative intention, to be collected from the body of the act, but that it should also be within the plain, intelligible import of the words of the act itself. This is the rule as laid down by Dwarris, p. 53, from whose works I have taken the preceding extracts.

The foregoing rules are of universal application. They grow out of the very nature of, and distinction between, legislative and judicial powers. Their birth was coeval with the science of civil government, and they must continue to exist until civil liberty shall end.

They prevail as cardinal rules, through the whole of continental Europe, and have prevailed from the earliest ages. They have been regarded by the wise and good of all nations as founded in the nature of law and of government. It is said by Vattel, that the first general maxim of interpretation is, " that it is not allowable to interpret what has no need of interpretation." Vattel, b. 2, chap. 17, § 263.

Puffendorff, on Law, Nature, and Nations, pr. b., p. 13, § 12, says : " If the words of the law express clearly the sense and intention, we must hold to that."

Again, Vattel, b. 2, ser. 17, § 270, says : " The sole object of interpretation of a statute, is to discover the intention of the framers. That intention is, however, sometimes very obscurely expressed. Whenever we meet with an obscurity in a statute, we are to consider what, probably, were the ideas of those who drew the act, and to interpret it accordingly." I do not give his precise words for brevity's sake.

Smith, in his Commentaries, 627, has the following : " When the words of an act are in clear and precise terms, when its meaning is evident and leads to no absurd conclusions, there can be no reason for refusing to admit the meaning which the words naturally present; to go elsewhere in search of conjecture in order to restrict or to extend the act, would be but an attempt to elude it. Such a method, if once admitted, would be exceedingly dangerous; for there would be no law, however definite and precise in its language, which might not, by interpretation, be rendered useless. However luminous each clause might be, however clear and precise the terms of it, all this would be of no avail if allowed to go in quest of extraneous arguments to prove that it is not to be understood in the sense which it naturally presents."

Again, Puffendorff says (p. 5, ch. 12, § 3) : " As for the words, the rule is, unless there be reasonable objections against it, they are to be understood in their proper and most known signification, not so much according to grammar as to the general use of them."

Again, Vattel lays down this rule. It is to be presumed, that the legislature employed the words in their proper signifi-

cation, that is, the signification which common usage has affixed to them.  It is not to be presumed, that it did not intend to annex the same meaning to the words which common usage has annexed to them.  Hence, in no instance ought courts to deviate from the common usage of the words, unles it should clearly appear, that they were intended to be used in a different sense, &c.    Vattel, b. 2, ch. 17, §§ 274, 277.

With these lights before us, by which we perceive the rules to which courts must resort, when they undertake to ascertain the legal effect of statutes, how can we possibly reach the conclusion, that when the legislature provided that the owners of real estate, situated in the State of Mississippi, shall be the only persons entitled to subscribe, they in legal effect intended that the State of Mississippi might subscribe for $5,000,000 ? That when they said, "that in order to facilitate the said Union Bank, for the said loan of $15,000,000 the faith of this State be and is hereby pledged," they in legal effect said, that in order to facilitate the said Union Bank, or such other bank as may be formed under this charter, with any modifications or changes that the next legislature may make, either as to the individuals who compose the corporation, or in its faculties or capacities, or in the security herein provided for the State; and notwithstanding it may be made a bank to provide a fund, "subject to the control of the legislature, for the purpose of internal improvement and the promotion of education," the faith of this State be, and is hereby pledged ?

If, when they made every provision for a definite and ascertained bank, they did not mean that such provisions should effect any thing, but their intentions were as the court has supposed, and carried out, they were certainly engaged in a most childish and idle enterprise in enacting a charter at all.  The means by which they might have attained that supposed great object were most simple and obvious.   A statute in these words would have effected all that they intended to effect. Instead of the title, "An act to incorporate the subscribers to the Mississippi Union Bank;" they should have adopted the title, "An act to pledge the faith of the State," and they should have commenced with this preamble to have made themselves.

74 *

perfectly intelligible : Whereas it is the great purpose of this legislature, that a bank hereafter be established with a capital stock of $15,500,000, to be raised by means of a loan of money to be negotiated by the directors of the institution.

Sect. 1. " Be it enacted by the legislature of the State of Mississippi, that in order to facilitate such bank as the next legislature may incorporate in obtaining a loan of $15,500,000, to constitute the capital stock of such bank, the faith of the State be, and is hereby pledged, both for the security of the capital and interest aforesaid."

Sect. 2. That this act be published, &c., and referred to the next legislature.

According to the opinion of the court, this simple enactment would have effected the great object that the legislature had in view, and would have attained every end which they proposed. For if the next legislature could wholly repeal, change, modify, add to, or subtract from, the charter without limit, and the provision pledging the faith of the State still remained a valid pledge, what end or object could the legislature have had in view which the above statute does not reach ? There could have been but one sensible object in passing the act, as it was passed, and causing it to be published and laid before the people, to influence them at the next election, and that object would have been a most reprehensible one. It could only have had the effect of deceiving the voters.

The whole difficulty of the case seems to me to grow out of the omission to ascertain,

1st. In what does the identity of a bank consist? and

2d. What is the correct rule of judicial interpretation, by which to ascertain the legal effect of words used by a legislature ?

I have endeavored to supply the one and the other. I hope and believe I have succeeded. Nothing but the deep conviction under which I labor could have induced me to present this application. I regret the length of the argument. I have not time to make it shorter.